1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

    SENJU PHARMACEUTICAL CO.      :   CIVIL ACTION
4   LTD. KYORIN PHARMACEUTICAL    :
    CO., LTD. And ALLERGAN,       :
5   INC.,                         :
                                  :
6            Plaintiffs,          :
                                  :
7        vs.                      :
                                  :
8   LUPIN LIMITED and LUPIN       :
    PHARMACEUTICALS, INC.,        :
9                                 :
             Defendants           :
10  --------------------------    :   NO. 11-0271 (SLR/MPT)
    SENJU PHARMACEUTICAL CO.,     :
11  LTD. KYROIN PHARMACEUTICAL    :
    CO., LTD. and ALLERGAN,       :
12  INC.,                         :
                                  :
13           Plaintiffs,          :
                                  :
14                                :
                                  :
15       vs.                      :
                                  :
16  HI-TECH PHARMACAL CO.,        :
    INC.,                         :
17           Defendants           :

18

19                            - - -

                         Wilmington, Delaware
20                       Wednesday, December 19, 2012
                         9:04 o'clock, a.m.
21
                              - - -
22

    BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
23
                              - - -
24
                         Valerie J. Gunning
25                       Official Court Reporter

```
 1    APPEARANCES:

 2

 3              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  JACK B. BLUMENFELD, ESQ.
 4

 5                       -and-

 6
                OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT,
 7              L.L.P.
                BY:  RICHARD D. KELLY, ESQ.,
 8                   STEVEN J. BAXTER, ESQ.
                     FRANK J. WEST, ESQ. and
 9                   TIA FENTON, ESQ.
                     (Alexandria, Virginia)
10

11                   Counsel for Plaintiffs

12

13
                PHILLIPS, GOLDMAN & SPENCE, P.A.
14              BY:  JOHN C. PHILLIPS, JR., ESQ.

15                       -and-

16

17              RAKOCZY MOLINO MAZZOCHI SIWIK LLP
                BY:  DEANNE MAZZOCHI, ESQ.,
18                   JOHN D. POLIVICK, ESQ. and
                     ANUJ K. WADHWA, ESQ.
19                   (Chicago, Illinois)

20
                     Counsel for Defendants
21                   Lupin Limited and Lupin Pharmaceuticals,
                     Inc.
22

23

24

25
```

1    APPEARANCES (Continued):

2

3              SHAW KELLER LLP
               BY:  KAREN KELLER, ESQ. and
4                   JEFFREY T. CASTELLANO, ESQ.

5

               Counsel for Defendant
6              Hi-Tech Pharmacal, Inc.

7
                        -  -  -
8

9
    ALSO PRESENT:
10

11             BILL SCARFF, ESQ.
               In-house Counsel
12             Allergan, Inc.

13

14                      -  -  -

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:04 a.m.)

 5

 6              MR. BLUMENFELD:  Good morning, your Honor.

 7              THE COURT:  Good morning, everyone.  Full house.

 8    I guess we should make reintroductions and then we can get

 9    started on the agenda.

10              MR. BLUMENFELD:  Good morning, your Honor.

11              THE COURT:  Good morning.

12              MR. BLUMENFELD:  Jack Blumenfeld for the

13    plaintiffs.  And at counsel table, Dick Kelly, Frank West,

14    Tia Fenton, and Steve Baxter behind the table, all from

15    Oblon Spivak.  And Bill Scarff, in-house at Allergan, is

16    with us today also.

17              THE COURT:  All right.  Thank you.

18              MS. KELLER:  Good morning, your Honor.  Karen

19    Keller of Shaw Keller on behalf of Hi-Tech Pharmacal, and

20    with me today is Jeff Castellano, also of my office.

21              THE COURT:  All right.

22              MR. CASTELLANO:  Good morning, your Honor.

23              THE COURT:  Good morning.

24              MR. PHILLIPS:  Good morning, your Honor.

25    Jack Phillips for Lupin, and with me at counsel table is
```

1    Deanne Mazzochi, Anuj Wadhwa, and John Polivick, all of

2    Rakoczy Molino Mazzochi & Siwik in Chicago.

3              THE COURT:  All right.  Thank you very much.

4              All right.  I tried to understand the

5    differences in the claim construction.  I'm not sure I do.

6    So you tell me what we should start with and I'm happy to go

7    with the flow here.

8              MR. WEST:  Your Honor, I might as well start

9    with an explanation of what we believe the dispute is.

10             THE COURT:  Yes.  I would love to know what the

11   dispute is.

12             MR. WEST:  Okay.

13             THE COURT:  And don't let me forget, I have a

14   proposed trial schedule based on the time I have.

15             MR. WEST:  Thank you, your Honor.

16             THE COURT:  So don't let me forget to hand it

17   out before the end of this.

18             MR. WEST:  Your Honor, my name is Frank West.

19   I'm with Oblon Spivak.  We represent the plaintiffs.

20             And with respect to the claim construction, I

21   believe the dispute is with respect to how the preamble of

22   the re-examined claim 6 should be interpreted, and I will

23   try to set forth what the plaintiffs believe the dispute is

24   here.

25             The defendants are seeking to interpret a

1    truncated version of the preamble and the plaintiffs are

2    seeking to have the full preamble interpreted.

3              What the plaintiffs believe the preamble

4    means is consistent with the Court's definition of the

5    original preamble of original claim 6, meaning the showing

6    of an increased concentration of gatifloxacin in aqueous

7    humor.

8              Although it's not too clear from the defendants'

9    briefing, it appears as though the defendants are taking the

10   position that the truncated version, showing a method for

11   raising corneal permeability, should be interpreted to mean

12   that in order to also have the flexibility to argue that the

13   additional language of an aqueous liquid, I'm sorry, aqueous

14   pharmaceutical gatifloxacin eyedrop solution could be used

15   to say that additional components of the eyedrop solution

16   should also be present in an increased concentration aqueous

17   humor.  They don't define what they also think should be

18   required to be present in an increased concentration, but I

19   think that is their position, and I will try to explain that

20   further as I go along.

21             So the preamble of the re-examined claim 6

22   recites in full, quote, "a method for raising corneal

23   permeability of an aqueous pharmaceutical gatifloxacin

24   eyedrop solution," close quote.

25             Now, the preamble of the re-examined claim 6

1    differs from the preamble of the original claim 6, which

2    recited a method for raising corneal permeability of

3    gatifloxacin, and the difference between the two is the

4    substitution of the words in re-examined claim 6, open

5    quote, "of an aqueous pharmaceutical gatifloxacin eyedrop

6    solution," close quote, for the words "of gatifloxacin in

7    the original claim."

8            Now, the substitution of the words was not meant

9    and did not change the scope of the claim, but only provided

10   clarity by providing antecedent basis for the term, at the

11   end of the re-examined claim of said gatifloxacin eyedrop

12   solution.

13           Now, it's plaintiffs' position, consistent with

14   the holding of this Court in the Apotex case, that the full

15   preamble of re-examined claim 6 is a limitation and must be

16   construed.

17           And plaintiffs believe that the preamble should

18   be construed consistent with this Court's claim construction

19   of the original preamble of claim 6 to mean showing an

20   increased concentration of gatifloxacin in an aqueous humor,

21   and we believe that this is consistent with the common and

22   ordinary meaning of the preamble of re-examined claim 6 to

23   one of ordinary skill in the art, and it's confirmed by the

24   specification and the original and re-examined file

25   histories of the '045 patent.  And not to belabor the point,

1   our briefs set forth in detail, as well as Dr. Curatola's

2   declaration, where we believe the support is for that

3   interpretation.

4           But two specific points I would like to make.

5   In both the prosecution of the original patent and the

6   re-examination, the plaintiffs distinguished over the prior

7   art by relying upon a showing of increased concentration of

8   gatifloxacin, no other components in the aqueous humor.  And

9   in the notice of allowance of both the original patent and

10  the re-examined patent, the Examiner found that the claims

11  were patentable because of a showing of increased

12  concentration of gatifloxacin, no other components in the

13  aqueous humor.

14          So we believe that the proper interpretation of

15  the full preamble of claim 6 is showing an increased

16  concentration of gatifloxacin in an aqueous humor.  And

17  plaintiffs' interpretation is not only supported by the

18  intrinsic record, but also the declaration of Dr. William

19  Curatolo.  While defendants argue Dr. Curatolo's declaration

20  is extrinsic evidence and should be ignored, the fact is

21  that Dr. Curatolo's declaration is under oath, and while not

22  intrinsic evidence, it is still evidence and it's consistent

23  with the intrinsic record.

24          Now, in contrast, defendants seek to truncate

25  the preamble and interpret only the phrase "a method for

1       raising corneal permeability," and defendants assert that

2       only this truncated portion of the preamble should be

3       construed to mean showing an increased concentration of

4       gatifloxacin in the aqueous humor.

5               And to support this interpretation, defendants

6       rely solely on attorney argument.  It's well established

7       obviously that attorney argument is not evidence and

8       defendants' arguments are not supported by evidence, whether

9       it be intrinsic or extrinsic.

10              Now, defendants accuse the plaintiffs of

11      gamesmanship in the exchange of claim construction terms,

12      and to be blunt, as a Kansas farm boy raised on principles

13      of sportsmanship, I really find that objectionable.  But

14      really, I think what the facts show is that there was a

15      misunderstanding on both parties' parts until the time of

16      the filing of the joint -- of claim construction statement

17      with the Court.

18              And the fact is that the record attached to

19      defendants' own brief and discussed at length by both

20      parties in their own briefing establish that plaintiffs

21      didn't engage in gamesmanship, but contrary to defendants'

22      representations, plaintiffs responded to a new construction

23      offered by the defendants on the day the joint claim

24      construction was due, which indicated that the defendants

25      would seek to construe the preamble inconsistent with the

1    specification file history, such that all components, or at

2    least some additional components, in addition to

3    gatifloxacin, must be shown to be present in an increased

4    concentration in aqueous humor.

5           And when the plaintiffs inquired whether or not

6    this was the case, we didn't get a direct response.  We were

7    just told that they -- that the defendants wanted to

8    maintain their flexibility with respect to claim

9    construction and so they refused to tell us whether or

10   not that was the case.  And even defendants' claim

11   construction briefing to date fails to directly address

12   that point.

13          Now, defendants also argue in their claim

14   construction briefing that because plaintiffs changed the

15   language of the preamble, the preamble must mean something

16   different.  And, again, this is attorney argument, it's not

17   supported by the intrinsic record.

18          And as I said earlier, the intrinsic record

19   shows that the change was solely made to provide clarity so

20   that you would have an antecedent basis for said

21   gatifloxacin eyedrop solution at the end of the claim.

22          And, in fact, if the re-examined claim were

23   construed to require an increased concentration components

24   other than gatifloxacin, there's no support whatsoever in

25   the specification or the -- or the file histories for that

1    position, and that would have constituted new matter and

2    gotten a rejection from the Patent Office.

3              So not only -- not only does the intrinsic

4    record support plaintiffs' interpretation, but it's the only

5    reasonable construction in light of the intrinsic evidence.

6    And that is plaintiffs' position.

7              THE COURT:  All right.  Thank you very much.

8              MR. WEST:  Thank you.

9              MS. MAZZOCHI:  May I approach, your Honor?  To

10   try to -- because I anticipated the Court might have some

11   questions on why we have the positions we do, I just made a

12   few slides so I could highlight for you.

13             THE COURT:  Okay.

14             (Ms. Mazzochi handed slides to the Court.)

15             MS. MAZZOCHI:  Your Honor, I think if we start

16   by taking a look at the third slide, this is where we have

17   the head-to-head claim language comparison between claim 6

18   as it originally issued and then claim 6 as it issued in the

19   re-examination certificate.

20             So if we start with both originally issued

21   claim 6 and the re-examination certificate, claim 6, they

22   both start off, a method for raising corneal permeability.

23   At the outset, we thought that was the only thing that

24   the plaintiffs wanted to construe.  We said we agreed.

25   We're going to abide by what the Court did in the first

```
 1        Apotex case, so it does not appear that we have a

 2        dispute.

 3               The problem is, is that they've now come in

 4        with an expert who is taking the position that if we look at

 5        the language that goes after a, a method for raising corneal

 6        permeability of, it says, of an aqueous pharmaceutical

 7        gatifloxacin eyedrop solution comprising, then it has a list

 8        of various ingredients that need to be in there at certain

 9        weight percentages.

10               Their expert is now taking the position that all

11        of that language really means gatifloxacin and nothing else.

12        Frankly, that, to me, is a lexicography definition.  That's

13        not something that is adhering to the ordinary plain

14        meaning, which is an aqueous pharmaceutical gatifloxacin

15        eyedrop solution that comprise these various elements.

16               So the question then that we have is since their

17        expert -- and this is in paragraph 22, I believe, of his

18        declaration -- since their expert is taking the position

19        that that language, after the of means gatifloxacin and no

20        other component from the eyedrop solution, our question

21        was, well, where was that definition, that clear

22        lexicography definition, ever actually given during

23        prosecution?

24               And if we take a look at our slide number 5, the

25        PTO Examiner, and this is from Mr., or Dr. Curatolo's
```

1    declaration.  So these were the things that he was relying

2    on.

3            The PTO Examiner specifically recognized that

4    the prior art may affect the penetration toxicity of

5    additives resulting in the increased corneal permeability of

6    the solution.  So that's not referring to increased corneal

7    permeability of just one additive.  They were talking about

8    the entirety of the solution there.

9            When it came to the arguments that the patentees

10   gave back to the PTO in response to some of the invalidity

11   rejections, we can see one of them in our slide number 6,

12   they are talking about corneal permeability and they said,

13   we've carried out experimentation that demonstrates that

14   compositions, including gatifloxacin and disodium edetate in

15   the amounts recited in claim 12 and having pH in the range

16   recited in claim 1, achieve unexpectedly superior corneal

17   permeability.

18           So they are referring there to the compositions

19   as a whole, not just to gatifloxacin itself.

20           Similarly, if we take a look at slide number 7,

21   when they talked about this Court's decision, they said,

22   the Court concluded that employing disodium edetate in an

23   amount of about 0.01 weight per volume percent results in

24   superior corneal permeability of gatifloxacin eyedrop

25   formulations.

1          So there again they are characterizing to the

2     PTO that it's the overall formulation that is achieving the

3     supposedly superior corneal permeability.

4          And if we look at the next slide, when they were

5     making arguments about unexpected results, would increase

6     corneal permeability of such formulation.  Improved corneal

7     permeability demonstrated for the gatifloxacin eyedrop

8     formulations, according to claim 12.  Then again, they're

9     not saying gatifloxacin to the exclusion of any other

10    component in the formulation.

11          And then when it came to claim 6 in particular,

12    they recognized that the PTO had rejected the claims by

13    saying it would have been obvious to incorporate disodium

14    edetate into a gatifloxacin eyedrop solution, and the

15    argument that they made back to the Patent Office is that

16    the prior art does not suggest incorporating disodium

17    edetate in the particular amounts recited in claim 6 into a

18    gatifloxacin eyedrop solution having the particular

19    composition recited in claim 6 to improve the corneal

20    permeability of such solution as required in claim 6.

21          So, again, when we take a look at the

22    re-examination claim 6 and we look at the language that

23    actually issued, the preamble language says, a method for

24    raising corneal permeability of an aqueous pharmaceutical

25    gatifloxacin eyedrop solution comprising all of these

1    various ingredients.

2              So all we're asking for is that a method for

3    raising corneal permeability, and we set this forth on our

4    slide number 10, should be construed as it was in Apotex,

5    showing an increased concentration in the aqueous humor.

6    But what has changed in the re-examined claim 6 compared to

7    the original claim 6 is that original claim 6 said,

8    permeability of gatifloxacin.  The re-examined claim 6 says

9    permeability of an aqueous pharmaceutical gatifloxacin

10   eyedrop solution.

11             So that's the phrase essentially that should

12   be -- that should be part of what they have to show the

13   increased concentration of in the aqueous humor.

14             THE COURT:  This is a very creative lawyering

15   argument, but from a common sense point of view and from a

16   claim construction point of view, I have to say that I'm a

17   little confused for the following reasons.

18             Number one, we don't generally truncate a

19   sentence.  At least I don't.

20             Number two, it sounds like you're suggesting

21   that the re-examined claim can be broader when, in fact, it

22   can't be because it's the same ingredients in the original

23   claim, the re-examined claim.  That's the only thing

24   supported in the intrinsic record.

25             So I don't even know -- I don't know how you're

1       going to spin this at trial, quite frankly.  And it

2       certainly makes some sense to me that the patentee

3       incorporated into the preamble the language at the end of

4       the claim that talks about eyedrop solutions.

5               So I, frankly, I'm not going to make a decision,

6       because I don't usually in a bench trial.  I want to see how

7       you spin it, but I don't understand how you're going to spin

8       it, and I don't think it makes any sense to me when I'm

9       looking at this re-examined claim that has passed muster.

10      And, yes, you can play this wordsmithing game you're doing,

11      but I don't know why you would.

12              MS. MAZZOCHI:  Well, your Honor, let me try to

13      backtrack here.

14              First, I don't think that we're trying to

15      truncate anything.  My understanding from my read of the

16      Apotex claim construction is that in the context of the

17      preamble language in claim 6, which I think both sides agree

18      was limiting there, it's limiting the -- the preamble

19      language for the claim language is limiting here.

20              There was no need to construe of gatifloxacin in

21      the original claim 6 because it was accepted.  There was a

22      plain meaning for "of gatifloxacin."  Here, all we're saying

23      is that when they say, "of an aqueous pharmaceutical

24      gatifloxacin eyedrop solution," that that also likewise has

25      a plain and ordinary meaning that does not require any

1    particular unique construction from the Court.

2              THE COURT:  It would need a meaning for me

3    because I don't understand what it is other than what

4    is in the claim, which is gatifloxacin or its salt, and

5    disodium edetate.

6              I mean, if you want to truncate this, then I

7    don't want you to say plain and ordinary meaning when I

8    don't know what the plain and ordinary meaning is.

9              Now, obviously, I'm not one of ordinary skill in

10   the art, but that is the kind of vagueness going into a

11   trial that, a bench trial that doesn't bother me too much,

12   but certainly if this were a jury trial, I wouldn't allow

13   it, because I don't know how it's going to play out.  I

14   don't know how you are going to use this plain and ordinary

15   meaning at trial.

16             So if you want to suggest something to me now of

17   what the meaning is of the second phrase, I'm happy to

18   consider it.  At some point, you are going to have to

19   make it clear to me.  Otherwise, this whole exercise

20   will have just been churning fees that your client has to

21   pay.

22             MS. MAZZOCHI:  Sure.  Well, your Honor, I mean,

23   to me when it says gatifloxacin eyedrop solution, that's

24   referring to the solution as a whole.  Their expert is

25   offering the opinion, which is not supported by the

specification or the statements made during prosecution,

that when it's referring to a solution, that you should

really strike out all of that language about solution and

just have it mean gatifloxacin and no other components that

could be in the solution.  That was their expert

declaration.  I believe it was at paragraph 22.

He says, no other component.  That is redefining

what the solution is.  And to us, if they're going to try to

make an argument of redefinition of the term solution, then

they needed to give it that kind of a lexicography

definition, they needed to actually show where that is in

the intrinsic record, and they have not done that.

And I think, quite frankly, they were trying to,

in front of the Patent Office, give the appearance that

there was something significant about it being the solution

as a whole having increased corneal permeability.  I don't

think they have supported that with the specification.  I

don't think that those arguments that they made to the PTO

to try to differentiate the prior art are valid on the

merits.

But, nevertheless, I don't see anything

supporting their expert's assertion that when you read

aqueous pharmaceutical gatifloxacin eyedrop solution, you

exclude every single component that could be in that

solution except for gatifloxacin, because that's what

1    their expert declaration has put in, that's the extrinsic

2    evidence and there is no support for that in the intrinsic

3    record.

4              THE COURT:  Tell me something.  In the original

5    claim 6, it referred to gatifloxacin eyedrop solution, did

6    it not?

7              MS. MAZZOCHI:  It says, a method for raising

8    corneal permeability of gatifloxacin, which comprises

9    incorporating disodium edetate into eyedrops containing

10   gatifloxacin or its salt.

11             So I think if you look at how the language is

12   being modified there, I think it's fine to say, well, what

13   you are going to be focusing on in the aqueous humor is just

14   the gatifloxacin, because I think the language is then clear

15   that what they are saying is we want to raise the corneal

16   permeability of -- of what?  Of gatifloxacin.

17             In re-examined claim 6, they've now come back

18   and they said, a method for raising corneal permeability of

19   an aqueous pharmaceutical gatifloxacin eyedrop solution

20   comprising.  So they really have changed the nature of what

21   is supposed to be subjected to this method for raising

22   corneal permeability.

23             THE COURT:  And so is this really a claim

24   construction argument or is it something different than

25   that?  I mean, I guess I'm trying to figure out where this

1    all comes -- where the rubber meets the road here.

2                    MS. MAZZOCHI:   Sure, your Honor.   And I think it

3    really boils down to more the question of, can they prove

4    each and every element of the claim language.

5                    We have never perceived this as being a

6    genuine claim construction issue because I don't think

7    the -- because we don't think that there's anything

8    ambiguous about what does it mean to be an eyedrop solution

9    that has got various components in it in that sense.   They

10   are the ones who are coming back and saying, see all that

11   new language that we added.

12                   You know, before we said of gatifloxacin, now

13   we've really we've expanded it to cover gatifloxacin in

14   solutions and other things that may be contained within

15   it.   They are now coming back and trying to say, oh, no,

16   no.   Just interpret that as gatifloxacin and to the

17   exclusion of everything else that's in that solution, and

18   there's simply no support for that premise in the intrinsic

19   record.

20                   THE COURT:   All right.

21                   MS. MAZZOCHI:   Thank you.

22                   THE COURT:   Thank you very much.   Food for

23   thought.

24                   I will let plaintiffs' counsel respond, if you

25   care to, and whether it was intentional or not, the added

1    language seems to have added some...

2              MR. WEST:  Your Honor, I have a short response

3    to this.

4              What is being proposed is inconsistent with the

5    intrinsic record.  In fact, the sole example relating to

6    corneal permeability in the specification only talks about

7    increasing the corneal permeability of gatifloxacin.

8              The only arguments presented to the -- to the

9    Examiner and the only finding made by the Examiner related

10   to increasing the concentration of gatifloxacin in the

11   aqueous humor.  And certainly we agree with you your Honor,

12   that the re-examined claim could not be any broader, and

13   that was the point that I was trying to make in my original

14   discussion.

15             So we don't, quite frankly, see where defendants

16   are going with this art.  We do believe it's inconsistent

17   with the intrinsic record.

18             Thank you.

19             THE COURT:  All right.  Thank you.

20             I guess, unless someone told me that this was

21   dispositive somehow, I will not change my normal practice

22   and I won't include my claim construction in my post-trial

23   opinion.

24             What other issues are there?  Are there

25   other claim construction issues, or do we go on to trial

1   issues?

2           MS. MAZZOCHI:  I think we're at trial issues,

3   your Honor.

4           THE COURT:  Okay.  Let me -- Tinna, can you hand

5   these out?  They're the trial schedule.  Unfortunately, you

6   were double-booked.  You're now only single-booked.  That's

7   the good news.  The bad news it's the week of our annual

8   admissions ceremony and I've got an oral argument scheduled

9   on that Friday, as I tend to schedule my claim construction

10  arguments.  So I'm hopeful that this is sufficient time.  As

11  a bench trial, if you think we need more time, we can start

12  earlier and go later.  You need to let me know.  Generally,

13  I do have 8:30 proceedings and 4:30 proceedings, but, you

14  know, we can go to extremes if we need to.

15          All right.  Why don't we go plaintiffs' most

16  important trial issue, defendants' most important,

17  plaintiffs' next most important, defendants' next most

18  important, go back and forth and see where we end up.

19          So plaintiffs' most important trial issue.

20          MR. WEST:  Thank you, your Honor.  Frank West

21  again.

22          THE COURT:  Yes.

23          MR. WEST:  We would like to address the

24  intervening rights issue.  We believe there's still one

25  outstanding issue.

1              Specifically, your order granted Lupin leave to

2    amend its answer to add intervening rights as a defense, and

3    in light of the Court's ruling, plaintiffs also believe that

4    Hi-Tech will make a similar request and that the Court may

5    very well grant that request.  But, in fact, Hi-Tech's

6    counsel called yesterday and asked whether plaintiffs would

7    agree to that, and plaintiffs informed Hi-Tech that they

8    would consider it if Hi-Tech agreed to provide discovery of

9    its basis prior to trial.  Hi-Tech refused.

10             And so while plaintiffs respectfully disagree

11   with your decision, your decision did not address our

12   request for discovery should you grant them the right.

13             THE COURT:  I think I said we would discuss it;

14   right?  Well, I meant to say we should discuss it.  So we

15   should discuss it.

16             MR. WEST:  All right.  Great.

17             THE COURT:  What kind of discovery is left for

18   you to take in connection with this?

19             MR. WEST:  Well, your Honor, neither defendant

20   ever identified a basis for the alleged intervening rights,

21   so, quite frankly, if it's simply the filing of the ANDA, we

22   did extensive research trying to find where there's case law

23   to support the administrative act like a filing of an ANDA

24   will be sufficient to support intervening rights.  We

25   couldn't find anything to that effect.  So the case law

1  traditionally requires some indication that there was a --

2  of an actual sale, or offer to sell, importation.

3              THE COURT:  I don't think we found any case law

4  that didn't support it, just no case law.

5              MR. WEST:  That is correct, your Honor.  You are

6  correct.

7              And so absolute intervening rights require

8  them to have actually engaged in otherwise infringing

9  conduct.

10              THE COURT:  Which you accuse them of; right?

11  Well, an ANDA is statutorily --

12              MR. WEST:  ANDA is statutory -- you know, the

13  preparation work for it is not considered.  You know, it's

14  exempt from infringement.

15              And what the statute actually states with

16  respect to intervening rights is that they have made, used,

17  sold, offered for sale or imported.  It does not discuss

18  ANDA.  So for absolute intervening rights, it actually

19  requires one of those conducts in which, as far as we know,

20  they have not engaged in because that would have been --

21  that would have been infringement of our patent and we would

22  have asserted damages, and we certainly would have been --

23  we should have certainly been put on notice of that.  And

24  also it would have violated FDA law, which presumably the

25  FDA wouldn't permit them to sell unauthorized unimproved

1   products.

2           To the extent that they're possibly going to

3   assert equitable intervening rights, that's based upon a

4   substantial preparation to engage in infringing activities

5   again.  And the case law that we've been able to find

6   talks about issues such as hiring sales personnel, whether

7   or not they've made substantial investment in terms of

8   manufacturing facilities devoted to the product, or whether

9   there are existing and proposed contracts relating to the

10  sale of these otherwise infringing products.

11          THE COURT:  So just to cut to the chase here,

12  what you need is a proffer to support their --

13          MR. WEST:  Your Honor, we agree, but we'd like

14  to know what evidence they're going to rely upon and, quite

15  frankly, we'd like to depose the witness that they'll have

16  at trial.

17          THE COURT:  Right.

18          MR. WEST:  Yes.

19          THE COURT:  Yes.  Okay.  Well, let me hear from

20  both defendants perhaps and see whether this was a wasted

21  exercise on my part or whether there really is something to

22  discover.

23          MR. CASTELLANO:  Good morning, your Honor.

24          THE COURT:  Good morning.

25          MR. CASTELLANO:  I think plaintiffs are correct,

1    that at least with respect to Hi-Tech, since Lupin's motion

2    did not pertain to us as well, we would, with the Court's

3    permission, amend our answer.

4            I think the important point here is that

5    plaintiffs have been on notice of this defense since March.

6    We provided a response to their contention interrogatory

7    that laid out the basis for our response -- for this

8    defense, excuse me.

9            Specifically, Hi-Tech stated that, we contend

10   that plaintiffs are barred from asserting the new and

11   substantially changed claims during the ex parte

12   re-examination against Hi-Tech under the doctrines of

13   absolute and equitable intervening rights.  Hi-Tech

14   developed and manufactured the products at issue and

15   prepared and filed ANDA numbers 203189 and 203190 before the

16   ex parte re-examination certificate issued on October 25,

17   2011, and the new and amended claims became public.

18           So more than nine months ago plaintiffs were on

19   notice of this defense, as Lupin noted in their briefs, and

20   they conducted discovery with that knowledge, and they took

21   the -- they noticed the deposition of several Hi-Tech

22   employees and, in fact, took the deposition of our 30(b)(6)

23   witness, who is our chief scientific officer, Dr. Egbaria.

24           In the notice of deposition, 30(b)(6) notice,

25   they laid out numerous topics that could easily be

1    interpreted as going to intervening rights.  They didn't

2    specifically list intervening rights.  But, for example,

3    both of the ANDAs were topics that were identified for the

4    30(b)(6) deposition and related research development,

5    manufacturing and testing of the ANDA products.

6              And then during the actual deposition they asked

7    questions pertaining to those subjects, and I have a list

8    here.  But I mean --

9              THE COURT:  Well, let me just make sure.

10             MR. CASTELLANO:  Sure.

11             THE COURT:  So your client, although you feel

12   the need to amend your answer to actually assert intervening

13   rights, which you never did until now, you presented it in a

14   contention interrogatory, and the basis of your claim is

15   that you made substantial preparations to actually make the

16   product and then they came out with their re-examined claim?

17   I mean, so there is something real happened.  It wasn't just

18   the filing of the ANDA?

19             MR. CASTELLANO:  Correct, your Honor.  Well, the

20   ANDA itself is evidence of the substantial preparation that

21   we made.

22             THE COURT:  Well, theoretically, it is until the

23   Federal Circuit tells me otherwise, because apparently

24   there's not a whole lot of case law out there.

25             MR. CASTELLANO:  Well, we also have the, you

1    know, the preparation activities that Hi-Tech actually

2    performed, which we expect Dr. Egbaria to testify about

3    and which plaintiffs were free to ask about at the

4    deposition.

5             We believe -- I mean, just to go to your

6    question about not amending our answer in terms of our, why

7    we think this is in the case, we thought it was in the case

8    as of March when we put it in our contention interrogatory

9    response.  We think it's subsumed under our noninfringement

10   affirmative defense.  But to the extent that the pleadings

11   need to be amended now to bring them in line with the

12   evidence that's going to be presented, we'd be happy to do

13   that.

14            THE COURT:  But you have an objection to -- in

15   order to make sure that we're all on the same page at the

16   same time, your client has an objection to having a short --

17   a supplemental focused 30(b)(6) deposition of your witness

18   that goes directly to intervening rights so that -- I mean,

19   I don't like surprises.

20            It strikes me that under the circumstances, it's

21   not unreasonable to allow a three-hour deposition of this

22   witness before he takes the stand.

23            MR. CASTELLANO:  Well --

24            THE COURT:  Because you have to introduce

25   affirmative evidence; right?  It's your defense.

```
 1                    MR. CASTELLANO:  That is true, your Honor.  And

 2     we would oppose an additional deposition.  And in terms of

 3     the testimony that was actually sought at this deposition

 4     and given at the deposition, it included many pages of

 5     testimony about the testing done on the active

 6     pharmaceutical ingredient in the ANDA and on the actual ANDA

 7     products themselves, the decision to proceed with the

 8     development of the product, the process validation for the

 9     product, the sourcing of the API from a third party, plans

10     to launch.

11                    And it also included testimony about the

12     Hi-Tech's knowledge of the '045 patent and the

13     re-examination which, according to plaintiffs in their

14     briefs, are actually relevant to the intervening rights

15     question.

16                    THE COURT:  So you think the discovery has been

17     done?

18                    MR. CASTELLANO:  I think they had the

19     opportunity to do it, and if they didn't get it, that

20     shouldn't be the -- the burden of their failure to do so

21     shouldn't be placed on us at this time.

22                    THE COURT:  Well, I'm the one on the line here,

23     so, okay.  All right.  Well, thank you very much.

24                    I mean, it strikes me that under the

25     circumstances, particularly with Hi-Tech and with the
```

1    contention interrogatory out there, I will hear from

2    plaintiffs' counsel first.  But it strikes me that this

3    is not an unreasonable request to amend the answer if

4    we need to to make the pleadings consistent with the

5    discovery.

6              MR. CASTELLANO:  Thank you.  Your Honor, I will

7    just add one quick thing.

8              THE COURT:  Yes?

9              MR. CASTELLANO:  We don't intend to introduce

10   any additional documents.  Everything we intend to rely on

11   this for documentary evidence has already been produced and

12   is on our exhibit list, so there will be no comprises in

13   that regard.

14             THE COURT:  Okay.

15             MR. CASTELLANO:  Thank you.

16             THE COURT:  All right.  Let me hear from counsel

17   for Lupin about additional discovery, and then I will

18   get back to plaintiffs' counsel in terms of where we stand

19   here.

20             MS. MAZZOCHI:  Sure, your Honor.  For what it's

21   worth, I'm not going to belabor the points.  We received

22   similar deposition topics from the plaintiffs.  We presented

23   a 30(b)(6) witness on the preparation of the ANDA.  They

24   deposed three individuals as well who had knowledge about

25   the ANDA preparation efforts.  You know, for example, the

1    biostudy.   That's obviously not an inexpensive undertaking.

2    It's used to support the ANDA.

3              But, you know, we offered to the plaintiffs in

4    the spirit of compromise, we would try -- so that we

5    wouldn't have to bring it up in front of the Court, that we

6    would give them a deposition, you know, briefly if they

7    thought there was really something knew that they hadn't

8    covered before.

9              We're happy -- you know, we're happy to do that

10   if that takes the burden off the Court, a three-hour

11   deposition, but, again, we're not planning on introducing

12   any new witnesses or any new documents that we hadn't

13   already produced before and any new witnesses who hadn't

14   already been deposed before.

15             THE COURT:  Well, I guess, depending on what the

16   defendants' answer -- defendants' answers are to this

17   question, there may or may not be a need for additional

18   discovery.

19             If, in fact -- I understand there are no new

20   documents, but I guess the question is, is there additional

21   testimony that you all would want to present specifically to

22   carry your burden of proving intervening rights?  And, if

23   so, I don't want any surprises.  I think that the plaintiff

24   should be able to take a deposition and make sure it

25   understands the scope.

1              If, in fact, what you are saying is even though

2     intervening rights wasn't specifically, arguably wasn't

3     specifically in the case, that all you're relying on is the

4     evidence with respect to your ANDA preparation and there's

5     nothing more, then I'm not confident any further discovery

6     is necessary.

7              So I mean if you are not sure, then I think we

8     need to take a deposition so everyone understands what the

9     scope of the defense is.

10             MS. MAZZOCHI:  Right.  And, you know, I'm not

11    trying to speak on behalf of --

12             THE COURT:  Right.  I will go back to them.

13             MS. MAZZOCHI:  -- of Hi-Tech.  I don't know if

14    there's anything supplementary that has occurred, you know,

15    in the last couple of months, but certainly when we were

16    contemplating substantial preparation, we were, in fact,

17    focused on the substantial preparation that is needed to

18    actually get the ANDA together and filed.  Those are fixed

19    costs.  They're irretrievable costs.

20             So, you know, we think that -- and we think that

21    when it comes to the dates of the re-examination and the

22    notice that we had or lack thereof, particularly in view of

23    when the timing of this Court's invalidity decisions, you

24    know, we don't think there needs to be any discovery on

25    those particular issues.

1          So maybe what might be the most prudent way for

2    us to go about it would be to identify to the plaintiffs, do

3    we think there's anything more, you know, separate and apart

4    from the ANDA that we think we would introduce at trial that

5    hasn't been previously identified.  If there is, then we

6    certainly would identify it.  You know, we can agree to

7    identify it no later than Monday, and then if they want to

8    take a brief deposition on that new material, we'd be happy

9    to let them take a new deposition on that score.

10              THE COURT:  Okay.

11              MS. MAZZOCHI:  I think that's fair.

12              THE COURT:  All right.  Thank you very much.

13              MS. MAZZOCHI:  Thank you.

14              THE COURT:  Let me go back to counsel for

15   Hi-Tech before I go back to plaintiffs' counsel.

16              And I guess the question is this.  If there's

17   any evidence besides the evidence that is in the record

18   already that you might be introducing, then there needs to

19   be a deposition, because I'm not comfortable with the fact

20   that the issue was kind of there but not really, and I want

21   to make sure that, right or wrong about the substance of

22   allowing it to go forward, I at least want there to be a

23   fair record.

24              MR. CASTELLANO:  Well, I think we would in

25   general agree with the position of Lupin, although I would

1     say that pursuant to your Honor's rule about introducing

2     documentary evidence through a witness, we would need, if

3     we're going to a rely on the ANDA as the operative evidence

4     for this defense, we will need to use a witness to introduce

5     the relevant portions and to give it context.  And to the

6     extent those specific points were not raised at deposition,

7     you know, we don't think there's a need for a deposition on

8     that point.  They have the ANDA.  They know what's in it.

9     We don't intend to have additional editorial testimony from

10    the witness about it, of them to simply explain what it is.

11    But I think most likely that would be the only thing beyond

12    what's already in the record.

13                THE COURT:  Well, I think by Monday both

14    defendants need to identify the witness that you are going

15    to use to introduce whatever this evidence is, and if they

16    have not been queried about what you're going to be

17    presenting, then plaintiffs can take a three-hour deposition

18    of each one some time before trial, or at least some time

19    before they testify.

20                MR. CASTELLANO:  All right.  Thank you, your

21    Honor.

22                THE COURT:  Thank you.  All right.

23                Well, let me hear from plaintiffs' counsel.  I

24    mean, it strikes me that I have gone down this path, and I

25    think at this point I will allow Hi-Tech to amend so that

1    the defendants are proceeding consistently, and if I'm

2    wrong, I will certainly hear about it.

3                MR. WEST:   I would just like to address a couple

4    of points that both the defendants made.   They said that all

5    the exhibits they would be relying upon are on their exhibit

6    list.   Their exhibit list is 1,275 exhibits long, so we

7    would have no clue what they are relying upon simply by that

8    and my understanding is they'll be identifying the documents

9    for us now.

10               To the extent they're relying upon the ANDA,

11   well, that's thousands of pages long, so we don't know again

12   what they're relying upon within the ANDA.

13               As for the deposition topics, the deposition

14   topics for the 30(b)(6) witnesses, we had discussions with

15   both defendants after those topics were served and removed

16   topics that related to the finances, business, marketing,

17   investment, because of Judge Thynge's order in January,

18   which we briefed in the papers.

19               Judge Thynge -- the parties agreed that we would

20   not be producing financial or cost for marketing data, and

21   Judge Thynge agreed that we didn't have to produce that data

22   as long as neither -- as long as plaintiffs weren't relying

23   upon commercial success and as long as the defendants were

24   relying upon a defense that required the presentation of

25   that data.   But she informed everyone that if that changed,

```
 1    it was incumbent upon that party asserting that defense or

 2    that claim to provide the discovery.  And, quite frankly,

 3    they are now asserting it, but they never provide the

 4    discovery, which I think is in contradiction of her order.

 5              THE COURT:  Well, I don't know whether they're

 6    contradicting it because I don't know that they're talking

 7    about financial data.  But the point is this.  And maybe I

 8    will amend this.

 9              By 12/28, which I think is the Friday after

10    Christmas, is it the Friday after Christmas, the defendants

11    have to identify the witness or witnesses who is going to

12    talk about this defense and the documents, and then you

13    can decide whether you want to take your three-hour

14    deposition.

15              MR. WEST:  All right.  Thank you, your Honor.

16              THE COURT:  Thank you very much.

17              All right.  I think we're going to defendants

18    for their most important issue that's left.  Oh, and I

19    guess we need to get some kind of a motion or whether

20    it is sufficient on the record about Hi-Tech being able to

21    amend its answer, if it's necessary, to assert intervening

22    rights.  We need to have something with or without the

23    transcript.

24              MR. CASTELLANO:  Well, your Honor, we'll make

25    the motion now on the record to amend both of our answers.
```

1    And we can file something, if you would like.

2              THE COURT:  All right.  It's granted consistent

3    with our discussion.

4              MR. CASTELLANO:  Thank you, your Honor.

5              THE COURT:  All right.  So what's the next issue

6    from defendant?

7              MR. WADHWA:  Good morning, your Honor.

8              THE COURT:  Good morning.

9              MR. WADHWA:  Anuj Wadhwa on behalf of Lupin.

10             Prior to this morning's conference, plaintiffs

11   indicated that they would not be raising prevention of

12   precipitation as a secondary consideration.

13             THE COURT:  Number 1 is off.

14             MR. WADHWA:  Number 1.  I believe it addresses

15   number 6 as well as well as their topic number 5.

16             THE COURT:  Okay.

17             MR. WADHWA:  We would just like some

18   clarification based on that statement about certain

19   witnesses that would be testifying at trial.

20             It's our understanding that Dr. Mahnken and Dr.

21   Curatolo relate specifically to secondary considerations and

22   so we would like confirmation they will not be testifying.

23             In addition, there are fact witnesses.  Dr.

24   Jamules (phonetic), Mr. Iemoto, and I believe Dr. Inada was

25   also a prevention and precipitation witness.  So we'd just

1    like confirmation on that issue.

2          MR. KELLY:  Your Honor, perhaps later we could

3    talk about the schedule because Mr. Wadhwa is correct, we

4    will not be bringing on to testify Dr. Curatolo, Ms. Iemoto

5    or Mr. Inada to talk about precipitation, and no one else is

6    going to talk about precipitation unless the defendants

7    raise it as well.

8          THE COURT:  Okay.  All right.

9          MR. WADHWA:  Thank you.

10         THE COURT:  Thank you.  All right.  Does that

11    mean we're back to the plaintiffs for your next issue, or is

12    there another --

13         MR. KELLY:  Your Honor, if it please the Court,

14    last week, Ms. Keller, on behalf of Hi-Tech, raised the

15    question of whether or not we had properly vetted the issue

16    of doctrine of equivalents infringement with respect to

17    their claim 6, and, in particular, whether or not our expert

18    reports, or report, actually went to that.  And we were

19    rather surprised because Dr. Stella, in two paragraphs, 134

20    and 159, specifically went to the question.

21         And the issue is, in claim 6, the EDTA is added

22    to a gatifloxacin solution, and Hi-Tech actually reverses it

23    and adds the gatifloxacin to a solution containing EDTA.

24         And our position is that is the equivalent for a

25    variety of factual reasons, which we shouldn't bore the

1   Court with.  But they're challenging whether or not our

2   expert report was sufficient to have someone testify on

3   this.

4          And what Dr. Stella specifically says, while

5   Hi-Tech adds gatifloxacin to the solution after the addition

6   of disodium edetate, I'm informed by counsel that case law

7   permits the steps of a process, i.e., order or addition to

8   be changed and infringement to be found.

9          It is further my opinion that when the addition

10  of disodium edetate occurs before or after the addition of

11  gatifloxacin, the same increased permeability would be

12  obtained with that identical solution but without sodium

13  edetate and would be achieved in the same manner by

14  including sodium edetate in the eyedrop solution containing

15  gatifloxacin.

16         So he has provided an explanation as to why the

17  function, way, result test for doctrine of equivalents.  We

18  didn't exactly put a heading over doctrine of equivalents.

19  That's what he explained.  And so we'd like, you know, the

20  issue of whether or not we can present it to be resolved one

21  way or the other.

22         Ms. Keller did refer us to a decision by Judge

23  Sleet to support its position, Edwards Life Sciences v.

24  Corevalve.  It's completely different facts, your Honor.

25         THE COURT:  Well, I was just going to say,

1    generally, experts use the right words and don't give you

2    any substance.  Here, it sounds like the expert gave you

3    some substance and just didn't use that heading.

4           So I mean I guess I need to hear from

5    defendants, but it strikes me that's a doctrine of

6    equivalents argument.

7           MR. KELLY:  Thank you, your Honor.

8           THE COURT:  Okay.

9           MS. KELLER:  Your Honor, plaintiffs' conclusory

10   expert statements and barebones interrogatory responses are

11   insufficient to assert this claim.

12          THE COURT:  Well, as I said, though, that

13   was much less -- I mean, well, so forget the

14   interrogatories.

15          MS. KELLER:  Sure.

16          THE COURT:  I'm focused on what was read to me,

17   and he says that the order of adding ingredients is an

18   insubstantial change.  Now, to me, that's more than I get

19   from a lot of experts, but you're saying that's

20   insufficient, that there should have been more, or you're

21   saying that because the phrase doctrine of equivalents

22   wasn't thrown in there, that it's insufficient?

23          MS. KELLER:  No.  I think, I think, your Honor,

24   we agree, plaintiffs do not need to use any kind of magic

25   words or specific language, but they did need to present

```
1    evidence to establish what function, way and result of both

2    the claimed invention and the accused products are, and why

3    those functions, ways and results are substantially the

4    same.

5              The Federal Circuit has said that they must

6    present evidence and argument concerning the doctrine in

7    each of its elements.  It cannot be subsumed in their

8    literal infringement argument.  They need to rely on a

9    detailed description supporting this doctrine of equivalents

10   argument that links the argument as to the insubstantiality

11   of the differences between the claimed invention and the

12   accused product to the present evidence on a limitation-by-

13   limitation basis.

14             In this situation, your Honor, Dr. Stella's

15   report is very broad and in this section is actually

16   addressing literal infringement.  The order -- and whether

17   the order of -- the claim language -- let me take a step

18   back here, your Honor.

19             The claim language that is at issue here is the

20   limitation that it incorporate about .01 percent weight, .01

21   weight per volume percent disodium edetate into said

22   gatifloxacin eyedrop solution.  And as plaintiffs mention,

23   Hi-Tech does not incorporate the disodium edetate into

24   gatifloxacin solution, but instead incorporates the

25   gatifloxacin into the disodium edetate.
```

1           So what plaintiffs are trying to do here is make

2    a doctrine of equivalents argument out of what is their

3    literal infringement argument, and the Federal Circuit has

4    been clear that you cannot subsume this -- their doctrine

5    of equivalents argument into a literal infringement

6    argument.

7           Dr. Stella's report does not provide any

8    limitation-by-limitation discussion.

9           THE COURT:  But isn't that discussion limited to

10   one part of the limitation, the incorporation?

11          MS. KELLER:  I mean, one could maybe postulate

12   that that is true, but when Dr. Stella went into his claim

13   charts, there's, again, no mention of this doctrine of

14   equivalents supposed argument that they're making.  There's

15   no mention of doctrine of equivalents in the standards

16   section of Dr. Stella's report.  There's no further mention

17   of the order, possibility of the order changing within the

18   claim charts of Dr. Stella's report.

19          And the interrogatory response, I know your

20   Honor said to not be concerned about that at this point, but

21   as far as notice goes to Hi-Tech of this doctrine of

22   equivalents argument, was a form generic response that

23   they're relying on literal or infringement or under the

24   doctrine of equivalents.  And all of their subsequent

25   analysis contained no claim chart or element-by-element

1    analysis under the doctrine of equivalents, no description

2    of how the accused ANDA products meet the function, way,

3    result test or the insubstantial differences test in any way

4    whatsoever.  It was solely based on a literal infringement

5    argument.

6                THE COURT:  Well, tell me something.  Did

7    your -- clearly, the language that was read to me was

8    in the expert report, and did your expert respond to

9    that?

10               MS. KELLER:  No, your Honor, because as far as

11   our reading of this, this was solely with regard to their

12   literal infringement argument and they were trying to argue

13   that there can still be literal infringement even if the

14   order is changed.

15               THE COURT:  And he didn't say there couldn't be

16   literal infringement if the order is changed?

17               MS. KELLER:  No, your Honor.

18               THE COURT:  Well, so I'm, quite frankly, here we

19   are again.  I'm not sure -- so you've got one expert saying,

20   under the heading literal infringement, you can literally

21   infringe, and it does not matter whether you -- what order

22   you add the ingredients?

23               MS. KELLER:  To be fair, your Honor, there's no

24   heading that says literal infringement.  I think it's just

25   infringement.

```
 1                 THE COURT:  Okay.

 2                 MS. KELLER:  But there's no mention of anything

 3      other than literal infringement.

 4                 THE COURT:  Okay.  So you've got one expert

 5      saying there's infringement regardless of which ingredient

 6      is added first.  You've got another expert saying nothing

 7      about the order of incorporation.

 8                 MS. KELLER:  Correct.  Our expert -- and

 9      correct me if I'm wrong, I will defer to Jeff Castellano

10      here, but the defendants' experts are opining primarily

11      that plaintiffs have not met their burden to prove

12      infringement.

13                 THE COURT:  Well, I'm, frankly, not sure whether

14      there's a doctrine of equivalents issue at all, and at this

15      point I'm going to allow the expert to testify and see what

16      shakes out, because I'm not -- if you don't have to use the

17      words and there was clear notice that the order, that one

18      expert says the order of how you add things isn't important,

19      then it strikes me that there's no unfair notice as to the

20      facts of his expert opinion.  And I'm not sure the label,

21      you know, I'm not sure how to handle this without hearing

22      the testimony.

23                 So I'm not committing to saying that that isn't

24      a bona fide doctrine of equivalents argument, but certainly

25      I'm troubled by the fact that it was in the report and that,
```

1    you know, it was not responded to buy other experts.  I'm

2    not quite sure what to make of that.

3              So the testimony can come in and I will just do

4    with it what I do at the end of the day.  All right.

5              MS. KELLER:  Just to clarify, your Honor,

6    I think we requested the testimony be consistent and limited

7    to the scope of what's in the paragraphs of his report.

8              THE COURT:  Well, certainly, that's true.  You

9    can't expand on it.  He said this and that's all he can say.

10   All right?

11             MR. KELLY:  We understand, your Honor.

12             THE COURT:  All right.

13             MR. KELLY:  Thank you.

14             THE COURT:  All right.  Good.

15             All right.  So I don't know where we are.  I

16   guess defendants' next issue.

17             MR. POLIVICK:  Good morning, your Honor.  John

18   Polivick for defendants.

19             THE COURT:  All right.

20             MR. POLIVICK:  I've going to be addressing

21   Dr. Mayo's, one of plaintiffs' statistical experts,

22   failure to disclose data that he used in one of his

23   analyses, and it is his correspondence to plaintiffs'

24   miscellaneous issue number 9 and defendants' miscellaneous

25   issue number 2.

1              Dr. Mayo, again, plaintiffs statistical expert,

2    performed several statistical analyses that were described

3    in his expert reports.  For all but one of them, he

4    disclosed the exact data that he analyzed, but for one of

5    them, he did not.

6              Now, for that study, he, it was -- well, Senju,

7    one of the plaintiffs, conducted a series of corneal

8    permeability studies.  They were separate, small corneal

9    permeability studies and plaintiffs purportedly produced the

10   underlying data for those studies to us.  That was in the

11   form of a 1600-page document that contained just basically

12   numbers indecipherable to a normal person.

13             And Dr. Mayo took some of the data from some of

14   those studies and some data from other studies.  We don't

15   know which studies.  We don't know what data.  But he picked

16   this data from the 1600-page document and he combined it all

17   together.  He then built his own statistical model for the

18   purposes of this litigation, stuck the secret data into his

19   model, and out comes this conclusion, which obviously

20   supports plaintiffs' positions.

21             We deposed Dr. Mayo and asked him what data he

22   used.  He doesn't know.  We gave him the 1600-page document

23   and said, could you point to the data that you used.  He

24   couldn't do it.  Well, why couldn't he do it?  Because he

25   had help.  Who helped him?  He doesn't know.  Was it

1    somebody from plaintiffs' counsel's firm?  He does not know.

2    Somebody from one of the plaintiffs?  He doesn't know.

3    Apparently, this person had some familiarity of the

4    underlying studies, but he didn't know who they were.

5              So did he select the correct data?  We have no

6    idea.  We don't know what data he selected.  And you won't

7    hear us cross-examine Dr. Mayo about the specific issue

8    because he has shielded himself from any effective

9    cross-examination.

10             Did he -- assuming he could pick the correct

11   data, did he analyze it appropriately?  Nobody knows.

12   Nobody knows what he did.  Our experts would love to have

13   this data so that they could analyze it under whatever

14   methods they think are more appropriate and then they could

15   tell you what the answers would be under that situation.

16   But, again, he has shielded himself from any real criticisms

17   because the data he used has always been a secret.

18             Did he make some simple mathematical error?

19   Again, nobody knows.  We basically have to trust Dr. Mayo,

20   that he selected the correct data, he analyzed it

21   appropriately, his math was perfect.

22             And so his analysis of this data has not been

23   properly vetted through the discovery process.  He has

24   shielded himself from any criticisms.  They failed to comply

25   with Rule 26, which requires the mandatory disclosure of the

1  facts and data the expert relied upon.

2          THE COURT:  So do I need to review his

3  deposition because attorney argument is not going to help me

4  at all.

5          MR. POLIVICK:  Sure.  I have it right here.

6          THE COURT:  Okay.

7          MR. POLIVICK:  I can show you portions or read

8  in portions.

9          THE COURT:  No.  Don't read in portions.  I

10  think it's something I want to take a look at and I will get

11  back to you on this.

12          But I think what I need is whatever the -- I

13  need the deposition highlighted by both defendants and

14  plaintiffs so that I get the full scope of what you all are

15  claiming he knew and didn't know and whether there really

16  has been a fair opportunity to vet his statistical analysis.

17  I think as much as I'd love to hear you argue, I don't think

18  that's going to be helpful to me.

19          So you will need to work with plaintiffs'

20  counsel to get me one copy with highlighting.  I like

21  highlighting.  I need colors to keep me awake.  So

22  highlighted deposition or depositions, and just produce it

23  to me in the next week or so so that we can take a look at

24  it and get it back to you well before trial.

25          MR. BAXTER:  May I offer a few comments with

1    regard to plaintiffs' side?

2              THE COURT:  Well, sure.

3              MR. BAXTER:  Thank you.

4              THE COURT:  Unless you're saying defendants are

5    correct, I'm not sure what it's going to add to the

6    deposition.

7              MR. BAXTER:  Well, it refers to other

8    opportunities the plaintiffs had to ascertain this

9    information, or defendants had to ascertain this

10   information.

11             Plaintiffs first identified the document in

12   question last January, almost a year ago.  In response to

13   two interrogatories by defendants, one with regard to

14   reduction to practice, a second interrogatory with regard to

15   secondary considerations, Senju identified only two

16   documents, the report in question and the 1600-page raw

17   data, the data used.  Those were the only two documents that

18   Senju indicated related to reduction to practice the

19   experiments in the patents, or unexpected results.

20             Last April we received a 30(b)(6) notice, and

21   many of the topics covered reduction to practice and the

22   unexpected results despite the fact -- and we noted that we

23   designated Mr. Inada, one of the inventors of the patent, to

24   address these topics.  Despite the fact that we had only

25   identified these two documents as relating to conception and

1    reduction to practice for the examples of the patent and the

2    unexpected results, defendants didn't even mark those

3    documents as exhibits during the 30(b)(6) deposition.

4    They didn't ask him a single question about the data

5    underlying the Table 7.

6              THE COURT:  He's not the one who did the --

7              MR. BAXTER:  He was the one who was designated

8    to talk about the -- the explanation, recordation in the

9    notebook.  Now, Mr. -- Dr. -- later on, and another thing is

10   they first received Professor Mayo's expert report in

11   August.  They didn't raise this question about which

12   specific pages from the 1600-page document he pulled the

13   data from until during his deposition.  And even after --

14   and he just couldn't remember at his deposition.  He told

15   them he had the information back in his office.  They never

16   followed up.

17             We've never denied them the opportunity to ask

18   which specific -- you know, we told them this document in

19   January.  We gave them a 30(b)(6) witness on this document.

20   And the expert said he had the specific page numbers in his

21   office.  He just couldn't remember the specific page numbers

22   during his deposition.

23             THE COURT:  So despite all this back and forth,

24   you just didn't come forward and say, listen.  If there's

25   any problem, these are the pages that I used to perform this

1    analysis?  Has it just been simmering, and so here we are a

2    couple weeks before trial?

3                MR. BAXTER:  They never followed up until we got

4    this notice.  We're willing to give them those pages.

5                THE COURT:  Well, why don't you do that.

6                MR. BAXTER:  Yes.

7                THE COURT:  And then we'll see if there's an

8    issue.  If there's an issue, I will need to see his

9    deposition.  So you need to do that promptly.

10                MR. BAXTER:  Okay.

11                THE COURT:  All right.  Then I will need to see

12    the deposition if there's still an issue.

13                And, quite frankly, I mean, I have not seen

14    the deposition.  Whatever questions he couldn't answer in

15    the deposition, you need to provide the information.  And

16    under those circumstances, if I'm going to allow him to

17    testify, once again, there might be a need for a short

18    re-deposition.

19                MR. BAXTER:  We understand.

20                THE COURT:  All right.  All right.  So what's

21    the next issue?  I think it's plaintiffs' turn.

22                MR. KELLY:  You're right, your Honor.

23                Again, if it please the Court, the issue we have

24    is that we went through the entire case with defendants

25    never raising an issue of enablement at all, not in any

1      interrogatory responses, and, in fact, Lupin affirmatively

2      said they weren't raising an enablement defense.

3              And in the opening expert reports of the

4      defendant on the invalidity question, there's no question --

5      nothing is raised about enablement.  And when we get the

6      expert reply report of Dr. George M. Grass, at paragraph 20,

7      for the first time, we see raised enablement.

8              And we think that this is simply, they waited

9      too long to raise this, especially when Lupin affirmatively

10     stated they weren't raising it as recently as October 9th, I

11     believe, of this year.  And --

12             THE COURT:  So enablement wasn't raised until

13     the reply?

14             MR. KELLY:  That's correct, your Honor.  A month

15     later, on November 9th, 2012, or at least that's the date

16     it's dated.  So we just think that's not fair, to at this

17     point be bringing in enablement as a defense.

18             THE COURT:  All right.  Let's hear from

19     defendants' counsel.  It sounds late when you've got the

20     burden of proof.

21             MR. WADHWA:  First off, your Honor, I'd like to

22     just clarify that our interrogatory responses actually say,

23     at this time we are not currently asserting any enablement

24     defenses under 112, but we reserve the right to in the

25     future.  Notwithstanding that, I believe that this is just a

1    mischaracterization.

2            In Dr. Grass' August 27th report, he provides an

3    analysis of the prior art.  In rebuttal, Dr. Stella,

4    plaintiffs' expert, in his October 12th report, says,

5    look at all these tests that provide secondary consideration

6    of unexpected results.  In Dr. Grass' November 9th reply

7    report, he says, look.  I've looked at all these tests, and

8    these tests do not support your contention of an unexpected

9    result.

10            THE COURT:  No longer in the case.

11            MR. WADHWA:  I'm sorry?

12            THE COURT:  Unexpected results are no longer in

13    the case.

14            MR. WADHWA:  Well, unexpected prevention of

15    precipitation, but with respect to claims 12 through 16,

16    they're still asserting a secondary consideration of

17    increased corneal permeability as a secondary consideration.

18            So Dr. Grass has looked at all of these studies

19    that Dr. Stella raises for increased permeability as a

20    secondary consideration of unexpected results and said these

21    studies don't support what you're trying to say.

22            Now, to the extent that Dr. Stella is going to

23    come in and give testimony or any other factual assertions

24    coming in at trial that may support a 112 defense, we're

25    certainly going to reserve our right under Federal Rule of

1     Civil Procedure 15(b) to ensure that the final judgment

2     informs with the proof presented at trial.

3               THE COURT:  Isn't that inconsistent with the

4     whole notion of expert reports and fair notice and vetting

5     discovery?

6               MR. WADHWA:  Well, your Honor, I believe that

7     Dr. Grass' statements were simply in rebuttal to Dr.

8     Stella's assertion of secondary considerations, so I believe

9     that they were timely.

10              THE COURT:  Well, but that's a different thing

11    than saying lack of enablement.  I mean, to say that your

12    evidence regarding secondary considerations isn't viable,

13    isn't believable, is wrong, is different than saying these

14    are not enabled.  I mean, that's -- you know, that's a whole

15    different instruction.  So I'm not confident that you can

16    affirmatively assert a defense as opposed to asserting a

17    defense to their defense.

18              MR. WADHWA:  Well, and I think Dr. Grass' reply

19    report simply says that.  He's only talking about these

20    studies at this point and is saying these studies are not

21    adequate.

22              THE COURT:  All right.  Well, that's different

23    than lack of enablement.  I don't think you've properly

24    raised lack of enablement.  If you want to preserve your

25    right at some point in trial to say you think you did,

```
 1    that's fine.  But to assert enablement as a separate defense

 2    that I have to address, I don't think that has been done

 3    properly.  Okay?

 4              MR. WADHWA:  Okay.

 5              THE COURT:  All right.  All right.  Defendants'

 6    next issue, if there is one.

 7              (Pause.)

 8              THE COURT:  I only see number 5.  Is that still

 9    at issue?

10              MS. MAZZOCHI:  Your Honor, I think we've

11    completed the things that were on our list, so the only

12    remaining issues are on plaintiffs' list.  But one thing I

13    did want to address with the Court, and we can certainly do

14    that now, is going to be the actual order of trial.

15              Our understanding is that, and I don't know

16    whether plaintiffs are going to agree or not, but because

17    there are both infringement and invalidity issues in the

18    case, we would assume that the plaintiffs would go first,

19    put on their infringement case.  We would then go next with

20    our witnesses, who would respond to infringement, put on our

21    invalidity case.  Then they would put on whoever they're

22    going to call to do secondary considerations in rebuttal to

23    our infringement case, and then we will have a brief

24    opportunity to respond to their secondary considerations

25    evidence.
```

1                    THE COURT:  It sounds right to me.

2                    MS. MAZZOCHI:  Okay.  Just making sure on

3        that.

4                    THE COURT:  Yes.

5                    MS. MAZZOCHI:  Thank you.

6                    THE COURT:  Yes.  Thank you.

7                    All right.  It's in the plaintiffs' court again.

8                    MR. PHILLIPS:  Your Honor, just to be clear on

9        the record, you were asking about number 5 on defendants'

10       list.  We think that's subsumed under the precipitation

11       agreement.

12                    THE COURT:  Oh, okay.  Thank you very much,

13       Mr. Phillips.

14                    MR. PHILLIPS:  Thank you.

15                    THE COURT:  I crossed it out, but I didn't quite

16       know why.  Thank you.

17                    So plaintiffs have a lot of issues left.

18                    MR. WEST:  Your Honor, you'll be pleased to hear

19       this is going to be the final issue we'd like to raise.

20                    THE COURT:  Oh.

21                    MR. WEST:  And this relates to number 7 and

22       whether or not the defendants should be permitted to rely

23       upon combinations that their experts didn't include in their

24       expert report.  And subsequent to the filing of the pretrial

25       order, we also received the defendants' 282 notice, and we,

1    quite frankly, would just like confirmation also that

2    combinations that weren't set forth in the expert reports,

3    again, would not be relied upon to assert obviousness.  And

4    that's really the only issue here.

5              THE COURT:  It sounds like an easy one, but let

6    me hear from defendants.

7              MR. WADHWA:  Your Honor, I think what Mr. West

8    just raised is a different issue than what's listed in

9    number 7.

10             THE COURT:  Well, I think it's two issues.

11             MR. WADHWA:  Okay.

12             THE COURT:  Number 7 plus the 282 notice.

13             MR. WADHWA:  And with respect to that, we

14   certainly have no intention of raising any new combinations

15   of prior art that are not in the pretrial order or

16   interrogatories or, you know, previously presented in the

17   papers.

18             THE COURT:  Well, they have to be presented by

19   the expert, I think.

20             MR. WADHWA:  And presented by the expert.

21             THE COURT:  All right.

22             MR. WADHWA:  That's correct.

23             THE COURT:  Okay.  All right.

24             MR. WADHWA:  And then with respect to number 7,

25   these two particular references, I didn't really hear

1   Mr. West's opinion on them, but --

2           THE COURT:  I think they said that the

3   combinations themselves weren't addressed by your experts.

4   That's what I understood.

5           MR. WADHWA:  I don't think that necessarily goes

6   to the admissibility of these two articles and our experts

7   are not relying on these two particular references for any

8   combinations of anything we're relying on.  I think that

9   that addresses the issue.

10          THE COURT:  Beats me.  Does it?

11          MR. WEST:  I believe so, your Honor.

12          THE COURT:  Okay.

13          MR. WEST:  As long as they're not relying upon

14  combinations outside the expert reports, we're fine.

15          THE COURT:  Okay.

16          MR. WEST:  Thank you, your Honor.

17          THE COURT:  All right.  All right.  So the

18  trial -- are there any other issues that we should be

19  addressing now?  Is the trial schedule -- Mr. Kelly, you

20  mentioned something about the trial schedule being too

21  short, too long?

22          MR. KELLY:  Not too -- not too -- we have

23  dropped -- by dropping the secondary considerations, we've

24  dropped three witnesses off the top of my head, which should

25  actually shorten the amount of time.  The only thing --

1    that would normally tell me to tell you that we don't need

2    all these days, but we've got 1200-some-odd exhibits from

3    the other side, and looking at their pretrial order, it

4    seems like they want to retry the Apotex case and

5    simultaneous invention and everything.  If that's the case,

6    it probably would take four days.  It might not go Friday.

7              THE COURT:  All right.  I won't take any time

8    away from you.

9              One thing you need to let me know, sometimes in

10   bench trials, and I don't want to put an added burden on

11   Valerie.

12             I allow -- when I'm looking at your designations

13   for depositions, they seem extremely long, and I don't what

14   you actually intend to do with that once you get down to the

15   nitty-gritty.  But I, quite frankly, find depositions read

16   in court helpful.  I pay attention.  Although I will read

17   them, it's just better for me to hear that information.

18             But I'm willing, if you've got hours and hours

19   of depositions to read or play in the court, to give you

20   each two hours to submit, of deposition, to her to include

21   in the transcript as though they had been here or read here.

22   I don't think it's as effective way to present testimony,

23   and I don't want any -- but, nevertheless, and I don't

24   want, I don't necessarily want controversial testimony to go

25   in that way or critical documents to come in through that.

1    But talk to each other.

2              All I'm saying is, talk to each other on the

3    first day of trial.  Certainly, we can talk about

4    supplementing the in-court record with deposition

5    designations if you both agree that it's appropriate and we

6    can put some fine-tuning to it.

7              MR. KELLY:  Thank you.

8              THE COURT:  Okay?  And I actually didn't mean to

9    say two hours each party, because that would be a lot.  But

10   two hours combined, everybody.  If there's two hours of

11   deposition designations that you find are necessary for your

12   record, but not -- anyway, all right.  That's the offer out

13   there.

14             All right.  What else do we need to address?

15   Yes?

16             MS. MAZZOCHI:  Your Honor, the one thing, if I

17   could just respond in terms of a number of exhibits, since

18   that seems to have been a concern for the plaintiffs, is

19   that we had submitted to the plaintiffs recently, we took

20   some of your Honor's proposed findings of fact from the

21   Apotex case, submitted them to the plaintiffs to say, will

22   you stipulate to these facts, and they have declined to do

23   so as of today.

24             So one of the reasons why we essentially

25   included on our exhibit list all of the materials from the

1    Apotex case is that if they're really not going to agree to

2    your Honor's prior filings, you know, or your Honor's prior

3    findings.  You know, I mean, we're not looking to retry the

4    Apotex case, but plaintiffs' position at this point in time

5    is essentially going to obligate us to put more of that

6    evidence back into the record than we think we otherwise

7    should have to.

8                    THE COURT:  All right.

9                    MR. KELLY:  Your Honor, we received that -- we

10   had extensive discussions on agreed-to facts, stipulated

11   facts that are in the pretrial order.  There was a lot of

12   give-and-take.  This list, which is over a hundred, comes in

13   Saturday night.  And, quite frankly, there are things in

14   there that we will try to agree to, we'll try to reach out.

15   There are things that we don't agree with.

16                    And they have truncated some of your Honor's

17   rulings, which leaves us a little bit concerned, because the

18   prior art here, we're dealing with a different claim.  But

19   we certainly intend to go through that list and see if

20   there's a way that we can.

21                    THE COURT:  Okay.

22                    MR. KELLY:  There are some things we'd like them

23   to stipulate to as well to make this an easier case.

24                    THE COURT:  All right.  Well, I'm satisfied that

25   you'll operate in good faith and try to present this fairly

1    and efficiently.

2                MR. KELLY:   Thank you, your Honor.

3                THE COURT:   And not re-do facts that shouldn't

4    be in dispute.   Not necessarily my findings, but anything.

5    Okay.

6                Counsel, to the extent you can, have a wonderful

7    holiday season, and I look forward to seeing you next year.

8    Thank you.

9                (Counsel respond, "Thank you, your Honor.")

10                (Court recessed at 10:28 a.m.)

11                          -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25