```
1                        - VOLUME A -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -
   SENJU PHARMACEUTICAL CO.     :   CIVIL ACTION
5  LTD. KYORIN PHARMACEUTICAL   :
   CO., LTD. and ALLERGAN,      :
6  INC.,                        :
              Plaintiffs,       :
7                               :
         vs.                    :
8                               :
   LUPIN LIMITED and LUPIN      :
9  PHARMACEUTICALS, INC.,       :
              Defendants        :
10 ---------------------------  :   NO. 11-0271 (SLR/MPT)
   SENJU PHARMACEUTICAL CO.,    :
11 LTD. KYORIN PHARMACEUTICAL   :
   CO., LTD. and ALLERGAN,      :
12 INC.,                        :
              Plaintiffs,       :
13                              :
                                :
14       vs.                    :
                                :
15 HI-TECH PHARMACAL CO.,       :
   INC.,                        :
16            Defendants        :

17                          - - -

18                              Wilmington, Delaware
                                Monday, January 14, 2013
19                              9:26 o'clock, a.m.

20                          - - -

21 BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

22                          - - -

23
                                Valerie J. Gunning
24                              Brian Gaffigan
                                Official Court Reporters
25
```

```
 1     APPEARANCES:

 2

 3               MORRIS NICHOLS ARSHT & TUNNELL LLP
                 BY:  MARYELLEN NOREIKA, ESQ.
 4

 5                       -and-

 6
                 OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT,
 7               L.L.P.
                 BY:  RICHARD D. KELLY, ESQ.,
 8                    FRANK J. WEST, ESQ.,
                      TIA FENTON, ESQ.,
 9                    LISA MANDRUSIAK, ESQ.,
                      CHRISTOPHER RICCUITTI, ESQ. and
10                    AKIHIRO YAMAUKI, ESQ.
                      (Alexandria, Virginia)
11

12               Counsel for Plaintiffs

13

14               PHILLIPS, GOLDMAN & SPENCE, P.A.
                 BY:  JOHN C. PHILLIPS, JR., ESQ.
15

16                       -and-

17
                 RAKOCZY MOLINO MAZZOCHI SIWIK LLP
18               BY:  WILLIAM RAKOCZY, ESQ.,
                      PAUL MOLINO, ESQ.,
19                    DEANNE MAZZOCHI, ESQ.,
                      JOHN D. POLIVICK, ESQ.,
20                    ANUJ K. WADHWA, ESQ. and
                      BRIAN MURRAY, ESQ.
21                    (Chicago, Illinois)

22
                 Counsel for Defendants
23               Lupin Limited and Lupin Pharmaceuticals,
                 Inc.
24

25
```

1    APPEARANCES (Continued):

2

3              SHAW KELLER LLP
               BY:   KAREN KELLER, ESQ.,
4                    JEFFREY T. CASTELLANO, ESQ. and
                     STEVEN ROTH, ESQ.
5

6                    Counsel for Defendant
                     Hi-Tech Pharmacal, Inc.
7

8                      -   -   -

9

10   ALSO PRESENT:

11

               BILL SCARFF, ESQ.
12             In-house Counsel
               Allergan, Inc.
13

14                     -   -   -

15

16

17   ALSO PRESENT:

               Satoko (Sophie) Utsunomiya, Interpreter
18             Keijiroh Yama-Guchi, Interpreter

19

20                     -   -   -

21

22

23

24

25

P R O C E E D I N G S

1
2
3          (Proceedings commenced in the courtroom,
4  beginning at 9:26 a.m.)
5
6          THE COURT:  I am not used to this new setup yet.
7  We're experimenting, so if I keep looking over here instead
8  of there, please forgive me.
9          I guess you can get me up to speed on what we're
10  doing here.  I had thought the proposed findings of fact
11  would help make sure that we only try facts that need to be
12  tried, but apparently you all couldn't agree to that, so I
13  don't know what, if anything, I would need to do.
14          I'm not sure it should be my job to go through
15  the opinion and come up with some facts, but, in any event,
16  the one issue I have is that over the weekend I developed a
17  sore swollen, weepy eye, so I'm leaving at 3:30 to get to
18  the doctor, and so I will owe you all an hour and 15 minutes
19  at some point in time if we need it.
20          All right.  Let's start with plaintiffs' counsel
21  to see if there are any preliminary matters, and, if not, we
22  can go to our opening statements.
23          I'm going to bend down and turn on my computer,
24  so give me a minute.  Okay.
25          MS. NOREIKA:  Your Honor, Maryellen Noreika.

1    May I just do some introductions for the record.

2              THE COURT:  Yes, please.

3              MS. NOREIKA:  So for plaintiffs, Maryellen

4    Noreika from Morris Nichols.  With me at counsel table, from

5    Oblon Spivak, are Dick Kelly, Frank West and Tia Fenton.

6    And then continuing along the wall, Akihiro Yamazuki,

7    Christopher Riccuiti and Lisa Mandrusiak.

8              THE COURT:  Good morning, all.

9              MS. NOREIKA:  And we also have some

10   representatives from each of the clients with us.  For

11   Kyorin, we have Dr. Swada, who is the manager of

12   intellectual property.

13             THE COURT:  Good morning.

14             MS. NOREIKA:  From Senju, we have Ms. Kashida,

15   who is also a manager of intellectual property for Senju

16   Pharmaceuticals, and from Allergan, we have two

17   representatives, Debra Condino, who is the Chief Patent

18   Counsel, and William Scarf, the Chief Litigation Counsel.

19             THE COURT:  Good morning, sir.

20             MS. NOREIKA:  Thank you, your Honor.

21             THE COURT:  Thank you.

22             All right.  Let's do introductions.

23   Mr. Phillips?

24             MR. PHILLIPS:  Good morning, your Honor.  Jack

25   Phillips on behalf of Lupin.  And with me in the courtroom

1    are Bill Rakoczy, Deanne Mazzochi, Anuj Wadhwa, and Paul

2    Molino, all from Rakoczy Molino.

3              THE COURT:  Good morning.

4              MR. PHILLIPS:  Your Honor, once the

5    introductions are finished, we do have one other issue that

6    we think needs some preliminary attention.  That is the

7    Japanese translations.

8              THE COURT:  All right.

9              MR. PHILLIPS:  Or lack thereof.

10             THE COURT:  All right.  Thank you.

11             Ms. Keller?

12             MR. KELLY:  Good morning, your Honor.  Karen

13   Keller from Shaw Keller on behalf of Hi-Tech Pharmacal

14   Company, Incorporated, and with me today is my partner, Jeff

15   Castellano, also of Shaw Keller, and Steven Roth of Hi-Tech

16   Pharmacal, in-house counsel.

17             THE COURT:  All right.  Thank you.  Good

18   morning, all.

19             MR. PHILLIPS:  And, your Honor, I apologize.  I

20   neglected John Polivick, also Rakoczy Molino.

21             THE COURT:  Thank you.

22             MR. PHILLIPS:  I don't want to leave anybody

23   out.

24             THE COURT:  All right.  So defendants' counsel,

25   preliminary issue.

1          MS. MAZZOCHI:   Good morning, your Honor.   Deanne

2     Mazzochi.

3          Over the course of the weekend, the plaintiffs

4     provided us with a copy of a demonstrative exhibit as well

5     as an exhibit that they say that they plan on introductions

6     and referring to specific pages within this exhibit.

7          The concern that we have is that much of the

8     document is written in Japanese.   Many of the pages that

9     they've identified are written in Japanese and they've never

10    provided us with an English translation, and yesterday

11    counsel took the position that they have no English

12    translation to provide.

13          Now, I know under the local Court rules, here,

14    certainly for submission of any briefs, the local rules

15    mandate that any document submitted has to have an

16    accompanying English translation with it.   The concern that

17    we have is that because neither of these pages were

18    specifically pinpointed during the discovery process as

19    relevant to any particular issue, and the fact that we don't

20    have an English translation, they're now going to have a

21    Japanese witness get up on the stand and talk about what's

22    in these documents, and we have no way of independently

23    verifying the accuracy of what he's saying about these

24    documents because we have no translation.

25          And we certainly don't think that any document

1    that's written in Japanese that is going to be introduced

2    into evidence should do so without an accompanying English

3    translation.  So we asked counsel if they would withdraw it,

4    if they would give us English translations for those pages,

5    and they've declined.  So, you know, for a document that

6    they're attempting to affirmatively use, we just think it's

7    improper and it's prejudicial to us because we had no

8    advance notice that they would be relying on those

9    particular pages for any part of their case until this

10   weekend.

11              THE COURT:  All right.  Thank you.

12              MS. MAZZOCHI:  Thank you.

13              Mr. Kelly?

14              MR. KELLY:  Your Honor, the document in question

15   is specifically identified in interrogatories.  It is a --

16   made up of basically the raw data underlying the experiments

17   and three laboratory notebooks, all of which are segregated

18   in that document quite clearly.

19              Our purpose is not to rely on the document in

20   any briefing per se, but we're going to, because we have

21   summary pages, summaries of the testing in reports which

22   have been translated for your Honor, so that anything that's

23   relied upon is going to be -- have a corresponding English

24   translation.

25              What this document is is to help the witness go

1    through and provide a chronological description of how he

2    came up with the invention and so as to explain the

3    difficulties that he encountered along the way in trying to

4    solve the problem of corneal permeability.

5                THE COURT:  Are you saying it's being used to

6    refresh his recollection?

7                MR. KELLY:  Yes, your Honor.

8                THE COURT:  Certainly, you can't submit it if

9    there's no translation.  Right?

10               MR. KELLY:  Your Honor, we don't intend to rely

11   on -- I have to get the number.

12               THE COURT:  It would be helpful just for the

13   record to be identifying it.

14               MR. KELLY:  JTX-8, your Honor.

15               THE COURT:  Is it JTX?

16               MR. KELLY:  Yes, your Honor, 8.  And we

17   understand that for your Honor's consideration for briefing,

18   the documents we rely upon there have to have English

19   translations and those do have English translations.

20   They've been provided to defendants' counsel.

21               And this is, you know, we're talking about work

22   done, and I have to do -- about 14 years ago, 15 years ago.

23   And this is to help him go through the chronological

24   development of the process, of the product, excuse me, and

25   the process.

1              THE COURT:  Well, I'm having difficulty in

2    visualizing, visualizing what is going to be happening with

3    this document.

4              Is defendants' counsel asking that the witness

5    not be able to use or refer to this document at all during

6    the course of his examination to help him keep facts

7    straight?

8              MS. MAZZOCHI:  The concern that I have, your

9    Honor, is that they've prepared a demonstrative exhibit

10   based -- well, first of all, yes.  I'm concerned that they

11   are going to be using it in that way, and since I don't have

12   an English translation, I have no basis to know if what he's

13   being, quote unquote, refreshed on is, in fact, accurate.

14   So without an English translation, I can't know that.

15             But they have created this demonstrative exhibit

16   where they have pulled out particular pages, many of which

17   have Japanese characters on them, so, you know, we can't

18   read them.

19             I don't know what part of them they're going to

20   rely on and I don't speak Japanese.  I can't sit here and

21   translate it on the fly, and they have not even given us the

22   courtesy of giving us an English translation for those pages

23   that they've already culled out in their demonstrative.

24             And, your Honor, this is a document that's over

25   1600 pages long.  So if the plaintiffs knew that there were

1       particular pages the witness was going to need to refer to

2       to refresh his recollection or to remember something, I

3       don't think it's unreasonable for them to have provided us

4       with an English translation and it's prejudicial for them to

5       not do that today.

6                   THE COURT:  So I guess it strikes me as odd that

7       you're using for your demonstrative pages from a document

8       that is only being used to refresh your witness'

9       recollection, so it strikes me that I don't have a

10      particular problem with the witness using it to refresh his

11      recollection in testifying.  I am saying this just

12      generally, documents can be used to refresh recollection,

13      but I certainly don't think it's appropriate for you to be

14      using pages from this document as an exhibit.

15                  MR. KELLY:  Your Honor, the demonstrative is

16      simply to provide a timeline of the work that was done, and

17      the page numbers are simply markers for him and probably me

18      to put it up there to show in a time sequence where he began

19      and where he finished up and identify simple --

20                  THE COURT:  Is there any reason why this wasn't

21      or can't be translated, though?  I mean, it's difficult to

22      cross-examine something --

23                  MR. KELLY:  First off, you're going to see, your

24      Honor, that many of the pages, the portions that are going

25      to be discussed, are, in fact, written in English.  Much of

1    the work, because it's chemistry, the words are in English.

2    There are -- somewhere there is Japanese, but there is a

3    corresponding report, which we're going to refer to as he

4    goes through the document, to show where he reported this

5    information to his superiors.  Those documents are

6    completely translated.

7                    THE COURT:  Well, I'm not going to make a

8    decision now.  I really do have to wait and see how this

9    goes.

10                   MR. KELLY:  Thank you, your Honor.

11                   MS. MAZZOCHI:  Thank you, your Honor.

12                   THE COURT:  Anything else before we go to

13   opening statements, if there are any?

14                   MR. WEST:  Yes, your Honor.  I just filed an

15   emergency request with respect to some documents that were

16   just very recently, in fact, last week, produced by both

17   Hi-Tech and Lupin.

18                   THE COURT:  At your request, however; right?  I

19   mean, the documents were requested?

20                   MR. WEST:  The documents themselves, I'm sorry,

21   your Honor, weren't requested.  We never requested

22   production for additional documents.  The 30(b)(6) notice

23   just simply followed the factors that we would use as a

24   basis for intervening rights.

25

1   ████████████████████████████████████ so that would

2   signify that they would have something that dealt with the

3   cost and preparation, that they would have stuff that was

4   really information that was related to the investment, and

5   plant equipment, and that they would have information that

6   was related to inventories that they had created.

7           So those were documents that presumably would

8   have been produced earlier, and both Lupin and Hi-Tech

9   represented during the December 19th pretrial conference

10  that they would only be relying upon information that was

11  previously produced and witnesses who were previously

12  deposed.

13          So what happened is after we served the notice

14  on January 2nd without informing plaintiffs, the counsel for

15  each defendant instructed their clients to go back and find

16  this information.  And then beyond the purchase orders that

17  were provided by Hi-Tech, they actually created the

18  document.  It's not a business record, your Honor.  It was

19  created for the litigation.  And it's that document that

20  they primarily rely upon to argue that they have certain

21  costs, that they have certain investments, and that they

22  have inventory.  And on top of that, the morning that

23  Hi-Tech produced its documents, they served objections, and

24  those objections refused to provide a witness for certain

25  categories based in part because they had previously

1    identified the documents on December 28th per your order.

2         But that evening, contrary to their

3    representations in the objections, they produced additional

4    documents.  And then, without informing us that they would

5    be relying upon a summary document, Lupin included on its

6    exhibit list the next day this cost summary document.

7         And both Lupin and Hi-Tech were deposed on

8    January 10th.  Lupin's document was provided on January 9th,

9    and Hi-Tech's documents were provided on January 8th, the

10   evening of January 8th.

11        So they are complaining about being surprised by

12   documents that we'll be using as demonstratives, but the

13   same situation occurred here.  We were surprised very

14   shortly before the depositions of these witnesses.

15   Certainly, the witnesses were prepped to volunteer

16   information with respect to these documents, so we did try

17   our best to depose them.  But in the three-hour period that

18   we were allotted with respect to the detailed information

19   they provided and these summaries, but not the supporting

20   information for it, we couldn't do an adequate job of

21   deposing the witnesses, your Honor.

22        THE COURT:  All right.  Let me hear from

23   defendants' counsel.  And I do recall defendants' counsel

24   saying that they would rely -- that they didn't need to rely

25   on anything other than what they relied on or what necessity

1    had produced before.

2            So I guess my question is, why new documents now

3    when you know it's going to create issues.

4            MR. MOLINO:  Good morning, your Honor.  Paul

5    Molino on behalf of the other Lupin defendants.

6            At the final pretrial order, this issue came up

7    with respect to the intervening rights and providing

8    additional information.  We went back and we found those

9    documents.  No misrepresentation was made, your Honor.  We

10   were looking to provide information with respect to

11   intervening rights specifically with respect to the cost

12   structure because they did file a deposition, a Rule

13   30(b)(6) notice, asking for a witness.

14           We went back to the client looking for

15   additional documentation in response to the 30(b)(6) notice,

16   which specifically asked during, I believe it was topic 1,

17   2 and 3 about costs associated with filing the ANDA.

18           In order to prepare that witness to provide that

19   information, which was requested by plaintiffs in their

20   deposition notice, Lupin went back and found one document,

21   about eight lines of information, in order to educate that

22   witness about the cost structure, in order to educate the

23   Court about this defense, about the intervening rights,

24   which was pled in a timely manner.

25           We provided that document to plaintiffs prior to

1    the deposition.   I brought that document to the deposition,

2    provided it to counsel.   They questioned the witness for a

3    good 45, 50 minutes about the document, again, just to

4    educate them about the information.

5             I don't see any prejudicial effect here.   It

6    goes to one of the issues about intervening rights and the

7    costs associated with it.   There was no misrepresentation in

8    any shape or form.   A single piece of paper, about eight or

9    nine lines of information dealing with cost that was

10   specifically requested in their Rule 30(b)(6) notice, your

11   Honor.

12             THE COURT:   All right.   Thank you.

13             Let me hear from the Hi-Tech people.

14             MR. CASTELLANO:   Good morning, your Honor.

15             THE COURT:   Good morning.

16             MR. CASTELLANO:   I would largely echo what

17   Mr. Molino said, but to address a couple of specific points

18   that Mr. West made, we, in response to the 30(b)(6) notice,

19   which contained topics regarding the cost of preparing and

20   filing each of Hi-Tech's ANDAs, investments in plant and

21   equipment to manufacture the ANDA products, and also

22   inventory of the ANDA products, we instructed our client to

23   gather that information in order to fulfill our obligations

24   under Rule 30(b)(6), to provide an educated witness.

25             That information, rather, financial information

had previously by agreement of the parties been excluded

from the scope of discovery.  When plaintiffs served their

30(b)(6) notice, we immediately began to assemble that

information and did it as fast as we possibly could.

They served the notice on January 2nd.  We

produced the documents less than a week later and produced

the witness on the 10th.  And in order to head off any

complaints that plaintiffs might have at the deposition, if

we had the witness bring the documents along with him to

assist him in providing the testimony that the plaintiffs

asked for, we produced the documents in advance.

Plaintiffs did not at that time file a motion to

exclude the documents or e-mail your Honor.  Instead, they

took the deposition and asked a series of questions about

the documents.  And it's our position that they asked for

this information.  It was previously outside the scope of

discovery.  They brought it in.

By putting it in the 30(b)(6) notice, and this

30(b)(6) was to be directed specifically to intervening

rights, they signaled that they thought it was relevant to

that issue, and so we stated that we intended to rely on it

to the extent that, you know, I mean, based on the fact that

it was gathered and produced in response to their specific

discovery requests.

We did object to one of their topics on the

1    basis we had previously made the identification of documents

2    on December 28th that we intended to rely upon.  However,

3    the real reason we have withheld -- we did not produce a

4    witness on that topic which was, in a quote, "identification

5    of all documents upon which Hi-Tech will rely to assert

6    interring rights was because it's a, in our opinion that's a

7    contention topic.

8               The witness isn't bound to know what documents

9    Hi Tech's counsel is going to rely upon to prove up their

10   defense.  He was prepared to discuss the facts that are

11   relevant to that defense but he couldn't specifically

12   identify the documents himself.

13              Unless your Honor has any questions?

14              THE COURT:  I do not at the moment.  Let me go

15   back to counsel for plaintiff.

16              MR. CASTELLANO:  Thank you, your Honor.

17              THE COURT:  And just ask this.  I mean generally

18   you want educated witnesses.  Generally, that means

19   reviewing corporate information.  That generally means

20   documents is generally a good thing that the witnesses

21   identify the documents upon which they've educated

22   themselves for purposes.

23              So your problem is what?

24              MR. WEST:  Well, your Honor, I would like to

25   address a couple things and I think that will answer your

1    question.

2              These documents, these types of documents were

3    not excluded, the financial documents, by agreement of

4    counsel.  This goes back to Judge Thynge's order where she

5    stated that if we, the plaintiffs were going to, not going

6    to -- we took the position we're not going to assert

7    commercial success.  They were not launching.  So Judge

8    Thynge said you did not have to produce the film documents

9    unless you are going to rely upon a defense that requires

10   the production of those documents, in which case you must

11   produce those documents before the end of discovery.

12             Those documents were not produced.  They,

13   Hi-Tech has certainly taken the position they pled

14   intervening rights previously and it was well aware of that

15   and did not produce those documents.  Had it been produced

16   during normal discovery, we would have been entitled to the

17   full deposition with respect to those documents.

18             In addition, these documents aren't, the

19   documents that they're primarily relying upon are these cost

20   summaries and these cost summaries are not business records

21   of the company but they were created specifically to respond

22   to this issue.  And the notice, your Honor, was a notice for

23   testimony.  It did not ask for documents.  And the witness

24   specifically testified with respect to both of the documents

25   that the documents were created, the cost summaries, between

1    January 2nd and January 7th after they received the notice.

2    So there is a real question about the reliability of these

3    documents.

4               In addition, both witnesses testified that

5    these -- that a large number of the costs that are included

6    with respect to these are sheer estimates, and so there is a

7    question about the reliability of the documents that we

8    haven't been fully able to explore.

9               With respect to the position on whether or not

10   it's a contention deposition, well, I would submit the

11   following:  Contention depositions are meant to be

12   prohibited because the parties are intended to provide a

13   full response to contention interrogatories.  And as your

14   Honor is aware, Hi-Tech asserted intervening rights, but the

15   only thing that they said they would be relying upon in

16   their interrogatory was their ANDA.  Lupin never provided

17   any response whatsoever with respect to intervening rights

18   and interrog responses.  They sought amend their answer just

19   two days before the deadline, and that caused the motion for

20   amendment to be before your Honor.

21               And, again, they were aware of the factors.

22   Hi-Tech produced some of the documents previously in

23   accordance with your order.  They had, they identified the

24   documents that they said they were going to rely upon.

25               Their objections to 30(b)(6) notice weren't

1    objections to just a single topic, they were objections to

2    three topics by both of them with respect to the documents

3    having previously identified in the December 28th letter.

4              THE COURT:  How about -- well, as I understand

5    it, Lupin produced one document?

6              MR. WEST:  One page, your Honor, with

7    information and no details behind that information.  It's

8    just a summary of costs.  They do not provide any invoices,

9    any contracts, anything else that we could explore the

10   veracity of the document.

11             THE COURT:  And Hi-Tech provided summaries.  Did

12   they provide any other documents besides these summaries?

13             MR. WEST:  Yes, your Honor.  They provided some

14   purchase orders and some invoices.  The purchase orders and

15   the invoices do not state that they're associated with the

16   gatifloxacin project.  There is just highlighting of certain

17   costs here and there.  And there is no correlation between

18   the purchase orders and the invoices and the cost summaries

19   themselves.

20             THE COURT:  All right.  Thank you.

21             MR. WEST:  Thank you, your Honor.

22             THE COURT:  Last word from the defendants

23   counsel, and I'm going to think about this for a moment.

24             MR. MOLINO:  Quickly, your Honor.  The documents

25   were not requested in any discovery prior to the 30(b)(6).

1              THE COURT:  Well, I assume that's because you

2    all particularly didn't affirmatively assert intervening

3    rights.   Therefore, it wouldn't a topic of discovery.

4              I'm not confident, quite frankly, that it is --

5    well, I'm not confident it's appropriate for you all to be

6    buttressing your intervening rights case by my allowing

7    the plaintiff to take additional discovery because the

8    intervening rights defense wasn't really pursued vigorously

9    by the defendants through discovery.  So I will think about

10   it but I think you all are fighting an uphill battle.

11             If you think it would help me to actually

12   look at what was produced and what you would intend to

13   affirmatively use at trial, I'm happy to review the

14   documents themselves.  I don't know that that makes a

15   difference, but if, as plaintiffs' counsel says, they're

16   really not self-explanatory in the first instance, then

17   certainly I think you are fighting an uphill battle.

18             MR. MOLINO:  Your Honor, we will.  That's one

19   single page and they got to question the witness about it,

20   and we provided information about the 30(b)(6) requested.

21   Thank you.

22             THE COURT:  All right.  Any other?

23             MR. CASTELLANO:  Your Honor, can I make just one

24   point?

25             THE COURT:  Yes.

1          MR. CASTELLANO:  I think the -- two things, your

2     Honor.  First of all, the representations that Hi-Tech made

3     to the Court at the pretrial conference are and were

4     entirely accurate.  At that time, we did not intend to rely

5     on any, any documents that had been produced.

6          In our view, these I'll call it financial topics

7     but they included the 30(b)(6) notice brought into the scope

8     of discovery on this issue things that had previously been

9     excluded by Judge Thynge's ruling and the agreement of the

10    parties.

11         As for whether the documents are summaries or

12    the actual underlying invoice and purchase orders, it's our

13    burden to make clear to the Court the admissibility and the

14    relevance of those documents.  That's a different matter

15    than whether they would be altogether precluded, which is

16    what plaintiff is asking for now.  We can deal with --

17         THE COURT:  Well, the issue is whether they were

18    self-evident enough to make plaintiffs' limited discovery

19    opportunities actually helpful and sufficient, so that

20    really is the question.

21         And if your documents, assuming I get to the

22    second step, if your documents are not related and not

23    self-evident, then it could be that I would decide that

24    they were just insufficient for the purposes of the limited

25    discovery I gave plaintiffs.

```
 1                    So I will take a look at them.

 2                    MR. CASTELLANO:  Thank you, your Honor.  We

 3       would be happy to make a submission on that point.

 4                    THE COURT:  All right.  Thank you.

 5                    All right.  Are we ready to start.

 6                    MS. FENTON:  Your Honor, plaintiffs have two

 7       more brief issues on slides.

 8                    THE COURT:  All right.  Although this is a bench

 9       trial and generally even in a jury trial, if you all don't

10       agree you don't get to show something in opening.  So, you

11       still arguing about opening slides?

12                    MS. FENTON:  Your Honor, this actually has to do

13       with collateral estoppel the plaintiffs believe you decided

14       in early December.  And if you recall, your Honor decided

15       Lupin's motion to dismiss under collateral estoppel with

16       respect to the reexamined claims at issue in this case in

17       early December.

18                    Despite this ruling, defendants have indicated

19       to us that they somehow intend to litigate collateral

20       estoppel at trial, and they told us as much during a meet

21       and confer.  And we received their opening argument slides

22       this weekend which mention collateral estoppel at least

23       three times.

24                    And, your Honor, for your convenience, I want to

25       put up one of the openings slides, please.
```

1          As you can see, it says, your Honor, that

2    plaintiffs are seeking a do-over, that your Honor already

3    found the claims obvious, and we should be collaterally

4    estopped.

5          Plaintiffs obviously disagree this is an open

6    issue and read Your Honor's ruling that way as well.

7          Each of the reexamined claims at issue are,

8    among other things, limited to .01 percent EDTA and the

9    issues relating to validity of these claims had to have been

10   both, No. 1, litigated and, No. 2, decided for collateral

11   estoppel to apply.  As can be seen from the next slide, your

12   Honor, you already found that neither occurred.

13         With respect to the issue of validity of the

14   reexamined claims already being litigated, your Honor found

15   that plaintiffs did not fully litigate a claim with the

16   limitation of .01 percent EDTA.

17         And with respect to the issue of the validity of

18   the reexamined claims being decided, as you can see, your

19   Honor already found this Court did not specifically make

20   findings for a claim with a limitations .01 percent EDTA.

21         Therefore, collateral estoppel does not apply

22   and your Honor denied their motion.

23         And also one other additional point I would like

24   to make is that there are different accused products in this

25   case than in the Apotex case.  In Apotex, the only accused

```
 1    products dealt with the .3 percent gatifloxacin and here the

 2    accused products were the .3 gatifloxacin formulation and

 3    the .5 percent gatifloxacin formulation.  So, surely, the

 4    .5 percent gatifloxacin accused products had not been

 5    litigated in the previous Apotex case.

 6              So, your Honor, collateral estoppel to me is a

 7    bar at trial and it's not something to be litigated at

 8    trial.  This issue was fully briefed and decided by your

 9    Honor.

10              I feel it would be prejudicial to the

11    plaintiffs.  It would confuse the issues and unnecessarily

12    extend the trial.  And we ask that consistent with your

13    ruling in early December, your Honor, that defendants be

14    prohibited from arguing and presenting collateral estoppel

15    at trial and that we just proceed solely on the merits.

16              In reading Your Honor's order from December, I

17    feel like this was the intent.  If we can go to the final

18    slide here.

19              Your Honor held that, "Although Lupin's failure

20    to demonstrate that the reexamined claims are substantially

21    identical to the original claims, claim 6 prevents it from

22    prevailing on collateral estoppel grounds.  Lupin may later

23    succeed in showing that the reexamined claims were are

24    invalid for obviousness."

25              Given Your Honor's order, I think it is
```

1   appropriate to move forward fully on the merits and see if

2   the defendants can meet the burden of proof.

3                    And one last point, your Honor.

4                    Defendants appear to be at times using the term

5   collateral estoppel inconsistently, and if what they are

6   referring to is a stipulation of facts issue, I would ask

7   that Mr. West be allowed to address that issue because I

8   wasn't present at those meet and confers on that point.

9   Thank you.

10                   THE COURT:  All right.  Thank you.

11                   MR. RAKOCZY:  Good morning, your Honor.  William

12  Rakoczy on behalf of the Lupin defendants.

13                   Please pull up slide 9.

14                   Your Honor, several points.  First off, to

15  provide background and context for this litigation and why

16  we're here, we need to talk about the Court's prior decision

17  and what those factual findings were.  So just as a matter

18  of context for why we're here, I intended to go through some

19  of the Court's findings, for example, as you can see from

20  our slide 9, these are the composition claims and elements

21  this Court found obvious in the prior decision, so this is

22  the baseline.  This is the obvious subject matter we're

23  starting with.

24                   Next slide, please.  Slide 10.

25                   Excuse me, your Honor.  Technical glitch.

1          Your Honor, in connection with that obvious

2    subject matter, the Court obviously made certain factual

3    findings.  So all we intended to do was just go through some

4    of the factual findings, for example, talking about the

5    prior art and what the Court had previously found about what

6    the prior art disclosed about gatifloxacin, gatifloxacin

7    compositions, EDTA in prior art quinolone compositions.

8          And this is exactly right on the Court's factual

9    findings and opinions.  So, number one, just as a matter of

10   background and context, we believe it's fair to be able to

11   talk about where all this arises from.

12         Number two, your Honor, we're not litigating at

13   trial the same issue the Court decided in that collateral

14   estoppel opinion, which was the ultimate issue.  Do we win

15   or lose on the .01 percent EDTA?  We understand your Honor's

16   ruling that the Court does not believe the claims are

17   substantially identical enough to knock out that .01 percent

18   EDTA species.  But the fact of the matter is, your Honor, it

19   is true that they're collaterally estoped from relitigating

20   issues and facts this Court already found.  Collateral

21   estoppel just does not go to the ultimate issue.  It goes to

22   facts and issues you had a full and fair opportunity to

23   litigate before.

24         And, for example, the fact that EDTA is a

25   conventional excipient used in ophthalmic compositions with

1    beneficial properties, including increasing corneal

2    permeability and preventing discoloration, that is a fact

3    that this Court found over and over based on the prior art.

4    Collateral estoppel prevents them from relitigating that.

5    But regardless of collateral estoppel, your Honor, we're

6    here to prove up our case and we will reprove up all these

7    elements again.  We're prepared to do it.

8             We went to them, asked them to stipulate to

9    those findings from the opinion so that we didn't burden the

10   Court and the parties with doing everything over again.

11   They refused.  That's fine by us, your Honor.  We are

12   prepared today and this week to reprove up all these

13   elements.  Our experts will do it.

14             These are only in our opening slides to

15   demonstrate to the Court again what is the baseline we're

16   operating under.  What is the obvious subject matter we

17   already know from the Court's prior opinion and then what

18   did they add during re-examination.  And, again, we're not

19   shortcutting anything.  We're not retrying collateral

20   estoppel.  We are making the point, we believe as a legal

21   matter they shouldn't be entitled for a do-over to

22   re-challenge things the Court has already found.  But again

23   we're prepared to reprove it up, all of it.  So we don't

24   think there is anything improper about mentioning collateral

25   estoppel, mentioning the background and the facts and the

1    prior art that this Court has already found in the prior

2    opinion.

3                    THE COURT:  All right.

4                    MR. RAKOCZY:  Thank you, Judge.

5                    THE COURT:  Thank you.  All right.  Can we get

6    started with openings, then?

7                    By the way, I'm satisfied defendants are going

8    forward on a good-faith basis.

9                    MR. KELLY:  We understand that, your Honor, but

10   we are ready to go ahead with opening.

11                   THE COURT:  All right.  Mr. Kelly, please

12   proceed.

13                   MR. KELLY:  Or at least I will be as soon as I

14   turn the switch on.

15                   Oh, your Honor, Mr. Rakoczy tells me he has an

16   issue about sealing, I think with respect to certain

17   exhibits and so --

18                   MR. RAKOCZY:  Yes, your Honor.  I apologize.

19   William Rakoczy for the Lupin defendants again.

20                   There are several slides they wanted to publish

21   with the Lupin ANDA formulation on it right out of the ANDA,

22   which is obviously confidential.

23                   THE COURT:  In the opening?

24                   MR. RAKOCZY:  Yes.  And we just wanted to ask

25   that the courtroom be sealed to qualify.

1          THE COURT:  That is just so much trouble.  I

2  would suggest that, rather than that, if you can skip the

3  public disclosure of those and just give me my own copy of

4  those so that -- unless you're going to talk about them

5  extensively.

6          MR. KELLY:  Well, your Honor, the problem here

7  is, we actually wouldn't be using them had we been able to

8  reach the kind of understanding that we did in Apotex.

9          We have to show, and I wanted to show your

10  Honor why we're asserting infringement of these claims even

11  though infringement has been denied by both Lupin and

12  Hi-Tech.

13          THE COURT:  Even though infringement has been?

14          MR. KELLY:  It has been denied.  They deny it

15  even though every single element of the claim is -- now,

16  what we can do is I will ask Chris to skip those slides, but

17  if I could hand a copy to your Honor --

18          THE COURT:  Right.

19          MR. KELLY:  -- we will do that.  And if I could

20  have a second, I can hand them to you now.

21          THE COURT:  That would be good.  I think that

22  would be helpful.  It's just awkward in the opening,

23  particularly, to be having people coming and going.

24          MR. KELLY:  Okay.  Your Honor, why don't I just

25  give you the entire set and when I come to the slide that

```
 1    we talk about, the infringement, you'll have the slide

 2    there.

 3                  THE COURT:  All right.  Thank you.

 4                  MR. KELLY:  Thank you.  If I may, your Honor?

 5                  THE COURT:  Yes, please.

 6                  (Mr. Kelly handed slides to the Court.)

 7                  MR. KELLY:  Thank you.

 8                  THE COURT:  Thank you.

 9                  MR. KELLY:  If I could have one second?

10                  THE COURT:  Sure.

11                  MR. CASTELLANO:  Your Honor, Hi-Tech is in the

12    same position obviously with regard to a couple slides in

13    there with our information, so I would ask they skip those

14    as well.

15                  MR. KELLY:  Your Honor, we're going to do that.

16                  THE COURT:  All right.  Thank you.

17                  MR. KELLY:  I will have to ask for Chris' help

18    with that.

19                  THE COURT:  All right.

20                  MR. KELLY:  Thank you.  Good morning, your

21    Honor.

22                  THE COURT:  Good morning.

23                  MR. KELLY:  This case involves United States

24    patent 6,333,045 that we'll call the '045 patent.  And this

25    patent is directed to the successfully formulated in aqueous
```

1      gatifloxacin ophthalmic solution.

2                Ophthalmic -- and particularly the key point in

3      the patent is its discovery, the but contrary to teachings

4      in the art, at low concentrations of EDTA, in the claims

5      .01 percent, that they were able to achieve a 29 to

6      30 percent improvement in the corneal permeability of

7      gatifloxacin.  And as we're going to show, this was an

8      entirely surprising and unexpected result in view of the

9      state of the art at the time.

10               Now, the claims in issue are different from the

11     claims that were at issue in the Apotex case.  All the

12     claims require a narrow pH and, in particular, they are

13     limited, as your Honor noted in your 12(c) decision, to a

14     0.01 weight percent of EDTA.  And that is the key element

15     that is going to go through all of the claims from the

16     method of raising corneal permeability of the solution

17     through the solution itself.

18               Now, this case is very different from Apotex

19     because that 0.01 is a 20 percent, is a twentyfold

20     difference in the amount of EDTA that was recognized by your

21     Honor from the claims originally presented.  Indeed, it's a

22     tenfold difference from the .1 that is mentioned in your

23     Honor's decision in Apotex specifically.

24               Now, the Apotex case, we don't want to go

25     through it again, but it is important to note that this

1    case did go through a re-examination.  It's a re-examined

2    patent.

3            During the course of the re-examination, we

4    provided the Patent Office with all of the Court's opinions

5    in their entirety.  We provided them with the trial

6    testimony.  There were invalidity expert reports, which we

7    were able to submit that were submitted by Apotex.  The

8    parties' briefs, the parties' proposed findings of fact.

9    And your Honor's opinions provided a roadmap for the

10   Examiner as to what your Honor had found to be very

11   important, and the parties' briefs obviously augmented and

12   perhaps added other things to it.

13           And this is an index that we provided the Patent

14   Office with everything that we provided.  You can see

15   specifically your Honor's opinion was included.  And after

16   all of that, the Patent Office found the re-examined claims

17   to pass muster.

18           Now, as your Honor is aware, there is a claim

19   construction issue that is simmering in this case.  And I

20   think it's important to note that when the Patent Office was

21   deciding on claim 6, which is the claim that the claim

22   construction issues seems to be simmering on, the Patent

23   Office discussed the unexpected results that were shown with

24   the declaration that we say provided unexpected results, and

25   the Examiner found that we provided unexpected results

1    relating to increasing the corneal permeability of

2    gatifloxacin with the addition of 0.01 in the composition

3    as compared to composition of gatifloxacin without the

4    EDTA.

5                So the Examiner understood very clearly that the

6    operative language in claim 6 was the gatifloxacin.  And

7    that's something that everybody would understand.  There's

8    no advantage to increasing the corneal permeability of

9    sodium chloride, water, EDTA or BAK.  The active ingredient

10   that has got to do the job is gatifloxacin.

11               So claim 6 is a claim that's directed to

12   raising -- to a process of raising the corneal permeability

13   of gatifloxacin ophthalmic solution by adding to that

14   solution EDTA in an amount of 0.01.

15               Now, when Dr. Yasueda and his colleagues began

16   this project at Senju, they started with a set of criteria

17   that they had to meet for a successful formulation.  Because

18   it's an anti-effective, they needed good corneal

19   permeability.  It couldn't irritate or damage the eye.  Yes,

20   you can increase corneal permeability, but that does not do

21   you a lot of good if you're damaging the cornea.  You've now

22   created a different problem.  You don't -- you want it to be

23   robust.  This product is going to be traveling around.  It's

24   going to go different places.  It's going to be exposed to

25   light, heat, perhaps freezing and thawing.  You don't want

1    it to precipitate during its normal shelf life.

2              The other thing is shelf life.  Again, from a

3    practical point of view, I might be able to make a wonderful

4    formulation, but if it only lasts three months on the shelf,

5    I failed.

6              No discomfort.  This is a critical element,

7    because every doctor will tell you, patient compliance is a

8    big factor, and if the patient finds the drug causing

9    discomfort, whether it's irritation or a stickiness to the

10   eye, the eyelid sticking together, the likelihood they're

11   going to follow the dosing regime is very low.

12             And, finally, one of the hardest things is to

13   meet all of these things and try to make it easy to

14   manufacture, both from a cost point of view and also a

15   quality point of view.

16             And this is where I like to -- Senju did an

17   extensive program here to develop this solution.  And what

18   they started with initially when they started this protocol

19   out, they thought that maybe they could improve the

20   partition coefficient of the gatifloxacin solution through

21   the use of what they call ion pairs.

22             The partition coefficient is an indication of

23   the ability of the drug to go through the cornea.  They

24   quickly realized that that might not be a terribly

25   successful method and added as additional things they might

1    try a viscosity agent.  If they can retain the drug in the

2    eye longer, you're going to get more drug in.

3            And the other thing that they discovered is the

4    concentration in the solution to be applied could also be

5    used to increase corneal permeability.  And as you will see

6    through Dr. Yasueda's testimony, that third item is going to

7    be something he's continually coming back to try to do.

8            And this is an example of an ion pairs

9    experiment.  And in this example, there is a -- this is the

10   original formulation that came into Senju from its partner,

11   Kyorin.  And you can see a significant change in the

12   concentration of the cornea.  The problem was, this

13   irritated the eye.  As a result, this was a failure.  It

14   could not pass the second element.

15           Along the way, Dr. Yasueda also looked to see,

16   well, how does pH of the solution impact corneal

17   permeability?  Now, the eye itself, is it about a pH of 7, a

18   physiological pH?  And what he found, a bit surprisingly,

19   is, as the pH went down, so did the corneal permeability.

20           This is a one-percent solution.  This is .5

21   percent solution (indicating).  What's not on here, however,

22   as the pH went down, the solubility went up.  So while they

23   could increase concentration by going down, he lost the

24   corneal permeability effect because the pH was actually

25   adversely impacting the drug's corneal permeability.

1           He next tries viscosity increasing agents.  He

2    tried two of them.  One of them was hyaluronic acid.  The

3    other was chondroitin sulfate sodium.  And, again, these,

4    has reported here, improved the corneal permeability.  The

5    problem was, after it goes into the eye, it became sticky

6    and didn't feel good.  Again, a failure.  Patient

7    compliance.  And we'll see a lot of failures as we go

8    through it.

9           The next thing he tried was sorbic acid.  Now,

10   sorbic acid had been discovered at Senju by one of Dr.

11   Yasueda's co-workers to be an enhancer of corneal

12   permeability, Carteolol, another ophthalmic drug.  Dr.

13   Yasueda went to that and he tried sorbic acid.  It didn't do

14   the job for him.  Here's a known corneal permeability

15   enhancer not working for him to get the corneal permeability

16   up to the point that he needed.

17          They then book took look at BAK.  Again,

18   something that's known at higher concentrations to improve

19   the corneal permeability, but also to irritate and possibly

20   damage the cornea.  So he tried a small amount and he found

21   that, again, he did not achieve the results that he was

22   looking for.

23          As you raise, the reason corneal permeability

24   was important to Dr. Yasueda was this levofloxacin.  This

25   drug they new was under development for ophthalmic solution

1    and they needed to be able to tell the world and for

2    efficacy to match pretty closely that corneal permeability

3    factor.

4            The original solution, by this time they come to

5    a pH of 6, isn't going to make it.  If they could formulate

6    a pH of 7 they would be the same.

7            What he discovered, quite surprisingly, a very

8    small amount of EDTA has the impact of making that pH 6

9    solution competitive with levofloxacin at a pH 7.

10           As you raise, these results were achieved only

11   after a large number of tests, and only after that did Senju

12   finally settle on the 0.1 percent solution which improved

13   the corneal permeability of gatifloxacin such that its

14   content increased in the aqueous humor, which is part of

15   your Honor's claim construction.  It's necessary that we

16   show the increase in the aqueous humor.

17           As you raise, I'd like to turn to infringement.

18   And I'm go to ask Chris to give me a little help.

19           Chris, can you make sure I skip slides 22 and

20   23?  Thank you.

21

22

23

24

25

1　▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

2　▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

3　▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

4　▆▆▆▆▆▆▆▆▆▆

5　　　　And in order to show infringement, we're relying

6　on some work that was done at Senju back in 2006, long

7　before there were any disputes over infringement.

8　　　　This is JTX-15.  And what this is, is it shows a

9　direct comparison between a system that has EDTA with a

10　system that has EDTA.  This is a direct comparison.  The

11　only difference between the formulations is no EDTA.

12　　　　As you raise, the current formulation that is

13　referred to there is the Japanese formulation which is free

14　of EDTA and also free of benzalkonium chlorine.

15　　　　And your Honor can see for the area under the

16　curve, which is the one you are going to look at being the

17　most probative of corneal permeability, that is total

18　exposure to the gatifloxacin, is 1.27 times that of the

19　current formulation or about a 27 percent increase in the

20　amount of the gatifloxacin in the aqueous humor.

21　　　　And we have a second test also performed in

22　2006, again with the same formulations.  The current

23　formulation being the Japanese formulation which is free of

24　EDTA.  We added EDTA to it in amount of 0.01 percent.

25　　　　And when you run through and you look at the

1    area under the curve again, you are seeing a 1.29 fold

2    increase or 29 percent increase over that of the product

3    without EDTA.   This is, we think, a rather unexpected

4    result.

5                   Chris, if I could ask you to bring up slide 43

6    for me?

7                   Slide 43 is going to tell us something about the

8    sizes of the molecules that we're going to be talking about

9    in the next few slides.

10                  As you raise, these are molecular weights and

11   molecular weights are related to the physical or volumetric

12   size of something.

13                  Glycerol is going to be the smallest molecules

14   we'll talk about here.   That has was molecular weight of 82.

15                  Mannitol is almost exactly that of 182.   And,

16   again, that means it's volumetrically larger than glycerol.

17   And,

18                  Finally, gatifloxacin has a molecular weight of

19   375, double again that of mannitol and roughly four times

20   that of glycerol.   So you can see these molecules are going

21   from small to large.

22                  And we're talking about getting through the

23   point of membrane.

24                  Can you take me where it is, which should be

25   slide 31.   It's slide 32.

1                    This is a table from the Grass reference,

2    JTX-50.  And what he is doing is he is showing these are in

3    vivo tests.  So he is looking at the product in the aqueous

4    humor, and with glycerol, he is showing the concentration

5    effect of EDTA.

6                    And .5 percent EDTA, he has 106 percent.

7                    At .1 percent, it drops dramatically to 36.

8                    As you raise, what we ought to do is look what

9    happens to mannitol, which is a much larger molecule and is

10   the gold standard what they call paracellular transport,

11   which is what we're talking about here, which is transport

12   of the drug between the corneal cells as a space.  They

13   don't fit 100 percent tight as a gap and that is where the

14   drug is sliding to get through.

15                   And, here, mannitol, with half a weight percent

16   EDTA, a nine percent improvement.

17                   Here, a molecule that is half the size of

18   gatifloxacin, at 50 times the amount of EDTA that is recited

19   in the current claims, was able to be only improved by about

20   nine percent.

21                   As you raise, the small improvement of mannitol

22   permeability at .5 percent would lead the formulator to know

23   doubling the size of the molecule is going to result in an

24   even smaller improvement or the necessity of increasing the

25   amount of EDTA.

1              What Grass is telling the formulator is as the

2     size of the molecule increases, the formulator needs to use

3     more EDTA and not to decrease it by a factor of 50 as was

4     done in the '045 patent claims.

5              Claim construction.

6              Your Honor's claim construction, as I said

7     earlier, requires a showing of an increased concentration of

8     gatifloxacin in the aqueous humor.

9              As you raise, what Dr. Grass was concerned with

10    was expanding the spaces between the cells to increase that

11    permeability, and that is how Dr. Grass is telling you the

12    effect of EDTA.

13             As you raise, this is an in vitro test.  And

14    here we  have a control.  And here we have 0.5 percent EDTA

15    and Dr. Grass is reporting a zero change.  This is what he

16    is telling the formulator.  .05 percent, he has 88.  At .1,

17    he has 307.

18             But this is an in vitro test.  That is not what

19    is going to happen in the humor.

20             In contrast to our zero percent improvement

21    of .01, as your Honor as seen, is about a 28 percent

22    improvement in the gatifloxacin permeability into the

23    aqueous humor in an in vivo test with only .01 percent of

24    EDTA.

25             Let's turn quickly back to slide 33.

1              This is our in vivo test with mannitol, half the

2      size of gatifloxacin.

3              And if your Honor will recall, in the in vivo

4      test, with glycerol at 1.1 percent of EDTA, the improvement

5      was one-third you see in the in vitro test.  In vitro

6      testing is not at all similar to what happens in the eye.

7      This is a test that is conducted for three hours in an

8      apparatus.

9              As you raise, let's take a look at what Grass is

10     also teaching.  And Dr. Grass's teachings found a sequence

11     of articles.  He had the first one published in 1985.  Then

12     he published three in 1988 as part of a series that were

13     published back to back to back.

14             And the first thing he is telling you is this is

15     again a perfusion experiment, in vitro.  He takes a look at

16     the .1 percent EDTA and he has some pictures of cells, and

17     you can see spaces clearly shown around the cell.

18             As he goes to .05 weight percent solution,

19     suddenly the situation is looking different.  And here his

20     conclusion is some of the endothelial cells are more rounded

21     than normal and they're not as tightly joined as the control

22     samples.  So he is getting less of an effect.

23             And, finally, with our .01, what is his

24     conclusion?  EDTA perfused for three hours.  The tissue

25     appears normal with no visible expansion of the

1    intercellular spaces.  And you can see these are markedly

2    different than what happened at .1.

3            He specifically says, as you raise, in vitro

4    concentrations of EDTA above 0.01, in vitro, caused

5    increased permeability of the cornea to glycerol.  It

6    doesn't say what would happen with mannitol.  But what he

7    does specifically teach -- as you raise, our friends will be

8    turning back to a reference by a name called Rojanakskul who

9    they claim fills in the gap here.

10           This is in vitro testing.  I have got a jumbo in

11   vivo because I have to get it into the aqueous humor but he

12   doesn't fill in the field here.

13           His test with glycerol like those in Grass are

14   perfusion experiments for three hours.  And what he measures

15   is not the amount of glycerol that passes across the

16   membrane, he measures the change in potential in capacitance

17   during his three hours process.

18           What he does is he cites the Grass articles here

19   to show how that relates to the amount of glycerol that

20   passes through.  And Grass specifically has taught that an

21   increase in corneal permeability in vitro testing is

22   greater, much greater than what you are going to see in an

23   in vivo test.

24           So this is in vitro he says you have to be above

25   .01.  If you have in vivo, it has to be higher.

1           In any event, this test doesn't tell you

2    anything about how larger molecules are going to respond

3    such as mannitol, which at .5 percent only has nine percent

4    improvement in an in vivo test.

5           As you raise, I've been saying the size is

6    related to  the molecular weight.  That's a factor in

7    corneal permeability, and that is exactly what Dr. Grass

8    reports as part of the series of articles.

9           And one other thing I wanted to point out, your

10   Honor, is what you have then is the toolbox is teaching away

11   from where we want to be.

12          As you raise, the products that are marketed

13   under the ANDAs, they infringe.  There is no doubt about

14   that.  They have all the components.  They have them in the

15   right amount.  And they're bioequivalent.  If they're not

16   bioequivalent, then they have a bigger problem than patent

17   infringement.

18          The prior art teaches away the .01 EDTA to

19   increase the corneal permeability of gatifloxacin in the

20   aqueous humor.

21          And, further, the unexpected results were

22   relating to the increase in corneal permeability with the

23   addition of EDTA, but we submit for claim 6, your Honor, you

24   don't need to look at unexpected results.  The prior art

25   teaches away from it.  It teaches if you want to increase

1    corneal permeability, you have got to be above that limit

2    and, for in vivo, which is what the claims are directed to,

3    you have to be much above that level.  So we submit there is

4    no prima facia case of obviousness for current claim 6.

5              As for the composition claims, the unexpected

6    results of improved corneal permeability carry the day.

7    Thank you.

8              THE COURT:  All right.  Thank you, Mr. Kelly.

9              MR. RAKOCZY:  Good morning, your Honor.  William

10   Rakoczy on behalf of Lupin defendants again.

11             May I pass up our slides?

12             THE COURT:  Sure.

13             (Binders passed forward.)

14             MR. RAKOCZY:  Your Honor, the facts giving rise,

15   or the background of facts giving rise to this dispute or

16   litigation are not in dispute.

17             In June of 2010, your Honor issued a decision

18   invalidating the original asserted composition and method

19   claims.  We take the position that those claims were

20   virtually identical to the re-examined claims as you raise.

21             Plaintiffs did not appeal the bulk of that

22   decision.  They appealed only the invalidity decision with

23   respect to claim 7, which included the EDTA element.  That

24   decision was affirmed by the Federal Circuit I believe in

25   one day without opinion.  It wasn't even close.

1           Subsequent to that invalidity decision, Lupin

2    filed the first of its ANDAs giving rise to this action.  As

3    part of Lupin's ANDA, it filed a paragraph 4 certification

4    challenging the patent and relied actually on this Court's

5    invalidity decision.

6           After that, the plaintiffs ran back to the

7    Patent Office to circumvent this Court's obviousness ruling,

8    to get re-examined claims, and in October of 2011 those

9    claims issued.  And here we have the asserted composition

10   claims, 12 to 16, and you've already heard a lot about them,

11   your Honor.

12          Suffice it to say they're generally directed to

13   gatifloxacin eye drops just as they were before with, you'll

14   hear a lot about the .01 percent EDTA limitation, which as I

15   will get to in a moment, was the same amount being used

16   already in prior art quinolone compositions.

17          Then obviously we have the asserted method claim

18   6, which, again, is very similar to the prior invalid claim

19   6, with the exception of this species that they plucked out

20   of the prior range of .01 percent EDTA, again, which you'll

21   be hearing a lot about.

22          We respectfully submit, your Honor, that once

23   the evidence is all in, judgment should be entered in favor

24   of the defendants for several reasons.

25          Number one, all asserted claims, we believe the

1    evidence will clearly and convincingly show, are invalid for

2    obviousness.

3              Number two, plaintiffs cannot carry their burden

4    of proof of infringement on method claim 6.

5              And, number 3, even if they could, intervening

6    rights should apply to bar those claims.

7              I'd like to start briefly with invalidity and in

8    particular note again the Court is not writing on a blank

9    slate here, your Honor.  You already issued a decision in

10   which you found very similar claims with a range of EDTA

11   from .001 percent to .2 percent were invalid as obvious.

12   That is the obvious range.

13             What plaintiff did here was, again, they plucked

14   out the .01 percent of that range and put that into the

15   re-examined claims and as you raise claim that that somehow

16   was a patentable distinction or some type of new and novel

17   or nonobviousness distinction.

18             We submit, your Honor, they're simply seeking a

19   do-over based on elements that were already in the prior

20   art, including that .01 percent EDTA, which we will show and

21   our experts will explain by clear and convincing evidence.

22   And, again, that is putting aside any issues of collateral

23   estoppel.  We obviously believe they are collaterally

24   estopped from relitigating many of these findings, but

25   regardless of that, we will show that even claims of

1    .01 percent EDTA are, in fact, obvious.

2              As you raise, these issues, your Honor, you'll

3    hear from the defendants' experts, which include Dr. David

4    Sherman, an expert in medicinal and pharmaceutical chemistry

5    and drug design, Dr. George Grass, an expert in aqueous

6    pharmaceutical formulations and drug development.  And, by

7    the way, that's the same Dr. Grass that authored and

8    actually conducted the research underlying the prior art

9    Grass references, which you addressed some of them in your

10   prior decision and you just heard about some of the other

11   references in plaintiffs' opening.  He will explain for the

12   Court exactly what that research was about, how it was

13   designed, and what those results actually show regarding

14   .01 percent EDTA.

15             Your Honor will also hear from Dr. Daniel Bloch,

16   an expert in biostatistics.

17             As you raise on to the asserted composition

18   claims 12 to 16 first, your Honor, which, interestingly

19   enough, I believe you heard nothing about them in

20   plaintiffs' opening, nothing, and we think for good reason,

21   because they're obvious.

22             And to get there, to provide some context, we

23   need to start with what we know to be obvious already.  And

24   we know from the Court's prior decision and findings that a

25   composition that is an aqueous liquid pharmaceutical

1    composition in the form of eye drops containing

2    gatifloxacin, containing .001 to .2 percent EDTA, as well

3    and as including .1 percent EDTA and a pH of 5 to 8 is

4    obvious subject matter.  That is directly in the Court's

5    prior opinion.  That comes right out of the prior art, which

6    I'm going to address in a moment.

7              But some of the Court's factual findings, your

8    Honor, regardless of estoppel, are very instructive, and we

9    believe equally applicable here.  Those include, number one,

10   that gatifloxacin is structurally similar -- but superior --

11   to prior art quinolones in both activity and safety

12   profiles.

13             Number two, the gatifloxacin compositions, like

14   all quinolones, follow very well-known routes of

15   administration, including pHs of 5 to 8, and they can be

16   formulated according to the exact same recipes of the prior

17   art quinolone compositions, which I'm going to show you in a

18   moment, and which our experts will explain as well.

19             Number three, there seems to be no serious

20   dispute anywhere as you raise that EDTA is a very

21   conventional excipient used in ophthalmic preparations with

22   very beneficial properties, including, for example,

23   preventing discoloration and as a known effective corneal

24   permeability enhancer.

25             And, number four, multiple quinolone

1    compositions in the prior art already use .01 percent

2    EDTA.

3              And, again, your Honor, based on those findings

4    and the prior art, this Court found that the composition

5    claims, again, the eye drops with the gatifloxacin, with the

6    range of EDTA, which include .01 percent, and the pH of 5 to

7    8, were obvious.

8              During re-examination all they did, your Honor,

9    was add so-called new additions or some new species into

10   these claims, these composition claims.  For example, they

11   limited the quinolone active amounts to .3 to .8.  They

12   added the .01 percent EDTA, again, which was plucked outside

13   of the prior obvious range.

14             They changed the pH from 5 to 8 to 5 to 6, and

15   they added an isotonic agent limitation, which, by the way,

16   is one of the most common excipient ever used in ophthalmic

17   preparations.  We submit all of these elements are found in

18   the same quinolone prior art the Court already used to

19   invalidate the prior composition claims.

20             We can look at just some of it here, your Honor.

21             First off, the '470 prior art patent.  This is

22   the patent that discloses gatifloxacin itself and that it is

23   a superior quinolone, again, in terms of both activity and

24   safety.  The '470 discloses that it follows those well-known

25   routes of administration, including eye drops.

1          And, lastly, the well-skilled person would know

2    from the structures disclosed in the '470 patent that

3    gatifloxacin is a very polar compound.  That's important as

4    we'll get to in a moment because the teachings in the prior

5    art also tell the person of ordinary skill that that is

6    important because EDTA, that known penetration or

7    permeability enhancer, enhances the permeability of polar

8    compounds, like gatifloxacin.

9          Then we can move on, your Honor, to the prior

10   art '456 patent.  This is one of the patents that discloses

11   literally each and every element of the re-examined claims,

12   including all the so-called new additions or new claim

13   limitations.  It discloses quinolone eye drop compositions,

14   active concentrations of .03 to 3 percent with a preferred

15   range of .15 to .6 percent, .01 percent EDTA dead on, an

16   isotonic agent dead on, including sodium chloride, and an

17   exemplary pH of 5.2, right in the claimed range.

18         In fact, if you go to Example 1 of the patent,

19   as our experts claimed, you get literally every single

20   addition.  You have the .3 percent active quinolone.  You

21   get .01 percent EDTA.  You have sodium chloride.  You have a

22   pH of 5.2.  Literally every element, both old and supposedly

23   new in the re-examined composition claims found right here

24   in the '456 patent.

25         If any more were required, your Honor, we can

1    look to the '465.  I won't belabor the point, but it, too,

2    discloses all of the new additions and elements in these

3    asserted composition claims, which, if necessary, we will

4    reprove again.  Again, it has the active quinolone amount,

5    .3 percent.  It has another isotonic agent, in this case,

6    glycerin.  It has .01 percent EDTA.  It has a pH of 6.  So,

7    again, disclosing all of the addition.

8              So know matter how you view these claims, your

9    Honor, all of the so-called additions or new parts of the

10   composition claims in the re-examination claims are all

11   there in the prior art and the Court's rationale from the

12   prior opinion applies equally here.

13             We believe it would be an understatement to say

14   that the skilled person would just substitute the superior

15   gatifloxacin of the '470 patent for any of the quinolones in

16   the '456 and '465 prior art compositions which, again,

17   comprise that same range, .3 to .8 quinolone, .01 percent

18   EDTA, the isotonic agent, and the pH of 5 to 6.

19             No more is required, we submit, to invalidate

20   those composition claims for obviousness, and, again, we

21   heard nothing in plaintiffs' opening about the absence of

22   these elements in the prior art because they're all there

23   in the same prior art this Court used in the prior

24   decision.

25             As you raise we can move on to method claim 6.

1   And, again, as our baseline and background, your Honor, we

2   need to start with, what do we know was obvious subject

3   matter already that was not only in the Court's prior

4   decision, but was also in the prior art?  And we know from

5   the previous invalid method claim 6, which was very similar

6   to amended claim 6 in the re-examination, other than that

7   .01 percent EDTA, we know that the Court found obvious a

8   method for raising corneal permeability of gatifloxacin.  In

9   other words, showing an increased concentration in aqueous

10  humor by formulating .001 to .2 percent EDTA in eye drops

11  that contained gatifloxacin.  That is the obvious subject

12  matter.

13          And, again, the Court's findings are very

14  instructive here, your Honor, and our experts will take

15  the Court again through the prior art from which these

16  findings and these teachings are all found.

17          Number one, corneal permeability is obviously a

18  desirable property for a drug.  Plaintiffs will not dispute

19  that.

20          Number two, ordinary creativity would have led

21  the skilled person to place special value on the Grass

22  references, which Dr. Grass will explain and testify about,

23  which are reinforced by the fact that gatifloxacin, like all

24  the quinolones, are compatible with EDTA, and the fact the

25  that prior art quinolones were already using .01 percent

1    EDTA.

2            And, lastly, within that range of excipients, it

3    would have been obvious to use one like EDTA that was known

4    to have this beneficial property of increasing corneal

5    permeability of polar compounds that everyone in the art

6    wanted for their quinolone eye drop composition.

7            And, again, the Court found based on all of this

8    art that the person of ordinary skill would have expected

9    the EDTA, even at concentrations as low as .1 percent, in

10   fact, would demonstrate an increased concentration of

11   gatifloxacin in aqueous humor.

12           And regardless of estoppel, your Honor, the

13   prior art actually teaches you can go well below .1 percent,

14   well below .01 percent even, and a person of ordinary skill

15   in the art would still expect to see that same property,

16   that same increase of gatifloxacin in aqueous humor.

17           And, again, when you boil it down, your Honor,

18   claim 6 is different from the prior opinion only, only in

19   the fact that they plucked out this species, this

20   .01 percent out of that prior obvious range, .001 to .2.

21   That's all they did, your Honor, in the Patent Office,

22   and then told them somehow that this was patentable.  The

23   problem, your Honor, besides the fact that that .01

24   comes out of an obvious range, that's the same amount that

25   was already being used in the prior art quinolone

1    composition.

2            So in this method, your Honor, they're basically

3    saying that we get to go back and re-patent something,

4    a composition that was already using .01 percent, and

5    somehow this inherent property of increasing corneal

6    permeability.

7            We submit the prior art would still leave the

8    skilled person to believe that even .01 percent and even

9    well below that, in fact, would lead to some increase in

10   corneal permeability, thus rendering even new method claim 6

11   invalid.

12           And our experts will take your Honor through

13   just some of the prior art.  This is the first one of the

14   Grass manuscripts from 1985, which we'll refer to as Grass

15   '985.  And, again, Dr. Grass himself will explain the basis

16   for this research and the conclusions.

17           Suffice it to say for purposes of today, this

18   reference teaches that EDTA is a known permeability

19   enhancer.  It does so as a -- by a chelation by reducing

20   calcium ions, thus creating those small channels between

21   corneal epithelial cells that allow polar molecules like

22   gatifloxacin to penetrate through the cornea into the

23   aqueous humor.

24           It teaches EDTA concentrations even lower than

25   .5 percent would be effective for this purpose and would

accomplish this mechanism of action.  And, in fact, as the

Court found in the prior art, and I believe plaintiffs

mentioned in opening, even as low as .1 percent we know for

certain.

And also Grass teaches it has a direct bearing

upon ophthalmic solutions currently in use.  Why is that

important, your Honor?  Because the quinolone prior art

compositions in use already have this .01 percent EDTA in

it.  In Grass 1988 and the subsequent work in other

references that Dr. Grass and Dr. Sherman will testify, all

showed that .01 percent EDTA and lower showed some increase

in corneal permeability.

And this is the Grass 1988 reference, your

Honor.  This expands and builds upon the earlier Grass 1985

work.  It reinforces the proof of concept and mechanism of

action of EDTA as a known corneal permeability enhancer.  In

this publication and study, Dr. Grass tested several

percentages of EDTA, including as low as .01 percent, on and

based on this work, he found in the Grass 1988 reference

teaches that even .01 percent showed some increase in

corneal permeability of a polar compound.

And we see that from the very same chart that

plaintiffs put up.  This is Table 13 from the Grass

reference, your Honor.  And they wanted to focus solely on

this zero element at the end, which is for a whole other

1    purpose I will get to in a moment.

2              The fact of the matter is, your Honor, if you

3    look at the difference in control with no EDTA and the study

4    drug with glycerol .01 percent EDTA, it, in fact, increased

5    corneal permeability.  That is the raw data.  That is the

6    number.

7              As you raise, plaintiffs want to hinge an

8    argument on the fact that somehow that was not a

9    statistically significant result.  And the fact of the

10   matter is, that does not change the fact, as Dr. Grass will

11   testify, that .01 percent did show an increase in corneal

12   permeability, as he says right here, expressly, in the Grass

13   1988 reference.

14             He says, and I quote, "For glycerol, three

15   concentrations of EDTA, 0.01, 0.05, and 0.1 percent, were

16   added to the donor solution, causing a progressive increase

17   in permeability of glycerol which was directly related to

18   the increase in chelating agent," end quote.

19             So both the raw mean data, your Honor, as well

20   as the manuscript itself teach the skilled person that even

21   as low as .01 percent, you are going to get an increase in

22   corneal permeability and it's going to be concentration

23   dependent, meaning as you go up in concentration and it's

24   time dependent, as well goes, excuse me.  As you go up in

25   concentration and time, you are going to get more of this

property, but that does not change the fact that even at

.01 percent, this reference teaches, as Dr. Grass will

confirm, that you will get increased corneal permeability.

          And that's all that's required of this claim,

your Honor.  Plaintiffs are implying or suggesting that

there's some type of statistical significance or limitation

on degree as to the amount of increase of gatifloxacin in

aqueous humor.  There is none, your Honor.

          According to plaintiffs, this claim is as broad

as any increase in gatifloxacin concentration in aqueous

humor.  There's no statistically significant requirement in

this claim.  All that you need to look at is the objective

reach of that claim, which is any increase in concentration,

and that's exactly what Grass 1988 and other references

teach.

          And, in fact, we can go to other prior art

references, which you'll hear about, and I apologize ahead

of time.  I'm about to butcher this professor's name.  I

believe it's Rojanakskul.

          Professor Rojanakskul and his colleagues also

actually studied EDTA and other penetration enhancers for

the cornea and also found that EDTA promotes absorption of

compounds in the cornea.  It does so again by the same

mechanism of action by interfering with calcium ions, and

they found, your Honor, that EDTA concentrations well below

1    .01 percent increase corneal permeability.

2              In fact, if we look at the reference in the

3    manuscript, they tested several compounds and they said,

4    quote, "As compared to control, digitonin in Figure 10,

5    sodium deoxycholate, Figure 11, and cytochalasin B in

6    Figure 12 increased permeability and concentration of

7    approximately .01 to 1 millimols or higher while EDTA

8    demonstrates such an effect at all concentrations used in

9    this study," end quote.

10             That's important, your Honor, because

11   .1 millimols transfers to an order of magnitude less than

12   .01 percent EDTA.

13             So here we have the prior art further teaching

14   the skilled person that virtually any amount of EDTA put

15   into that solution is going to increase corneal

16   permeability, whether it's .01 percent, whether it's less

17   than 0, .01 percent.  And, again, .1 millimols is far, far

18   less than .01 percent.

19             So when you slice it, your Honor, and you look

20   at what the prior art actually teaches, plaintiffs have done

21   nothing by drilling down on and putting that species of

22   .01 percent EDTA into the method claim.  Whether it's

23   .1 percent, .01 percent, or far lower, the skilled person is

24   going to anticipate and accept -- expect some increased

25   corneal permeability by using EDTA, no question about it,

1    and our experts will confirm that.

2              As you raise, again, you heard several arguments

3    by plaintiffs, and we submit this is all smoke and mirrors,

4    your Honor, all designed to muddy the record here.  This

5    whole idea of statistical significance and the Grass

6    reference, again, it misses the point.  The point of the

7    Grass reference is, is that EDTA and its ability as a

8    corneal permeability enhancer is concentration dependent.

9              So as you raise the concentration, you will

10   raise its ability to have that property.  That doesn't mean

11   that it's not having that property at .01 percent.  The data

12   shows that it does.

13             And, again, I want to emphasize, there is no

14   statistically significant requirement in the claim its any

15   increase in gatifloxacin in aqueous humor.  And we submit

16   no one can dispute that putting EDTA in even at .01 percent

17   or lower is going to have effect on increasing corneal

18   permeability, and that is what the skilled person would

19   expect.

20             No. 1.  You heard this molecular weight

21   argument.  The experts will explain this far better than I

22   can.  Again, that falls flat as well, your Honor.

23             They want to say that because gatifloxacin is

24   this big molecule, somehow EDTA at .01 percent is not going

25   to have that effect.  Well, what they did mention, your

1          Honor, was that Dr. Grass and his colleagues tested much

2          bigger molecules than the patent that had an effect on

3          corneal permeability using EDTA.  So that argument falls

4          flat as well.

5                    And also there is no direct correlation between

6          molecular weight and corneal permeability.  The references

7          don't say that.  They don't teach that.

8                    Lastly, your Honor, you are going to hear about

9          this "pretty picture" argument.  They're going to show you

10         some pictures and say we could tell, looking at these

11         pictures, they know it when they see it, whether corneal

12         permeability is being enhanced or increased.

13                   Well, to begin with, I'm not sure where we see

14         that in the patent or the specification, much less their

15         infringement proofs on this pictorial idea.

16                   But the fact of the matter is, your Honor, those

17         pictures don't prove anything and they certainly don't show

18         that .01 percent EDTA as having no effect.

19                   As Dr. Grass will explain, there are other

20         amounts of EDTA such as .05 percent which showed statistical

21         significance in increasing corneal permeability that showed

22         nothing on those photographs.  A function of the photograph

23         is only as good as the magnification and just because at

24         that particular magnification, they didn't see something

25         happening doesn't mean it's not happening.  The raw data

shoes that .05 percent, .01 percent and less than

.01 percent is all increasing corneal permeability.

So when it boils down to it, your Honor, in plaintiffs' view here it's all about unexpected results.

The problem they have is if you look at the prior art as a whole, the Grass reference, Rojanakskul reference, as Dr. Grass and Dr. Sherman will testify, there is nothing unexpected about 0.1 percent EDTA increasing corneal permeability.  That is exactly what the references teach.  That is exactly what the skilled person would expect.

No. 2.  Plaintiffs are talking out of both sides of their mouth here, your Honor.  They criticize the prior art on the ground that it somehow doesn't show statistically significant results but at the same time they promote their own testing that doesn't do so either.

The fact of the matter is the same trends in increasing corneal permeability that plaintiffs claim to see in their raw numbers, in their own testing are same trends that existed in the prior art as Dr. Grass would testify to.

Beyond that, plaintiffs internal testing is flawed, your Honor.  First off, they're relying on the exact same test.  They are not bringing you anything new in terms of unexpected results testing that they didn't throw at the court in the prior case which was rejected.  We think it

1    should be rejected this time around as well.

2              For example, their 802 study, we're not even

3    sure why they raise this.  It doesn't even test .01 percent

4    EDTA.  Like all their studies, it's an unfair comparison.

5    The control and study drugs were different by more factors

6    and variables than just EDTA.  If you want to see what

7    effect EDTA, you run a test with identical formulations and

8    you only change the EDTA.  They didn't do that.

9              That's same thing in their 202 study.  Only this

10   study, one of the drugs had BAK in it and EDTA, the study

11   drug.  So you had two penetration enhancers in there so

12   nothing can be drawn from this study.

13             By the way, this study doesn't meet their

14   magical statistical significant threshold they want to throw

15   at everything and they want to throw at the prior art, so it

16   don't even satisfy their own standard.

17             The same is true for the 901 study.  No

18   statistical significance, according to plaintiffs.  And,

19   again, triplicate dosing in this study was not

20   representative at 0.1 percent EDTA.  And,

21             Finally, their 904 study again didn't even meet

22   their own statistical significance requirement as Dr. Block

23   will testify to.

24             As you raise, just a few words on

25   noninfringement, your Honor.  We believe they will not be an

1    able to carry their burden of proof on infringement of

2    method claim 6.  Again, we believe their proofs are

3    insufficient for many of the same reasons I mentioned for

4    their studies they're going to rely on.  And,

5            Again, here plaintiffs want to have their

6    cake and eat it, too.  Again, they argue statistically

7    insignificant results can somehow show a trend for

8    infringement but not for the prior art.  They don't get to

9    have it both ways, your Honor.  They need to apply a

10    consistent standard to this testing.

11            Finally, your Honor, something worth mentioning

12    here.  This is an absence of proof issue.  This is a method

13    claim you heard plaintiffs talk about in the opening.

14    Method claims had to be performed and infringed in the

15    United States.  To this day, we're not sure who the direct

16    infringer is supposed to be of this claim.  It's not a

17    product claim, it's a method for doing something.

18            Lupin is going to make the product and throw

19    EDTA into it in India.  Then they're going to import it and

20    sell it, your Honor.  Lupin is not going to do anything for

21    this method inside the United States.  So we're not sure

22    who the direct infringer is, and there can't be direct

23    infringement.

24            But the fact of the matter is it must be some

25    kind of indirect infringement, and there has not been a

1    shred of evidence in this case, and I don't think you will

2    hear any, about any requisite intent to indirectly infringe.

3              Just briefly, your Honor.  I believe now we

4    whittled down our infringement proofs to the 901 study which

5    I already mentioned.  It didn't test the ANDA formulation.

6    It had a lot of other faults as well, not meeting their

7    statistically significant threshold and even the authors

8    themselves of this study said that in fact it was unreliable

9    and overestimated migration into the aqueous humor.  And,

10             The 904 study didn't test the ANDA formulation

11   as well and wasn't a proper comparison or statistically

12   significant.

13             So, again, we believe they cannot prove

14   infringement of claim 6, but even if they could, your Honor,

15   lastly, we submit equitable intervening rights are

16   appropriate here.

17             Plaintiffs contend that defendants have

18   infringed the reexamined claims.  They continue to take the

19   position that the reexamined claims are not identical in

20   scope to the invalid original claims.

21             To top it off, your Honor, there is no serious

22   dispute that Lupin developed its product, made its product,

23   tested that product, prepared the ANDA, and submitted it for

24   regulatory approval before the reexamined claims were

25   granted.  All of that happened.  On top of that, Lupin also

1    relied on the invalidity decision of this Court in its

2    paragraph IV certification and notice letter.

3            We submit under those facts, plaintiff should

4    not be able to recapture and preclude a generic product,

5    again, that was developed and substantially prepared for

6    marketing before the reexamined claims issued.  On both the

7    facts and evidence and the equities, we submit intervening

8    rights is appropriate here.

9            Indeed, they've already had a 30 month stay

10   since this action started, your Honor.  They've had long

11   enough to keep Lupin's products off the market.  We believe

12   it's time for this to end and the intervening rights should

13   bar the infringement claims across the board.

14           For all these reasons, your Honor, we

15   respectfully submit the Court should enter judgment for

16   the defendants and against the plaintiffs on all asserted

17   claims.

18           Thank you, Judge.

19           THE COURT:  All right.  Thank you.  Any other

20   openings statements?

21           MS. KELLER:  No, your Honor.  We submit on

22   Lupin's opening statements.

23           THE COURT:  Should we start or should we take a

24   short break before we present our first witness?

25           MR. KELLY:  Your Honor, we have to get some

```
 1   notebooks up there, so it might be a good time to take a

 2   break.

 3             THE COURT:  All right.

 4             MR. KELLY:  Thank you.

 5             THE COURT:  Fifteen minutes.

 6             (Brief recess taken.)

 7             *      *      *

 8             (Proceedings reconvened after recess.)

 9             THE COURT:  Mr. Kelly.

10             MR. KELLY:  Yes, your Honor.  We would like to

11   call Dr. Shinichi Yasueda as our first witness.

12             THE COURT:  We should swear the interpreters in,

13   wherever they are.

14             THE DEPUTY CLERK:  Please stand.

15             (Satoko Utsunomiya, interpreter; Keijiroh

16   Yama-Guchi, check interpreter; placed under oath.)

17             THE COURT:  All right.  You all may be seated

18   then.

19                 ... SHINICHI YASUEDA, having been duly

20             sworn as a witness, was examined and testified

21             through the Interpreter as follows ...

22             MR. KELLY:  Your Honor, to make this move a

23   little faster, we put the five binders in front of the

24   witness with the exhibits.  The thick one, which is JTX-8,

25   we have provided, we have broken into three individual
```

Yasueda - direct

1    notebooks so that the witness isn't fumbling with that.

2             Through a glitch, we did not provide the three

3    individual notebooks to defense counsel.  We will after

4    lunch so that they will have the same notebooks.  All the

5    pages are in JTX-8.  It's just for convenience we took them

6    out.  We can go through and show them.

7             THE COURT:  Just don't kill any more trees than

8    you have to.

9             MR. KELLY:  Well, it's the thin ones that we're

10   going to ...

                     DIRECT EXAMINATION

11

12   BY MR. KELLY:

13   Q.    Good morning, Dr. Yasueda?

14   A.    Good morning.

15   Q.    Dr. Yasueda, could you provide us briefly with your

16   educational background?

17   A.    I majored in the pharmacy in Japanese university.  And

18   I moved on to master's course.

19   Q.    Is that pharmacy or pharmaceutical sciences,

20   Dr. Yasueda?

21   A.    I think pharmaceutical science is correct.

22   Q.    Thank you.  Which university did you graduate from?

23   A.    I graduated from a university called Kinki University

24   which is located in Kansai in Japan.

25   Q.    And do you have any degrees beyond the master's

Yasueda - direct

1    degree?

2    A.    Yes.

3    Q.    And what degree is that?

4    A.    I obtained a Ph.D. related to pharmaceutical science.

5    Q.    And which university, please?

6    A.    The same university.

7    Q.    Who do you work for, Dr. Yasueda?

8    A.    Senju Pharmaceuticals.

9    Q.    And how long have you worked at Senju?

10   A.    For 18 years.

11   Q.    Can you provide us with a brief description of your

12   employment history at Senju?

13   A.    I joined Senju Pharmaceutical Company Limited in 1994.

14   And I was doing research work at a research laboratory.  I

15   was doing formulation work.  I was researching on

16   formulation and I was working on formulation of

17   gatifloxacin.

18            I moved on to other departments, and I belong to

19   international development division and pharmaceutical

20   development division and quality assurance division.

21            I went back to the research laboratories later,

22   and currently I am at the formulation area at laboratories.

23   Q.    And what is your position at the laboratory today?

24   A.    I am the director of formulation division.

25   Q.    Could you just briefly describe for us Senju's

Yasueda - direct

1    business?

2    A.    In the business of Senju is mostly development,

3    manufacturing and sales of ophthalmic solutions.  Mostly we

4    manufacture products for the Japanese market, but we export

5    to countries such as United States, and also we license our

6    products out to such countries, and also we do joint

7    development with foreign countries as well.  That's all.

8    Q.    Could you describe for us how eye drop formulations

9    are developed at Senju?

10   A.    So, first, a compound is given as the medicine to be

11   used, and we discuss how that can be formulated.  And the

12   eye drop has to be very effective, so we try to come up with

13   a formulation which helps the compound to reach the targeted

14   tissue.

15           The process of formulation, which is excipient,

16   have to be the stable, and also the formulation has to be

17   easy to manufacture, and that formulation will go through

18   clinical trials.  After finishing them, the manufacturing

19   starts.

20   Q.    Dr. Yasueda, why don't you simply take an existing

21   formulation for one drug and substitute for that old drug

22   the new drug?  Why go through this whole process again?

23           MS. MAZZOCHI:  Object to the form of the

24   question, your Honor.

25           (Translation.)

1          MS. MAZZOCHI:  Objection, your Honor.  It calls

2     for speculation.  And it is not relevant to the extent it

3     seems to be seeking expert testimony.

4          THE COURT:  It's overruled.  For purposes of

5     this bench trial, it's overruled.

6     BY MR. KELLY:

7     Q.    You may answer, Dr. Yasueda.

8     A.    Each drug is different in terms of the structure, the

9     structure formula, and also the molecular weight and the

10    physical and chemical properties are different as well.  So

11    the formulation has to be changed to suit such

12    characteristics.

13          If it's so simple that we can simply change

14    the drug using the same formulation, then there would be no

15    work for the formulation laboratories which exist in the

16    world.

17    Q.    Thank you.

18          Dr. Yasueda, I'm going to ask you to look at

19    JTX-1, which is in a book to your far right.  And it should

20    be the first document in that first book.

21          Do you have that document?

22    A.    Yes.

23    Q.    Do you recognize that document?

24    A.    Yes, I do.

25    Q.    Are you the Shinichi that's listed on JTX-1 at page 2?

1    That would be .0002.

2    A.    That's correct.

3             MR. KELLY:  I'm going to offer JTX-1 into

4    evidence, your Honor.

5             MS. MAZZOCHI:  No objection, your Honor.

6             THE COURT:  Thank you.

7             (Joint Trial Exhibit No. 1 was admitted into

8    evidence.)

9    BY MR. KELLY:

10   Q.    Dr. Yasueda, can you briefly explain to me what this

11   patent at JTX-1 relates to?

12   A.    This patent is about the improvement of intraocular

13   permeability of gatifloxacin by adding extremely small

14   amount of EDTA.

15   Q.    Tell us when you first became involved with

16   gatifloxacin.

17   A.    Well, my recollection is approximate, but it was

18   spring of 1997.

19   Q.    As you raise I'm going to ask you to look at JTX-8,

20   which, unfortunately, is the thick binder to your right.

21   A.    Yes.

22   Q.    And JTX-8 contains Senju documents starting SEN17521

23   through 19129.

24             My question for you, Dr. Yasueda, is, do you

25   know who prepared this, the pages in this document?

Yasueda - direct

1   A.    Myself.

2   Q.    And did you prepare this as part of your normal duties

3   at Senju?

4   A.    Yes.

5   Q.    And has this document been retained in the ordinary

6   course of business at Senju?

7   A.    Yes.

8           MR. KELLY:  I'd like to offer JTX-8 into

9   evidence, your Honor.

10          MS. MAZZOCHI:  Oh, we object, your Honor.

11  Again, this is the document we discussed before the opening

12  statements.  It's a 1600-plus-page document with no

13  accompanying English translation.

14          MR. KELLY:  Your Honor, let me just use the

15  document with the witness and I think you'll see that most

16  of this is not going to be used, your Honor.

17          THE COURT:  All right.  Well, we won't admit the

18  entire document as you raise.  We'll see how it goes.

19          MS. MAZZOCHI:  Thank you, your Honor.

20          THE COURT:  Generally, when something is called

21  a joint trial exhibit, I don't know why it's called a joint

22  trial exhibit if the parties don't agree on it, but that's

23  what it is.

24          All right.  So let's take it one page at a

25  time.

Yasueda - direct

1           MR. KELLY:  Certainly, your Honor.

2    BY MR. KELLY:

3    Q.    Dr. Yasueda, for the convenience, your convenience on

4    the stand, we have broken JTX into three subparts and they

5    are for identification purposes JTX-B.

6           MR. KELLY:  Let me give you the Bates numbers,

7    Deanne.  That's at Senju, SEN19057 through 19129.  And then

8    we have a second breakdown, which we've marked C for

9    convenience of identification, JTX-8C, at SEN18943 through

10   19011.

11          And, finally, we've broken it down to the third

12   section, which is SEN19012 through 19056, which we have

13   marked for identification as JTX-8B.

14   BY MR. KELLY:

15   Q.    And can I ask you to turn to JTX-8B, Dr. Yasueda?

16   A.    Yes.

17   Q.    And can you tell me what the pages in JTX-8

18   constitute?

19   A.    Are you asking about JTX-8B?

20   Q.    Yes.

21          THE COURT:  And it's one thing to allow this

22   witness to use this to refresh his recollection.  It's

23   quite another to put it up as though it were an admitted

24   exhibit.  So I mean you can't have it both ways.  It is

25   either --

Yasueda - direct

1            MR. KELLY:  That's fine.

2            THE COURT:  Okay.

3            MR. KELLY:  All right.  I was hoping to let you

4     be able to see it, but that's fine.

5            THE INTERPRETER:  I haven't translated it yet.

6            MR. KELLY:  Oh, I'm sorry.

7            THE WITNESS:  This is a laboratory notebook I

8     was using when I was researching on gatifloxacin.

9     BY MR. KELLY:

10    Q.    And what does the number 97022 just signify on the

11    first page?  97022 signify on SEN 19057?  19057.

12            THE INTERPRETER:  And the other number you

13    mentioned, the beginning?  I'm sorry.

14            MR. KELLY:  Oh, I said, what does the number on

15    page SEN19057 signify.

16            THE INTERPRETER:  This is a number this was put

17    on the laboratory notebook at the time when I was doing this

18    research to identify each notebook.

19    Q.    And can I ask you to look at JTX-8C and ask you what

20    these pages comprise.

21    A.    The first page; is that right?

22    Q.    I was asking what the first -- on JTX-8C, can you tell

23    me what these pages comprise.

24    A.    This is also a laboratory notebook of the testing.

25    Q.    And the number on page 18943, is that the notebook

1    number?

2    A.    No.   97033.

3    Q.    Yes.   Is that the notebook number?

4    A.    That's correct.

5    Q.    And JTX-8B, what do those pages comprise?

6    A.    This is also a notebook of experiments of mine.

7    Q.    And let me direct you back to JTX-8B.

8              MR. KELLY:  And, your Honor if I might take the

9    large one away from him so he has a little room on the

10   stand?

11             THE COURT:  Sure.

12             (Mr. Kelly removed a notebook from the witness

13   stand.

14   BY MR. KELLY:

15   Q.    Dr. Yasueda, can I ask you to turn in JTX-8B to the

16   page JTX-8.1540.

17   A.    Yes.

18   Q.    What does this page describe, Dr. Yasueda?

19   A.    A protocol which I used when I started, I was about to

20   start this experiment that is attached on this.

21   Q.    And what's the date?

22             MS. MAZZOCHI:  Your Honor, I'm going to object

23   to this line because he's not using the document to refresh

24   his recollection; he's using it to identify things on the

25   page.

Yasueda - direct

 1           THE COURT:  I guess I'm really confused about

 2    how this is being used.  If, in fact, you want this

 3    admitted, then we need to take the time, take the witness

 4    off the stand and take your time to establish that the

 5    translation is not necessary to give the defendants an

 6    appropriate opportunity for cross-examination.  Otherwise,

 7    you need to be asking this witness questions and seeing if

 8    he can answer them --

 9           MR. KELLY:  Yes.

10           THE COURT:  -- without reading from a document

11    that's not admitted.

12           MR. KELLY:  Thank you.  Thank you, your Honor.

13           MS. MAZZOCHI:  Thank you.

14    BY MR. KELLY:

15    Q.    Do you recall when you began your experimental work?

16    A.    I started this experiment in March 1997.

17    Q.    And did you have a protocol prepared for your

18    experimental work?

19    A.    I did.  I prepared.

20    Q.    Did the protocol contain any suggestions as to how you

21    should formulate the gatifloxacin?

22    A.    To come up with a very effective ophthalmic solution,

23    we wanted to improve the -- how the gatifloxacin constituted

24    inside the eye.  From that perspective, I prepared this

25    protocol.

Yasueda - direct

1   Q.     Did you, at the beginning, have any particular

2   solution in mind for that problem?

3   A.     I thought about using the solution which utilizes ion

4   pair agent.

5   Q.     What is the objective using an ion pair agent?

6   A.     By using the ion pair agent, I thought about enhancing

7   a partition coefficient of gatifloxacin so that the

8   permeation into the eye would be improved.

9   Q.     Did you conduct tests on the ion pair?

10  A.     Yes.

11  Q.     And were those the first tests you began or were they

12  done later?

13  A.     I think I did it the first.

14  Q.     If you can look at JTX-8B and see if that refreshes

15  your recollection, if that was the first, or a subsequent

16  effort.

17  A.     C or D?

18  Q.     B.

19  A.     Well, the chronological order of these notebooks is

20  B, C and D.

21  Q.     And my question is, using your notebooks, can you tell

22  which was the first, where you started -- which experiments

23  did you start with first?

24  A.     I measured -- I measured the partition coefficient by

25  using as an ion pair agent.

Yasueda - direct

1   Q.     Were these tests successful in develop an ophthalmic

2   solution with an improved corneal permeability?

3   A.     By using SDS, the partition coefficient went up.

4   Because of that, we decided to move on to the next level of

5   experiment to see the corneal permeability.

6   Q.     Dr. Yasueda, did you prepare a report on your ion pair

7   experiments?

8   A.     Yes, I did.

9   Q.     Can I ask you to turn to JTX-19.  And, for the record,

10  we also have a translation which we have designated as

11  JTX-19-TR.

12  A.     Yes.

13  Q.     Have you seen JTX-19 before?

14  A.     Yes.

15  Q.     What is it?

16  A.     This is monthly report I wrote around this time.

17  Q.     Did you prepare this as part of your normal duties at

18  Senju?

19  A.     Yes, that's right.

20         MR. KELLY:  Your Honor, I'd like to offer JTX-19

21  and its companion translation into evidence.

22         MS. MAZZOCHI:  No objection, Your Honor.

23         THE COURT:  Thank you.

24         (Joint Trial Exhibit No. 19 was admitted into

25  evidence.)

Yasueda - direct

 1              MR. KELLY:  Chris, can you -- thank you, Chris.

 2         I'm not sure that is going to help us.

 3    BY MR. KELLY:

 4    Q.    In JTX-19, you report your conclusion from the tests,

 5    the ion pair tests you just talked about?

 6    A.    Yes.

 7    Q.    And you mentioned SLS as having successfully raised

 8    the partition coefficient; is that correct?

 9    A.    That's correct.

10    Q.    And is that reported as Lauryl sodium sulfoacetate?

11    A.    That's correct.

12    Q.    Thank you.  And we see a significant number, we see

13    other compounds listed on that table.  Were those also

14    compounds you used in your ion pair experiments?

15    A.    Well, I experimented with all these but I couldn't

16    find the many good ones except for SLS, which I mentioned,

17    and also benzalkonium chloride.

18    Q.    Did you report your conclusion from these?  Excuse me.

19    Did you report your conclusion from these tests in this

20    report, JTX-19?

21    A.    Yes.

22    Q.    And where might I find that in the exhibit?

23    A.    On the bottom right, it says that:  Going forward, we

24    will study the concentration of ion pair apartments and the

25    impact of pH using BAK and SDS, sulfonic acid.

1    Q.    Thank you.  As you raise, did you conduct the tests

2    that were suggested at the bottom of page SEN03599?

3    A.    Yes, I did.

4    Q.    Do you recall what the results of those tests were?

5    A.    No, I don't.

6    Q.    I'm going to ask you to turn to JTX-12.1571.

7    A.    Slow.

8    Q.    Excuse me.  JTX-8 at page 1571.

9    A.    Yes.

10   Q.    Does that refresh your recollection as the result of

11   tests?

12   A.    Well, later, I thought that SDS would be good.  And

13   this is a result of installing this formulation into a

14   rabbit.  A rabbit.

15   Q.    This is an in vivo test, Dr. Yasueda?

16   A.    Correct.  Yes, we instilled it into rabbit.

17   Q.    Was it successful in increasing the corneal

18   permeability?

19   A.    Well, in comparison with the reference formulation

20   that we are using at that time, the permeability into

21   aqueous humor was better in terms of the amount.

22        And we noticed while SDS was instilled into the eye of

23   the rabbit, the rabbit was blinking a lot.  Normally, a

24   rabbit doesn't blink so much, but at that time, the rabbit

25   was repeating the blinks.  It looked like it was hurting the

1    rabbit, so I thought it would not be good if we used this in

2    actual formulation.  And I felt sorry for the rabbit.

3    Q.    Can I ask you to look in your right-hand book?  That's

4    your left.  Right.  Look at JTX-13.

5    A.    Yes.

6    Q.    Can you describe for me, have you seen JTX-13 before?

7    A.    Yes, I have.

8    Q.    What is JTX-13?

9    A.    This is a report I wrote with regard to improvement of

10   increasing constitution of gatifloxacin.

11             MR. KELLY:  Your Honor, I'd like to offer JTX-13

12   into evidence.

13             MS. MAZZOCHI:  No objection, Your Honor.

14             THE COURT:  Thank you.

15             (Joint Trial Exhibit No. 13 was admitted into

16   evidence.)

17   BY MR. KELLY:

18   Q.    Dr. Yasueda, are the results of your Lauryl sulfate

19   corneal permeability test reported in JTX-13?  I direct your

20   attention to page 6 and to page 11.

21   A.    Yes.

22             THE INTERPRETER:  What was the second part?

23             MR. KELLY:  I was just asking for his attention

24   to two pages.

25   BY MR. KELLY:

Yasueda - direct

1   Q.    Is this test on SDS, the test on corneal permeability,

2   reported on those pages on JTX-13?

3   A.    Did you say SDS?

4   Q.    Yes.

5   A.    Yes.  On page 8, the results are shown.

6            MS. MAZZOCHI:  Your Honor, because we're showing

7   the English translation, can we move the English translation

8   into evidence as well.

9            THE COURT:  All right.  JTX-13 TR?

10            MR. KELLY:  When I was moving documents with

11   translations, I assumed the translation was moved in with

12   it.

13            THE COURT:  All right.  Good.

14   BY MR. KELLY:

15   Q.    That was I believe 23738; is that correct?

16   A.    Correct.

17   Q.    Now, I believe -- was this successful?  So this result

18   was a successful ophthalmic formulation?

19   A.    No.

20            MR. KELLY:  Chris, can you bring up the

21   demonstrative at this point?

22            (Counsel confers with IT person.)

23            MR. KELLY:  Let's move on.  We can fill that in

24   later.

25   BY MR. KELLY:

Yasueda - direct

1    Q.     Can I ask you to turn to JTX-18 in your book?

2                MR. KELLY:  For the record, JTX-18 also has a

3    translation.

4    BY MR. KELLY:

5    Q.     And can you describe for me, have you seen this

6    document?

7    A.     Yes, I have.

8    Q.     And did you prepare this document?

9    A.     I did.

10   Q.     And what is that document?

11   A.     A monthly report.

12   Q.     Was that document a report on the test with the SDS?

13   A.     No.

14   Q.     What did you work on next?

15   A.     We decided to study on viscosity agent, so we thought

16   about ophthalmic solutions which include viscosity agents.

17   Q.     Was that effort successful in producing an ophthalmic

18   solution?

19   A.     Well, we made ophthalmic solution using sodium

20   hyaluronic and also sodium chondroitin sulfate.  And

21   ophthalmic solutions themselves quite good.

22   Q.     Did it result in a successful ophthalmic solution?

23   A.     We still enter eyes of rabbits and the permeability

24   was good.  So that means the gatifloxacin can be transferred

25   and that was good.  However, by using viscosity agent, the

Yasueda - direct

1    solution became sticky, so we started to have a concern

2    about compliance and adherence.

3    Q.    As you raise, are those results shown in JTX-18?

4    A.    Correct.

5              MR. KELLY:  I got the right number that time,

6    your Honor.

7    BY MR. KELLY:

8    Q.    I hate to do this to you, but can I ask you to turn

9    back to JTX-17.

10   A.    Yes.

11   Q.    And just for the record, there's a JTX-17, a

12   corresponding English translation at JTX-17R.

13             And could you tell me, Dr. Yasueda, have you

14   seen that before?

15   A.    Yes, I have.

16   Q.    What is it?

17   A.    This is also a report I prepared.

18   Q.    Does that document contain results for the lauryl

19   sulfate ion pair experiment?

20   A.    That's correct.

21   Q.    As you raise, let us --

22             MR. KELLY:  Chris, as you raise we can bring up

23   the timeline and show us where we are.  It's not good to get

24   lost.

25   BY MR. KELLY:

Yasueda - direct

1    Q.    All right.  So through this point in time, you tried

2    partition co-efficients.  You did corneal permeability

3    testing on partition co-efficients, and you also tried

4    viscosity enhancing agents.  And did they all fail?

5    A.    That's correct.

6    Q.    As you raise, can I ask you, Dr. Yasueda, what did you

7    do next in your sequence of trying to develop a gatifloxacin

8    solution?

9    A.    Okay.  We thought about using, I thought about using

10   sorbic acid as an ion pair agent and also the benzalkonium

11   chloride was considered as well to enhance the partition

12   coefficient.

13   Q.    Was that the next thing you tried, Dr. Yasueda?  If it

14   helps you, you can look at JTX-8B.  8B.

15          It looks like I get to direct the witness to the

16   page.

17   A.    Before that, we looked at solutions which had

18   different concentrations of gatifloxacin.

19          MR. KELLY:  And, your Honor, before I forget,

20   I'd like to move JTX-17 and 18 into evidence.

21          MS. MAZZOCHI:  No objection to those two with

22   the translations, your Honor.

23          THE COURT:  Thank you.

24          (Joint Trial Exhibit No. 17 and Joint Trial

25   Exhibit No. 18 were admitted into evidence.)

Yasueda - direct

1   BY MR. KELLY:

2   Q.   And what did you find out as a result of trying

3   different concentrations?  And it's different concentrations

4   of what, Dr. Yasueda?

5                THE INTERPRETER:  Different concentrations of

6   what?

7                MR. KELLY:  Of what?

8                THE INTERPRETER:  Gatifloxacin.

9   BY MR. KELLY:

10  Q.   And what did you learn from that test?

11  A.   With regard to the concentration response, the higher

12  the concentration of gatifloxacin is, the better the corneal

13  permeability was.

14  Q.   Is that recorded -- did you record that in a report,

15  Dr. Yasueda?

16               Do you recall?

17  A.   I don't remember.

18  Q.   Can I ask you to look at JTX-17.

19  A.   Yes.

20  Q.   Did you find the concentration test reported there?

21  A.   Part of ICN348, I can see it.

22  Q.   Thank you.

23               What did you try next, Dr. Yasueda?

24  A.   And next one is what I described earlier.  That is use

25  of sorbic acid and also the benzal -- benzalkonium chloride

Yasueda - direct

1    as ion pair agent to measure the coefficient -- excuse me,

2    the partition coefficient, thinking about the -- how the

3    gatifloxacin was constituted the eye.

4    Q.    And did this result in an increase of the partition

5    coefficient?

6    A.    With regard to benzalkonium chloride, there was a

7    slight increase, and I thought about looking at the actual,

8    transferring into the aqueous humor.

9    Q.    Was there an increase with the sorbic acid?

10   A.    No, it did not increase.

11   Q.    It failed?

12   A.    Correct.

13            MR. KELLY:  Chris, can we have another flag?

14   BY MR. KELLY:

15   Q.    As you raise, you just testified that -- what did you

16   do next?

17   A.    I measured the permeability into aqueous humor by

18   changing pH.

19   Q.    And do you recall what the result was?

20   A.    Yes.  The higher the pH was, the better the corneal

21   permeability of gatifloxacin was.

22   Q.    Can I ask you to turn to JTX-13.

23            Do you recognize that document?

24   A.    Yes.

25   Q.    Who prepared it?

1    A.    Myself.

2    Q.    Are the results for the pH shown in JTX-13?

3    A.    That's shown on SEN23736.

4    Q.    And that's -- is that the bottom table?

5    A.    Correct.

6    Q.    And are the formulations you tested shown on the top

7    table of SEN23732?

8    A.    Yes, that's correct.

9    Q.    As you raise, what did you do next?

10   A.    By adding sorbic acid and the benzalkonium chloride,

11   earlier, we measured the partition coefficient, but this

12   time we measured the actual corneal permeability into the

13   aqueous humor.

14   Q.    Why were you trying sorbic acid?

15   A.    Well, my colleague used the sorbic acid as an ion pair

16   agent for another product called Carteolol and the corneal

17   permeability enhanced significantly by sorbic acid.  So I

18   wondered if that would happen to gatifloxacin as well.

19   Q.    What was your conclusion?

20   A.    Well, with sorbic acid, we did not observe any

21   enhancement of the corneal permeability of the gatifloxacin,

22   and at that time there was a big hype in my company about

23   the sorbic acid because that worked very well on the

24   Carteolol.  But it hit home that if the compound was

25   different, the behavior -- behaviors are very different.

1    Q.    Are those results reported in JTX-13, Dr. Yasueda?

2    And to help you, Dr. Yasueda, I direct your attention to

3    23733 and 23739.

4    A.    Yes, that is reported.

5    Q.    Thank you.

6              MR. KELLY:  Your Honor, what's usual pleasure

7    for a lunch break today?

8              THE COURT:  I was going to try to get to

9    1:00 o'clock, but if we can't do that, then --

10             MR. KELLY:  Well, I would like to finish this

11   notebook, and that should get us close to 1:00 o'clock, your

12   Honor, if that's --

13             THE COURT:  That's fine.

14             MR. KELLY:  Thank you.

15   BY MR. KELLY:

16   Q.    Dr. Yasueda, what did you try to do next?

17   A.    Well, I used many different excipients.  Excipients

18   are not used not only for the enhancement of corneal

19   permeability and the -- I looked at the stability as well.

20             So thus far, we had already discovered that the

21   higher the concentration of gatifloxacin, the better the

22   corneal permeability was, and also among pH 5, 6 and 7, 7

23   is -- produces better corneal permeability.

24             So the -- I tried to find the stable

25   formulations out of higher concentration and the pH 7.

Yasueda - direct

1   Q.    And were you successful?

2   A.    So in these experiments, I used .5 percent

3   gatifloxacin and pH 7, and I added many different

4   excipients, but I was not successful.

5   Q.    What did you try next, Dr. Yasueda?

6   A.    Next, I used the .005 percent concentration of

7   benzalkonium chloride to see the corneal permeability into

8   aqueous humor, and in earlier experiments, I used

9   .01 percent, but the -- that could cause injury in the eye.

10  So I reduced the concentration.

11  Q.    And do you recall what the result was?

12  A.    The conclusion was we found that the risk, the

13  benzalkonium chloride of .005 percent, the corneal

14  permeability of gatifloxacin would not go up.

15  Q.    Did you record that in your report?

16  A.    Yes, but I do not remember where.

17  Q.    Can I ask you to turn to JTX-13.

18  A.    I found it on SEN2742.

19  Q.    And those are the results; correct?

20  A.    Yes.

21  Q.    And is the formulation used shown on 23735?

22  A.    Yes, that's correct.

23              MR. KELLY:  Chris, can you put some more

24  flags on the timeline.

25  BY MR. KELLY:

Yasueda - direct

1    Q.    And was that experiment a failure?

2    A.    That's correct, unfortunately.

3    Q.    Well, as you raise that you tried BAK and failed, what

4    did you try next?

5    A.    So we knew that already the higher concentration would

6    be better, so we decided to enhance solubility, so we

7    studied the excipients which could increase solubility.

8    Q.    And what was the result of those experiments?

9    A.    I couldn't find good ones.

10   Q.    Let me ask you to turn to, I hate to do this to you,

11   PTX-19, which also has a corresponding translation of PTX-19

12   TR.

13   A.    (Witness complies.)

14   Q.    I would like to first ask you, Dr. Yasueda, have you

15   seen this document before?

16   A.    Yes.

17   Q.    Who prepared it?

18   A.    I did.  This is a report of our research.

19   Q.    Did you prepare this as part of your normal duties?

20   A.    Yes.

21   Q.    Was it prepared at or about the time?  Was it retained

22   by Senju as a business record?

23   A.    Yes.

24            MR. KELLY:  Your Honor, I'd like to offer

25   PTX-19, and it's corresponding translation, PTX-19 TR into

1    evidence.

2                    MS. MAZZOCHI:  No objection, Your Honor.

3                    THE COURT:  Thank you.

4                    (Plaintiffs' Trial Exhibit 19 admitted into

5    evidence.)

6    BY MR. KELLY:

7    Q.    Are the tests you just described reported or at least

8    summarized in PTX-19?

9    A.    That is written on SEN17513.

10   Q.    Thank you.  Were the tests a success?

11   A.    As this says, it was not successful.

12   Q.    Thank you.

13                   MR. KELLY:  Could you put another flag up there,

14   Chris?  Thank you.

15   BY MR. KELLY:

16   Q.    As you raise, what did you do next, Dr. Yasueda?

17   A.    By the same token, I looked at the stability of

18   formulation which have high concentration.

19   Q.    And what did you conclude?

20   A.    We tried many different excipients but we failed.

21   Q.    Dr. Yasueda, when you were conducting these tests,

22   were there any particular competitive products that you were

23   giving consideration to?

24   A.    At that time, in the Japanese market, ofloxacin was in

25   use and the levofloxacin was about to come out.  So we

1    wanted to make an effective product against this

2    levofloxacin.

3    Q.    Did you considering the corneal permeability of

4    levofloxacin?

5    A.    Yes.

6    Q.    And how did it compare with the corneal permeability

7    of -- well, did you compare that corneal permeability with

8    anything?  Let me stop.

9           Did you compare the corneal permeability of

10   levofloxacin with gatifloxacin?

11   A.    Yes, I did.

12   Q.    And what did you find?

13   A.    When I compared the corneal permeability of

14   levofloxacin and gatifloxacin, I used the solution of

15   gatifloxacin of pH 7 and .5 percent for patients.  And those

16   two were almost equal.

17          But by that time, we had already known that the

18   gatifloxacin of .5 percent and pH 7 would not be stable

19   enough, so if we did not do anything, we thought we would be

20   beaten by levofloxacin.

21   Q.    Is your corneal permeability testing comparing

22   levofloxacin with gatifloxacin at a pH 7, did you report

23   that anywhere?

24   A.    Yes, somewhere.

25   Q.    Can I help you along a little bit?  Can I ask you to

Yasueda - direct

1    look at JTX-13?

2    A.    The result is shown on SEN23741.

3    Q.    And the formulation you tested, are they shown, 23735?

4    A.    Yes.

5    Q.    Dr. Yasueda, what does AM-1155 stand for that we see

6    on your documents?

7    A.    This means gatifloxacin.  This is a development code

8    used between Senju and Kyorin from which we licensed this

9    in.

10   Q.    Thank you.

11              MR. KELLY:  Your Honor, would this be a good

12   time for a lunch break?  This is the end of this book.

13              THE COURT:  All right.  Let's take our half

14   hour.

15              MR. KELLY:  Thank you, Your Honor.  Half hour,

16   Your Honor?

17              THE COURT:  Half hour, unless you think we can

18   afford more.

19              MR. KELLY:  No.  I just want to make sure I

20   heard you correctly, Your Honor.  Thank you.

21              (Lunch recess taken.)

22              *     *     *

23              (Proceedings reconvened after recess.)

24              THE COURT:  You may continue.

25              MR. KELLY:  Thank you, your Honor.

1    BY MR. KELLY:

2    Q.    Dr. Yasueda, you can put away Book B.  We will as you

3    raise turn to JTX-8C.

4          Let's pick up where we were when we stopped at

5    lunch.  What did you do next in your efforts to formulate

6    gatifloxacin?

7    A.    It was low, gatifloxacin.  When the pH is in neutral

8    area, solubility was low.  And when acidity is high,

9    solubility was high.  However, with regard to partition

10   coefficient, when the pH is neutral, that was high, whereas

11   when the pH is on the acid side, it was low.  So I started

12   to seek what point would be optimal.

13         So with regard to this kind of balance, it is

14   very tricky to come up with good solution of gatifloxacin.

15   So next solution we made was pH 5.5 and concentration of

16   gatifloxacin 2 percent.  And we started to look at

17   permeability in that way.

18   Q.    Was there a comparison that you were using when you

19   were taking the gatifloxacin at 2.0?

20   A.    Consistently were using .5 percent concentration of

21   gatifloxacin and pH 7 as reference.  And so we use that this

22   time, too.  However, with regard to stability, .5 percent of

23   concentration in pH 7 were not good, and we knew that.  It

24   would not be possible to store this product for a long time,

25   so we knew that would not be possible to commercialize that

1    formulation.

2    Q.    Would it be possible to commercialize the 2 percent

3    formulation?

4    A.    At that time, we already knew that a 2 percent would

5    be difficult for the gatifloxacin which was an

6    antibacterial.  But to look for good solution for better

7    permeability, we decided to do that experiment.

8    Q.    Were either of the formulations -- would you consider

9    either of these formulations to be successes?

10          THE INTERPRETER:  Either formulation?

11              MR. KELLY:  Either formulation.

12              THE WITNESS:  Well, with 2 percent, interocular

13   permeation went up but this formulation also was not stable,

14   so we decided to give it up.

15   BY MR. KELLY:

16   Q.    Thank you.  What did you do next, Dr. Yasueda?

17   A.    Well, next, by adding EDTA, we experimented with the

18   corneal permeability or interocular permeability.

19   Q.    And what concentration did you try?

20   A.    Gatifloxacin .5 percent, EDTA .1 percent.

21   Q.    And the control was gatifloxacin without any EDTA?

22   A.    That's correct.

23   Q.    And what was the result?

24   A.    EDTA was very effective in increasing permeability of

25   gatifloxacin in this experiment.  But at this time, we

Yasueda - direct

1    failed with so many excipients so we started to do whatever

2    was available blindly, and the EDTA was just right so that

3    surprised me.

4    Q.    Why did it surprise you?

5    A.    Because I did not think EDTA would be that effective.

6    Q.    What did you do next?

7    A.    Well, we added more samples of EDTA and also with

8    regard to 2 percent of concentration, I added more samples.

9    Q.    Why did you add more samples?

10   A.    Well, the effectiveness of EDTA was the level, which

11   was unbelievable.  So I wanted to repeat an experiment many

12   times to ascertain the result.

13   Q.    Did this test result in a successful formulation?

14   A.    Well, we found out EDTA has possibility.

15   Q.    After the -- after finding out that EDTA had a

16   possibility, what did you do next?

17   A.    We checked if a formulation or formulations with EDTA

18   would be stable.

19   Q.    And did you use any controls?  That may not be a good

20   word to translate.  Did you have any comparisons that you

21   used in that test?

22   A.    I don't understand the meaning of the question.

23   Q.    Can I ask you in Notebook C to turn to JTX-8.1432 and

24   see if that helps you refresh your recollection.

25             THE CHECK INTERPRETER:  Did you say 143?

Yasueda - direct

1                    MR. KELLY:  1432.

2                    THE INTERPRETER:  We looked at the separating

3      the solution in which .5 percent of gatifloxacin was

4      included with EDTA and a solution of two percent of

5      gatifloxacin.  And two percent was not good, but the --

6      excuse me.  And .5 percent was stable.

7      BY MR. KELLY:

8      Q.    What was the pH?

9                    THE INTERPRETER:  Correction.  I'm sorry.  The

10     interpreter misheard the statement, the testimony.  Okay.

11     So I'd like to start the translation.

12                    I looked at the solution of .5 percent

13     gatifloxacin with EDTA and a solution with two percent of

14     gatifloxacin, and two percent was not stable.

15     BY MR. KELLY:

16     Q.    And what was the pH of the EDTA-containing solution?

17     A.    Seven.

18     Q.    Was that stable?

19     A.    No.

20     Q.    Thank you.

21                    What did you do next?

22     A.    I added a sample of two percent gatifloxacin once

23     again.

24     Q.    And you compared that with what?

25     A.    I compared that with .5 percent gatifloxacin pH seven.

1    Q.      Why did you repeat that test?

2    A.      I have discovered that the higher concentration of

3    gatifloxacin, the better the intraocular probability was.

4    And also with EDTA, the intraocular permeability was better.

5    By repeating the test twice, I wanted to ascertain that

6    result.

7              MR. KELLY:  Your Honor, I'd like to show the --

8    to show you and the Court SEN18955.  It's a page from JTX-8,

9    but it's virtually almost all in the English language.

10              THE COURT:  All right.  I will see what the

11   defendant has to say.

12              MS. MAZZOCHI:  Well, your Honor, I don't know

13   what he's going to say about it, but there are characters in

14   here in Japanese, and for the material in Japanese, we don't

15   have an English translation.

16              THE COURT:  Are you just talking about --

17              MR. KELLY:  It's a compilation table, your

18   Honor, showing down one side the eyes, the formula, which is

19   in English, and then the results.

20              I just wanted to show the extensive nature of

21   the work.  I'm not going to go into in great detail with it,

22   but I think that it is fair to show it, because it is

23   virtually a hundred percent in English.  Well, 90 percent in

24   English.

25              THE COURT:  I will let you put it up.  Let me at

1    least see it.

2              MR. KELLY:  What I want to focus on, your Honor,

3    is the right hand table.

4              THE COURT:  It looks -- I don't know.  Are there

5    any particular concerns?

6              MS. MAZZOCHI:  Your Honor, I don't know where

7    these samples came from or what they represent.  I don't

8    know if these are contained in a report somewhere, so I

9    don't understand how relevant it is, quite frankly.

10             THE COURT:  Well, let me have you at least ask

11   those foundation questions.

12   BY MR. KELLY:

13   Q.    Dr. Yasueda, the test results that are reported there,

14   are those the ones that you had been doing, that we've been

15   talking about this morning?  Well, actually, mostly this

16   afternoon?

17   A.    Yes.

18   Q.    And what was the purpose of this test?

19   A.    The measurements are taken comparing three solutions.

20   One is .5 percent of gatifloxacin pH 7 without EDTA.  And

21   the second one is with EDTA.  Third one, 2 percent

22   gatifloxacin pH 5.5.  And the data were taken at the

23   cornea.

24             And gatifloxacin goes into -- goes through the

25   cornea and so there is some remaining portion, and the one

Yasueda - direct

1    which goes through the cornea goes into aqueous humor.

2              And the -- we measured the concentration and

3    aqueous humor and the concentration in cornea to see.

4    Effectiveness of EDTA as the enhancer and effectiveness of

5    higher concentration were looked at with regard to if both

6    were enhancing both the concentration in the cornea and

7    aqueous humor equally.

8              MR. KELLY:  You can take that down, please,

9    Chris.

10   BY MR. KELLY:

11   Q.    What did you try to do next?

12   A.    So by this time we came up with the multiple

13   formations, and we had difficulty establishing stability of

14   those.  And we measured solubility.

15   Q.    Did you give any thought to testing sorbic acid?

16   A.    Sorbic acid was a part of it.

17   Q.    Was this test successful?

18   A.    No.

19   Q.    What did you try to do next?

20   A.    We tried to enhance the solubility.  The best thing we

21   should do, we would do is in pH seven and high concentration

22   of gatifloxacin, but it was not possible.  So we started to

23   look for excipients which would enhance the solubility and

24   suppress precipitation.

25   Q.    Did you do any testing on the relationship between pH

1    and stability?

2    A.    Yes.

3    Q.    And what did you learn from those tests?

4    A.    Well, again, the higher the pH was, the lower the

5    stability was.  So it's better, it was better to have lower

6    pH in -- for the sake of stability.

7    Q.    Thank you.

8          And after testing pH, what did you do next?

9    A.    Well, we concluded that with higher pH, it's -- it

10   would be difficult to make a formulation of gatifloxacin,

11   but still we would have to think about the way to enhance

12   the intraocular permeation, and, once again, we decided to

13   look at the EDTA.  And we decided to experiment on formulas

14   with EDTA with slightly lower pH.

15   Q.    As you raise, Dr. Yasueda, before you did that, did

16   you try to stabilize a formulation of .5 gatifloxacin at a

17   pH of about six-and-a-half?  6.5?

18   A.    Well, the formulation I thought of was the

19   gatifloxacin .5 percent and the pH 6 with EDTA.

20   Q.    Can I ask you to take a look at JTX-12, page 1445, see

21   if that refreshes your recollection.  JTX-12.  JTX-8.

22   Excuse me.

23   A.    Yes.

24   Q.    That's at 1445.  Do you see that?

25   A.    Well, here, we are looking for excipients with pH 6.5

Yasueda - direct

1    to prevent the -- or to enhance solubility.  I worked very

2    hard on this, but I skipped one page as you raise.  Thank

3    you.

4    Q.    And were you successful with the excipients?

5    A.    No.  With pH 6.5, also I thought it would be difficult

6    to come up with .5 gatifloxacin solution.

7    Q.    And it was then that you turned to the experiments

8    with EDTA?

9    A.    Correct.

10   Q.    And the EDTA in these experiments enhanced the corneal

11   permeability?

12   A.    Yes.

13   Q.    Were you able to come up with a formulation, a

14   successful ophthalmic formulation?

15   A.    Well, we didn't look at stability in these experiments

16   yet, but we understood that EDTA was very effective very

17   well in these experiments.

18   Q.    And what did you do next?

19   A.    After deciding that we would use EDTA, we looked at

20   different concentrations of EDTA to see effectiveness of the

21   corneal permeability.

22   Q.    Did you consider the stability of the formula with

23   either the .1 or .05 EDTA?

24          And perhaps if I could direct your attention to

25   JTX-8, 1450 and 1451 to see if that refreshes your

Yasueda - direct

1    recollection.

2    A.      Yes, we looked at the stability.

3    Q.      And what did you conclude from that test?

4    A.      45 percent EDTA, EDTA 6 was found out to be pretty

5    good formula.

6              6 was pH.  So I repeat the translation.

7              45 percent with EDTA, pH 6 was found to be

8    pretty good solution.

9    Q.      And did you report this anyplace?

10   A.      Yes.

11   Q.      Can I direct your attention to PTX-19?  And perhaps to

12   help us along, SEN17510 and SEN17515.

13           THE INTERPRETER:  SEN17515?

14           MR. KELLY:  The first one is 17510 and then the

15   second one is on 17515.

16           THE WITNESS:  This is a result.

17   BY MR. KELLY:

18   Q.      And on 17510 are the compositions from the tests that

19   you recorded?

20           MS. MAZZOCHI:  I'm sorry.  Your Honor, I'm going

21   to object to this line of questioning because this is

22   relating to the free thaw precipitation which the plaintiffs

23   at the pretrial conference said they were not going to be

24   presenting in this case.  And in reliance on that

25   representation, we do not have two experts here.  They said

Yasueda - direct

1    they were not going to be relying on the freeze thaw

2    precipitation issue.  So ...

3                    MR. KELLY:  Your Honor, we're not relying on

4    freeze thaw for any expected results.  This is simply part

5    of his work to come up with a stable formulation.  That's

6    all this is about.  Part of the development of the product.

7                    MS. MAZZOCHI:  Your Honor, it's not relevant

8    here.  I mean I understand that Mr. Kelly wants to talk

9    about some background of the invention but I think we're

10   getting really far afield beyond that.  They're not tying it

11   to the patent, and they said they weren't going to be

12   relying on it.

13                   THE COURT:  I do have some concerns about

14   mischief in the future, so I'm not going to allow you to

15   talk about freeze thaw information.

16                   MR. KELLY:  Okay.  Thank you, your Honor.

17   BY MR. KELLY:

18   Q.    After this, what did you do next?

19   A.    Once again, I remeasured the partition coefficient

20   using sorbic acid.

21   Q.    And what did you conclude?

22   A.    Oh, I failed.  I don't know how many times I did.

23   Q.    After the failure with sorbic acid, what did you do

24   next?

25   A.    The stability was difficult to establish, so the

1    methyldopamine was used as an excipient this time.

2    Q.    What was the result?

3    A.    No good.

4    Q.    And what was the target pH you were trying to

5    formulate out here?

6    A.    7, because we were still thinking that 7 would be

7    possible.

8    Q.    Thank you.  And after trying the meglumine, what did

9    you try to do next?

10   A.    Well, after this, I started the tests of interocular

11   permeability using .1 percent EDTA and .05 percent of EDTA.

12   Q.    And what did you conclude from these tests?

13   A.    Effectiveness of EDTA was very high, and we used

14   .1 percent and .05 percent, but even with .05 percent the

15   effectiveness was significant.

16            What intrigued us was there was similar response

17   of the EDTA.  At .1 percent and .05 percent, the interocular

18   permeability of gatifloxacin was similar.

19   Q.    Did you report the conclusions from these series of

20   tests anywhere?

21   A.    I think so.

22   Q.    Can I ask you to turn to JTX-13?

23   A.    Yes.

24   Q.    Let me direct your attention to SEN23740.

25   A.    Yes.

Yasueda - direct

1    Q.    Is that a table showing some comparisons of .1 and

2    .05 percent EDTA?

3              THE INTERPRETER:  Excuse me.  You are away from

4    the microphone.

5              MR. KELLY:  Excuse me.

6    BY MR. KELLY:

7    Q.    Does that show comparisons between .05 and .1 EDTA?

8    A.    Yes.

9    Q.    And in the paragraph above that, did you write out

10   your conclusion?

11             MR. KELLY:  Actually, I want the part from the

12   next paragraph.

13             There you go.

14             THE WITNESS:  Yes.  That is here.

15   BY MR. KELLY:

16   Q.    Thank you.  As you raise, Dr. Yasueda, did you

17   continue to conduct tests with respect to formulation

18   stability?

19   A.    Yes.

20   Q.    And did you continue to try other avenues?

21   A.    I don't remember if I did after this point in time,

22   but we did a lot of different things.

23   Q.    Can I direct your attention to JTX-8 at page 1468, see

24   if that refreshes your recollection?

25             THE INTERPRETER:  1468?

1              MR. KELLY:  68.

2              THE WITNESS:  Yes.  Here, we changed the buffer,

3      buffer agent to see the stability of gatifloxacin solutions,

4      formulations.

5      BY MR. KELLY:

6      Q.     And are some of the results from that page reported in

7      PTX-19?

8      A.     I think so.

9      Q.     I direct your attention to the table on the bottom of

10     SEN 17510, and at the top of 17511.

11             MS. MAZZOCHI:  Your Honor, again I apologize.

12     I'm going to have to object to this because it looks like

13     again they're getting into crystal precipitation prevention

14     issues and that.  That gets back to the freeze thaw

15     precipitation materials that they said they weren't going to

16     rely on.  In fact, all the solubility stuff is about the

17     precipitation stuff and all of it is improper.

18             MR. KELLY:  Your Honor, it's relevant to what he

19     had to do to make a stable solution.  That's it.  And this

20     gentleman went through a lot of work to try to develop a

21     stable solution.  That is all we're trying to get at here.

22     This just wasn't going to the shelf and pulling off a

23     pre-existing formulation, switching out the active and

24     pouring it in.

25             MS. MAZZOCHI:  But, your Honor, the problem is

Yasueda - direct

1    that the stable formulation issue is the crystal

2    precipitation issue.

3              THE COURT:  Well, I take it all of this

4    information that we've heard so far is to indicate, to

5    demonstrate that this was not an obvious solution.  Right?

6    And their argument is if there are 100 steps, that must mean

7    it's not as simple as defendants are trying to say.

8              MS. MAZZOCHI:  But, your Honor, if that was one

9    of their theories, I'll note for the record it's not in

10   their secondary considerations.  No expert has offered

11   opinions relying on.

12             If he is trying to suggest there is a failure of

13   others, I guess prior failure of the inventor, that has not

14   been, secondary consideration, ever raised and their experts

15   have not relied on that.

16             MR. KELLY:  We're not relying on secondary

17   consideration, your Honor.  That is exactly as you say.

18   We're simply showing what went into getting to the end

19   result here.  That there was a lot of work, a lot of

20   different things tried, and the legal conclusions that you

21   can draw from his testimony you can draw.

22             We're not going to present and expert what is

23   going to get up here and talk about failures.  We're not

24   opining him.  We're didn't offer him for secondary

25   consideration.  We're trying to show what it takes to

Yasueda - direct

1    develop a formulation.  That is all this is about.

2              MS. MAZZOCHI:  Well, with all due respect, I

3    just don't see the relevance of that given that the issue

4    before the Court is what would the person of ordinary skill

5    in the art be able to accomplish.

6              MR. KELLY:  And I think that is exactly what

7    this goes to, your Honor.

8              MS. MAZZOCHI:  No expert has relied on this as

9    indicative or any of this activity as indicative of the

10   typical experience of a person of ordinary skill in the art,

11   so I don't see the relevance.  We're getting sandbagged

12   here.

13             THE COURT:  I'm sorry.

14             MS. MAZZOCHI:  I feel we're getting rather

15   sandbagged here because our experts did not necessarily have

16   the opportunity to respond to this theory either.  They

17   could have identified Dr. Yasueda as an expert on their

18   behalf and had him do a report, and we could have taken his

19   deposition on these kind of issues, and they did not.

20             THE COURT:  Well, again, I don't know whether

21   this is a new theory or not.  It strikes me that all this

22   information is in the record.  Clearly, it is what happened.

23   I'm concerned that it will be misused down the line, not so

24   much that it can be misused in this trial, and I don't know

25   how I pin plaintiffs in, so there is no mistake as the case

Yasueda - direct

1    goes along towards its inevitable appeal, that this is

2    background only.

3              MS. MAZZOCHI:  I understand, your Honor.  Thank

4    you.

5              THE COURT:  All right.  So you may continue.

6              MR. KELLY:  I'm trying to remember if he gave me

7    an answer or not, your Honor.  I'm not sure.  Let me ask it

8    again.

9    BY MR. KELLY:

10   Q.    Are some of the results of the test we just talked

11   about, are they recorded in PTX-19?

12   A.    Yes, I think so.

13   Q.    Thank you.  As you raise, what happened next in your

14   development efforts?

15   A.    Next, we figured out 45 percent EDTA was very

16   effective as ophthalmic solution, so we did the experiment

17   of instilling that on cornea in vitro.

18   Q.    Let me just make sure.  All the tests on corneal

19   permeability thus far has all been in vivo?

20   A.    To look at the permeability, we believe that in vivo

21   would be clearer.  But to look at the mechanism or action,

22   we use in vitro method this time.

23              So this time, in vitro, we looked at the corneal

24   permeability of a solution which included EDTA, but EDTA's

25   effectiveness was not evident at all in this case.  So it

Yasueda - direct

1    became clear to us that in vitro experiments were just

2    supplemental to in vivo and to confirm some parameter, in

3    vivo was essential.

4    Q.    And JTX-13, the corneal permeability results were

5    quoted there.  Are they all done in vivo?

6    A.    Yes, all of them were in vivo.

7    Q.    And after this in vitro test, did you continue to try

8    to form a stable gatifloxacin solution using additives?

9    A.    Are you asking if we did that -- this in vitro

10   experiment?

11   Q.    No.  I'm looking -- you had testified that several

12   times in the past you tried to use excipients to improve the

13   stability of the gatifloxacin solution.

14              Do you recall that?

15   A.    Yes.

16   Q.    As you raise, after you -- this in vitro experiment

17   you talked about, did you then go back and try to use

18   excipients to produce stable solutions?

19   A.    Other than the excipients per se, after this we

20   adjusted pH and also the -- we used the buffer agents, which

21   can be excipients as well.

22   Q.    Were you successful?

23   A.    By changing pH, we could come up with stable

24   solutions.

25   Q.    If pH --

1        MS. MAZZOCHI:  Objection, your Honor.

2        THE COURT:  All right.  Your objection is noted.

3   BY MR. KELLY:

4   Q.   What happened?  Did you try pH 7?

5   A.   No.  We decided to lower that.

6   Q.   Well, can I ask you to look at JTX-8, 1475?  See if

7   that refreshes your recollection.

8   A.   Yes.  So what is being looked at here is changing

9   buffers and the lowering of a pH.

10  Q.   But did you --

11       MS. MAZZOCHI:  Your Honor, I'm going to object

12  to these because I think this is, again, getting back to

13  the slide.

14       THE COURT:  All right.

15  BY MR. KELLY:

16  Q.   Did you conduct any of these at a pH of 7?

17  A.   Yes.

18  Q.   Were those successful in performing -- forming a

19  stable solution?

20  A.   No, not with 7, but we found out that a lower pH, it

21  would be successful.

22  Q.   Are those results summarized in PTX-19?

23  A.   Yes.

24  Q.   Thank you.  And you can put Notebook C to one side.

25       Did you continue your work after the experiments

Yasueda - direct

1   we've just talked about?

2   A.    Yes.

3   Q.    Does JTX-8, Book D, refer to tests that you performed

4   in formulating gatifloxacin?

5   A.    Correct.

6   Q.    And what's -- when did you -- when does the notebook

7   reflect you stopped, or when does the notebook end, the

8   entries for experiments end in Notebook D?

9   A.    The last date is June 18th of 1998.

10  Q.    Thank you.

11        As you raise, Dr. Yasueda, did Senju ever

12  conduct any corneal permeability tests on the gatifloxacin

13  solution at an EDTA concentration of 0.01?

14  A.    Yes.

15  Q.    Do you recall when those tests were?

16  A.    The first time was 1998, I think.  Could be the end of

17  1998.

18  Q.    Can I ask you to turn to -- and do you recall what the

19  results of those experiments were?

20  A.    Well, I don't remember it clearly, but I think the

21  result was the same as that of my experiments.

22  Q.    Do you know where those experiments were performed?

23  A.    Yes.

24  Q.    Where?

25  A.    In research laboratories of our company.

Yasueda - direct

1    Q.    Same -- was that the same laboratory you were?

2    A.    Yes, the same place.

3    Q.    Can I ask you to turn to JTX-14.  For the record, we

4    also have a translation that has been marked as JTX-14TR.

5    A.    Yes.

6    Q.    Can you tell me what JTX-14 is?

7    A.    This is the report which report, the results of the

8    tests done in research laboratories.

9    Q.    Can you tell us the date of JTX-14?

10   A.    The start of these tests was December 24th of 1998,

11   and the end of -- the end was January 29th of 1999.

12   Q.    Are you familiar with Senju's policy regarding its

13   records?

14   A.    What do you mean by "policy"?

15   Q.    What is the practice of Senju with respect to

16   maintaining keeping records?

17   A.    Well, the -- officially, these books are stored in a

18   storing place.

19   Q.    Thank you.

20         JTX-14, is that the type of test that was

21   performed in your lab as part of Senju's normal course of

22   business?

23   A.    Correct.

24   Q.    And was the report prepared at about the time the

25   tests were performed?

1    A.    Yes, that's right.

2    Q.    And does Senju regularly make records of these type of

3    tests?

4    A.    Yes.

5    Q.    And does Senju retain these type of documents in the

6    normal course of business?

7    A.    Yes.

8            MR. KELLY:  I'd offer JTX-14 and its

9    accompanying translation into evidence.

10           MS. MAZZOCHI:  Your Honor, I don't think that

11   this is a report that he offered, so I would just like to

12   note that for the record, just because I don't know the

13   extent to which he's going to continue to question him about

14   this, but otherwise, for the exhibit itself, we don't have

15   an objection.

16           THE COURT:  All right.  Thank you.

17           (Joint Trial Exhibit No. 14 was admitted into

18   evidence.)

19           MR. KELLY:  Only a few questions, your Honor.

20   BY MR. KELLY:

21   Q.    Dr. Yasueda, does JTX-14 contain a record of the

22   experiment regarding the use of 0. -- let me start over.

23           Is Senju corneal permeability test on the

24   0.01 percent EDTA gatifloxacin ophthalmic solution described

25   in JTX-14?

Yasueda - direct

1   A.    Yes.

2   Q.    And does JTX-14 describe the formulations that were

3   tested?

4   A.    Yes.

5   Q.    And what do you understand -- JTX-14 makes reference

6   to a Japanese formula.

7             Do you see that?

8   A.    Yes.  That is written here.

9   Q.    What do you understand the Japanese formulation to be

10  referring to?

11  A.    There is a reason why EDTA would not be able to be

12  used in Japan, so the -- for clinical trials, we use the

13  formulation of gatifloxacin without EDTA.  So for the

14  Japanese domestic market, we created that formulation.

15  Q.    And the formulation that has been described as

16  foreign, do you understand what that refers to?

17            THE INTERPRETER:  Formulation?  Could you repeat

18  the question, please?

19  BY MR. KELLY:

20  Q.    Sure.  There's a formulation described as foreign.

21            THE INTERPRETER:  Foreign.  And the question is?

22  BY MR. KELLY:

23  Q.    What formulation is that referring to?

24  A.    Zymaxid.

25  Q.    And from the results reported, did EDTA improve the

Yasueda - direct

1    corneal permeability of the foreign formulation as opposed

2    to Japanese?

3    A.    Yes.   The corneal permeability was increased by about

4    1.2 times here.

5              MR. KELLY:  Your Honor, I would like Dr. Yasueda

6    to look at JTX-15 and 16.

7              Is there any objection to these being moved into

8    evidence?

9              MS. MAZZOCHI:  19?

10             MR. KELLY:  No.  15 and 16.  They're

11   translations.

12             (Pause while counsel conferred.)

13   BY MR. KELLY:

14   Q.    All right, Dr. Yasueda.  Can I ask you to look at

15   JTX-15, which has the corresponding translation at

16   JTX-15TR.

17             Can you tell me what type of document this is?

18   A.    This is the research report we used in our research

19   laboratories.

20   Q.    And is the test recorded in JTX-15 the type of test

21   that's performed regularly that is performed as part of

22   Senju's business?

23   A.    Yes.

24   Q.    And is this report prepared about the same time as the

25   tests described in the report were performed?

Yasueda - direct

1    A.    Yes.

2    Q.    Does Senju regularly make records of such tests?

3    A.    Yes.

4    Q.    Does Senju retain these types of documents in the

5    normal course of its business?

6    A.    Yes.

7               MR. KELLY:  I'd like to offer JTX-15 into

8    evidence, your Honor.

9               MS. MAZZOCHI:  Your Honor, we object to JTX-15

10   because this is a report that he did not author.  There's no

11   indication that he actually did the testing that's set forth

12   here.

13              The doctor is here as a fact witness, so he

14   cannot lay the foundation for all the testing in this

15   particular report.

16              THE COURT:  Why are these called joint?  I mean,

17   aren't Js joint trial exhibits?  I'm confused.

18              MR. KELLY:  You're not the only one, your Honor.

19   They are joint.

20              THE COURT:  Well, in any event, if this witness

21   didn't author the exhibit and he's a fact witness, I don't

22   know that you have established that he has any knowledge

23   about them.  I'm not sure.

24              MR. KELLY:  Your Honor, I just want to

25   authenticate it as a business record.  Then I'm moving on.

1                    MS. MAZZOCHI:  But --

2                    THE COURT:  Generally, I don't have documents

3        just come in with no testimony about them to allow attorneys

4        just to argue about them.  I don't know what its relevance

5        is or anything else, so I guess I'm confused about the

6        document.

7                    MR. KELLY:  Your Honor, this was used by the

8        experts in their expert reports that were served back in

9        August, I believe, and they've been identified in

10       interrogatory answers early on, and we have treated them as

11       a business record of Senju.

12                   THE COURT:  I guess my only concern is, is

13       anyone going to be testifying about them?  Will I know what

14       their relevance are?

15                   MR. KELLY:  Yes, your Honor, you will.

16                   MS. MAZZOCHI:  Well, your Honor, no fact

17       witnesses, and that's the concern that I have.  That even if

18       their experts looked at it, that does not necessarily render

19       the underlying document admissible into evidence.

20                   THE COURT:  Well, I thought your objection was

21       this witness can't testify about it because he didn't author

22       it.  As you raise you're saying the objection is we don't

23       know whether it's a real business record.

24                   So what's the objection?  If it's a business

25       record, I'm not sure this witness should be getting it in,

Yasueda - direct

1    but if it's relevant to someone else's testimony, I'm not

2    sure what the danger is.  I don't know why we're getting it

3    in through this witness, I guess.

4                MR. KELLY:  He is the only --

5    BY MR. KELLY:

6    Q.    Dr. Yasueda, are you familiar with, in your position

7    as director at the pharmaceutical labs, with the

8    recordkeeping policy of Senju?

9    A.    Yes.

10               THE COURT:  Well, and actually my practice is

11   things get admitted, but if no one mentions them because

12   they're not testified about during the course of trial and

13   they're not mentioned in post-trial briefing, they're

14   stricken from the record.

15               So if there is a real issue about their

16   authenticity about they're being a business record, I need

17   to know that.  If that is not the objection, I don't have

18   any real concern about it coming in through this witness.

19               MS. MAZZOCHI:  Sure.  Your Honor, the concern

20   that I have is they're calling it a business record because

21   obviously it's hearsay, but the concern that we have is that

22   there is not going to be anybody that actually ran these

23   tests to authenticate or establish the foundation for these

24   tests:  that they were run, the numbers are accurate.  So,

25   you know, really if there is nobody who is going to do that,

Yasueda - direct

1    then we don't have a way to effectively cross-examine

2    anybody as to the substance of the documents to the extent

3    they want their experts to subsequently rely on them.

4              So I don't think he -- so this particular

5    witness, I don't think can lay the foundation for it.   I

6    don't think this witness can even necessarily lay the

7    foundation for it being a business record because, again,

8    there is no indication that he participated in the tests,

9    ran the tests, authored the report.

10              THE COURT:   My experience in these things is

11    that companies have protocols and that all their reports

12    basically look alike, and if it's identified as a Senju

13    research report -- I haven't seen it so I don't know -- then

14    I don't have any real concerns that it isn't a real Senju

15    business record.

16              If, in fact, it's not mentioned during the

17    course of the trial by a witness, then it will be stricken

18    from the record.   There can't just be attorney argument.

19    There has to be some evidence about it.

20              I would just assume that you say yes, it's a

21    business record, but we won't admit it until someone is

22    going to testify about it, then arguing about it as you

23    raise.

24              MS. MAZZOCHI:   Okay.

25              THE COURT:   So if this witness is not going to

Yasueda - direct

1    testify about it, we'll get it in another time.  I mean he

2    can say it looks like a real business record to me but we're

3    not going to admit it right as you raise.

4                MS. MAZZOCHI:  Thank you, your Honor.

5                THE COURT:  Until someone talks about it.

6    BY MR. KELLY:

7    Q.    Dr. Yasueda, I didn't want to do this to you.  Can I

8    ask you to turn to JTX-15, at page 14821.

9    A.    Yes.

10   Q.    And on that page, are the results of a corneal

11   permeability test shown?

12   A.    Yes.

13   Q.    Now, we've just gone through your notebooks in

14   probably excruciating detail.  Are the results shown here

15   consistent with the results you obtained in your tests?

16   A.    Yes, I think so.

17   Q.    Now, let's turn to JTX-16.

18         I'm going to go through the same routine, your Honor.

19   A.    I said "I think so" but in English it doesn't sound

20   good, I hear.  So I will say yes, that is correct.  That's

21   the customary way of saying things in Japanese.

22   Q.    And JTX-16 has a corresponding translation, JTX-16 TR.

23         Again, is this the type of test that is

24   performed as part of Senju's business?

25   A.    Yes.

Yasueda - direct

1    Q.     And was this report prepared about the same time as

2    the tests describing it were performed?

3    A.     Yes.

4    Q.     Was the report made by someone with knowledge of the

5    tests?

6                   MS. MAZZOCHI:  Objection.

7                   THE COURT:  Yes.  I'm not sure how this

8    person -- I'm really --

9                   MR. KELLY:  Your Honor, I'm sorry.

10   BY MR. KELLY:

11   Q.     Does Senju regularly make records of such tests?

12   A.     Yes.

13   Q.     Does Senju regularly prepare records of such tests?

14   A.     Yes.

15   Q.     Does Senju retain these type of documents in the

16   normal course of its business?

17   A.     Yes.

18   Q.     Dr. Yasueda, are you familiar with the recordkeeping

19   process at Senju?

20   A.     Yes.

21   Q.     I'd like you to take a look at SEN15055, please?

22                  THE INTERPRETER:  Can you repeat that?  I got

23   55.

24                  MR. KELLY:  15055.

25                  THE INTERPRETER:  15?

Yasueda - direct

1                MR. KELLY:  15055.

2                THE WITNESS:  Yes.

3      BY MR. KELLY:

4      Q.    Do you see in the upper right-hand corner, the

5      notation report number?

6      A.    Yes.

7      Q.    Who signs that number?

8      A.    I think computer does.  There is a system which

9      assigns the number.  It is a unique number.

10     Q.    And this is a computer that sends you the assigned

11     number?

12     A.    Computer determines the number of the report.

13     Q.    That is a computer maintained at Senju?

14     A.    Yes.  The number is sequential or serial, so it could

15     be 900 for the report of 2006.  The computer gives out the

16     numbers sequentially.

17     Q.    Can I ask you to look at SEN15063.

18     A.    Yes.

19     Q.    And is that report there consistent with the data that

20     you obtained in your experiments?

21     A.    Yes.

22     Q.    Thank you.

23                MR. KELLY:  Chris, can you bring up the first

24     slide of the timeline?

25                Your Honor, what I would like to do is summarize

Yasueda - direct

1    the testimony using the timeline so that we can put into

2    some kind of context the effort that was done here.

3              MS. MAZZOCHI:  We object to that, your Honor.

4    This is not attorney argument.

5              THE COURT:  Yes, I'm not sure how -- well, what

6    do you want to do?

7              MR. KELLY:  Just run --

8              THE COURT:  Summarize his testimony through the

9    use of this demonstrative?

10             MR. KELLY:  I wanted to show him one slide, yes,

11   your Honor, is everything that went on.

12             MS. MAZZOCHI:  Your Honor, for what it's worth,

13   we object to this demonstrative.

14             THE COURT:  Well, the demonstrative is not going

15   to go into the record.  If you want to go over the bolded

16   parts and the admitted exhibit parts, you may.  But in terms

17   of even reading into the record the parts of the record that

18   aren't admitted, then you may not, Mr. Kelly.

19             MR. KELLY:  Your Honor, I understand your

20   instruction, which means I'm going to pass on this part.

21             THE COURT:  All right.

22             MR. KELLY:  And if I could have a minute?

23             THE COURT:  Sure.

24             (Pause.)

25   BY MR. KELLY:

1   Q.     Dr. Yasueda, was this a difficult process to formulate

2   gatifloxacin?

3   A.     Yes.  With my experiments alone, we sacrificed about

4   17 rabbits.

5          So not only that sacrifice, but also we spent

6   one and-a-half years.  And my time and the other inventor

7   Inada's time was spent.  And we were put energy and passion

8   into this.

9          Today, I spent this much time to explain this

10  because we made that much effort and the results were

11  obtained because of that.

12         So all those resulted in our invention, which

13  led to the patent.

14  Q.     Dr. Yasueda, when you started on this, did you expect

15  adding 0.01 percent EDTA to solve the corneal permeability

16  problem?

17  A.     Yes.

18  Q.     You expected 0.01 at the time you started?

19  A.     Not the very initial point.  When I succeeded in the

20  experiment with .05 percent, I thought .01 percent might

21  work because it's close to the .5 -- .05 percent.

22  Q.     Did any prior art or literature help you with this in

23  reaching your invention here?

24         MS. MAZZOCHI:  Objection, your Honor, to the

25  extent he is attempting to characterize the prior art.

1                    (Translation.)

2                    MR. KELLY:  I will withdraw the question, your

3       Honor.

4       BY MR. KELLY:

5       Q.    Can I ask you to turn to PTX-1, Dr. Yasueda, and page

6       3 of that exhibit?

7       A.    (Witness complies.)

8       Q.    And do you see that you cite some prior art or some

9       literature, rather, at the bottom of column 1 and at the top

10      of column 2?

11      A.    Yes.

12      Q.    Did that help you arrive at a 0.01 percent

13      concentration of EDTA?

14      A.    No.

15      Q.    Thank you.

16                   MR. KELLY:  We have no further questions at this

17      time.

18                   THE COURT:  I take it PTX-1 is the same as --

19                   MR. KELLY:  JTX.  I'm sorry, your Honor.

20                   THE COURT:  That's all right.

21                   MR. KELLY:  I'm use to the prior numbering

22      system.

23                   THE COURT:  All right.  Cross-examination.

24                   MS. MAZZOCHI:  Thank you, your Honor.  I have a

25      binder for your Honor, if you would like one.

Yasueda - cross

1              THE COURT:  No, I don't.

2              MS. MAZZOCHI:  I assumed, but just in case.

3              May I present one to the witness, your Honor?

4              THE COURT:  Yes.  I don't know whether he needs

5     to clear anything.

6              (Documents passed forward.)

7                      CROSS-EXAMINATION

8     BY MS. MAZZOCHI:

9     Q.    Good afternoon, Dr. Yasueda.

10    A.    Good afternoon.

11    Q.    In your binder that I handed you, could you please

12    look at JTX-13?

13          And I believe the translation is also in the binder,

14    your Honor.

15    A.    Yes.

16    Q.    And this study, what is the date it was started?

17    A.    March 19th, 1997.

18    Q.    And what was the date of the end of this study?

19    A.    August 27th, 1998.

20    Q.    If you could take a look at Joint Trial Exhibit 1 in

21    your binder?  First page.

22    A.    (Witness complies.)

23    Q.    Do you see where it says foreign application priority

24    data, August 21st, 1998?

25    A.    The second page, right?

Yasueda - cross

1    Q.    My apologies.  Right here (indicating).

2    A.    Yes.

3    Q.    If we can go back to Joint Trial Exhibit 13?

4    A.    Yes.

5    Q.    This is the report.  It has the number 802, last three

6    numbers.  Do you see that?

7    A.    Yes.

8    Q.    Had you completed the lab work in this report before

9    August 21st, 1998?

10   A.    Yes.

11   Q.    If you can turn to tables 7, 9, and 10 in JTX-13?

12   A.    (Witness complies.)

13   Q.    And for the record, they are at SEN23740 and 23742.

14   A.    Table 7, table 9, table 10; right?

15   Q.    Yes.

16   A.    Right.

17   Q.    Table 7, did the test formulations have 0.05 and 0.1

18   weight volume percent EDTA?

19   A.    Yes.

20   Q.    And no test in Table 7 with 0.01 weight volume percent

21   EDTA; correct?

22   A.    Correct.

23   Q.    And if we turn to SEN23741, Table 9 --

24   A.    Yes.

25   Q.    -- the EDTA levels tested versus levofloxacin solution

Yasueda - cross

1    were 0.05 percent EDTA; right?

2    A.    Yes.

3    Q.    And no 0.01 weight volume percent EDTA formulation in

4    Table 9; correct?

5    A.    Correct.

6    Q.    And the next page, SEN 23742, Table 10.  If you could

7    look at that, please.

8    A.    Yes.

9    Q.    You said earlier today this is the test result that

10   you said solved the problem of corneal permeability for

11   gatifloxacin?

12   A.    Yes.

13   Q.    And the only EDTA levels tested are 0.05 percent

14   weight volume; is that correct?

15   A.    Correct.

16   Q.    There's no 0.01 weight volume percent EDTA formulation

17   tested here in Table 10, is there?

18   A.    Correct.

19   Q.    And, in fact, there's no formulation you tested in

20   this 802 study that included 0.01 weight volume percent

21   EDTA, is there?

22   A.    Correct.

23   Q.    On page SEN23742, the summary section, in the first

24   part, it states, one of the intraocular migration tests

25   performed use sodium edetate; correct?

1   A.     Yes.

2   Q.     And we can also refer to that material as EDTA?

3   A.     Correct.

4   Q.     Okay.  In around the middle of this summary paragraph,

5   you -- did you conclude that actual use of sodium lauryl

6   sulfate is problematic due to ocular injury?

7   A.     Correct.

8   Q.     Is sodium lauryl sulfate recognized as having

9   detergent qualities?

10              THE INTERPRETER:  Detergent qualities?

11              MS. MAZZOCHI:  Yes.

12              THE INTERPRETER:  Detergent?  Detergent you use

13  in the kitchen and laundry?

14  BY MS. MAZZOCHI:

15  Q.     As a surfactant.

16  A.     Is there any indication?

17  Q.     I'm asking you, sir, is it a surfactant?

18  A.     Are you asking me about my knowledge or what is

19  written?

20  Q.     Yes, sir.  Your knowledge.

21  A.     Yes.  I think the value of -- it had quality of

22  surfactant, but sodium lauryl sulfate has the function of

23  surfactant, I think.

24  Q.     Thank you.

25              A little bit further on in that paragraph, is it

Yasueda - cross

1    written, given the fact that ocular injury due to sodium

2    edetate is not completely unheard of and its effect is not

3    that great, we have given up on use as an agent for

4    enhancing the intraocular migration of AM-1155?

5    A.    Oh, with regard to this writing, at this time we were

6    not thinking about developing this product in the United

7    States, for the United States at all.

8    Q.    Okay.

9    A.    Well, earlier, we talked about Japanese formulation,

10   and for a reason EDTA would not be included in Japanese

11   formulation because of the doctors in Japan having bad

12   feeling about EDTA or BAK as excipient.  So at this time we

13   already knew that the EDTA would not be accepted by Japanese

14   market, so in having Japanese market in mind only, we wrote

15   in this way.

16   Q.    All right.  And you wrote that given the fact that

17   ocular injury due to sodium edetate is not completely

18   unheard of and its effect is not that great, we have given

19   up on use as an agent for enhancing the intraocular

20   migration of AM-1155.  That's what you wrote?

21   A.    Yes.  We gave it up --

22   Q.    Okay.

23   A.    -- as Japanese formulation.

24   Q.    Please look in your binder at Joint Trial Exhibit 14,

25   please.

Yasueda - cross

1              This study began December 24th, 1998; is that

2      correct?

3      A.    Yes, that's correct.

4      Q.    After your Japanese patent application filing date?

5      August --

6      A.    I don't remember.

7      Q.    It was August 21st, 1998.

8      A.    So is that the date I saw a while ago?

9      Q.    Yes.

10     A.    Yes.

11     Q.    Okay.   In JTX-14, the study number ends with a number

12     202.

13              Do you see that?

14              THE INTERPRETER:   Could you repeat the question?

15     BY MS. MAZZOCHI:

16     Q.    Sure.   Can you confirm this study number at JTX-14

17     ends in the numbers 202?

18     A.    Yes.

19     Q.    Can we agree that the lab work in this 202 study was

20     performed before August 20th, 1999?

21     A.    Are you asking me if these tests were finished before

22     August 20th of 1999?

23     Q.    Yes.

24     A.    That's correct.

25     Q.    If you can look on the front -- the second page of

1    Joint Trial Exhibit 1, if you can look at the left-hand

2    column, do you see where it says PCT filed August 20th,

3    1999?

4    A.    I can see that is what is written here.

5    Q.    Okay.  That's fine.

6          Let's go back to JTX-14 at SEN56583, please.

7    A.    Yes.

8    Q.    And does this study include two formulations?

9    A.    Yes.

10   Q.    All right.  And the top study drug formulation had

11   0.01 weight volume percent EDTA; is that correct?

12   A.    Yes.

13   Q.    And also 0.005 percent benzalkonium chloride?

14   A.    Yes.

15   Q.    And the other formulation, control drug had no

16   benzalkonium chloride or EDTA?

17   A.    Correct.

18   Q.    In this 202 study, was the drug concentration in the

19   anterior chamber of the eyes measured one hour after

20   administration?

21   A.    Correct.

22   Q.    Okay.  If you can take a look on this page, does it

23   indicate that no substantial differences were observed

24   between the gatifloxacin concentrations in the anterior

25   chamber between the two formulations after single

1   administration?

2   A.    I think there was a difference.

3   Q.    Is it written here that no significant differences

4   were observed between the formulas after single

5   administration?  This is page SEN56584.

6   A.    Well, this says no significant differences.  That

7   means there were small differences.

8   Q.    Right.  And they were not perceived as being

9   significant differences in this report based on what's

10  written here; is that correct?

11  A.    I don't know.

12  Q.    I think the document will speak for itself, then, sir.

13  If you can turn back a page to SEN56583.

14  A.    Yes.

15  Q.    And do you see the study drug formulation?

16  A.    Yes.

17  Q.    Can you confirm that that formulation is the one

18  presented in Example 8 of your '045 patent?  And I will put

19  them side by side for you, sir, up on the screen.

20  A.    That's correct.

21  Q.    Thank you.

22         As you raise, if we look at experiment one in

23  your patent, JTX-1, let's look at Column 3, starting at line

24  39, please.

25         As you raise, there are three inventions in your

Yasueda - cross

1     patent; right?

2     A.     I don't understand what you mean by three inventions.

3     Q.     Well, this '045 patent doesn't just talk about corneal

4     permeability.  It also includes testing on and inventions

5     relating to preventing coloration of gatifloxacin; is that

6     right?

7     A.     Well, I still do not understand your question.  Of

8     course, the patent consists of multiple claims, but I wonder

9     if the invention can be isolated into three.  I think the

10    totality is what you look at as an invention.

11              I do not know actually because I'm not an expert

12    in patents.

13    Q.     But, sir, you gave testimony in the Senju v. Apotex

14    case around 2010.

15              Do you recall that?

16    A.     Yes.

17              THE COURT:  I don't generally allow this.  You

18    can refer to it.

19    BY MS. MAZZOCHI:

20    Q.     Sir, do you recall giving --

21              MR. KELLY:  Your Honor, could we have a chance

22    "to get a copy of the transcript?

23              THE COURT:  It's coming.

24              MR. KELLY:  It's Defendants' Exhibit No. 121.

25    BY MR. KELLY:

1      Q.     Sir, do you recall in the Apotex case giving testimony

2      as follows.   "This patent is about gatifloxacin ophthalmic

3      agent and there are three inventions?  One is the

4      improvement of gatifloxacin" --

5                  MR. KELLY:  Could she tell us --

6                  THE COURT:  You need to let everyone know where

7      you are.

8                  MS. MAZZOCHI:  Sure.  I was just going to ask

9      whether he recalled giving that testimony, see if he

10     recalls, and if he didn't, then bring it up on the screen.

11                 MR. KELLY:  I would like to know where she's

12     reading from.

13                 THE COURT:  I understand.  The way I do

14     impeachment or refreshing recollection, whatever you want to

15     call it, is, you have to identify where it is first and then

16     ask so that everyone is on the same page.

17                 MS. MAZZOCHI:  That's fine, your Honor.

18                 If we could call up on the screen, then,

19     Defendants' Exhibit No. 121.

20                 THE COURT:  I'm sorry.  I don't allow things to

21     go on the screen until we're sure that it's impeachment.  If

22     it's impeachment, if it's refreshing recollection, it does

23     not belong on the screen.

24                 MS. MAZZOCHI:  That's fine, your Honor.  It's in

25     Defendants' Exhibit No. 121, page 63, line 20 to 21, and

1    then 64, line 5 to 15.

2                    MR. KELLY:  Thank you.

3                    THE COURT:  All right.

4    BY MS. MAZZOCHI:

5    Q.    Sir, do you recall giving testimony in the Apotex case

6    that your '045 patent is about gatifloxacin ophthalmic

7    agents and there are three inventions?

8    A.    I think I said mainly three inventions or something

9    like that.

10   Q.    That's fine.  And do you recall testifying that one

11   such invention included the improvement of gatifloxacin's

12   corneal permeability at a low concentration of EDTA for

13   gatifloxacin ophthalmic agent?

14   A.    Yes, I remember that.

15   Q.    And do you recall identifying another one as during

16   the manufacturing of gatifloxacin eye drops, the coloration

17   of it is prevented?

18   A.    Yes.

19   Q.    Thank you.  If we can go back then to experiment 1 in

20   the '045 patent at column 3, line 39.

21                    Experiment 1 talks about the effect of disodium

22   edetate on transfer of gatifloxacin to aqueous humor;

23   correct?

24   A.    Yes.

25   Q.    And does experiment 1 relate to corneal permeability?

1    A.    Yes, that's correct.

2    Q.    Now, the only formulation containing disodium edetate

3    or EDTA in experiment 1 is formulation C; correct?

4    A.    That's correct.

5    Q.    Formulations A and B have no EDTA; correct?

6    A.    Correct.

7    Q.    And the EDTA concentration in formulation C was 0.05

8    weight volume percent EDTA; correct?

9    A.    Correct.

10   Q.    Can we agree in experiment 1, you did not test any

11   formulation that contained 0.01 weight volume percent EDTA?

12   A.    I did not know timing-wise whether that was not

13   experimented, but certainly that is not written here.

14   Q.    That's fine.  And there is no formulation in Table 1

15   that contains benzalkonium chloride based on what is written

16   here; right?

17   A.    That is correct.

18   Q.    Okay.  Does table 2, part of experiment 1, in your

19   patent show any results from the 202 study we looked at

20   which was Joint Trial Exhibit 14 for the study drug

21   formulation that had 0.01 weight volume percent EDTA?

22   A.    No, .01 percent is not included here.

23   Q.    That's fine.  If we can go to Joint Trial Exhibit 14

24   at page SEN11864 -- I'm sorry -- 65.  Actually, I apologize.

25   864.

1    A.    Yes.

2    Q.    Okay.  If we look in the results and discussion

3    section, can you confirm that neither formulation produced

4    results above 1.118 plus or minus 0.6500 microgram per mL?

5    A.    Could you repeat the question?

6    Q.    Sure.  In the 202 study, Joint Trial Exhibit 14, did

7    either formulation you tested, whether Japanese or foreign

8    formulation, produce a gatifloxacin concentration in the

9    anterior chamber that exceeded 1.118 plus or minus

10   0.6500 micrograms per mL?

11   A.    Could you simplify your question?

12   Q.    Sure.  The Japanese formulation without EDTA and

13   without benzalkonium chloride produced gatifloxacin

14   concentrations in the anterior chamber of 0.9335 plus or

15   minus 0.5718 micrograms per mL.  Is that correct?

16         THE INTERPRETER:  Now you changed from that to

17   there.

18   A.    So without EDTA or the BAK.

19   Q.    Correct.

20   A.    What is above .9335.

21   Q.    Plus or minus.

22   A.    And what is the subject?

23   Q.    That one is the Japanese formula.

24   A.    This is a culmination of Japanese, .9335.

25         THE CHECK INTERPRETER:  Translator question.

1                       (Check translator confers with witness.)

2       A.      Japanese formula which is indicated on 11683 resulted

3       in .9335 plus or minus 0.5718 mL.

4       Q.      What were the results reported in the same test for

5       the non-Japanese formula gatifloxacin concentration?

6       A.      That is what is written as the foreign formulation on

7       11683, which is 1.118 plus or minus 0.6500.

8                       THE COURT:  And I unfortunately need to

9       interrupt because I need to leave.  I owe you all an hour

10      and 15 or 16.  I remind the witness and translators that

11      because he is on cross-examination, he may not talk about

12      the substance of his testimony during the overnight recess.

13      I'll see you all tomorrow at 9:30.

14                       (Court recessed at 3:15 p.m.)

15                              -  -  -

16

17

18

19

20

21

22

23

24

25