```
 1                      - VOLUME B -

 2            IN THE UNITED STATES DISTRICT COURT

 3            IN AND FOR THE DISTRICT OF DELAWARE

 4                        - - -
     SENJU PHARMACEUTICAL CO.      :   CIVIL ACTION
 5   LTD. KYORIN PHARMACEUTICAL
     CO., LTD. and ALLERGAN,       :
 6   INC.,                         :
                 Plaintiffs,       :
 7                                 :
         vs.                       :
 8                                 :
     LUPIN LIMITED and LUPIN       :
 9   PHARMACEUTICALS, INC.,        :
                 Defendants        :
10   --------------------------    :   NO. 11-0271 (SLR/MPT)
     SENJU PHARMACEUTICAL CO.,     :
11   LTD. KYORIN PHARMACEUTICAL    :
     CO., LTD. and ALLERGAN,       :
12   INC.,                         :
                 Plaintiffs,       :
13                                 :
                                   :
14       vs.                       :
                                   :
15   HI-TECH PHARMACAL CO.,        :
     INC.,                         :
16               Defendants        :

17                        - - -

18                        Wilmington, Delaware
                          Tuesday, January 15, 2013
19                        9:37 o'clock, a.m.

20                        - - -

21   BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

22                        - - -

23
                            Valerie J. Gunning
24                          Brian Gaffigan
                            Official Court Reporters
25
```

1    APPEARANCES:

2

3            MORRIS NICHOLS ARSHT & TUNNELL LLP
             BY:  MARYELLEN NOREIKA, ESQ. and
4                 JULIA HEANEY, ESQ.

5
                      -and-
6

7            OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT,
             L.L.P.
8            BY:  RICHARD D. KELLY, ESQ.,
                  FRANK J. WEST, ESQ.,
9                 TIA FENTON, ESQ.,
                  STEVEN J. BAXTER, ESQ.
10                LISA MANDRUSIAK, ESQ.,
                  CHRISTOPHER RICCUITTI, ESQ. and
11                AKIHIRO YAMAUKI, ESQ.
                  (Alexandria, Virginia)
12

13                Counsel for Plaintiffs

14

15           PHILLIPS, GOLDMAN & SPENCE, P.A.
             BY:  JOHN C. PHILLIPS, JR., ESQ.
16

17                    -and-

18
             RAKOCZY MOLINO MAZZOCHI SIWIK LLP
19           BY:  WILLIAM RAKOCZY, ESQ.,
                  PAUL MOLINO, ESQ.,
20                DEANNE MAZZOCHI, ESQ.,
                  JOHN D. POLIVICK, ESQ.,
21                ANUJ K. WADHWA, ESQ. and
                  BRIAN MURRAY, ESQ.
22                (Chicago, Illinois)

23
                  Counsel for Defendants
24                Lupin Limited and Lupin Pharmaceuticals,
                  Inc.
25
             Bio waive

1    APPEARANCES (Continued):

2

3              SHAW KELLER LLP
               BY:  KAREN KELLER, ESQ.,
4                   JEFFREY T. CASTELLANO, ESQ. and
                    STEVEN ROTH, ESQ.
5

6                   Counsel for Defendant
                    Hi-Tech Pharmacal, Inc.
7

8                        -  -  -

9

10   ALSO PRESENT:

11

12             BILL SCARFF, ESQ.
               In-house Counsel
               Allergan, Inc.
13

14                       -  -  -

15

16

     ALSO PRESENT:
17

18             Satoko (Sophie) Utsunomiya, Interpreter
               Keijiroh Yama-Guchi, Interpreter
19

20                       -  -  -

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:37 a.m.)

 5

 6              THE COURT:  Mr. Kelly?

 7              MR. KELLY:  Yes, your Honor.  We have a brief

 8    matter.  Last night Hi-Tech's counsel provided your Honor

 9    with a letter and documents under seal and I would like to

10    hand to the Court our response.

11              THE COURT:  All right.  Thank you.

12              MR. KELLY:  I previously provided responses to

13    defense.

14              THE COURT:  All right.

15              (Mr. Kelly handed documents to the Court.)

16              MS. KELLER:  Thank you, your Honor.

17              Your Honor, just one thing and unfortunately I

18    have not informed plaintiffs of this.  Hi-Tech is not

19    intending to get the documents admitted into evidence.  We

20    would only seek to use them and refresh the witness'

21    recollection and aid them through his testimony.

22              THE COURT:  Just like Joint Trial Exhibit 8?

23              MS. KELLER:  Exactly.

24              THE COURT:  All right.

25              MR. PHILLIPS:  Your Honor, good morning.
```

Yasueda - cross

1    Jack Phillips on behalf of Lupin.  One other housekeeping

2    matter.

3              It's our understanding that plaintiffs intend to

4    read some deposition designations this morning or sometime

5    today to which we have ongoing objections that we'd ask the

6    Court to rule upon.  So I just wanted to give you a heads-up

7    and let you determine when you want to hear those

8    objections.

9              THE COURT:  Okay.  Generally, with those, I need

10   to actually see the transcripts, so I guess as soon as you

11   get those to me, I will take a look at them.

12             MR. PHILLIPS:  Fine.  Thank you, your Honor.

13             THE COURT:  Thank you.

14             All right.  Cross-examination.  That's correct.

15   Sorry.

16             MS. MAZZOCHI:  Thank you, your Honor.  May I

17   proceed?

18             THE COURT:  Yes, you may.

19             MS. MAZZOCHI:  Thank you.

20                 ... SHINICHI YASUEDA, having been

21        previously duly sworn as a witness, was examined and

22        testified further as follows ...

23   BY MS. MAZZOCHI:

24   Q.   Good morning, Dr. Yasueda.

25   A.   Good morning.

Yasueda - cross

1   Q.     If you could pleasing to column 4 of the '045 patent,

2   starting at line 6.

3   A.     Yes.

4   Q.     And it says that the concentration of disodium edetate

5   normally used for raising corneal permeability is 0.5 weight

6   volume percent; correct?

7   A.     On yes.

8   Q.     And your patent next says, these results show that

9   corneal permeability of gatifloxacin has been improved even

10  by using disodium edetate in one-tenth amount as much as

11  that normally used; correct?

12  A.     Yes.

13  Q.     You did not say in your patent that the corneal

14  permeability of gatifloxacin has been improved for a

15  concentration that is one-twentieth of what is normally

16  used; correct?

17  A.     It doesn't say that.

18  Q.     Okay.

19  A.     One-twentieth will enhance the permeability.  But it

20  doesn't say that, it will not increase the permeability

21  either.

22  Q.     And your patent also doesn't expressly say that

23  corneal permeability of gatifloxacin can be improved for a

24  concentration that is one-fiftieth of what is normally used;

25  correct?

Yasueda - cross

1    A.    Correct.

2    Q.    Can you please go to Experiment 2 in your '045 patent,

3    column 4, lines 20 to 55.

4    A.    Yes.

5    Q.    Does Experiment 2 relate to corneal permeability?

6    A.    No.

7    Q.    If you could take a look at experiment three in your

8    '045 patent, it starts column 4, lines 56 to 58.

9    A.    Yes.

10   Q.    Experiment 3 tested the effects of disodium edetate on

11   preventing coloration of gatifloxacin; correct?

12   A.    Correct.

13   Q.    Does Experiment 3 in your '045 patent relate to

14   corneal permeability?

15   A.    No.

16   Q.    Can we agree that in your '045 patent, the only

17   experiments you report where you tested a 0.01 weight volume

18   percent EDTA formulation is in Experiment 3?

19   A.    In terms of experiments, that is correct.

20   Q.    Thank you.

21         Can you look in your binder at Joint Trial

22   Exhibit 50, please, the 1988 Grass and Robinson paper.

23   Joint Trial Exhibit 50.

24   A.    Yes.

25   Q.    Have you seen this paper before, sir?

Yasueda - cross

1    A.    Yes.

2    Q.    And were you aware of this paper when you wrote the

3    202 study report we were looking at yesterday?

4    A.    Most likely, I cited from this paper.

5    Q.    Thank you.

6          If you could turn to Exhibit, Joint Trial

7    Exhibit 13 at SEN23742, and the translation is Joint Trial

8    Exhibit 13TR.

9    A.    23742?

10   Q.    Yes, sir.

11   A.    Yes.

12   Q.    Can you please look at Table 11.

13   A.    Yes.

14   Q.    Is the number, the mean number for the formulation

15   with BAK 1.14 higher than the mean number for the

16   formulation without BAK?

17   A.    In terms of value, I think that's higher.  When we

18   conducted various experiments -- and I do not believe we

19   thought this was meaningful change.  Well, as of yesterday,

20   with regard to EDTA, the difference or change was

21   significant to me, but I didn't find this change significant

22   with regard to this .005 percent BAK.

23   Q.    Sir, was the answer -- did you actually answer yes,

24   that the number, the mean number for the BAK formulation

25   1.14 is higher than the mean number for the formulation

1   without?

2   A.    That's correct.

3   Q.    Okay.  Thank you.

4         Dr. Yasueda, if you could please take a look at

5   Joint Trial Exhibit 10, which is in your binder.  And I'd

6   like to, in particular, direct your attention to column 3,

7   lines 24 to 36.

8         MR. KELLY:  Your Honor, I have an objection.  We

9   seem to be going with this reference into prior art grounds

10  and it was not the subject of anything in his direct

11  examination.

12        MS. MAZZOCHI:  Your Honor, I am simply going to

13  ask him whether something in here is consistent with some of

14  the testimony that he gave on direct examination --

15        MR. KELLY:  Your Honor --

16        MS. MAZZOCHI:  To try to clarify the nature and

17  scope of the formulations that he has investigated.

18        THE COURT:  Is this a prior art reference that

19  was mentioned in the patent or otherwise part of his

20  repertoire?

21        MS. MAZZOCHI:  It is on the face of the

22  re-examination certificate, your Honor.

23        MR. KELLY:  Your Honor, I think the issue goes

24  to what he was doing when he developed the invention and

25  what he knew at that time and not about subsequent events

 1   long after the patents issued.

 2            THE COURT:  I agree.  The objection is

 3   sustained.

 4   BY MS. MAZZOCHI:

 5   Q.   Dr. Yasueda, as part of your efforts to try to make a

 6   gatifloxacin eye drop formulation, in the documents that

 7   you discussed and called failures during your direct

 8   testimony --

 9            THE COURT:  Oh, you can take that down.  Thank

10   you.

11   BY MS. MAZZOCHI:

12   Q.    -- did you ever try to make any of the formulations,

13   the ocular formulations set forth in this '456 patent?

14            MR. KELLY:  Your Honor, same objection.  She's

15   not tying it to any point in time.

16            MS. MAZZOCHI:  I just did.  The failures that

17   they discussed yesterday.

18            THE COURT:  Well, during that time?

19            MS. MAZZOCHI:  Yes.

20            THE COURT:  All right.

21            MR. KELLY:  Thank you, your Honor.

22            THE INTERPRETER:  Could you read back the

23   question, please?

24   BY MS. MAZZOCHI:

25   Q.   Dr. Yasueda, as part of your efforts to try to make a

Yasueda - redirect

1    gatifloxacin eye drop formulation in the time frame you

2    discussed yesterday when you were making formulations you

3    called failures, did you ever try to make any of the

4    formulations set forth in this '456 patent?

5              THE COURT:  And is this -- I'm sorry.  For

6    purposes of the record, the '456 patent, is that --

7              MS. MAZZOCHI:  I'm sorry.  That's Joint Trial

8    Exhibit 10.

9              THE COURT:  Okay.

10             THE INTERPRETER:  No.

11             MS. MAZZOCHI:  Thank you, your Honor.  No

12   further questions.

13             THE COURT:  All right.  Redirect.

14             MR. KELLY:  Yes, your Honor.

15                   REDIRECT EXAMINATION

16   BY MR. KELLY:

17   Q.   Dr. Yasueda, can I ask you to look at Experiment 3 in

18   JTX-1.

19   A.   Yes.

20   Q.   Do you know when that experiment was added to --

21   excuse me.  Was that experiment originally in the Japanese

22   priority document that was filed in August 1998?  And if you

23   need to refer to it, it is DTX-092 and 192TR in the book,

24   which you and I are looking into.

25   A.   No.  The patent we filed, the very first did not

1    include this Experiment No. 3.

2    Q.    In any of the examples in the priority document -- let

3    me stop.  Do any of the examples in the priority document

4    describe a formulation of .01 percent EDTA?

5    A.    Yes.

6    Q.    Which one?

7    A.    Example 5 indicates 0.01 percent of EDTA.

8    Q.    Thank you.

9          Now, you were asked a question about Experiment

10   2 in JTX-01.  Let me get the page and column for you.  It's

11   Experiment 2, column 4.

12         Does that relate to the stability of the

13   solution?

14   A.    That's correct.

15   Q.    Now, Dr. Yasueda, I'd like you to turn back to the

16   examples which you described yesterday as relating to Zymar

17   and Zymaxid.  Do you see those?  I think you testified that

18   was Examples 8 and Examples 9.

19   A.    That is correct.

20   Q.    Were those examples present in the original Japanese

21   priority document?

22   A.    No.

23   Q.    Were they added after January of 1999?

24   A.    Oh, I'm not sure about the date, but it is certain

25   that we added that.

Yasueda - redirect

1   Q.      And they first show up in August of '99; is that

2   correct?

3   A.      Correct.

4           MR. KELLY:  Your Honor, we have no more

5   redirect.

6           THE COURT:  All right.  You may step down, then,

7   sir.  Thank you.

8           MR. KELLY:  Your Honor --

9           MS. MAZZOCHI:  Your Honor, I apologize.  I don't

10  think, for the record, I don't think I asked anything about

11  Zymaxid or Zymar of this witness during my

12  cross-examination.  I'm just looking at the transcript, so

13  those questions were outside the scope of my

14  cross-examination.

15          THE COURT:  All right.  All right.

16          MR. KELLY:  Your Honor, Ms. Fenton will be

17  putting on the next witness, and if we could just have a

18  second to clear the witness stand?

19          THE COURT:  Sure.

20          MR. KELLY:  So the next witness has some room.

21          THE COURT:  All right.  Certainly, though, this

22  witness may step down.  Thank you, sir.

23          (Witness excused.)

24          MS. FENTON:  Your Honor, plaintiffs would like

25  to call Dr. Matthew Mayo to the stand, please.

Mayo - direct

```
 1              ... MATTHEW MAYO, having been first duly sworn,

 2     was examined and testified as follows ...

 3              THE WITNESS:  Sorry, your Honor.  My back will

 4     be to you because I don't fit under this.  I apologize in

 5     advance.

 6              THE COURT:  That's all right.  We're talking

 7     about unleashing the chair so there is a little more

 8     flexibility.

 9                      DIRECT EXAMINATION

10     BY MS. FENTON:

11     Q.    Good morning, Dr. Mayo.

12     A.    Good morning.

13     Q.    Could you briefly describe your educational background

14     after high school?

15     A.    I have a bachelor's and master's in Statistics from

16     the University of Missouri.  I have a Ph.D. in Applied

17     Statistics from the university of Alabama; and I have a

18     master's in Business Administration from Baker University.

19     Q.    After receiving your Ph.D., what did you do?

20     A.    I took a job at the University of Alabama at

21     Birmingham, School of Medicine in their cancer center as a

22     post-doc.  It's supposed to be a two year post-doc but after

23     a five and-a-half months, I was already 100 percent grant

24     funded, collaborating with people on research, so I got a

25     faculty position.  And then I was a research assistant
```

Mayo - direct

1    professor there for a few years.

2         And then I went to the University of Kansas Medical

3    Center to direct biostatistics for the cancer center and

4    build biostatistics at the school of medicine.  Eventually

5    created a core, then a center for biostatistics and advanced

6    informatics, and then created a department of biostatistics.

7    In 2007, the department initially formed and I am the

8    founding chair.  We have an EMS and Ph.D program  with about

9    20 graduate students.

10        And that's the kind of my job history.

11   Q.    Thank you.

12   A.     Briefly.

13   Q.    Can you briefly describe your duties as a full

14   professor and chair at the department of biostatistics?

15   A.     Is to basically run our department at the medical

16   center.  Part of our job is, administratively, we have to

17   support the administration.  So our department supports

18   administratively the animal care and use committee.  So we

19   review, our department has to review all the animal studies

20   connected at the university for scientific rigor and ethics.

21   We also review the human studies for the cancer center of

22   translational science.

23            Collaboratively, we work with approximately 200

24   investigators on over 400 studies conducted at the medical

25   center so I have to make sure they're operating correctly

Mayo - direct

1     lie across the department in our institution.

2              And teaching, we teach graduate courses to

3     students that are not statisticians:  nurses, allied health

4     students, medicine graduate students.  Then we teach our

5     graduate students in getting master's and/or Ph.D. in

6     biostatistics.

7     Q.    Do you have any national teaching experience?

8     A.    Yes.  I was a distinguished faculty member for the

9     school of breast oncology for five years where I provided

10    the clinical trial design and analysis.  Lectures for the

11    national school held at Emery every year; and I did that for

12    five years.

13    Q.    Do you have service activities relating to your

14    position?

15    A.    Yes.  I do a lot of NIH grant review.  In fact, I will

16    be reviewing cancer centers for grants February 5th, 6th,

17    and 7th.  I continue to have to do numerous of those.

18              I sit on numerous committees.  I'm on the American

19    Joint Commission of Cancers Statistical Task Force where we

20    meet to create the staging manuals when people get staged

21    for cancer.  We take the evidence in the literature as

22    statisticians and provide the physicians who are working in

23    the stage and to say whether this is level 1, level 2, level

24    3 evidence to support a claim and add that into the staging

25    documents.

Mayo - direct

1    Q.    I think you mentioned you are involved in researching

2    activities.  Can you elaborate on that a little bit?

3    A.    I basically still have to be involved with researchers

4    from petri dish studies as I define them to population based

5    studies throughout the nation.  Currently, you know, we work

6    with the design and analysis.  We probably help with about

7    100 grant applications a year with faculty members to NIH

8    alone.  I direct biostatistics.  I direct biostatistics for

9    our institute's clinical and translational science award.

10          I also provide support to my junior faculty.  I

11   do some methodological research now that my job as chair is

12   more to promote their research.  So I mentor them to do

13   their methodological research, so they are coming with new

14   methods, and support students doing their research because

15   we want to have graduates from our department.

16   Q.    Okay.  Thank you.  Have you ever authored any

17   scientific articles in peer reviewed arms that contain your

18   statistical analysis?

19   A.    Yes, over 160.

20   Q.    And have you won any awards pertaining to your work as

21   a statistician?

22   A.    A few.  Institutionally, I was given -- one of my

23   favorite awards was I was the recipient of school of

24   medicine's first Excellence in Mentoring award, where I

25   mentored junior faculty and clinical faculty in research and

Mayo - direct

1    career development.  I have won teaching awards when I was

2    at Alabama and Missouri.  And then I was -- I'd say those

3    are my awards.

4    Q.    And have you received honors as a statisticians?

5    A.    Yes.  I was elected a fellow of the American

6    Statistical Association in 2011.  And I was accredited as a

7    professional accredited statistician by the American

8    Statistical Association in 2012.

9    Q.    Can you explain the importance or relevance of these

10   honors?

11   A.    The fellow is a great honor because only fellows can

12   nominate fellows.  They can only nominate two a year, and no

13   more than one-third of one percent can be in that.  So it's

14   a high honor for me for people from the outside to nominate

15   and write letters supporting what I have done in my career.

16             Even though I may be gray, that is more being a

17   chair, I'm not that involved.  So it was quite an honor to

18   receive that.

19             Then the Pstat accreditation.  It's kind of a

20   new accreditation.  The British and Canadians have been

21   accrediting statisticians a little bit longer than we have.

22   We have an open membership in the American Statistical

23   Association, but accreditation is deemed to be more

24   important because many people can say they're statisticians

25   or have statistical expertise but there is no checks and

1    balances.  So this is a way to start implementing checks and

2    balances that you can officially say your hanging a shingle

3    as a qualified applied statistician.

4    Q.    Thank you.  How many members are there in the American

5    Statistical Association?

6    A.    About 18,000.

7    Q.    How many are accredited by this Pstat that you

8    referenced?

9    A.    182.

10   Q.    Have you ever been awarded any grants related to

11   statistics?

12   A.    Yes.  I was lucky enough to obtain an award to build

13   biostatistics and informatics relating to cancer where I got

14   an NCI award to build that.  That is a five year,

15   $1.4 million award to build that.

16         Currently we have an external contract from a company

17   that does IBI gene therapy for neuromuscular disease in

18   youth and we were building their database to do a national

19   study, and the building of the database invalidating that

20   was about a $300,000 award.  And hopefully I'll find at the

21   end of the month we have another $1.3 million pending to

22   finish the study and do the analysis.

23   Q.    Do you have any particular experience in animal

24   studies dealing with the concentration of therapeutics and

25   in systems?

1    A.     Yes.   When I was at the University of Alabama in

2    Birmingham, I was lucky to work with Al Abulio (phonetic),

3    who was the director of their cancer center, and Don

4    Luxbaum, who was the director of radiation biology, and I

5    worked with them and I was the responsible party.

6         We would look at the and build the animal models and

7    do the animal studies related to cancer therapeutics and we

8    would do the animal models looking at tissue specific

9    pharmacokinetics, looking at different treatments, what it

10   did with the tumor, how it was absorbed in the body, how

11   much uptake was in the tumor, the blood, the liver, all

12   those types of things and I was responsible for all those

13   animal studies.

14   Q.     Thank you.

15            MS. FENTON:  Your Honor, at this time plaintiffs

16   would like to offer Dr. Mayo as an expert in the field of

17   statistical analysis.

18            MR. RAKOCZY:  No objection, your Honor.

19            MS. FENTON:  May I approach the witness?

20            THE COURT:  Yes.

21            THE WITNESS:  Thank you, ma'am.

22            MS. FENTON:  Um-hmm.

23   BY MS. FENTON:

24   Q.    Dr. Mayo, before we discuss the specific analysis you

25   performed, let's talk a little bit about statistics and some

Mayo - direct

1    of the general terms that you are using today.

2              Just briefly, generally speaking, what are

3    statistics used for?

4    A.    Well, broad classifications, I would say there are two

5    broad classifications.  There are descriptive and

6    inferential statistics.

7              Descriptive statistics are just describing

8    something.  We just say here is the mean and weight of a

9    group.  Here is the maximum value of something.  You are

10   just describing a population or a sample to just get an idea

11   about the data.

12             Inferential statistics is where you are taking

13   sample data and inferring to a population or inferring to a

14   target population or the real population.  And generally

15   when we're talking about inferential statistics, we're doing

16   some type of statistical test, statistical inference:

17   confidence intervals, P values.  Something like that

18   generally are involved in inferential statistics.

19   Q.    Do you use both types of statistics?

20   A.    Yes.  Descriptive is very important.  I mean,

21   unfortunately, some people go too fast to the conclusion and

22   don't look at the data.  You need to look at the data, you

23   need to understand what that means and describe it and graph

24   it, and then you need to analyze it and see if you are

25   testing a hypothesis or not.

Mayo - direct

1  Q.    In statistics, you often hear the term P value.  Can

2  you explain that for us, please?

3  A.    Okay.  It's when we have a hypothesis of interest, we

4  conduct the test under the assumption that the null

5  hypothesis is always true.  So, in other words, the burden

6  of proof is on the data to discard what the null hypothesis

7  is.  So we might say the null hypothesis is there is no

8  difference.  And we collect the data, and then we calculate

9  the P value.  The P value is the probability our test

10  statistic, which is a function of our data, is as extreme or

11  bigger than what we see or smaller, depending on the

12  direction you want to go, and we say given the null is true.

13         So basically as the P values go down, that gives

14  less and less evidence supporting the null hypothesis

15  because we are always doing it under the assumption the null

16  is true.  Or innocent until proven guilty, in other words.

17  Q.    And you mentioned null hypothesis a couple times.  Can

18  you explain what that is, please?

19  A.    Generally, it's, you might sit there and say this is

20  what has been -- some people say this is what we know today.

21  So maybe this is -- this is, we know that this IQ test that

22  we have has a mean of 100.  Okay?  And this is the average

23  where people fall.  Well, if I do some things, if I give

24  them a new pill, can I increase their IQ?  So the null would

25  be the mean would be 100 versus the alternative and the mean

Mayo - direct

 1   may be higher than that.

 2        If you are comparing two treatments, if you want to

 3   know if a new treatment is better, your null hypothesis is

 4   the two treatments, the mean or whatever, depending on the

 5   measure of the statistic, would be the difference is the

 6   equal to zero versus the difference is not equal to zero, or

 7   maybe the difference is greater than zero or less, depending

 8   if you have a directional one-sided or two-sided test.

 9   Q.   Just to make sure I'm understanding you correctly.  Is

10   it appropriate to say it's sort of a baseline or a starting

11   point where you assume something is true?

12   A.   Yes, I mean we always assume the null is true.  So if

13   you are starting a research and you sit there and say this

14   is what I know today, so I want to see if this is better,

15   maybe then I can improve something.  So ...

16   Q.   What do you do with a P value?

17   A.   Well, you calculate it.  We take the data and we

18   calculate it based on the statistical test we're using for

19   that set of data or that experiment, experimental design.

20        And then if you have a priori hypotheses that you're

21   testing, you can compare then compare that maybe      a

22   priori what is called a type 1 error rate.  You compare it

23   to that.

24   Q.   What is a type 1 error rate?

25   A.   The type 1 error rate is a value that is a probability

Mayo - direct

1    where we're saying it's the probability you reject the null.

2    You say that you support or -- yes, you reject the null when

3    in fact the null is actually true.  And we never really know

4    whether the true null is true, but we set the probability in

5    advance.

6    Q.    Is there a standard type 1 error rate?

7    A.    Standard, no.

8    Q.    Is there a value that is commonly used?

9    A.    Yeah.  I've seen type 1 error rates from, I mean use

10   them from 1 percent to 10, even 20 percent.  But most common

11   I would say is .05.  I would say that is the most common.

12   Q.    Now, is there anything special about that .5 or I

13   think you said .05?

14   A.    .05.  No, it kind of comes from Fisher way back from

15   the English, but there is nothing magical about it.  If you

16   are actually doing it appropriately, you would assess the

17   risks of type 1 error and type 2 error and you would set

18   your study then, but it's become somewhat of a very common

19   value people use.

20   Q.    Okay.  Thank you.  I guess with that background, let's

21   move on to some of the particular analyses that you did.

22   You have a notebook in front of you with a couple of

23   exhibits in it.  And I would ask you to turn to what is

24   labeled JTX-15 in your notebook.  And there should be an

25   accompanied translation of that document labeled JTX-15 TR.

Mayo - direct

1   A.    Okay.

2   Q.    Do you recognize this document?

3   A.    Yes.

4   Q.    In particular, I'll direct your attention to SEN14817.

5         MS. FENTON:  Can you put that up, please?

6   A.    All right.  In the translation?

7   Q.    Yes.

8   A.    Okay.

9   Q.    Assuming that is easier for you.

10  A.    Yes, that would be a lot easier.  I just wanted to

11  make sure.  14817?

12  Q.    14817.

13  A.    Okay.

14        MS. FENTON:  Chris, if you would blow up I think

15  maybe paragraphs 11 and 12 of that page.  Thank you.

16  BY MS. FENTON:

17  Q.    And tell me if this is enough?

18  A.    Yes.

19  Q.    Does this describe the experimental design of the

20  study?

21  A.    Yes.  To a certain extent, yes.  It does a good job.

22  Basically, it identifies we're going to have four test

23  groups of animals.  The extract time is going to be at a

24  half hour, one hour, two hours, four hours.  There is going

25  to be five rabbits sacrificed at each of those time points.

Mayo - direct

1    They're basically saying that after they -- they used

2    the term "euthanize" -- they kill it, they're going to

3    sample stuff out of the aqueous humor of the eye.  They're

4    going to tap the eye.  They're going to talk about

5    preparation of the samples.  I think it does a decent job

6    identifying how the study was conducted.

7  Q.    Thank you.  Now, I'm going to direct your attention to

8    the page labeled SEN14821.

9          MS. FENTON:  And, Chris, I don't know if you can

10   blow up the whole page and get it a little bit bigger, the

11   text?  Thank you.

12  BY MS. FENTON:

13  Q.    Are you familiar with this data?

14  A.    Yes.  I'm familiar with these summaries of the data,

15   yes.

16  Q.    And can you briefly explain your understanding of the

17   data on this page?

18  A.    Well, they're looking at some kinetic parameters.  As

19   you know, this was to look at the drug, the profile of

20   gatifloxacin.  So we're looking at the profile.  Generally,

21   you are doing that over time.

22      Unfortunately, with animal studies, just for

23   explanation purposes, they don't have the luxury of taking

24   samples from the animal at multiple time points because to

25   do it, you have to kill the animal.  So unlike in many human

Mayo - direct

1     studies and other type of studies where you are drawing

2     blood, maybe a little tail vein blood out of it, they have

3     to sacrifice it.

4          In any event, you generally look at concentrations.

5     So what describing in the top table is looking at the

6     average concentration and standard deviation for the two

7     formulations that are .5, the 1, the 2, and the 4 hour.  As

8     you can see, it kind of relates to the graph below.  And as

9     you can see, the formulation with the .01 percent EDTA added

10    is consistently higher ranking from 68 to, you know, almost

11    40 percent higher at different time points.

12         Table 2 offers information related to the Cmax,

13    the Tmax, the AUC from zero to two hours and the AUC from

14    zero to four hours, which are global descriptions.  The AUC

15    is really how much you are getting into the system, how much

16    drug you are getting in the system.

17         I can't say always because statisticians very

18    rarely use always or never, but most of the time when you

19    are using the drug, you want to get more drug into what you

20    are trying to buy.

21         So the AUC is kind of a global measure over

22    those time points.  And as you can see, just from zero to

23    two hours, there is a 40 percent increase in the AUC when

24    you add EDTA; and from zero to four hours, there is a

25    27 percent increase when you add EDTA.  So you are getting

Mayo - direct

1       more of the gatifloxacin into the system.

2               MR. RAKOCZY:  Excuse me, your Honor.  I'm going

3       to object to that whole last line of questioning.  There is

4       no mention of any AUC analysis in his expert report.  None.

5       His report was limited to the first table at the top of

6       Table 1.  He did not go and analyze the AUC values in his

7       expert report.

8               THE COURT:  All right.  You may continue.

9               MS. FENTON:  Your Honor, just to respond to

10      that, I don't believe that's an accurate representation.

11      His whole analysis is based on analyzing the AUC, and we'll

12      go through that.  Thank you.

13      BY MS. FENTON:

14      Q.    And can we turn to page SEN14850, please.

15              THE COURT:  What was the page number?

16              MS. FENTON:  15840?

17              THE WITNESS:  That's in the Japanese version?

18              MS. FENTON:  I'm sorry.  Yes.  SEN.

19      BY MS. FENTON:

20      Q.    Now, is this the raw data that you used to perform

21      your analyses?

22      A.    Yes.  It has the time points.  They're collected.  The

23      animal.  They're the location, which eye was treated, right

24      or left eye, and the concentration.

25      Q.    Okay.

Mayo - direct

1              MS. FENTON:  Your Honor, at this point I would

2      like to move in JTX-15 and JTX-15TR into evidence, please.

3              MR. RAKOCZY:  We object to that, your Honor,

4      for the same reasons it was objected to yesterday during

5      the witness' testimony, Mr. Yasueda, who was not able

6      to lay the foundation for this document as a business

7      record.

8              As your Honor may recall, he didn't conduct the

9      tests, he was not there whether they were conducted.  He has

10     no idea exactly how this data was collected.  All he could

11     say was that he knew some of the general recordkeeping

12     practices of the company, but he did not know and could not

13     testify as to this document, JTX-15, or JTX 16, your Honor.

14     And certainly the expert is not capable of laying that

15     foundation either.  So we would object to their

16     admissibility.

17             Obviously, an expert is entitled to rely on

18     hearsay to the extent it's something he normally relies on

19     in the course of his work, but the experiment should not be

20     permitted to just admit documents wholesale like this.

21             THE COURT:  Number one, did this document come

22     from Senju out of their records?

23             MS. FENTON:  Yes, your Honor.

24             THE COURT:  Number two, was this included in his

25     report?

1          MS. FENTON:  Yes, your Honor.

2          THE COURT:  Then for purposes of this trial,

3     your objection is noted, but I will allow the admission of

4     the document for purposes of this testimony.

5          MR. RAKOCZY:  Thank you, your Honor.

6          MS. FENTON:  Thank you, your Honor.

7          (Joint Trial Exhibit 15 and Joint Trial Exhibit

8     15TR were admitted into evidence.)

9     BY MS. FENTON:

10    Q.    Now, did someone from our firm ask you to conduct the

11    analysis of the data included in JTX-15?

12    A.    Yes.

13    Q.    Did anyone ever tell you what they expected or hoped

14    your analysis to show?

15    A.    No.

16    Q.    And based on you not knowing the objective of the test

17    or not knowing what we wanted you to evaluate, what type of

18    test did you choose to do?

19    A.    Well, the method I chose was, the hypothesis I

20    generated was a two-sided test, because I knew no

21    directionality.  So because I didn't want to know, because I

22    didn't know what -- at that point in time, I had no idea

23    what was being disputed or claimed or anything.

24          So I basically said, I want to assume to know

25    that these concentrations over time, these time dependent

Mayo - direct

1    concentrations are the same between the two treatments

2    versus the alternative that they differ.  Now, that's much

3    more difficult and it's a conservative method because most

4    researchers have a directionality.  They want to see an

5    increase.

6         Generally, you add on to a treatment, especially

7    in early stage research, to where you really just want to

8    know, is this new treatment better than what was existing.

9    But not knowing, not talking to the researchers, I had

10   performed a two-sided test at that time.

11   Q.   And can you explain the difference between a two-sided

12   test and a one-sided test?

13   A.   A two-sided test really is saying the null hypothesis,

14   if I've got two groups, and let's just assume the measure of

15   interest is the mean.  As I would say, the two means equal.

16   So the means for group one and the mean for group two are

17   equal, which means their difference is equal to zero.  So

18   that's the null.  And my alternative, if it's two-sided,

19   would be that they differ.  The difference is not equal to

20   zero.  May be above, may be below.

21        Sometimes we do research and we don't know the

22   directionality, have no idea what might happen.  Sometimes

23   we want to know, maybe it may be better, help, but we also

24   want to detect.  Maybe it's worsening somebody.  Maybe it

25   could help.

Mayo - direct

1      So we would want to be able to detect both of

2  those sides.  But one-sided could be, I want to know is mean

3  one bigger than mean two, so my alternative hypothesis, mean

4  one minus mean two assuming not equal to zero would be

5  greater than zero.

6  Q.    Thank you.

7      So is it fair to say that a two-sided test is a

8  more conservative test than a one-sided test?

9  A.    Oh, yes.

10 Q.    Dr. Mayo, I'd like to direct your attention to

11 SEN14815, and I believe that's in the translated version of

12 JTX-15.

13 A.    Yes.

14     MS. FENTON:  And, actually, let's go to -- can

15 we flip ahead a few more pages.  Actually, no.  We can go

16 back to that.  That's fine.  14815.  Thank you.

17     And looking at the table, Chris, can you just

18 blow up that top table?  Thank you.

19 BY MS. FENTON:

20 Q.    Looking at the table on the top of this page, can you

21 tell us what this information represents?

22 A.    It looks at the -- what's in and the amount, what's in

23 the solutions for each of the two groups.

24 Q.    And how much EDTA was added to the sample containing

25 EDTA here?

1    A.    .01 grams, which would result in .01 percent.

2    Q.    Okay.  Thank you.

3          And do you see any other differences between the

4    sample labeled EDTA, added formula, and the formulation

5    labeled current formulation?

6    A.    No.

7    Q.    Now, if you turn back to SEN14821 in this document,

8    JTX-15, and this is the page we were just previously looking

9    at.  Do you see that Table 1 and Figure 1 also indicate that

10   this test included .01 percent EDTA added to the

11   gatifloxacin solution?

12   A.    Yes.  The top row under Table 1 says formulation

13   added, .01 percent EDTA.  Gives the concentrations across

14   that time point, those time points, and then there's a

15   formulation added.  01 percent EDTA is the, I guess you

16   call them, it looks like diamonds, the graph with the

17   diamonds.

18   Q.    Okay.  Now, this test in JTX-15 comparing the

19   formulation with .01 percent EDTA and the formulation

20   without EDTA, do you consider that a well-designed

21   experiment to examine the effect of .01 percent EDTA on the

22   concentration of gatifloxacin?

23   A.    Yes.  I think this is a very well-designed animal

24   study.  You are taking time points of interest.  You're

25   taking animals you're going to sacrifice at time points.

1    You're treating one eye with the other.  You're paring the

2    data.  You know, this is a fairly large animal study.

3    Q.    And do you think it's a good study to examine the

4    effect of .01 percent EDTA on the concentration of

5    gatifloxacin in aqueous humor?

6              MR. RAKOCZY:  Objection, your Honor.  This is

7    well outside the scope.  His report, it devotes literally

8    less than a page to this study.  There's nothing about, no

9    opinions whatsoever about whether this is a well-designed

10   study, whether this is a lot of animals, none of that.

11   Outside the scope, your Honor.

12             THE COURT:  All right.  It's noted.

13             MS. FENTON:  May I respond?

14             THE COURT:  You don't need to.

15             MS. FENTON:  Okay.  Thank you.

16             THE WITNESS:  Do you want me to elaborate?

17             MS. FENTON:  No.  That's okay.  I will move on.

18   Thank you.

19   BY MS. FENTON:

20   Q.    Given that you consider this a well-designed study, is

21   there a way for you to categorize or label the type of

22   evidence this is?

23   A.    Well, I mean, if I were to translate this, animal

24   studies don't have the labeling like human studies do, and

25   we do evidence-based medicine there, but given my experience

Mayo - direct

1    of doing both numerous animal studies and numerous human

2    studies and using evidence-based research, this would

3    probably be somewhere between level 2.1, 2-1 and level 1

4    evidence, or study designed to give that type of testified,

5    in my opinion.

6    Q.    Thank you.

7          And can you explain what level 1 evidence or

8    level 2-1 evidence is?

9    A.    Well, level 1 is primary evidence in a human study, so

10   it's a primary evidence.  So when you see a study and you're

11   sitting there, level 1 evidence changes therapy.  Okay?

12   Changes how patients are treated.

13         Level 2-1, sufficient enough level 2-1 evidence

14   can change the way people are treated.  Of course, it's not

15   quite as high, but that's how you classify evidence.

16   Q.    And do you have experience in categorizing studies

17   into this --

18   A.    That's what we do with the AJCC.  We take papers

19   published in the cancer research realm and then identify

20   that and then help the clinician work to see whether that

21   provides sufficient evidence to change staging or to change

22   treatment.

23   Q.    Okay.  And did you read defendants' expert, Dr.

24   Bloch's report in rebuttal to yours, which also relied on

25   this evidence, JTX-15?

1    A.    Yes.  I think he said this -- this experiment provides

2    a statistical, valid comparison to compare something of that

3    extent, to compare a formulation that just had -- that has

4    EDTA versus one that doesn't.

5    Q.    Thank you.

6           And I believe you already mentioned that you

7    conducted a two-sided test on the data included in JTX-15,

8    but can you explain more about what type of actual analysis

9    you performed on this data?

10   A.    Yes.  Because -- as I related earlier, your Honor,

11   because I can't sample out of the eye of the animal at the

12   same time, if I could do that, then we would have a time

13   curve for each animal.  And I would still use a similar type

14   of modeling.  It would just be -- have a correlation

15   structure.

16          What I have -- I have two factors here.  I have

17   group and I have time and I need a control for that.  As you

18   can see from the graph, these curves are very similar over

19   the time frame.  Okay?

20          Now, I have to account for the correlation

21   between the animals, so I have the right eye and the left

22   eye of the animal.  And one way to account for that

23   correlation is to run a mixed model, which basically says,

24   I'm accounting for the fact that when I take a measurement

25   at the half-hour, I've got the same animal for which I'm

Mayo - direct

1        getting two measures.  They're not independent.  So they're

2        not different people.  It's from the same person.  It's

3        matched or pared.

4               So there's different ways to account for that

5        correlation.  The most common would be a compound symmetric.

6        Now, it's -- that's another way of saying exchangeable.  So,

7        in other words, I could exchange the eyes.

8               If I treated the right eye or the left eye, it's

9        an exchangeable-type structure.  Okay?  There's no --

10       there's no reason to think the right eye is going to respond

11       differently than the left eye, you know.  If you knew there

12       was a reason, you might take that into account, but, to me,

13       that's really not the reason we do that.

14              But we use the entire time force to -- over the

15       entire time forces across all the animals to get an estimate

16       of that, because you are not going to get a stable estimate

17       at one time when you only have five observations, which is a

18       lot of animals.  I mean, you've got to kill these animals

19       and you've got to sacrifice them.  But, globally speaking,

20       I'm going to get a more stable estimate of that correlation

21       taking a global estimate of the correlation and controlling

22       for that correlation, and so then I look at those two

23       factors and I create a model.

24              Now, what I do is I took the two factors into

25       the model, accounted for that correlation, and I used -- as

Mayo - direct

1   you can see, the variances differ and standard deviations

2   differ over time, and typically, based on my experience, it

3   doesn't mean a lot of things.  I use the Kenmore and Rodger

4   approximation for degrees of freedom that basically accounts

5   for the non-constant variability in the process.  But you

6   take that and you get two factors.  I've got group and I've

7   got time.  Okay?

8           Now, based on the structure, those curves look

9   very similar over time.  Okay?  But I included an

10  interaction term because sometimes they don't appear to

11  interact, which means the curves really don't cross.  One

12  goes up and down and the other one stays down and then goes

13  up.  I don't have different shaped curves.

14          So then I tested that.  It was insignificant.

15  And so then that term is dropped because if you leave an

16  insignificant term in, you can bias your variance and you --

17  actually, it was getting better fit criteria for the most

18  part and then tested the main effect of the group effect,

19  because that's the effect of interest.  The question is,

20  over this time course.

21          So I don't have the luxury of truly estimating

22  the AUC for every animal, but this is -- you are looking at

23  the time course over drug.  The AUC based on that is a

24  summary statistic.  Okay?  And so we compared that over time

25  and then I got a P value for the group effect.

Mayo - direct

1    Q.     Thank you.

2                  And I believe you just testified that as opposed

3    to looking at the data, I think you used the word globally,

4    the approach of looking at the data at each time point, and

5    I think you said that that would not be an appropriate way

6    to look at the data.

7                  Can you elaborate on that, please?

8    A.     Yes.  Because, one, I'm looking at the time profile.

9    I have two factors.  If I had a group by treatment

10   interaction, so, in other words, if these curves were

11   different shaped, I'd want to identify where might that

12   difference exist.  Right here, it's a global effect.  I'm

13   seeing a global raising of the gatifloxacin.

14                 If the interaction term was significant, and I

15   published on this and this is highly known -- if the

16   interaction term is significant, then you need to run

17   what are called these pairwise comparisons or subgroup

18   analyses.

19                 In clinical trials, you may have an instance

20   where you may think the treatment may work differently.

21   There may be a different way the treatment works in men

22   versus women, so you would offer a way to design the test

23   for the interaction for the treatment, and if that

24   interaction between treatment and gender were significant,

25   you would analyze women and men separately.  Done that.  I

Mayo - direct

1    mean, we've done that with some exercise trials.

2            But here you're looking at the global effect.

3    How is Gatifloxacin -- they want to know, does this affect

4    the profile?  I think that's the title of the -- if I

5    remember the title of the study, it is the -- the effect to

6    issue a profile.   When you are talking about the profile of

7    the drug, you're talking about how does it affect what it

8    does over the time.

9    Q.    Right.  In JTX-15, I will now direct you to SEN 14849.

10   And I think that might be only in the non-translated

11   version.

12           MS. FENTON:  I'm sorry.  It's 14849, please.

13   Thank you.

14   BY MS. FENTON:

15   Q.    Looking at this data on SEN14849, do you recall that

16   Dr. Bloch criticized you for supposedly saying that the data

17   on this page contained a six-minute time gap?

18   A.    Yes.

19           MR. RAKOCZY:  I'm going to object your Honor.

20   Number one, it's also outside the scope.  Number two, this

21   is a Japanese language document for which we do not have a

22   translation.

23           The English language report that keeps being put

24   up on the screen is actually only a very small part of

25   JTX-15.  Most of JTX-15 is in Japanese.  It has not been

Mayo - direct

1   translated.

2           MS. FENTON:   Your Honor, if you look at their

3   expert's report, Dr. Bloch, he actually copies the figure,

4   the Japanese chart figure, and another figure from this and

5   paste it in his report, and so he relied on it

6   substantially.   I don't see how this is objectionable.   Both

7   experts relied on it in their analysis.   And, in fact, it's

8   this exact page that Dr. Bloch, their expert, uses to

9   criticize Dr. Mayo's analysis.   I think it's fair for him to

10  address this point.

11          THE COURT:   Assuming that is an accurate

12  representation, I have no objection to it.

13          MS. FENTON:   Thank you, your Honor.

14  BY MS. FENTON:

15  Q.    So looking at this page, can you please explain to me

16  the issue, this issue that Dr. Bloch brought up with the

17  time gap or the six-minute time gap?

18  A.    Well, I mean, he brought it up.   I mean, it's

19  basically the raw data is taken and put into a columnar form

20  and in one column related to the EDTA sample, the researcher

21  obviously put in what we call a jitter to the time.

22          When you are looking at dot plots, if the time

23  frame occurs, if all the values occur at the same time, your

24  Honor, even if you are putting squares or triangles or

25  things and they overlap, it's hard to distinguish, is there

Mayo - direct

1    a difference in these individual time points.  So if they

2    would have overlaid those and not put that in there, there's

3    no other place in the document where you do this.  You do

4    this, it's done, there are graphic packages that can do it

5    automatically.

6              Unfortunately, this looks like Excel.  Excel has

7    no standard package to do that, so you input a jitter.  So

8    you can see graphically that, hey, these individual points,

9    if you look at those triangles and diamonds, but if I put

10   them at the same time point, you would not be able to see,

11   you wouldn't be able to distinguish them if I didn't kind of

12   separate them a little bit somehow for the eye to see that

13   there's potentially an increase that the diamonds are a

14   little bit higher than those triangles at the time points

15   of interest.  So there's no six-minute time lag.  That's

16   just a graphical way to input that and to make a graphical

17   display.

18   Q.   And I think you used the term jitter to design this

19   graphical plot.  Is this done in your area of expertise?

20   A.   Yes.

21   Q.   And have you ever seen or authored any peer-reviewed

22   journals that have used jitters or graphically plotting data

23   this way for ease of use to see the data?

24   A.    I've seen it and I've been a co-author on at least two

25   papers that have done this.

Mayo - direct

1   Q.   Now, have you confirmed with anyone that the plot --

2   and we're looking at the scatter plot in the upper

3   right-hand corner on this page on SEN14849.  Have you

4   confirmed with anyone that this is, indeed, a jitter?

5   A.   Yes.  I had a phone conversation with Mr. Tajika, who

6   is the one who signed off on this report.

7   Q.   Thank you.  So do you think that Dr. Bloch's

8   characterization of this data as having a six minute time

9   gap is accurate?

10  A.   It's absolutely false.

11  Q.   Now, I'm going to direct your attention back to

12  SEN14821.

13  A.   Translated version?

14  Q.   Yes.

15  A.   Okay.

16         MS. FENTON:  Chris, if you could blow up that

17  page, it would be helpful.  Thank you.

18  BY MS. FENTON:

19  Q.   Looking at the data on this page, what did you find in

20  comparing the gatifloxacin sample with .01 percent EDTA to

21  the one without EDTA?

22  A.   When I conducted the two-sided test, I got a P value

23  of .089.  So although it is, the gatifloxacin is higher, it

24  didn't reach the .05 level of significance.

25  Q.   Now, can you take a moment, please, and explain a

1    little bit about the data in Table 2?

2    A.    So, again, because we have tissue specific, we don't

3    have necessary over time but we're trying to look at the

4    effect over time, the profile.  So it's the area under the

5    curve.  I mean the area under the curve is a summary

6    statistic here.  It's a way of describing the two curves.

7    Okay?  And it kind of looks at the magnitude of effect.

8            If you look at it, you know, your AUC from four

9    to 20 hours, the AUC from the formulation adding EDTA.  And

10   this, I will say, I have done this, when you have to do

11   harvesting, you can't get the two, you can't take multiple

12   samples from the same animal over time.  This is how you

13   would summarize.  They did a nice job using the trapezoidal

14   rule.  You can see that the formulation is 27 percent

15   higher.  That is quite a bit higher.

16   Q.    When you say, as you can see, the formulation is

17   27 percent higher, can you tell us which number you are

18   looking at?

19           MR. RAKOCZY:  Again, objection, your Honor.

20   Just for the record, this again is well outside the scope.

21   There are no opinions from data on the AUC opinions he is

22   giving right now.

23           THE COURT:  It's noted.

24           MS. FENTON:  Thank you.

25           THE WITNESS:  Basically, the AUC is a summary.

Mayo - direct

1    It averages out depending on the weight.   It can be

2    different samples and variability.   It looks at the

3    magnitude of difference across all the time points and kind

4    of summarizes that to give an estimate of the global effect.

5              It's kind of like looking at your stock

6    portfolio.   You don't necessarily look at it one day, you

7    look at it over time.   If I get a 27 percent better return,

8    I'll move my investment portfolio.

9    BY MS. FENTON:

10   Q.    Thank you.   I think you mentioned you got a P value of

11   .08?

12   A.    Yes, about .089.   Depending on how many decimal places

13   you want to round it.

14   Q.    How does this or does this P value relate to the

15   information that is contained in Table 1?

16   A.    Well, these are summary measures and what I did is

17   taking the raw data that makes up these summary measures

18   that basically says that there is roughly, I'll say, just

19   under a nine percent chance that I get a result, I get an

20   increase that or a difference that I'm seeing here with

21   that.   I get a difference in the formulations over the time

22   frames that I'm seeing as big or bigger or as extreme as

23   what I'm seeing or more given the null is true.

24   Q.    And, again, in analyzing this data, you used a

25   two-sided test; correct?

Mayo - direct

1    A.    Yes, that is what I did.

2    Q.    Okay.  Now, prior to conducting your analysis and

3    writing an expert report, did anyone inform you of anything

4    about this case in terms of the claim construction and how

5    the claims were construed?

6    A.    No.

7    Q.    Were you present for the opening statements where

8    plaintiffs' and defendants' counsel brought up claim

9    constructions of claim 6 in saying that your Honor's claim

10   construction says that claim 6 is construed to require

11   showing an increase in concentration of gatifloxacin aqueous

12   humor?

13   A.    Yes.

14             MR. RAKOCZY:  Again, objection, your Honor.

15   Outside the scope, legal conclusions.  It's a statistician.

16   He is not here to talk about claim constructions.  Again, it

17   is not in his expert report, obviously.

18             MS. FENTON:  Your Honor, I was just -- I'm not

19   going to go into any sort of legal conclusions.  I just

20   want, as a statistician, in his experience, if he -- it's

21   going to the conservative nature of what he, how he did his

22   testing.  And I just wanted to ask a couple questions about

23   if he knew that the actual intent was to increase

24   gatifloxacin.

25             THE COURT:  No. 1, I'm happy to have you object

Mayo - direct

1    when you believe an expert's testimony is outside the scope

2    of the report.  I understand that under our rules as they

3    presently stand, experts are fairly tied to their report.

4    However, there is some leeway in terms of what has happened

5    in court.  So make your objection and then sit down so we

6    can get on with the testimony.

7                    MR. RAKOCZY:  Absolutely, Judge.  Just for the

8    record, again, objection.  The witness hasn't even looked at

9    the patent.

10                    THE COURT:  Well, I actually don't know where

11    we're going with this.

12                    MS. FENTON:  It will be brief, your Honor.

13    Thank you.

14                    THE COURT:  Well, brief doesn't make it right.

15    But you can go ahead and ask your question.

16                    MS. FENTON:  Thank you.

17    BY MS. FENTON:

18    Q.    As a statistician, knowing that in the particular

19    claims at issue in this case are the intent to increase

20    concentration of gatifloxacin in an aqueous humor, do you

21    interpret that as a one-sided test or a two-sided test?

22    A.    I don't know Her Honor's intent but if that was were a

23    researcher where the intent was all I had to do was show an

24    increase and that was going to be all I needed to do, I

25    would have constructed a one sided test.  The claim from a

1   statistical standpoint says the burden of proof is only to

2   show it is above.  I don't have to worry about whether

3   gatifloxacin or EDTA reduces the effect of gatifloxacin.  I

4   only have to show it is bigger.  Then that would have been

5   constructing a one-sided test in my hypothesis, so my P

6   value would have been cut in half.

7   Q.   And that would be to .04?

8   A.   Yes, .0445, depending how many decimal places you want

9   to take it.

10  Q.   Thank you.  Just for the record, you choose a

11  two-sided test as a conservative approach?

12  A.   Yes, ma'am.

13  Q.   Can you interpret the .08 P value you obtained with

14  the two-sided test?

15  A.   Yes.  I would say, I think I gave the statistical --

16  the limits are basically -- I'm saying there is less than a

17  10 percent chance.  I'm just using 10 because of rounding to

18  .089.  There is less than a 10 percent chance I'm going to

19  see the results I'm seeing, and you talk about increase or

20  the difference between the two profiles over time,

21  concentrations over time if they were actually equal.

22  Q.   Okay.  So if I understand you correctly, and please

23  correct me if I'm wrong, is what you said that it's accurate

24  that there is a less than?

25  A.   There is less than a 10 percent chance that I would

Mayo - direct

1    see this curve, the gatifloxacin curve, the EDTA curve

2    falling above the other one in these profiles if the null

3    hypothesis were true, which is saying that those curves

4    would be same over that time frame.

5    Q.    All right.  Thank you.  And this is difficult for me

6    to understand.  Just be honest.  Is it accurate to say there

7    is a less than 10 percent chance that this increase in

8    gatifloxacin in the corneal permeability in addition to

9    the .01 EDTA would be this large if there was actually no

10   effect?

11   A.    Right.

12   Q.    Okay.  Thank you.  Now, is the sample size related to

13   the P value?

14   A.    Yes.

15   Q.    And just finally looking at SEN14821 where, again --

16   the data summarized on this page.  What does that suggest to

17   you?

18   A.    Well, what we have is we have five observations per

19   group.  Given this sample size, from a statistical

20   standpoint, more observation, everything else being equal is

21   better because if everything else is the same, more

22   observations I have, the P value drops down, it becomes

23   significant.  Okay.

24          From this standpoint, you know, you are seeing a

25   fairly large effect in an animal study that is looking at 20

Mayo - direct

1    animals.  It doesn't quite reach the .05 level of

2    statistical significance but it's highly suggesting that the

3    .01 EDTA is increasing the concentration of gatifloxacin in

4    the aqueous humor.

5    Q.    Thank you.  Based on this data, can you say the EDTA

6    does not have an effect --

7    A.    No.

8    Q.    -- on gatifloxacin permeability?

9    A.    No.

10   Q.    And based on your analysis, do you believe the

11   observed increase in the gatifloxacin permeability in the

12   aqueous humour with the sample containing EDTA was due to

13   random chance?

14   A.    I don't think it was.

15   Q.    Thank you.  You can put that exhibit aside.

16         Now, please turn to JTX-16 in your notebook, and

17   it has a corresponding translation, JTX-16 TR.

18         Do you recognize this document?

19   A.    Yes, ma'am.

20   Q.    And in particular, I'll direct your attention to

21   SEN15059.

22         Does this page describe the experimental design

23   of this study?

24   A.    Yes.  It's very similar to the previous one except for

25   a couple little differences.  You still have four groups.

Mayo - direct

```
 1    The extract times are different.  It's .25 hours, half hour,

 2    one hour, two hours.  There is actually six animals treated

 3    in each group.

 4              I think this is a single administration instead

 5    of three administrations but, yes, it describes the design.

 6    Q.   Now, I will direct your attention to SEN15063.

 7    A.   Okay.

 8    Q.   Are you familiar with this data?

 9    A.   Yes.

10    Q.   Okay.  And can you just very briefly explain your

11    understanding what the data on this page represents because

12    I think it's very similar?

13    A.   Table 1 is very similar.

14              THE COURT:  Am I just -- we don't have a jury

15    here so I'm fine with you doing what you are doing.  Is this

16    admitted yet?

17              MS. FENTON:  Not yet.  I'm establishing his

18    familiarity with the document first.

19              THE COURT:  Okay.

20              MS. FENTON:  I can move on, your Honor.

21              THE COURT:  Well, I mean generally things are

22    admitted before you start discussing them.

23              MS. FENTON:  I can ask him the specific

24    questions after it is admitted.  That's fine.

25              THE COURT:  All right.
```

Mayo - direct

1    BY MS. FENTON:

2    Q.    Can you -- I just want to direct your attention so

3    SEN15063.

4    A.    Okay.

5          Basically, it is the same as the previous study.

6    It describes the average concentration, standard deviation

7    at each of the time points where the samples were harvested

8    and it discusses the summaries of the different

9    pharmacokinetics parameters in Table 2.  And then it looks

10   at the graphical representation.

11   Q.    Thank you.

12   A.    There is an error in the tables because there is six

13   animals per group.  I think that was a cut-and-paste from

14   the previous study where they said five.

15   Q.    Thank you.  Just briefly turning to SEN15086.

16          Is this the underlying data you used for your

17   analyses?

18   A.    Yes, ma'am.

19          MS. FENTON:  Your Honor, at this point, I

20   would like to move in JTX-16 and JTX-16 TR into evidence.

21          MR. RAKOCZY:  Same objection as JTX-15.  No

22   witness has authenticated this.  No foundation of this

23   record.  Thank you.

24          THE COURT:  All right.  I will admit it subject

25   to the objection.

Mayo - direct

1              (Joint Trial Exhibit 16, 16 TR admitted into

2      evidence.)

3                  MS. FENTON:  Thank you, your Honor.

4                  MR. RAKOCZY:  Thank you, your Honor.

5      BY MS. FENTON:

6      Q.    Now, as with JTX-15, as we discussed previously, did

7      someone from our firm ask you to conduct an analysis on the

8      data contained in JTX-16?

9      A.    Yes, ma'am.

10     Q.    Did anyone ever tell you what they expected or hoped

11     to achieve with this analysis and for this particular

12     exhibit either?

13     A.    No.

14     Q.    Now, did you perform a two-sided test rather than a

15     one-sided test on the data on JTX-16 as well?

16     A.    Yes.  And they gave me direction.  I talked to a

17     researcher.

18     Q.    Thank you.  Dr. Mayo, I'd like to direct your

19     attention to SEN15057.

20     A.    Is that translated or untranslated?

21     Q.    I think it is translated.

22     A.    Okay.  I got it.  Yes.

23     Q.    Now, if we could look just at the table at the top, it

24     looks fairly similar to JTX-15.

25     A.    Yes.

Mayo - direct

1    Q.     Can you tell us what this information represents?

2    A.     It looks, tells us what is in the amount that makes up

3    the solution.

4    Q.     In comparing these two solutions, the one labeled EDTA

5    added formula and the other one labeled current formula, how

6    much EDTA was added to the sample containing EDTA?

7    A.     .01 grams.   .1 percent.

8    Q.     Thank you.  Now if you turn to SEN15063 again.

9    A.     Okay.

10   Q.     Do you see that Table 1 and Figure 1 also indicate

11   that in this particular study, .01 percent EDTA was added to

12   the sample containing EDTA?

13   A.     Yes.  The graphical says formulation added .01 percent

14   EDTA with a diamond, and the top row of the summary in Table

15   1 says formulation added .1 percent EDTA.

16   Q.     Thank you.  As with JTX-15, do you believe JTX-16 is a

17   well designed study to test the effect of EDTA on

18   gatifloxacin permeability?

19   A.     Yes.  I would say, again, related to humans -- from an

20   animal study, I would say this provides level 1, level 2.

21              MR. RAKOCZY:  Objection for the record.  Scope,

22   your Honor.

23              THE COURT:  Thank you.

24   BY MS. FENTON:

25   Q.     Do you recall if Dr. Bloch mentioned whether he

Mayo - direct

1    thought this was a scientifically --

2    A.    Yes, I think he said this would provide valid

3    comparison between groups, one containing EDTA only and one

4    that does not.  So a scientifically valid comparison.

5    Q.    Can you briefly describe to us?  I think previously

6    you defined it as a linear mixed model test you used in

7    JTX-15.  Is that the same type of analysis you did on the

8    data in JTX-16?

9    A.    Yes, it's similar.  Like I said, you really can't

10   create an AUC to look at a time course.  If I look up there,

11   and I see a .25, there is a global effect.  The AUC can

12   summarize all those individual time points.  I see about a,

13   you know, from .11 to .16, you know, that's over 50 percent

14   increase.  .58 to .68 gives me about a 20 percent, you know,

15   a little under 20 percent increase. .76 to .96, again a

16   30 percent increase.  .42 to .62.

17           So I know there is variability.  I got animals.

18   Animals vary, your Honor.  That AUC is just a descriptive

19   measure that kind of summarizes that global.

20           AUCs are very similar.  They get a 1.29 where we

21   get a 1.274.

22   Q.    Thank you.  And as with your testimony on JTX-15, in

23   JTX-16, do you believe it is appropriate or inappropriate to

24   analysis the data at the single time points as opposed to

25   globally?

Mayo - direct

1    A.      Now, if you look at the picture, your Honor, again you

2    see those curves track over time.  You don't see them

3    crossing.  You don't see a different type of curve, which

4    would indicate an interaction.  I mean there would be people

5    that would argue they didn't even need to test for the

6    interaction because the graphics doesn't depict one really.

7            I went ahead and put it in there.  You get a

8    P value of .77, so then it's dropped from the model which

9    basically says I can then look at a group effect, adjusting

10   for time.  Time is in the model to account for that time

11   difference.

12           And then you can test to see whether the group

13   with the formulation added .01 EDTA has higher amounts of

14   gatifloxacin.

15   Q.      Thank you.  Is the analysis where you look at much

16   individual time point and combine the P values for each

17   individual time point, is there a name for that?

18   A.      Well, I mean there is ways to do that.  I know Dr.

19   Bloch chose to look at Fisher's method.  I seen Fisher's

20   method used to compare the studies, so here is my conclusion

21   from a study.  From this study, maybe I'm comparing drug A

22   to drug B.  I got a P value of .05.  I did a separate study

23   and combined those, like a meta-analytic technique.

24           I think Artie Fisher created that method 20s or 30s

25   and it is still valid.  I mean it's still a good method.

Mayo - direct

1    Fisher is a great statistician.  I haven't really seen it

2    used within a study because this is one experiment, it's not

3    multiple experiments.  The investigator created one

4    experiment.  He didn't create an experiment and then do

5    another experiment.  He didn't say here is a set of animals,

6    I did this experiment.  Then here is a set of animals I do

7    another experiment.  He got a set of animals, assigned them,

8    graphically assigned them and conducted one experiment.

9         So there is a gatifloxacin increase from this

10   experiment.  To combine the P values within an experiment, I

11   haven't seen Fisher's method, and to my knowledge that is

12   not the intent.  The intent was a meta-analytic approach

13   where I'm taking the results of multiple experiments, not

14   components within an experiment.

15   Q.    Thank you.  Now, again, if we can go to --

16   A.    And if you take Fisher's method and combine the

17   results of these two experiments, that would be okay.  I

18   wouldn't have a problem with that actually.

19   Q.    But is your testimony that the --

20   A.    Within an experiment, I don't think -- across the

21   experiments, I think is it's when valid.  I'm just trying to

22   explain to your Honor.  Across two different experiments,

23   two different studies that are not related, I think that

24   method is appropriate.  Within one, I haven't seen it.

25   Q.    This was a --

Mayo - direct

1   A.    He was doing within each experiment.

2   Q.    Okay.  And this study, JTX-16, is a single study?

3   A.    Single experiment.

4         MS. FENTON:  Okay.  Thank you.  If we could turn

5   to, in JTX-16, SEN15085, please.

6   BY MS. FENTON:

7   Q.    As you can see, this looks fairly similar as it's laid

8   out to what we saw in JTX-15, so I won't belabor the point,

9   but I did want to address it with respect to JTX-16.  Again,

10  I believe Dr. Bloch criticized you for maybe not taking into

11  account a 12-minute time gap here.  Can you please --

12  A.    Right.  I mean these what he perceived as a 12-minute

13  time gap, he discredited it and said it has to be at each

14  interval time limit.  There is not a 12 minute time gap.

15  That is used for graphical purposes.  That is a jitter.

16  Q.    Okay.  And, again, applying a jitter to data to help

17  you graphically see all the data points is something that is

18  done in statistical analysis?

19  A.    Yes.

20  Q.    And as with JTX-15, did you also confirm with

21  Mr. Tacheka at Senju that the plot in the upper right-hand

22  corner of SEN15085 is, indeed, a jitter done for graphical

23  purposes?

24  A.    Yes.

25  Q.    All right.  Thank you.

Mayo - direct

1            And so do you think Dr. Bloch's characterization

2     of this data as having the time down is accurate?

3     A.     No.

4     Q.     Now, I believe earlier when you testified, you, I

5     think you said that there was a term called an interaction

6     term and that was not included in your analysis.

7     A.     I mean I ran the model with the interaction.

8     Q.     Okay.

9     A.     But when it's not significant, I removed it.  And it's

10    not that it -- not like it was close, not like the P value

11    was .1 or .2.  You know, the P value for the first model was

12    around .37.  These are .77.

13            Graphically, there's no depiction to say these

14    curves are crossing or that the effect is differential

15    across time.  The profile is not differential across

16    time.  The profile is different, but it's similar across

17    time.  That means there's no interaction between the two

18    factors.

19    Q.     And just so I understand it, can you briefly define an

20    interaction term?

21    A.     An interaction term would be, like I said, it's easier

22    if I sit there and say, I think women and men may respond

23    differently to a treatment.  Maybe it works for women, it's

24    does not work for men.

25            So if I'm looking at the effect, I would think

1     there's an interaction between the treatment and the gender.

2     So I would test that.  If that were significant, then I

3     would then analyze men separately from women.  Done that

4     numerous times when we were looking at a treatment.

5              If there's no interaction, then I'd combine all

6     the data for the men and women together and look at the

7     effect of the treatments.  There's no reason to look at them

8     separately.  It's like looking at subgroups.  So you

9     generally have a crossing.  So, in other words, if the

10    curves were like this, an X, there's an interaction.  If

11    they're -- if there's gross non-parallels, if one is like

12    this and one goes up like this, they may never cross, that's

13    an interaction.  Okay?

14             But if they're parallel, whether it's lines or

15    curves, that's not an interaction.

16    Q.   And in your analysis, the reasoning that you looked at

17    the interaction term but then, I don't know if this is the

18    right word, but discarded it is because --

19    A.   Well, there does not appear to be one.  I put it in

20    the model and tested it to statistically confirm that there

21    was no effect.

22    Q.   Thank you.

23             Now I'm going to direct you to 150 -- SEN, I'm

24    sorry, 15063.  And, again, this is -- it looks a lot like

25    what we discussed in JTX-15.

Mayo - direct

1                    Looking at the data summarized on this

2       page, what do you find in comparing the gatifloxacin sample

3       with .01 percent EDTA to the one without EDTA?

4       A.    When I tested to see if there was a difference, there

5       was a statistically significant difference in the

6       gatifloxacin concentrations for this study between the two

7       groups.

8       Q.    And does this data show the increase in gatifloxacin

9       concentration in the aqueous humor with the sample

10      containing EDTA?

11      A.    Yes.  I mean, there's a difference.  It's obviously

12      higher.  So for the two-sided tests, the tests with the

13      difference of P value of .04, I concluded there was a

14      statistically significant difference.  It's actually an

15      increase because it's above.  But that's the conclusion.

16      Q.    Okay.  And looking at Table 2 at the AUC 0 to 2 hours,

17      the last column, what does that number represent?

18      A.    Well, that's -- that's a statistic.  That is a

19      statistic that summarizes the data.  And it basically says

20      that the AUC for the formulation with EDTA added is

21      29 percent higher than the current concentration.

22      Q.    Than the formulation without EDTA; is that correct?

23      A.    Yes.

24      Q.    Thank you.

25                    And is that a -- is that a big increase?

1    A.      Well, it's all relative, but I mean that's a fairly

2    large increase.  Again, like I said, I cannot relate in this

3    day and time to my investment portfolio over time.  I mean,

4    I would take an investor that would give me a 29 percent

5    higher return than what I've got.

6    Q.      Thank you.

7             And how does this data relate to what you see in

8    Table 1 and the time periods across the table?

9    A.      Like I said, each time point you're looking at, here's

10   some differences and here's where you're going, and it

11   allows -- the AUC is just a measure that kind of describes

12   the magnitude of difference across all the time points.

13   Q.      Okay.

14   A.      It kind of tells you how much drug are you getting

15   into the system.  It's a measure of that.  Again, I would

16   love to be able to do this study sequentially, but you can't

17   do that.  You can't stick a needle in the rabbit's eye.  You

18   have to sacrifice them.

19   Q.      And can you give us a -- just looking at this table,

20   Table 1 specifically, going across the time points, can you

21   just give us a rough relative percentage of increase?

22   A.      You get about a 50-percent increase in the first one.

23   You get roughly about a 20-percent increase, a little over

24   that, in the second one.  You get roughly a 14, you know,

25   25-percent increase at one hour time point, and you get

1    about a 50-percent increase at the two-hour time point.  So

2    we know it's going to oscillate.  Just like your investment

3    portfolio oscillates, but the AUC, it's performance over

4    this time, these time frames.

5    Q.    And just for the record, when you were going through

6    those time points, you were looking at Table 1, the time

7    point .25, .51 and 2; is that correct?

8    A.    Yes.

9    Q.    Thank you.

10           And, again, you did a two-sided test, which you

11   considered more conservative test?

12   A.    Yes.

13   Q.    For this analysis as well; right?  And I think you

14   already mentioned that you concluded that you got a .04 P

15   value for the data in JTX 16 using the two-sided test; is

16   that correct?

17   A.    Yes, ma'am.

18   Q.    And can you interpret the .04 P value for us briefly?

19   A.    Basically, I've got -- right.  I will use .0417.  I

20   will use four percent.  Basically, there's a four-percent

21   chance I would see this difference between the two formulas

22   in relation to gatifloxacin, concentration of gatifloxacin

23   in the aqueous humor across these time points if, in fact,

24   there was no difference between the concentration.

25   Q.    And did you use a .05 type 1 error rate in this

Mayo - direct

 1    testing as well?

 2    A.    Yes.

 3    Q.    Thank you.

 4          And your calculation of a P value of .04 here

 5    with respect to the data included in JTX 16, is that a

 6    statistically significant difference?

 7    A.    Yes.

 8    Q.    And is that a statistically significant increase in

 9    gatifloxacin concentration with a sample containing EDTA?

10    A.    Yes.  If I was only doing a one-sided test, I would be

11    reduced to two percent.

12    Q.    Okay.  In trying to --

13    A.    That would make it much less likely that the data

14    supports the null hypothesis.

15    Q.    Okay.  Thank you.

16          And is it accurate to say that there is less

17    than a five-percent chance that this increase in

18    gatifloxacin of corneal permeability seen with the addition

19    of EDTA could be this large if there was actually no effect?

20    A.    Correct.

21    Q.    And based on the data in JTX 16, can you say that EDTA

22    does not have an effect on the corneal permeability?

23    A.    No.

24    Q.    And based on your analysis, do you believe the

25    observed increase in gatifloxacin in the aqueous humor

Mayo - direct

1    permeability with the sample containing EDTA was due to

2    random chance?

3    A.    No.

4    Q.    Now, with JTX-15, I think you used the word, I wrote

5    it down here -- one second.  Sorry.  Suggestive.  You said

6    you had a highly suggestive result, and here with JTX 16,

7    you have a definitive, or a statistically significant

8    result.

9          Can you explain these results generally?

10   A.    I mean, if I were using it a priori, which is what I

11   was asked to use, not saying that's necessarily the right

12   one, a prior but .05 level, my P value for the first test is

13   .089, which is above the .05, but would make it at the .1

14   level, which in many preliminary studies, Phase 2 clinical

15   trials, small studies, that's used.

16         Here, this is .05.  It's strongly suggesting

17   there's an increase because if I did a one-sided test, I

18   know this.  If I did a one-sided test, a P value would be

19   below .05.  In the first example here, my P value below .05

20   whether I did a two or one-sided test.  That's a definitive

21   difference based on the statistics.

22   Q.    Okay.  And overall, how would you summarize your

23   findings with respect to the data that we discussed in

24   JTX-15 and 16?

25   A.    I would say you've got two fairly well designed

Mayo - cross

1    studies that have moderate to large, I mean, I think they're

2    well.  For an animal study, you always like to have more,

3    but I mean that's hard to get.  You just can't do that.  I

4    think it basically indicates and that I've got a level 1-2,

5    it's highly suggestive.  I've got to what I think is close

6    to level 1 evidence that's suggestive.

7              It indicates to me that the addition of EDTA at

8    .01 percent increases the concentration of gatifloxacin in

9    the aqueous humor.

10             MS. FENTON:  Thank you, Dr. Mayo.  I will pass

11   the witness.

12             THE COURT:  All right.  Cross-examination.

13             MR. RAKOCZY:  Good morning, your Honor.  William

14   Rakoczy for the Lupin defendants.

15             May I approach with a binder for the witness and

16   the Court?

17             THE COURT:  I don't need one.

18             MR. RAKOCZY:  Just the witness (handing exhibit

19   binder to the witness).

20             THE WITNESS:  Good morning.

21                       CROSS-EXAMINATION

22   BY MR. RAKOCZY:

23   Q.    Now, Dr. Mayo, I just want to confirm, I believe you

24   testified or you agreed that the most common level of

25   statistical significance is generally 0.05; is that

Mayo - cross

1    correct?

2    A.    Yes.

3    Q.    Now, you reviewed some rabbit corneal permeability

4    studies; is that correct?

5    A.    Yes.

6    Q.    And you're not an expert in medicinal chemistry, are

7    you?

8    A.    No.

9    Q.    And you're not an expert in ophthalmic formulations;

10   is that correct?

11   A.    No.

12   Q.    You're not an expert in conducting rabbit corneal

13   permeability studies; is that correct?

14   A.    No.

15   Q.    Now, let's go to the first study you looked at, which

16   is JTX-15-TR, and it's in your binder in front of you.

17   Actually, you can use either binder.

18   A.    I can use --

19   Q.    Either one.

20   A.    Okay.

21   Q.    JTX-15-TR.

22          Now, is it okay if we refer to JTX-15-TR as the

23   901 report?

24   A.    Okay.  I see 901 up there, yes.

25   Q.    So this is the report number DT 006B-0901.

Mayo - cross

1           Do you see that?

2    A.    Yes, I see it.

3    Q.    Now, let's go to the table at the top of page

4    SEN14815.

5    A.    Okay.

6    Q.    Now, I believe you testified the only difference in

7    these formulations you believe is the .01 percent EDTA; is

8    that correct?

9    A.    I said based on what is stated in the table, yes.

10   Q.    Yes.  What's stated in the table.  And based on your

11   analysis, there were no statistically significant

12   differences between these two formulations in regards to

13   increased concentration of gatifloxacin in aqueous humor;

14   correct?

15   A.    Are you saying is there a statistically significant

16   difference in the concentrations or are you saying is there

17   a statistically significant difference in how these

18   concentrations affect the level of gatifloxacin in the

19   aqueous humor those time frames?

20   Q.    I will ask --

21   A.    I just want to make sure I'm clear.

22   Q.    According to your statistical analysis --

23           THE COURT:  You do need to slow down, all of

24   you.

25           MR. RAKOCZY:  Sorry, your Honor.

Mayo - cross

 1   BY MR. RAKOCZY:

 2   Q.    According to your statistical analysis, there were no

 3   statistically significant differences between these two

 4   formulations; isn't that correct?

 5   A.    No.  I can't -- I can't statistically compare the

 6   formulations.  I can compare how the formulations -- I

 7   tested the concentrations of these formulations in the

 8   aqueous humor.  I didn't test the construction of the

 9   formulations.

10   Q.    Okay.  I will ask it again.  In your opinion, the

11   differences in concentration of gatifloxacin in the aqueous

12   humor resulting from the application of gatifloxacin

13   solution containing EDTA and gatifloxacin solution omitting

14   EDTA was not statistically significant; is that correct?

15   A.    Correct.

16   Q.    Now, let's look at the results in Table 1 of the 901

17   report, which is JTX-15 TR, the English language version.

18   A.    Which page again?

19   Q.    That is SEN14821.  Are you there?

20   A.    Yes, sir.

21   Q.    Now, if we look at the top table, Table 1 on SEN

22   14821, the concentration of gatifloxacin in aqueous humor

23   was actually less for the EDTA formulation at the four-hour

24   time point; is that correct?

25   A.    Correct.  They all go to zero.  Eventually, they all

Mayo - cross

1    approach zero.

2    Q.    I'm sorry.  I didn't hear you.  So it is correct that

3    the four-hour time point --

4    A.    That time point, yes.

5    Q.    The EDTA formulation is actually lower than the

6    non-EDTA formulation; is that correct?

7    A.    Correct.

8    Q.    Now, going back to the formulation again on page SEN

9    14815, at least according to this table, neither the control

10   formulation nor the study formulation contain benzalkonium

11   chloride or BAK; is that correct?

12   A.    That's my understanding, correct.

13   Q.    And the pH, according to this table on SEN 14815 for

14   both the study formulation and the control formulation, was

15   6.0; is that correct?

16   A.    That's what it states, yes.

17   Q.    So it was not a pH of 5; isn't that correct?

18   According to this table?

19   A.    According to this table, no.

20   Q.    Now, you don't know whether pH affects corneal

21   permeability, do you?

22             MS. FENTON:  Your Honor, objection.  Outside his

23   area of expertise.

24             MR. RAKOCZY:  Your Honor, the witness testified

25   that he thinks this is a well-designed study.  I'm just

Mayo - cross

1    asking a few questions about the study design.  That's

2    all.

3              THE WITNESS:  Do I know whether it does?  No.

4    But at least it's fixed between the two formulations.

5    BY MR. RAKOCZY:

6    Q.    But you don't know whether pH affects corneal

7    permeability; is that correct?

8    A.    No.

9    Q.    Now, according to this chart on SEN 14815 of the 901

10   report of JTX-15 TR, the percentage of gatifloxacin, each

11   formulation, was 0.3 percent; is that correct?

12   A.    Yes.  You say as -- in the parentheses as anhydride.

13   Q.    Well, we could go back a page.

14   A.    I'm just saying because the gatifloxacin hydrate is

15   .32 grams.  I'm just clarifying, there are two rows on that

16   same variable.

17   Q.    Go to a prior page, SEN14814.  And there for the

18   bottom for the test method, we actually see the gatifloxacin

19   percentage for the test article and the control article;

20   correct?

21   A.    Yes.

22   Q.    And it's 0.3 percent; is that correct?

23   A.    That's what it states, yes.

24   Q.    It was not 0.5 percent; is that correct?

25   A.    Correct.

Mayo - cross

1   Q.    Now, this study, this 901 report at JTX-50-TR, it used

2   triplicate dosing; is that correct?

3   A.    It administered the dosing at basically three times

4   15 minutes apart, yes.

5   Q.    Three times 15 minutes apart, triplicate dosing.  And

6   that triplicate dosing actually overestimate the amount of

7   gatifloxacin in the aqueous humor in the second and third

8   instillations; is that correct?

9   A.    What do you mean by that?

10  Q.    By triplicate dosing, it's not representative of what

11  you would see with points 01 percent EDTA; is that correct?

12  A.    I don't understand your question.

13  Q.    Triplicate dosing skews the results here; is that

14  correct?

15  A.    Define what results you're using.

16  Q.    Using triplicate dosing is not representative of how

17  .01 percent EDTA is actually performing in these

18  formulations; correct?

19  A.    It represents -- this study represents how triplicate

20  dosing of .1 percent -- of .3 percent gatifloxacin, one

21  group with .01 percent EDTA, the other one not, represents

22  how that dosing scheme is represented from zero to

23  four hours.

24  Q.    That's not what the authors concluded, though;

25  correct?  They concluded that this triplicate dosing

Mayo - cross

1    overestimate the amount of gatifloxacin in aqueous humor; is

2    that correct?

3    A.    I'd have to read -- refresh what their conclusions

4    were.

5    Q.    Well, why don't we take a look at page SEN14820 of

6    JTX-50-TR, which, again, is the 901 report, and let's go to

7    the last paragraph.

8          Do you see the first sentence in the last

9    paragraph.  Do the authors conclude and state there, quote,

10   "With the formula that may cause corneal impairment such as

11   the one in the present test, the amount of migration in

12   aqueous humor of second and third instillations may be

13   overestimated as the corneal impairment has been caused with

14   the first instillation end quote.  That's what they

15   conclude; correct?

16         Sir, my question -- inch I'm reading the whole

17   paragraph so I make sure I have it in context.  Is that all

18   right, your Honor?

19   Q.    Did I read that sentence correctly?

20   A.    It says, it was considered that the verification needs

21   to be made after single instillation in the future when

22   evaluating the migration in aqueous humor of a formula that

23   may cause corneal impairment.  That's the last sentence of

24   that paragraph.

25   Q.    My question is the first sentence.

Mayo - cross

1    A.    I apologize.  I thought you said --

2    Q.    Do they conclude that using this triplicate dosing,

3    the amount of migration in aqueous humor, the second and

4    third instillations, may be overestimated?

5    A.    It says with the formula that may cause corneal

6    impairment such as the one in the present test, the amount

7    of migration in the aqueous humor of the second and third

8    instillations may be overestimated as a corneal impairment

9    has been caused at the first instillation.

10   Q.    Is that their conclusion?  I'm not trying to trick

11   you, Dr. Mayo.  Is that their conclusion in the first

12   sentence of this paragraph?

13   A.    They are saying it may.  They are not saying it

14   does.

15   Q.    And you have no reason to disagree with that; is that

16   right?

17   A.    No.

18   Q.    Because you don't know.  You are not an expert in

19   conducting rabbit corneal permeability studies; correct?

20   A.    Correct.

21   Q.    Now let's go on to the second study you looked at,

22   which is JTX-16-TR.  Is it okay if we call this one the 904

23   report?

24   A.    Sure.

25   Q.    Do you see on the top of the right-hand corner, it's

Mayo - cross

1    report number DT006B0904?

2    A.    Yes, sir.

3    Q.    Now, let's go to the formulations, the testing control

4    formulations on page SEN15057 of the 904 report, which is

5    JTX-16 TR.

6              And here in this table, these are the study and

7    control formulations that you analyzed the results for.

8    Correct?

9    A.    Those are the formulations for the study.

10   Q.    And at least according to this chart, neither the

11   study drug or the control drug contained benzalkonium

12   chloride or BAC; correct?

13   A.    Correct.

14   Q.    At least according to this chart, neither of these

15   formulations is the Lupin ANDA formulation; correct?

16   A.    I have no clue.

17   Q.    So you don't know what is in the Lupin ANDA

18   formulation?

19   A.    No.

20   Q.    Back on the 901 report, which is JTX-15 TR, you don't

21   know what either of those formulations are the Lupin ANDA

22   formulation; correct?  And we can go lack and look at that

23   chart.  It's JTX-15 TR.

24   A.    Are you talking about 901?

25   Q.    Yes.

Mayo - cross

1    A.    I'm just verifying I'm looking at the right --

2    Q.    Yes, the 901 report at SEN --

3    A.    Yes, I have it.  I do not know.

4    Q.    Okay.  And you don't know whether benzalkonium

5    chloride or BAC effects corneal permeability, do you?

6    A.    MS. FENTON:  Same objection.

7              MR. RAKOCZY:  I'm just asking about the study

8    design.

9              THE COURT:  I know, but there is a limit how

10   much further you are going to something you objected to in

11   the first instance.

12             MR. RAKOCZY:  He was asked a lot of questions

13   well outside the scope of his report.

14             THE COURT:  All right.  I'm giving you advice.

15   You can take it or not.

16             MR. RAKOCZY:  All right.  I will move on, your

17   Honor.  Thank you.

18   BY MR. RAKOCZY:

19   Q.    Now, according to the chart, and we'll go back now to

20   the 904 report.  This is JTX-16 TR and page SEN10157.

21   According to this chart on the study and control

22   formulations, the pH was 6.0; correct?

23   A.    Yes.

24   Q.    That was for each formulation tested; correct?

25   A.    Yes.

1  Q.     Now, I believe you testified you used a "linear mixed

2  model" to analyze the data from the 904 report; is that

3  correct?

4  A.     Yes.

5  Q.     Now, the authors of the 904 report did not use a

6  linear mixed model to analyze their data; correct?

7  A.     Correct.

8  Q.     Now, the authors --  and let's go to the results

9  section of the table of JTX-16 TR which is SEN15063.  And,

10  again, this is the Table 1 and the graph that you testified

11  about; correct?  For the 904 report?

12  A.     Correct.

13  Q.     Now, the authors here don't report -- at last here

14  in their report, they do not report that these were

15  statistically significant results; correct?

16  A.     Correct.

17          MR. RAKOCZY:  May I have one moment, your Honor?

18  BY MR. RAKOCZY:

19  Q.     I am sorry.  I forgot to ask you this, Dr. Mayo.

20  Again, we're looking at the JTX-16 TR of the 904 report.

21  This was only looking at .3 percent gatifloxacin in both the

22  control and the study drug; correct?

23  A.     Yes.

24  Q.     It was not testing .05 percent; correct?

25  A.     Are you talking about, it was gatifloxacin

Mayo - redirect

1   .3 percent., .01 EDTA.

2   Q.   So it was not testing 0.5 percent gatifloxacin?

3   A.   Sure.

4   Q.   And the same is true for JTX-15 TR, the 901 report.

5   That was only testing 0.3 percent gatifloxacin, not

6   0.5 percent gatifloxacin?

7   A.   I think I answered that already.  Yes.

8   Q.   Okay.  Thank you, Dr. Mayo.

9            MR. RAKOCZY:  No further questions.  Thank you,

10  your Honor.

11           THE COURT:  All right.  Thank you.

12           MS. FENTON:  I have some redirect.

13           THE COURT:  All right.  Redirect.

14                    REDIRECT EXAMINATION

15  BY MS. FENTON:

16  Q.   Dr. Mayo, if I could direct your attention to

17  SEN14820, please.  I'm sorry.  It should be JTX-15.

18           THE COURT:  And I take it none of your redirect

19  is going to be on study design?

20           MS. FENTON:  Correct.

21           THE COURT:  Thank you.

22  BY MS. FENTON:

23  Q.   Now, looking -- I'm sorry.

24           We can move on while he gets to it.

25           Dr. Mayo, did defendants' counsel ask you

Mayo - redirect

1    anything that made you change your opinions about what you

2    testified about today?

3    A.    No.

4    Q.    Is it your understanding that claim 6 in this case is

5    limited to .01 percent EDTA?

6             MR. RAKOCZY:  Objection, your Honor.

7    A.    Yes.

8    Q.    Thank you.

9             MR. RAKOCZY:  It's well outside the scope.  The

10   witness hasn't seen the patent and she is asking questions

11   about what is in the claims of the patent.

12            THE COURT:  I do have to say that last one was

13   conclusory.

14            MS. FENTON:  I'll move on.  Thank you, your

15   Honor.

16   BY MS. FENTON:

17   Q.    The experiment that you looked at in JTX-15 and 16

18   that you analyzed, I think you testified that they gave you

19   level 1 or level 2.1 evidence that .01 percent EDTA

20   increases gatifloxacin in aqueous humor; is that correct?

21            MR. RAKOCZY:  Objection, your Honor.  I didn't

22   ask him about level 1 anything precisely because of the

23   prior scope objection.  There is nothing about level 1

24   evidence.

25            THE COURT:  All right.  You have got to stick to

Mayo - redirect

1    the scope of the cross.

2              MS. FENTON:  Thank you, your Honor.

3    BY MS. FENTON:

4    Q.    Dr. Mayo, based on the analyses that you performed and

5    you discussed with defendants' counsel previously, is there

6    anything that was discussed that indicates that the addition

7    of .01 percent EDTA does not increase the level of

8    gatifloxacin in aqueous humor?

9    A.    No.

10             MS. FENTON:  Can we have SEN14820 up, please?

11             Let me see.  It's JTX-15 TR.  SEN14820.  In the

12   translated version, please.  Thank you.

13             And if we could blow up, please, the paragraph

14   that defendants' counsel was asking you about, with the

15   formulation.  It's the very last paragraph on that page.

16   BY MS. FENTON:

17   Q.    And I think defendants' counsel was asking you about

18   the first sentence, Dr. Mayo.  You pointed out the second

19   sentence:  "It was considered the verification needs to be

20   made after a single instillation in the future when

21   evaluating migration in aqueous humor of a formula that may

22   cause corneal impairment."

23             In the JTX study -- I'm sorry, the next study,

24   JTX-16, is that what Senju did?  Did they do a single

25   instillation test?

Mayo - redirect

1   A.    Yes, ma'am.

2              MS. FENTON:  Thank you, your Honor.  No further

3   questions.

4              THE COURT:  All right.  You may step down.

5              THE WITNESS:  Thank you, your Honor.

6              MS. FENTON:  Thank you, doctor.

7              Your Honor, we're going to read some deposition

8   testimony next.  I don't know if you want to take a break or

9   you want to get started.  We have about probably 45 minutes

10  of it.

11             THE COURT:  We can take our morning break.  Is

12  this some of the objected to testimony yet?

13             MR. RAKOCZY:  I believe --

14             MS. FENTON:  I think we have come to an

15  agreement.

16             MR. PHILLIPS:  Your Honor, during the

17  intervening time, they have worked out their differences and

18  it has been resolved.  Thank you.

19             THE COURT:  All right.  Thank you.

20             (Brief recess taken.)

21             *     *     *

22             (Proceedings reconvened after recess.)

23             MS. FENTON:  Your Honor, Christopher Riccuitti

24  and Lisa Mandrusiak on behalf of the plaintiffs are going to

25  read the deposition designations.

Avachat - designations

1              THE COURT:  All right.  Thank you.

2              MS. MANDRUSIAK:  Good morning, your Honor.

3    We're starting with the deposition of Makarand Avachat on

4    May 25th, 2012.

5              THE COURT:  Just give me a minute.  What is the

6    name again.

7              MS. MANDRUSIAK:  Makarand, M-a-k-a-r-a-n-d,

8    Avachat, A-v-a-c-h-a-t.

9              THE COURT:  All right.  Thank you.

10             (Deposition of Makarand Avachat read in as

11    follows:)

12             "Question:  Could you please state your name and

13    your business address for the record?

14             "Answer:  Okay.  My name is Makarand Avachat.

15    And the business address is 46/47, Village Nande, Taluka

16    Mulshi, Lupin Limited, Pune.

17             "Question:  And you have just been handed

18    Plaintiffs' Exhibit 14, which is the -- a notice of

19    deposition of Makarand Avachat.  Do you see this?

20             "Answer:  Yes.

21             "Question:  Have you seen this before?

22             "Answer:  Yes.

23             "Question:  And you understand that you're

24    testifying today, at least in part, in response to the

25    notice of deposition, which is Plaintiffs' Exhibit 14?

Avachat - designations

```
 1              "Answer:  Yes.

 2              "Question:  And I'd like for you to find in

 3    front of you Plaintiffs' Exhibit 2?

 4              "Answer:  He's given it to me.

 5              "Question:  That's great.  Thank you.

 6              "And I'd like you to flip through Plaintiffs'

 7    Exhibit 2 and tell me if you have ever seen any part of that

 8    before?

 9              "Answer:  Yes.

10              "Question:  Okay.  And do you understand that

11    Plaintiffs' Exhibit 2 is a 30(b)(6) notice of Lupin Limited?

12              "Answer:  Yes.

13              "Question:  And do you understand that you're

14    testifying today on behalf of Lupin Limited with respect to

15    certain of the topics set out in Plaintiffs' Exhibit 2?

16              "Answer:  Yes.

17              "Question:  And I'd like you to find in front of

18    you Plaintiffs' Exhibit 3, and I'd like you to flip through

19    that and tell me if you have ever seen any part of that

20    before?

21              "Answer:  Yes.

22              "Question:  Do you understand that Plaintiffs'

23    Exhibit 3 is a 30(b)(6) notice of Lupin Pharmaceuticals

24    Inc.?

25              "Answer:  Yes.
```

Avachat - designations

1          "Question:  And you also understand that you're

2     here to testify today on behalf of Lupin Pharmaceuticals

3     Inc. with regard to certain of the topics in Plaintiffs'

4     Exhibit 3?

5          "Answer:  Yes.

6          "Question:  Are you vice president for a

7     particular branch or part of Lupin Limited?

8          "Answer:  I'm vice president for developing the

9     products for the advanced market as well as developing the

10    products for the rest of the world and India market.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Avachat - designations



1    ████████████████████████████████

2                "Question:  So do you have in front of you a

3    copy of LUGA04412 and 4413?

4                "Answer:  Yes.

5                "Question:  And can you tell me what this is?

6                "Answer:  This it's the Paragraph IV

7    certification for the ANDA gatifloxacin ophthalmic solution

8    containing .5 percent drug.

9                "Question:  And this for what we've been calling

10   the '045 patent.  Do you have an understanding what the '045

11   patent is?

12               "Answer:  This one is Paragraph IV certification

13   for '045 patent.

14               "Question:  Have you seen this letter before?

15               "Answer:  I've seen it in preparation for the

16   deposition.

17               "Question:  And do you see in the second

18   paragraph, the one that begins, 'Lupin Limited (Lupin.)'?

19               "In that paragraph, do you understand that Lupin

20   Limited is certifying that the '045 patent is invalid and

21   unenforceable?

22               "Answer:  That's what is written there.

23                        ████████████████████████████████

24   ████████████████████████████████████████████

25       ████████████████████

Avachat - designations

1  ████████████████████████████████

2  ████

3  ████████████████████████████████████

4  ████████████████████████████████████

5  ██████████████████████

6  ████████████

7              "Question:   What is your understanding of the

8   phrase 'final product?'  What does that mean?

9              "Answer:  Where is it written?

10             "Question:  For example, in this little box,

11  'What are the components and composition of the final

12  product?'  'What is the function of each excipient?'

13             "Do you see that?

14             "Answer:  Yes.

15             "Question:  Okay.  Do you have an understanding

16  what is meant by final product?

17             "Answer:  Yes.  The, the -- the FDA wants to

18  know that this the final composition which Lupin has used in

19  their exhibit batch and is this the same composition which

20  Lupin intends to use when they commercialize this product.

21             "Question:  So this is the composition that --

22  if Lupin's ANDA is approved and Lupin launches in the U.S.,

23  this table describes the composition of the formulation

24  which would be sold in the U.S.?

25             "Answer:  Yes.

Avachat - designations

Avachat - designations



Avachat - designations

Avachat - designations



Avachat - designations



Avachat - designations

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20       "Question:  I'm going to ask you a few questions

21  about Topic 24.  And if you need to look at Topic 24, that's

22  fine.

23           "Are you aware of any publication, patent or

24  patent application that discloses or contains a composition

25  which contains both gatifloxacin or a salt of gatifloxacin

1    and EDTA?

2              "Answer:  Other than '045, none.

3              "Question:  With regard to Topic 31, does Lupin

4    Limited or Lupin Pharmaceuticals have any information

5    regarding whether EDTA affects the corneal permeability of

6    any drug substance.

7              "Answer:  No.

8              "Question:  Does Lupin Limited or Lupin

9    Pharmaceuticals have any information about the corneal

10   permeability of gatifloxacin or any salt of gatifloxacin

11   including any excipient or any reports, studies, internal

12   documents, communications, or publications that mention or

13   refer to the corneal permeability of gatifloxacin?

14             "Answer:  No.

15             █████████████████████████████████████████

16   █████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   █████████████████████████████████████████████

19   ████████

20             ████████████████████████████████████████████

21   ████████

22             "Question:  That concludes the reading from the

23   Avachat deposition.

24             THE COURT:  All right.  Thank you.

25             MS. RICCUITTI:  The next deposition is Pritesh

Upadhyay - designations

1    Upadhyay, dated Thursday, May 24th, 2012.

2            "Question:  Good morning.

3            "Answer:  Morning.

4            "Question:  Could you please state your name and

5    business address for the record.

6            "Answer:  Yeah.  My name Pritesh Upadhyay.

7    Business address, Lupin Research Park, Pune, India.

8            "Question:  I'm going to hand you a three-page

9    document that has been marked as Plaintiff's Exhibit

10   Number 1.  And take a minute to look at that.

11           "And then I'm going to ask you:  Have you ever

12   seen this before?

13           "Answer:  Yes.

14           "Question:  So do you understand that you're

15   testifying today at least in part in response to the

16   personal notice of deposition?

17           "Answer:  Yes.

18           "Question:  Are you currently a vice president

19   of Lupin limited?

20           "Answer:  Yes.

21           "Question:  Has your title changed since 2009?

22           "Answer:  No.

23

24

25

Upadhyay - designations

1       █████████

2       ███████████████████████████

3   ███████████████████

4       ██████████

5       ██████████

6       ████████

7       █████████████

8       █████████

9       █████████████████

10   ████████████████████

11       █████████

12       "Question:  Those were 'do you know' questions.

13 I have to ask -- I just have to.  I'm sorry.  We always --

14 we always do fall into this trap.

15       "I'm going to ask those two questions in a more

16 straightforward way again.

17       ████████████████████████

18   ██████████████████████████

19   ████████████████████████████

20   ███

21       ██████████

22       ████████████████████████████

23   ████████████████████████

24   ███████████████████████████

25   ████████████

Upadhyay - designations

1    ████████████████████████████████████████

2    ████████████

3    ███████████

4    ██████████████████████████████████

5    ████████████████████████████████████████

6    █████████████

7    ██████████████████████████████████████████

8    ██████████████████████████████

9    ███████████

10   ████████████████████████████████████████

11   ██████████████████

12   ███████████

13           "Question:  Welcome back.

14           Dr. Upadhyay, you've just been handed a

15   multi-page document which has been marked as Plaintiffs'

16   Exhibit Number 2.  Okay.  And I will represent to you that

17   this is plaintiffs' 30(b)(6) notice of Lupin Limited.  And

18   there's kind of a lot of legalese in the first six pages.

19   I'm no so interested -- I'm not going to ask you if you've

20   seen and studied all of that.  But have you ever seen the

21   list of matters upon which examination is requested

22   beginning on page 7?

23               "Answer:  Yes.

24               "Question:  And when was the first time you saw

25   that list of matters?

1               "Answer:  I think about one month back.

2               "Question:  And do you understand that a part of

3     your deposition today is to testify on behalf of Lupin

4     Limited with respect to certain of both matters?

5               "Answer:  Yes.

6               "Question:  Okay.  Let's use the Lupin Pharma

7     one too.  Let's make this Plaintiffs' Number 3.

8               "Dr. Upadhyay, you've just been handed now a

9     multi-page document, what has been marked as plaintiffs'

10    Exhibit Number 3.  I will represent to you that this is

11    plaintiffs' 30(b)(6) notice of Lupin Pharmaceuticals, Inc.

12               Answer:  Yes.

13               "Question:  And have you ever seen any part of

14    Plaintiff's Exhibit No. 3 before?

15               "Answer:  Yes.

16               "Question:  Okay.  And which part was that?

17               "Answer:  For the preparation of 30(b)(6).

18               "Question:  Okay.  And would that be the list of

19    topics starting on page 7?

20               "Answer:  Yes.

21               "Question:  Okay.  Are you also here today to

22    testify on behalf of Lupin Pharmaceuticals, Inc. in regard

23    to certain of the topics listed at -- beginning on page 7?

24               "Answer:  Yes.

25               "Question:  Let's take a look at topic number

1    one, which is on page 4 -- strike that.  Which is on page 7

2    of Plaintiff's Exhibit 2.

3                 "And that topic is ANDA No. 202-653.  Do you see

4    that?

5                 "Answer:  Yes.

6                 "Question:  And do you have an understanding of

7    what product that ANDA relates to?

8                 "Answer:  Gatifloxacin.

9                 "Question:  Is it a particular formulation of

10   gatifloxacin?

11                "Answer:  Yes.

12                "Question:  Can you tell me which one?

13                "Answer:  .5 percent.

14                "Question:  So that's a 0.5 percent.  Okay.

15                And do you know the name of the drug product for

16   the ANDA that that corresponds to?

17                "Answer:  Can you reframe the question?

18                "Question:  Okay.  Do you know what the name of

19   the NDA drug product is for 0.5 percent gatifloxacin?

20                "Answer:  Zymaxid.

21                "Question:  Zymaxid.  And does ANDA No. 202-653

22   refer to Zymaxid?

23                "Answer:  Yes.

24                "Question:  Okay.  I'm going to ask you a

25   parallel set of questions about topic No. 12, which is

Upadhyay - designations

1    not -- excuse me, I'm sorry.  I didn't mean to do that.

2    About topic number seven.  Topic number 7, which is ANDA

3    number 202-709.

4                "Do you see that?

5                "Answer:  Yes.

6                "Question:  And do you understand that is the

7    ANDA that relates to Zymar?

8                "Answer:  Yes.

9                "Question:  When was the last time you actually

10   looked through the Zymaxid ANDA?

11               "Answer:  Yesterday.

12               "Question:  And would that be true for the Zymar

13   ANDA?

14               "Answer:  Yes.

15               "Question:  Welcome back.  I don't want to waste

16   everyone's time and have you look at every page of this, but

17   what has been placed in front of you has been marked as

18   Plaintiff's Exhibit Number 4.  And I will represent to you

19   that plaintiffs believe this is a copy of the Zymaxid ANDA

20               "Answer:  Okay.

21               "Question:  And does this look like

22   approximately the same size as the ANDA that you looked at

23   in preparing for your deposition?  Remember -- and this is

24   double-sided, so maybe it looked a little taller when you

25   looked at it.

1      "Answer:  Yes.

2      "Question:  And starting there and going through

3   LUG004398, it looks like a four-page letter from Lupin

4   Limited to the FDA.

5      "Do you see that?

6      "Answer:  Yes.

7      "Question:  And on the first page of that

8   letter, which is dated December 6th, 2010, the third

9   paragraph of the letter reads, 'This ANDA refers to the

10   Reference Listed Drug (RLD), Zymaxid, trademark sign,

11   Gatifloxacin Ophthalmic Solution, 0.5 percent; NDA number

12   N 022548, held by Allergan, Inc., listed in the current

13   edition of the Orange Book.'

14      "Do you see that?

15      "Answer:  Yes.

16      "Question:  And that's also consistent with this

17   being the ANDA for the Zymaxid drug; is that correct?

18      "Answer:  Yes.

19

20

21

22

23

24

25

Upadhyay - designations

1    ███████████

2                    ████████████████

3                    "Answer:  Yes.

4                    "Question:  And it's your understanding that the

5    RLD referred to in that sentence is Zymaxid?

6                    "Answer:  Yes.

7                    "Question:  Okay.  And is that sentence true?

8                    "Answer:  Yes.

9                    ████████████████████████████████████████

10   ██████████████████████

11                   ████████████████████████████████████████

12   ████████████████████████████████

13                   ██████████████████████████████

14   ██████████████████████████████████████████████

15   █████████████████████████████████

16   ███████████████████████████████████████████████

17   ███████

18                   ████████████

19                   "Question:  I'd like you to turn to page

20   LUGA004430.  And on that page, it -- there's a heading, 1.0

21   Reference Listed Drug.

22                   "Do you see that?

23                   "Answer:  Yes.

24                   "Question:  And there's a sentence under there

25   that reads, 'This Abbreviated New Drug Application

Upadhyay - designations

1    (pre-assigned ANDA number 202-653 of Gatifloxacin Ophthalmic

2    Solution 0.5 percent is being submitted on the basis of

3    Reference Listed Drug (RLD).

4                    "Do you see that?

5                    "Answer:  Yes.

6                    "Question:  And in this case, the reference

7    listed drug is Zymaxid?

8                    "Answer:  Yes.

9                    "Question:  And proposed generic drug would be

10   Lupin's ANDA drug?

11                   "Answer:  Yes.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Upadhyay - designations



Upadhyay - designations



Upadhyay - designations

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ██████████████████████████████████

4              ████████████████████

5              "Question:  And do you understand edetate

6   disodium is sometimes referred to as EDTA?

7              "Answer:  Yes.

8              "Question:  Even if you don't know what UNII

9   stands for, do you have any understanding of what that

10  information in that column relates to?

11             "Answer:  I don't know.

12             "Question:  If you look through that nine-page

13  document, how many of the -- well, let's just count up how

14  many drug products there are.  Yeah.  It may just be easier

15  to count the ophthalmic formulations.  And in the list of

16  approved drug products which contain EDTA on these nine

17  pages, are any of them ophthalmic solutions?

18             "Answer:  Yes.

19             "Question:  And where do you see those?

20             "Answer:  On page numbered LUGA004980.

21             "Question:  Okay.  So on the first page of this

22  document, there are no ophthalmic solutions, are there?

23             "Answer:  No.

24             "Question.  And the same would be true for

25  page -- page 2 of 9 and 3 of 9 and 4 of 9.  Four of 9 at the

1    bottom has an ophthalmic gel; correct?

2                "Answer:  Yes.

3                "Question:  And there are -- there's an

4    ophthalmic solution at the top of page 5 of 9, so

5    LUGA004980.

6                "Do you see that?

7                Answer:  Yes.

8                "Question:  Is that the only ophthalmic

9    solution?

10               "Answer:  Yes.

11               "Question:  And how much EDTA does that contain?

12               "Answer:  Ten percent.

13               "Question:  Are we looking at the same place?

14   I'm looking at the -- I'm looking at the top of page

15   LUGA004980.

16               "Answer:  Yes.

17               "Question:  And how much EDTA does it contain?

18               "Answer:  On the last row?

19               "Question:  Oh, yes.  There are two.  There's

20   one that says ten percent.  And what does the other one

21   contain?  Aren't there two there?

22               "Answer:  Two is for the solution and drops.

23               "Question:  Right.  But what's the difference

24   between ophthalmic solution and ophthalmic solution drops?

25   Do you know?

1          "Answer:  I don't know.



Upadhyay - designations



1

2

3

4

5

6

7

8

9

10

11          "Question:  So if the court reporter can mark

12     this as Plaintiff's Exhibit No. 5.

13          "And, Dr. Upadhyay, I will represent to you that

14     this i what we believe is the ANDA as filed for Lupin's

15     Zymar product, the 0.3 percent product.

16          "And keeping in mind that this is a double-sided

17     copy in front of you, does this look like about the size of

18     the ANDA you looked at when you were preparing for today's

19     deposition?

20          "Answer:  Yes.

21          "Question:  And if you look at the front page,

22     which is LUGA000001, do you see an ANDA number?

23          "Answer:  Yes.

24          "Question:  And is that 202-709?

25          "Answer:  Yes.

Upadhyay - designations

1          "Question:  And does that correspond to the ANDA

2     number for Lupin's Zymar product?

3               "Answer:  Yes.

4               "Question:  Is this Lupin Limited's paragraph

5     for patent certification for the '045 patent?

6               "Answer:  Yes.

7               "Question:  And do you see in the second full

8     paragraph on page 1 that Lupin certifies a number of things

9     about the '045 patent?

10              "Answer:  Yes.

11              "Question:  And in that paragraph, Lupin

12    certifies that the '045 patent is invalid and unenforceable?

13    ▬▬▬▬▬▬▬▬▬

14    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

15    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

16    ▬▬▬▬▬▬▬▬▬▬▬▬

17    ▬▬▬▬▬▬▬▬▬▬

18    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19    ▬▬

20    ▬▬▬▬▬▬▬▬▬▬

21              "Question:  And then in the same paragraph,

22    Lupin also certifies that its sale of its ANDA Zymar product

23    would not infringe the '045 patent.

24              "Do you see that?

25              "Answer:  Yes.

1 ███████████████████████████████

2 ██████████████████████████████████

3 █████████████████████████████████

4 ████████████████

5         "Question:  Okay.  Is Lupin's ANDA No. 202-709

6 based on any already-approved drug product?

7         "Answer:  Yes.

8         "Question:  And what approved drug product is

9 that?

10        "Answer:  Zymar.

11        "Question:  So for this ANDA, Zymar would be the

12 Reference Listed Drug?

13        "Answer:  Yes.

14 ████████████████████████████

15 █████████████████████████████████████

16 ████████████████████████████████

17 ██████████████████████

18 █████████

19 ████████████████████

20 ████

21 ██████

22 ██████████████████████████

23 █████████████

24 ██████

25 ████████████████████████████

Upadhyay - designations



Upadhyay - designations



Upadhyay - designations



Upadhyay - designations



Upadhyay - designations



Upadhyay - designations



Upadhyay - designations

1

2

3

4

5

6

7

8

9

10

11

12

13         MS. MANDRUSIAK:  That concludes the Upadhyay

14   deposition.

15         THE COURT:  All right.  Before we move on, did

16   you give copies of the marked depositions to the court

17   reporters?  Because if you have not, you should do it

18   afterwards.

19         You are going really fast, and you are reading

20   quickly as opposed to what an examination might be like.  So

21   you need to help them out.

22         MS. MANDRUSIAK:  Okay.

23         THE COURT:  One way or the other.

24         MR. RICCUITTI:  They do have marked copies, your

25   Honor.

Sands - designations

1                THE COURT:  All right.

2                MS. MANDRUSIAK:  We're moving on to the

3        deposition of Leslie Sands, dated June 13, 2012.

4                (Deposition of Leslie Sands read into record as

5        follows:)

6                "Question:  Could you please state your name for

7        the record?

8                "Answer:  Leslie Sands.

9                "Question:  I'm going to hand you what has been

10       previously marked as Plaintiffs' Exhibit 50.  It's an

11       11-page document, which is the deposition notice of Lupin

12       Pharmaceuticals.

13               "Have you seen this document before?

14               "Answer:  Yes.

15               "Question:  Okay.  Directing your attention back

16       to Exhibit 50, page 10.  And topic 51, which reads, 'The

17       relationship between Lupin Limited and Lupin Pharma with

18       respect to the ANDA number 202-709 and/or ANDA 202-653.'

19               "Do you see that?

20               "Answer:  Yes.

21               "Question:  Is it your understanding that you

22       have been designated to testify with respect to this topic

23       for Lupin Pharmaceuticals?

24               "Answer:  Yes.

25               "Question:  And do you agree to testify on

Sands - designations

1    behalf of Lupin Pharmaceuticals with respect to this topic?

2                   "Answer:  Yes.

3                   "Question:  Could you -- did you do anything to

4    prepare to testify with respect to this topic?

5                   "Answer:  Yes.

6                   "Question:  And after your position as associate

7    director at Watson, did you obtain another position?

8                   "Answer:  Yes.

9                   "Question:  And when was that?

10                  "Answer:  2006.

11                  "Question:  And what was that position?

12                  "Answer:  Director of regulatory affairs.

13                  "Question:  Was that also at Watson?

14                  "Answer:  No.

15                  "Question:  Where was it?

16                  "Answer:  Lupin.

17                  "Question:  Okay.  And is that still your

18   current position at Lupin?

19                  "Answer:  That's correct.

20                  "Question:  What are your responsibilities at

21   Lupin as director of regulatory affairs?

22                  "Answer:  To -- I'm the primary contact with FDA

23   for the -- for the company.  I also support, you know, both

24   the generic and brand teams and review promotional items.

25                  "Question:  How do you support the generic

Sands - designations

1    teams?

2              "Answer:  By following up with the agency on the

3    status of all pending applications.

 1  ████████████████████████████████████████████████

 2  ██████████████████████████

 3            ███████████████████████████████████

 4            ████████████████████████████████████████████

 5  ██████████

 6            ███████████████████

 7            ████████████████████████████████

 8  █████████████████

 9            ███████████████████████████████████████████

10  ██████████

11              "Question:  Okay.  I have handed you a document

12  that's been previously marked Plaintiffs' Exhibit 4.  And I

13  will represent to you that it's plaintiffs' understanding

14  this is a copy of the ANDA No. 202-653.

15              "Could you take a look at the bottom of the

16  first page that is labeled LUGA004386?

17              "Do you see that?

18              "Answer:  Yes.

19              "Question:  And about a third of the way down

20  the first page, it says, 'new drug or antibiotic application

21  or biologics license application number, previously issued,'

22  and does it state 202-653?

23              "Answer:  Yes.

24              "Question:  And is it your understanding that

25  this is Lupin Limited's ANDA number for the .5 percent

1   gatifloxacin ophthalmic solution?

2                "Answer:  Yes.

3                "Question:  Okay.  I would ask you to turn to

4   page number LUGA04395 through 4398.

5                "Answer:  (Witness doing so.)

6                "Question:  Have you seen this document before?

7                "Answer:  Yes.

8                "Question:  And what is this document?

9                "Answer:  It's the cover letter for the -- for

10  the application.

11               "Question:  And by 'application,' you're

12  referring to ANDA No. 202-653?

13               "Answer:  Yes.

14  ████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████

18        ████████████████████

19       ████████████████████████████████████████████

20  ██████████████████████████████████████████████████████

21  ████████████

22       ██████████████████████████████████

23  ██████████████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ██████████████████████████████████████████████████████

Sands - designations



Sands - designations



Sands - designations



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      MS. MANDRUSIAK:   I think that is a question.

25

Sands - designations



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          "Question:  Ms. Sands, I've handed you a

25     document that's previously been marked Plaintiff's

1   Exhibit 5.   Looking at the first page, LUGA00001, about

2   one-third of the way down, do you see where it reads, 'New

3   drug or antibiotic application number or biologics license

4   application number if previously issued, 202-709?'

5              "Answer:  Yes.

6              "Question:  And is it your understanding that of

7   ANDA No. 202-709 is Lupin Limited .3 percent gatifloxacin

8   ophthalmic solution application?

9              "Answer:  Yes.

10             "Question:  I would ask you to turn to page

11  LUGA000010 through 13, out of Exhibit 4.

12             "Answer:  Exhibit 4?

13             "Question:  I'm sorry.

14             "Mr. Benchell:  No. 5.

15             "Mr. West:  5.  My mistake.

16             "Mr. Benchell:  And that's 10 through 14, is

17  that correct?

18             "Mr. West:  Yes.  10 through 13, I believe.

19             "Mr. Benchell:  Through 13.

20             "Mr. West:  Yeah.

21             "The Witness:  Okay.

22             "Question:  Do you recognize that document?

23             "Answer:  Yes.

24             "Question:  What is that document?

25             "Answer:  The cover letter for ANDA --

Sands - designations

1        "Question:  For --

2        "Answer:  -- 202-709.



Sands - designations



1    █████████████████████

2            ██████████████████████████

3            ██████████████████████████

4    █████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ███████████████████████████

7            ████████████████████████████████

8    ████████████████████████████████████

9              MS. MANDRUSIAK:  That concludes the reading from

10   the Sands deposition.

11              THE COURT:  All right.  Thank you.

12              MS. MANDRUSIAK:  This is the last one.  This is

13   the deposition of Dr. Kamel Egbaria, dated Wednesday, May

14   16th, 2012.

15              (Deposition of Dr. Kamel Egbaria read into the

16   record as follows:)

17              "Question:  Could you state your full name,

18   please?

19              "Answer:  Yeah.  My name, Dr. Kamel Egbaria.  I

20   am the chief scientific officer and executive vice president

21   for Hi-Tech Pharmacal.

22              "Question:  Could you just briefly describe your

23   education post high school?

24              "Answer:  Yeah.  Post high school, I have

25   pharmacy degree, Pharm.D, and I have a master's degree in

Egbaria - designations

1      pharmaceutical sciences, as well as a Ph.D. in

2      pharmaceutical sciences, industrial pharmacy, and post my

3      Ph.D., I have a post-doctorate from University of Michigan.

4              "Question:  I'm going to ask have you seen this

5      Notice of Deposition before?

6              "Answer:  Yeah, I did.

7              "Question:  Have you been designated by Hi-Tech

8      to testify with respect to the categories that Hi-Tech has

9      agreed to produce a witness for in response?

10             "Answer:  Yeah, I did.

11             "Question:  Are you familiar with the Pharmacal

12     0.5 percent gatifloxacin ophthalmic solution?

13             "Answer:  Yes.

14             "Question:  What was your involvement with the

15     development of the 0.5 gatifloxacin solution?

16             "My question was really what was your

17     involvement in the development?

18             "Answer:  My involvement?

19             "Question:  Yes.

20             "Answer:  Okay.  Okay.  My involvement.  I'm

21     actually the chief scientific officer and executive

22     president, so the last word stops with me, you know, so ...

23             "Mr. Kelly:  Okay.  I will ask the reporter to

24     mark as Deposition Exhibit 2 a document bearing

25     production -- first page production numbers

Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations



Egbaria - designations

1   ████████████████████████████████████████

2   ████████████████████████████████████████

3   █████████████████████████████████████████

4   ██████████████████████████████████████████

5   ████████████████████████████████████████

6   ██████████████████████████████████

7   ████████████

8                MS. RICCUITTI:   That is the end of Egbaria.

9                THE COURT:   All right.   Thank you very much.

10               MS. FENTON:   Your Honor, our next witness is Dr.

11   Stella.   Would now be an appropriate tame for lunch?

12               THE COURT:   I think so.   The half an hour.

13   While I'm on the subject, I owe you all an hour and

14   15 minutes or so.   My afternoon proceedings have been

15   canceled, so if you think you need that time, perhaps this

16   afternoon is the time to slip it in.   I might need to take a

17   few minutes to run an errand, but certainly I can be back

18   by -- take between 4:30 and 5:30 as a break and then be back

19   at five for another hour.   All right?

20               MS. FENTON:   Thank you.

21               THE COURT:   All right.   Thank you.

22               (Luncheon recess taken.)

23                   -   -   -

24               (AFTERNOON SESSION)

25               THE COURT:   All right.   Next witness.

Stella - direct

1          MR. BAXTER:  May it please the Court, my name is

2    Steven Baxter.  I will be handling the testimony of Dr.,

3    Professor Valentino Stella, plaintiffs' next witness.

4          THE COURT:  All right.  Good.  Thank you.

5              ... VALENTINO J.  STELLA, having been

6          first duly sworn, was examined and testified as

7          follows ...

8          THE COURT:  Good afternoon.

9          THE WITNESS:  Good afternoon.

10         MR. BAXTER:  Your Honor, may I hand Professor

11   Stella a notebook?

12         THE COURT:  Absolutely.

13                    DIRECT EXAMINATION

14   BY MR. BAXTER:

15   Q.    Professor Stella, could you please give us your

16   educational background?

17   A.    Yes.  I have a bachelor of pharmacy degree from what

18   was then the Victorian College of Pharmacy.  It's now Monash

19   University.  After completing my bachelor's degree I and

20   completed the education in '67, the degree was given in '68,

21   I then worked for one year as a hospital pharmacist at

22   Bendigo Base Hospital.  It's a small community hospital.

23            I then came to the United States in 1968 and in

24   1971 I completed my doctorate at the University of Kansas

25   under professor Takeru Higuchi in pharmaceutical chemistry.

Stella - direct

1    Q.    And did you obtain employment after you obtained your

2    pH?

3    A.    Yes.  I took an assistant professorship at the

4    University of Illinois in Chicago.  I had that appointment

5    from 1971 to June of 1973.

6             And in June, I returned to the University of

7    Kansas at the request of Professor Higuchi to take up the

8    assistant professor position.  And I am now a university

9    distinguished professor of pharmaceutical chemistry.

10   Q.    Do you have any other positions at the University of

11   Kansas?

12   A.    I was the director of the center for drug delivery

13   research for many years, stepped down about 10 years ago.

14   But that is, I am no longer on that.

15            But I was the coleader of the drug discovery

16   delivery and experimental therapeutics group of the

17   University of Kansas, Kansas Center.  Actually, we just got

18   a national cancer center designation a few months ago, so

19   I'm pretty excited about that.

20   Q.    About how long have you been university distinguished

21   professor of pharmaceutical chemistry?

22   A.    I think I got that title in around 1990.  So I think

23   it's been about 22 years.

24   Q.    And do you have any research responsibilities at the

25   University of Kansas?

1    A.      Like every faculty member, you have teaching service

2    and research responsibilities.  I'm at the tail end of my

3    research career, but I have, I have an active contract with

4    the National Cancer Institute where we formulate compounds

5    for the National Cancer -- experimental anticancer drugs for

6    the National Cancer Institute.

7            I carry on research in three areas:  Mainly

8    preformulation workup of drugs, how drugs are solubilized,

9    how they're stabilized, how they're formulated.

10           I also do research in an area called

11   cyclodextrins, which is a unique way of solubilizing drugs.

12   And I'm probably best known for my research in the area of

13   pro drugs.

14   Q.      Have you consulted with any companies in the field of

15   pharmaceutical formulation?

16   A.      Yes.  I actually looked through the list awhile ago.

17   I have now actually consulted for over 100 drug companies.

18   And as I mentioned, probably only half of them exist in name

19   because they've either merged or gone under or whatever, but

20   probably about 100 companies, and most of the major, the big

21   companies as well as some of the small companies, biotech

22   companies.

23   Q.      Have you consulted in the area of formulations dealing

24   with solutions?

25   A.      I would say about half of the work that I do is

1    solutions.  Maybe a little bit under half.  You know, these

2    days, of course, most products want to be oral delivery but

3    a lot are in solutions, injectables, ophthalmics, et cetera.

4    Q.    Have you done any work with ophthalmic solutions?

5    A.    I personally have published about 20 papers in the

6    ophthalmic arena.  And I have consulted for Ciba Vision,

7    Upjohn Pharmacia, Pfizer, which are all one company now.  I

8    did some work with them, with Merck, and with Allergan.

9    Q.    Have you had any government grants?

10   A.    Over the years I've had on and off NIH funding, but

11   for the last, since 1983, I've had continuous funding on my

12   NCI contract in the formulation of anticancer drugs.

13   Mainly, injectable anticancer drugs.  I've had that contract

14   now for pretty close to 29 years.

15   Q.    What does NCI stand for?

16   A.    National Cancer Institute.

17   Q.    Have you developed any commercial drug formulations?

18   A.    In my consulting capacity, I've advised companies a

19   lot but, personally, I do have a couple.  One is the drug

20   called Velcade, V-e-l-c-a-d-e.  It is a drug to treat

21   multiple myeloma.  And in March, we were named, myself and

22   a colleague were named co-inventors of the drug, of the

23   formulation of that drug.  So drug is commercialized.

24           I also developed Capasal, which is a unique

25   solubilizing agent.  And we set sort of the ground rules on

Stella - direct

1   how that could be used.  And I'm very proud to say there are

2   now six commercial FDA approved products containing Capasal,

3   and these are all used in drugs that could not have been

4   formulated without that solubilizing agent.  So I'm very

5   proud of the fact that we've had the impact in human lives

6   through the development of Capasal.

7   Q.     Of the drugs that the National Cancer Institute has

8   approved over the last 50 years, about how many of those

9   have you worked on?

10  A.     Well, the number that's been thrown around is a little

11  bit, not quite accurate.  There have been 17 drugs that have

12  come through the development therapeutics group at the

13  National Cancer Institute that have gone on into major

14  clinical trials or have gone on to the market.  Some of

15  those, only three of them actually went on the market as

16  commercializable materials.  But of the 17, that underwent

17  major clinical trials, my group, and my predecessor, Ani

18  Repta (phonetic), we were responsible for eight out of those

19  17.  Those are all injections and all solutions.

20  Q.     Have you been involved in starting up any companies?

21  A.     Yes, I've started -- I've been involved in starting

22  three drug companies.

23         One is a company called Cydex.  C-y-d-e-x.  It's now

24  part of Ligand, L-i-g-a-n-d.

25         The second one was a company called ProQuest,

1   P-r-o-Q-u-e-s-t, Pharma.  And,

2       The third one is a company called CritiTech.

3   C-r-i-t-i-T-e-c-h.

4           Cydex was started with the idea of utilizing the

5   Capasal, the solubilizer, and that company was sold to

6   Ligand about a year and-a-half ago.

7           ProQuest was a pro drug company.  And in that,

8   in its lifetime, I think we had six or seven patents, but at

9   our one major success, I was the inventor of the new

10  anesthetic drug called Lusedra, L-u-s-e-d-r-a.

11          And the third company is called CritiTech.

12  Wheat we do there is we use supercritical carbon dioxide for

13  pharmaceutical processing and drug processing, and we have

14  three drugs in clinical trials right now.

15  Q.    Have you received any honors?

16  A.    Yes.  I have an honorary doctorate from the University

17  of Kuopio.  K-u-o-p-i-o.  It's now called the University of

18  Eastern Finland.

19      I also have an honorary doctorate from Monash

20  University.  And,

21      In 2011, I received the two highest awards given by --

22  worldwide award given in our field.  I won the Higuchi prize

23  from the American Pharmacist Association.  Higuchi.

24  H-i-g-u-c-h-i.  And also that same year, I received the

25  Distinguished Scientist Award from a major scientific

1   organization, AIPS.  2011 was a good year.

2           In addition to that, I have a number of other

3   awards but they pail under comparison to those.

4           MR. BAXTER:  Your Honor, plaintiffs would like

5   to offer Professor Valentino Stella as an expert in the

6   field of pharmaceuticals and drug formulations.

7           MS. MAZZOCHI:  No objection, your Honor.

8           THE COURT:  Thank you.

9   BY MR. BAXTER:

10  Q.    Dr. Stella, is formulation important to drug

11  development?

12  A.    Obviously, or our field probably wouldn't exist.  But

13  pharmaceutical formulation is a very critical path in the

14  development of the drug product.  So if I may use the

15  analogy what I do for the National Cancer Institute.

16          The National Cancer Institute may test a drug in some

17  drug cell culture model or something like that and identify

18  a drug as being potentially suitable eventually for human

19  consumption as an anticancer drug.  But before that drug can

20  be given to a patient and even certain animal

21  experimentation, that raw drug has to be put into a form

22  that is acceptable.  That is, that the formulation doesn't,

23  doesn't add to damage, doesn't add to the toxicity and best

24  delivers a drug so that that drug can in fact be as

25  effective as it can be and therefore tested in the sense of,

1    for efficacy, toxicity and everything else.

2          So the formulation of a drug is a critical path.  In

3    the various stages, sometimes we come up with experimental

4    dosage forms that may be, not developable, because what you

5    want to do early is say is the drug active?  Is the drug

6    extremely toxic?

7               Having identified a drug then as a potential

8    candidate, there is a lot of steps that go into deciding

9    what the formulation of the drug is going to be.  And

10   sometimes that early on is done mainly for animal testing,

11   not necessarily with the idea of going into humans with that

12   dosage form.  But even that type of testing has to have some

13   chance that if that is successful, can we translate to the

14   human subject.

15              So that has been in an area called

16   preformulation research.  Preformulation really identifies

17   what are the problematic or what are the problems with the

18   drug relative to its efficacy and potential testing.

19              You have another question that you are asking

20   yourself at that point, and that is almost a marketing but

21   it's also an important industrial consideration.  What am I

22   competing against?  What drug is out there?  What product is

23   out there in this field?  Is it unique?  Are we going to

24   have to go head to head with a competitor product at some

25   point?  And to some extent your dosage form is also driven

1    by your comparison to a competitor product, if there is a

2    competitor product out there.

3              So one then develops a strategy based on the

4    solubility of the drug, based on the stability of the drug,

5    based on whether we can deliver this drug in a vehicle that

6    doesn't add to the toxicity of probably an already toxic

7    material, et cetera.  So those are very complicated set of

8    events that a drug company has to go through at the early

9    stage.

10             Now, once you come out with a formulation that

11   is workable, you then do animal testing and eventually human

12   testing, but also in that phase you also are doing toxicity

13   testing.  So you also are checking whether the drug is safe,

14   whether the way you are giving the drug is safe.  And so you

15   have a feedback loop.  That is, when things go wrong or

16   things don't look good, the question is asked, is it our

17   drug?  Can we compete?  Is the formulation stable?  Do I

18   have to modify it?

19             So that set of events decision making tree, if

20   you like, has to be made on a drug by drug basis.  And on

21   that, that set of events, you then begin to formulate what

22   you think is coming closer and closer to the final

23   formulation.  So when you go into humans, even in the first

24   time or maybe in a later phase, you have got a pretty good

25   idea of whether your drug is going to be efficacious,

1    whether it's going to be stable, whether you are going to

2    have a formulation that you can manufacture, can you make

3    it?

4              Cost comes in to play a role.  For example, my

5    cyclodextrin is a very expensive excipient and drug

6    companies will try to make it without the cyclodextrin

7    because it will cost them a dollar a gram.  So they don't

8    want to spend a dollar to formulate the drug when the drug

9    itself is going to cost hundreds of thousands of dollars.

10             So my Cyclodextrin may take a back seat to some

11   other technology that is less expensive and more

12   competitive.

13             So those are very complicated set of events that

14   all formulators have to go through and every company has to

15   go through, and it's not a trivial task, I can tell you.  If

16   it was trivial, I think someone said this morning, we would

17   not have to be employed.  We would not have to exist.

18   Q.   Are there any particular challenges associated with

19   the development of an ophthalmic formulation?

20   A.   Well, ophthalmic is somewhat unique.  The ophthalmics,

21   we don't like to use suspensions because we like to use

22   solutions, so that means that we have to get the drug in the

23   solution and it has to be maintained in solution under

24   normal storage conditions, such as being transported,

25   manufactured, stored in a glovebox of a car, if someone

Stella - direct

1    forgets it there, et cetera.

2              So there's a fairly high barrier to developing a

3    drug that's physically and chemically stable.  It has to be

4    in solution.  But eye drops or ophthalmic products have

5    another, not unique position, they also have to be isotonic.

6    Tonicity is an issue and I think we explained this in the

7    Apotex case.

8              If your Honor is bored by this, I can skip it.

9              THE COURT:  No.  No.

10             THE WITNESS:  For example, if you put a drop of

11   water in your eye, it will sting, and the reach a drop of

12   water will sting is that there's a certain osmotic pressure

13   inside your cells, such as a new cornea.

14             You have water, which is -- you haven't adjusted

15   tonicity.  If you have water on the outside and essentially

16   a salt solution inside the cells, then water gets drawn into

17   the cells.  The cells expand and it can actually trigger

18   nerve endings that say it hurts.  Okay?

19             If I put something in my eye that has an osmotic

20   pressure greater than the pressure of the cells, then it

21   tends to cremate the cells.  It tends to shrink them, pull

22   the cells apart, and that itself is also stinging.  We call

23   that hypertonic.  So tonicity is an issue mainly for

24   comfort, pain, et cetera.

25             There's nerve cells in the eyes, so obviously we

1   have to develop a product that the act of putting the drug

2   in the eye does not exceed some threshold of irritation,

3   some acceptable threshold of irritation.

4           We also have a sterility.  The eye drops have

5   got to be sterile.  For example, if you have -- are putting

6   drops in your eye, you've got a scratch on your cornea, and

7   if that -- if that eye drop is not sterile, they can

8   introduce bacteria into your eye and you could have a

9   problem.

10          So sterility is a big issue.  But the big

11  problem is if you then put this in a polypropylene or

12  polyethylene bottle with a screw cap on it.  So even though

13  I might make a solution sterile, that bottle, when I take

14  those drops and put them in my eye, if I touch my eyelid and

15  I pick up some bacteria from my eyelid and gets transferred

16  into the container, bacteria are going to grow or fungi are

17  going to grow, and so you have to not only be sterile, but

18  you have to have a preservative that maintains a sterility

19  of the solution.

20          And plastic is not impermeable to gases.  So if

21  you have a drug that's oxygen sensitive, et cetera, you

22  know, oxygen can go in and out of those bottles.  So if you

23  have an oxygen-sensitive drug, it makes -- develop an eye

24  drop formulation is far from trivial, and it's almost more

25  complicated in many other dosages.

Stella - direct

1              And drugs are just a lot more unstable in

2       solution, so if you've got a solution, generally, the

3       stability becomes a major problem.

4       Q.     In developing an ophthalmic formulation of an

5       antibiotic, is it conventional for the formulator to look at

6       the corneal permeability of the formulation or of the

7       antibiotic?

8       A.     Well, the assumption is, and the correct assumption is

9       that you're putting the antibiotic into the eye that's

10      preventing infection say from surgery where the eye is much

11      more fungible, or you have an infection in the eye.  And

12      having that infection, where is the infection?  There could

13      be a certain amount of infection that's on the surface of

14      the eye.  It could be that bacteria have begun to invade

15      into the cornea if it's -- especially if there's some

16      damage.  And you have the area behind the cornea, which is

17      called the aqueous humor, which is a great growth media for

18      bacteria.

19              And so when you put an antibiotic in the eye,

20      the whole idea, of course, is to have exposure to all those

21      tissues for which you want to treat the infection.  And the

22      most vulnerable one would be the cornea and the post corneal

23      area because post cornea is not an area that you get to

24      readily.  And so in making sure that the antibiotic is able

25      to get effectively across a cornea and treat any potential

Stella - direct

1   bacterial infection in the aqueous humor is highly

2   desirable.

3                    MR. BAXTER:  Can I put up PTX-240, please.

4                    THE WITNESS:  Can I have a pointer, please?

5                    MR. BAXTER:  Do we have a pointer?

6                    THE WITNESS:  Again, your Honor, I think you've

7   seen this one before, but it has been a few years, so I will

8   walk you through it again.

9                    So do you want me to sort of explain some of the

10  terminology that I've been using?

11  BY MR. BAXTER:

12  Q.    Could you tell us the details of what 240 is?

13  A.    This is the cornea.  So when you are looking at your

14  eye, it's not the white of the eye, it's the clear area of

15  the eye.

16                   So this is called the cornea (indicating).  This

17  is the area that we call the aqueous humor.  So the aqueous

18  humor is the fluid that essentially maintains the pressure

19  against the lens -- against your cornea, and this is the

20  lens.

21                   So vision, when you see something like the image

22  comes through here is focused by the lens.  It shows up on

23  the retina.  That retinal image is then transmitted through

24  the optic nerve and what we call vision is the information,

25  light, that's transmitted to the retina, then on to the --

1    through the optic nerve to the brain.

2            So the first step in vision is a non-distortion

3    of your vision by the cornea.  So if you have a corneal

4    infection, if you have damage eventually to the cornea, then

5    that can obviously distort your vision.

6            Here we have bacterial growth, for example, in

7    the aqueous humor.  It could damage the eye sufficiently

8    that you would lose potentially all vision.  Now, that's

9    catastrophic infection.  Most infections that we treat are

10   not catastrophic like that.  And today even we can, in the

11   worst case scenario, we can do corneal transplants.

12           But the point I want to make, however, is that

13   the cornea is essentially the eyes, the eye defense

14   mechanism.  We don't want bacterial infections, deleterious

15   things to get through the cornea into the rest of the area.

16           So we're going to be talking about the cornea,

17   so this is this region of the eye.  We're going to be

18   talking about the aqueous humor, which is this fluid right

19   behind the cornea (indicating).  And it's the ability of a

20   drop placed in the eye to drive a drug into the cornea and

21   into the aqueous humor to treat any potential infection or

22   actual infections that occur in this region.

23   Q.    Can you tell us how one goes about measuring corneal

24   permeability of a drug?

25   A.    Sort of the gold standard at this point is,

1    unfortunately for the rabbits, is the New Zealand albino

2    rabbit.  And basically the rabbit is used as a surrogate for

3    the human eye, and drops are placed in the -- in the

4    pre-corneal fluid in the same way that you would apply a

5    drop if you were having an eye drop for glaucoma or anything

6    else.

7              And the ability to get across the cornea is

8    basically you cannot stick a needle in here and take

9    multiple samples because if you stick a needle in here,

10   you're going to damage the cornea, and therefore you can't

11   take multiple samples, as Dr. Mayo mentioned earlier today.

12             So unfortunately, what you have to do is

13   sacrifice the animal, harvest the eye and then access the

14   aqueous humor and sample out of that aqueous humor.  And you

15   do that -- unfortunately, you have to use one animal per

16   time point, or one eye per time point.  So we do use the

17   left and right eye.

18             The only -- there are some techniques that have

19   been used to do perfusion techniques, but those have not

20   gained great popularity.  I think basically, if you're

21   interested in looking at corneal permeability from an

22   actual practical what goes across the lens, what goes across

23   the cornea, is harvesting aqueous humor.

24             There are in vitro techniques that we'll be

25   discussing later on I guess when we talk about invalidity as

Stella - direct

 1   well.

 2              MR. BAXTER:  Your Honor, plaintiffs would like

 3   to move PTX-240 into evidence.

 4              MS. MAZZOCHI:  Your Honor, my understanding is

 5   this is just a demonstrative.

 6              THE COURT:  Right.  And sometimes demonstratives

 7   come in.

 8              Is there any objection to this coming in?

 9              MS. MAZZOCHI:  No, your Honor.  Just that it is

10   a demonstrative.

11              (Plaintiffs' Exhibit No. 240 was admitted into

12   evidence.)

13   BY MR. BAXTER:

14   Q.    Professor, did you hear Dr. Yasueda's testimony over

15   the last two days?

16   A.    Yes, I have.

17   Q.    Is there anything in Dr. Yasueda's testimony that

18   confirms the description you've given about developing an

19   ophthalmic formulation?

20   A.    I would say that their effort to improve the delivery

21   of gatifloxacin, I thought there were two interesting

22   things.

23              One is that they were obviously trying to

24   improve the delivery of gatifloxacin based on what they felt

25   was going to be a competitor product, the levofloxacin.  But

1    to get that improvement, I thought that they went to a

2    really heroic measure.  I thought it was spectacular what

3    they did.  They did a lot of things that I thought was quite

4    heroic.  And so it was quite -- quite interesting to look at

5    the timeline that they developed it.

6              MS. MAZZOCHI:  I move to strike, your Honor.

7    None of this is in his expert report.

8              THE COURT:  Your objection is noted, consistent

9    with my practice.

10   BY MR. BAXTER:

11   Q.    Professor Stella, could you find JTX-001 in your

12   exhibit book?  And can you tell me what JTX-001 is?

13   A.    Yes.  It's what we've called the '045 patent, with

14   the -- with the re-examined -- this is the re-examination

15   with the re-examined claims.

16   Q.    Dr. Stella, were you asked to provide any opinions

17   with respect to the infringement of the '045 patent,

18   JTX-001?

19   A.    Yes, I have.

20   Q.    And what types of opinions were you asked to provide?

21   A.    I was asked whether the -- the two Lupin products, the

22   .3 and the .5 percent, and the two Hi-Tech products, the .5

23   and the .3 percent, infringed the '045 patent.

24              MR. BAXTER:  Put up PTX-260, please.

25   BY MR. BAXTER:

1    Q.    In reaching your opinions, did you use any particular

2    definition for the level of skill in the art?

3    A.    Yes.  I used the same level of skill in the art as I

4    used in the previous case, the Apotex case, your Honor.

5          I could read this out.  Would you like me to do

6    that?

7                    THE COURT:  Yes.

8                    THE WITNESS:  Okay.  A person of ordinary skill

9    in the art is defined as being the person of ordinary skill

10   in the art would be skilled in the art of formulating

11   aqueous pharmaceutical compositions as of August 21st,

12   1998.

13                   This person would have a Ph.D. in pharmaceutics,

14   pharmaceutical chemistry, or a closely related field, and at

15   least two years of experience in formulating aqueous dosage

16   forms.

17                   Alternatively, this person would have a lesser

18   degree in an appropriate field and substantially more

19   scientific training and practical experience in formulating

20   an aqueous pharmaceutical compositions.

21                   I believe that is the one that we all agreed on

22   in the Apotex case.

23                   MR. BAXTER:  Please put up Plaintiffs', PTX-261.

24   BY MR. BAXTER:

25   Q.    Dr. Stella, in reaching your conclusions about the

Stella - direct

1   infringement of the '045 patent, did you use any particular

2   set of, and interpretations for the claim terms?

3   A.    Yes.   The one that I used is aqueous pharmaceutical

4   composition.   The terms aqueous pharmaceutical -- aqueous

5   pharmaceutical gatifloxacin eye drop solution in claim

6   6 of the '045 patent re-examination certificate -- of the

7   '045 patent re-examination certificate and aqueous liquid

8   pharmaceutical eye drop composition in claims 12 through

9   16 of the '045 patent mean a liquid pharmaceutical

10  composition in which the liquid is largely water, is water,

11  aqueous.

12              MR. BAXTER:  May we have the next slide, please.

13              THE WITNESS:  And all the experiments that

14  were -- that were shown in experiments 1 through 3 were

15  aqueous compositions.

16  BY MR. BAXTER:

17  Q.    Did you use any particular interpretation for the

18  terms comprising, containing, comprises?

19  A.    Yes.   They all mean that the product in or the process

20  may contain ingredients or steps in addition to those

21  explicitly recited in the claim.   Basically, I said

22  comprising, comprises or containing all mean the same thing.

23              MR. BAXTER:  Can you put up 261C?

24  BY MR. BAXTER:

25  Q.    Is this the definition used for gatifloxacin or its

Stella - direct

1    salt?

2    A.      Please, your Honor, I would rather not spell out the

3    chemical name at the bottom there.  I think we all

4    understand that gatifloxacin in claim 6 and claim 12 through

5    16 means the drug gatifloxacin or its salts thereof.

6    Q.      And does PTX-261-D reflect your understanding of the

7    term having a pH from about five to about six?

8    A.      Yes.  It's -- I think the -- all parties would agree

9    that about in this particular claim is from the pH of about

10   five to a pH of about approximately six, but the term really

11   means in both claims 6 and 12 of the '045 patent, reflects

12   that.

13   Q.      And does 261 E, PTX-261-E reflect the interpretation

14   used for the term from about 0.3 to about 0.8 weight per

15   volume percent?

16   A.      Again, what -- the language here is that the solutions

17   contain approximately 0.3 to approximately 0.8 percent

18   gatifloxacin or its salts.  And this is in both claim 6 and

19   12.

20   Q.      And does PTX-261 F show the interpretation or meaning

21   you used for the term, incorporating about 0.01 weight per

22   volume percent disodium edetate in claim 6, and the term

23   about 0.01 weight per volume percent disodium edetate in

24   claims 12 through 16?

25   A.      Yes.  I feel that the claim language here represents

Stella - direct

1    that the -- that claim 6 in the '045 patent means that the

2    solutions contain the sodium edetate at the point -- at

3    approximately .01 percent.

4                Could I have a bottle of water, please?

5                And claim 12 of the re-examination was, again,

6    that the -- that the formulations contained approximately

7    .01 percent EDTA.

8    Q.   And does PTX-261-G show the definition you used for

9    the term isotonic agent?

10   A.   Yes.  Isotonic agent in the context of the -- of

11   claims 15 and 16 is that in the '045 patent, is the additive

12   added to the solution to achieve isotonicity with human

13   tissue.

14   Q.   What's the relationship or is there any relationship

15   between the term isotonic agent and tonicity agent?

16   A.   Yes.  I mean, they are the same thing.

17   Q.   Looking back at JTX-001, in particular, the

18   re-examined claims, which are on page 10 of JTX-001, did you

19   reach any conclusions with respect to the infringement of

20   claims 12 to 6 of the '045 patent?

21   A.   12 through 16?

22   Q.   12 through 16, yes.  Excuse me.

23   A.   Yes, I did.

24   Q.   Did you reach any conclusions about Lupin's

25   gatifloxacin ANDA products?

1   A.     Yes.   I felt that both the Lupin's -- both their

2   gatifloxacin products infringed the -- the claims 12 through

3   16.

4   Q.     Okay.  Well, let's start again.

5          Did you reach any conclusion about 0.3 percent

6   gatifloxacin ANDA product?

7   A.     Yes.   That the 0.3 percent is within the concentration

8   ranges within the .3 to -- sorry.   .3 to .8 percent.

9   Therefore, it did infringe the patent.

10  Q.     Okay.  And did you reach the same conclusion with

11  regard to Lupin's 0.5 percent gatifloxacin ANDA product?

12  A.     Yes.   Again, the .5 percent falls within the range

13  of -- of gatifloxacin, which is the .3 to .8 percent range,

14  as claimed -- that's claimed in the patent, in the approved

15  patent.

16  Q.     All right.  I'm going to ask you some questions in

17  more detail about Lupin's 0.3 percent ANDA product, so I'd

18  like you to turn to JTX-5 in your notebook.

19          In forming your opinion about Lupin's

20  0.3 percent ANDA product, did you consult JTX-005,

21  ANDA No. 202709 for Lupin's 0.3 percent gatifloxacin ANDA

22  product?

23  A.     I did in part.  I didn't look at all of it.

24  Q.     Did you look at page 126, which is JTX-005-00126?

25  A.     Yes.

Stella - direct



Stella - direct

321



Stella - direct

1    ████

2    █████████████████████████

3    ████

4    ████████████████████

5    █████████

6    █████████████████████

7    █████████████████████

8    ████  ████████

9    ████████████████

10   █████████

11   ████  ████████████████████

12   █████████████

13   ████  █████████████████████

14   ████████████████

15   ███████████████████

16   ████████████████████████

17   ██████████

18   ████  ████████

19          MR. BAXTER:  Your Honor, plaintiffs would like

20   to move into evidence JTX-005.

21          MS. MAZZOCHI:  Your Honor, we'll object just to

22   the extent it's not the complete ANDA document.  So -- and I

23   understand that it's a larger document, but it's not the

24   complete one, and the problem is that it doesn't fully

25   characterize all the specifications of the Lupin ANDA

1    product.

2              THE COURT:  Well, if you think there are some

3    other pages that need to be put in, then I will certainly

4    let you supplement.

5              MS. MAZZOCHI:  Thank you, your Honor.

6              THE COURT:  I'm not confident I need the entire

7    ANDA.

8              MS. MAZZOCHI:  I understand.  Thank you.

9              MR. BAXTER:  Your Honor, we anticipated their

10   objection.  We intend to move in JTX-005.  That is the

11   complete ANDA.  Just rather than having four books in front

12   of him and having to fish around, it's only his witness

13   notebook that has the separate pages.

14             THE COURT:  Oh, so --

15             MR. BAXTER:  We are intending to move in the

16   full ANDA.

17             THE COURT:  Thank you very much.  I appreciate

18   it.

19             My problem is you are using a document like

20   that.  99 percent of it isn't testified about.  Then, all of

21   a sudden, on appeal, you start raising issues that were

22   never presented to me.  So that's my concern.  So we might

23   have to talk about this a little bit more.

24             MR. BAXTER:  We'll be very flexible on that.

25             THE COURT:  All right.

1              MR. BAXTER:  I think we can reach some kind of

2    compromise.  But the same issue is going to come up with the

3    other three ANDAs.

4              THE COURT:  I understand that.  I have the same

5    concerns about it.

6              MR. BAXTER:  Plaintiffs would also like to move

7    in PTX-241, PTX-242, PTX-243 and PTX-244.

8              MS. MAZZOCHI:  Your Honor, because these are

9    titled things like Lupin's product infringe the claims,

10   they're demonstratives and they're argumentative.  That's

11   not appropriate to admit it into evidence.

12             THE COURT:  All right.  I take it, have you

13   talked about demonstratives, because sometimes, particularly

14   in bench trials, the parties agree that their demonstratives

15   should come in.  I take it you don't have that agreement or

16   have not even talked about that.

17             MS. MAZZOCHI:  We do not have that agreement,

18   your Honor.

19             THE COURT:  All right.  Well, absent an

20   agreement, I probably won't let demonstratives in, including

21   defendants'.

22             MS. MAZZOCHI:  Understood, your Honor.

23   BY MR. BAXTER:

24   Q.    I'd like to now ask you some questions about Lupin's

25   0.5 percent ANDA product, so I would like you to find

1    Exhibit JTX-4 in your notebook.

2              And did you look at Lupin's 0.5 percent

3    gatifloxacin ANDA?

4    A.    Yes, I did.

5    Q.    You didn't look at all of it, did you?

6    A.    No.  Just the -- just the relevant pages, the

7    composition.

8    Q.    I'd like you to take a look at page 117.  And did you

9    look at this page?

10   A.

Stella - direct



327

Stella - direct



1

2

3

4

5

6

7

8

9

10          MR. BAXTER:  Your Honor, we would like to move

11   in JTX-004, Lupin's ANDA for its 0.5 percent gatifloxacin

12   product.

13          MS. MAZZOCHI:  Your Honor, we won't object to

14   the whole ANDA, but we will work with counsel to reduce the

15   volume of paper that ultimately goes to your Honor.

16          THE COURT:  All right.  Thank you.

17          (Joint Trial Exhibit No. 004 was admitted into

18   evidence.)

19   BY MR. BAXTER:

20   Q.    I'm sorry to have to ask you to go through this, butts

21   we're going to have to do the same process for Hi-Tech's

22   ANDA products, so I'd like --

23          THE COURT:  I'm sitting here wondering why we're

24   going through this, but that's all right.

25          MR. BAXTER:  We're unable to have defendants

Stella - direct

1  agree about the infringement of claims 12 through 16.

2  BY MR. BAXTER:

3  Q.    So I would like to take a look at JTX-7.  And in

4  forming your opinion about Hi-Tech's 0.3 percent

5  gatifloxacin ANDA product, did you consult JTX-007 and the

6  number 230190 for Hi-Tech's 0.3 percent gatifloxacin

7  product?

8  A.    This is JTX-007?

9  Q.    007.

10  A.    Yes.  Just in part.

Stella - direct

17              MR. BAXTER:  Your Honor, plaintiffs would like

18     to move into evidence JTX-007.

19              MR. CASTELLANO:  No objection, your Honor.

20              THE COURT:  Thank you.

21              (Joint Trial Exhibit No. 007 was admitted into

22     evidence.)

23     BY MR. BAXTER:

24     Q.    I'd like to ask you a few questions about Hi-Tech's

25     0.5 percent gatifloxacin ANDA product, so I'd like you to

1    turn to the tab for JTX-006 in your book.

2              In forming your opinions about the infringement

3    of the '045 patent in connection with Hi-Tech's 0.5 percent

4    gatifloxacin ANDA product, did you consult JTX-006 and the

5    number 203189 for Hi-Tech's 0.5 percent gatifloxacin

6    product?

7    A.    Yes.  Just in part.  Not all of it.

8    Q.    Did you look at page 67 of that ANDA?

9    A.    Yes, I did.

332

Stella - direct



24         MR. BAXTER:  Could you put up PTX-250.

25    BY MR. BAXTER:

Stella - direct



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          MR. BAXTER:  Your Honor, plaintiffs would like

16    to move in JTX-006.  That's Hi-Tech's 0.5 percent

17    gatifloxacin ANDA.

18          MR. CASTELLANO:  No objection, your Honor.

19          THE COURT:  Thank you.

20          (Joint Trial Exhibit No. 6 was admitted into

21    evidence.)

22    BY MR. BAXTER:

23    Q.    I would like you to turn back to JTX-001.  And, in

24    particular, the claims of the re-examined patent.  And I

25    would like to take a look at the last page of the claims.

Stella - direct

1              And were you also asked to provide any opinions

2     with respect to claim 6 of the '045 patent?

3     A.     Yes, I was.

4     Q.     And did you reach any conclusions with respect to the

5     infringement of claim 6 of the '045 patent?

6     A.     Yes.

7     Q.     And what kind of conclusions did you reach with

8     respect to the -- to Lupin's 0.3 percent gatifloxacin

9     ANDA product and Lupin's 0.5 percent gatifloxacin ANDA

10    product?

11    A.     They both -- both the .3 and the .5 percent infringe

12    claim 6.

13    Q.     What conclusion did you reach with regard to Hi-Tech's

14    0.3 percent gatifloxacin ANDA product and the 0.5 percent

15    gatifloxacin ANDA product?

16    A.     I felt both the .3 and the .5 that infringe claim 6.

17    Q.     And in reaching these conclusions, did you use any

18    particular claim interpretation for the, or any particular

19    definition for the term raising corneal permeability of an

20    aqueous pharmaceutical gatifloxacin eye drop solution?

21    A.     Yes.  I used the claim interpretation that was

22    consistent with the Court in the previous case, and that is

23    that the -- that increasing the corneal permeability of

24    gatifloxacin involved increasing delivery of drug to the

25    aqueous humor.

1                Your Honor, if you remembered in the last trial,

2      I get low blood sugar and occasionally have to munch on

3      things, so if I have to take a few minutes to chew on

4      something, I hope you don't mind.

5                THE COURT:  I don't at all.

6                THE WITNESS:  Thank you.

7      BY MR. BAXTER:

8      Q.    In reaching --

9      A.    Go ahead.

10     Q.    Okay.

11     A.    I can chew and think at the same time.

12     Q.    Okay.  In reaching your conclusion, did you consider

13     data presented in certain testing conducted by Senju?

14     A.    Just a minute.  Yes, I did.

15     Q.    Could you turn to JTX-015 in your notebook?  And if

16     you -- I assume you prefer to look at the JTX-015-TR, the

17     English translation, which is behind it.

18                Did you review JTX-015 and its English

19     translation in reaching your conclusions about the

20     infringement of claim 6?

21     A.    Yes, I did.

22     Q.    Can you turn to page 9 of that document.  And did you

23     rely upon the data on this page?

24     A.    Yes.

25     Q.    Now, if you could go back to page 3 of the document.

Stella - direct

1              If you look at page 3, can you tell what types

2     of formulations are being tested in this study?

3     A.    Yes.  They're contained in the table at the top of

4     that page.

5     Q.    Are the two formulations identical with the exception

6     of the presence or absence of EDTA?

7     A.    Yes.  The only difference between the two

8     formulations -- the only difference between the two

9     formulations is the presence and absence of EDTA.

10    Q.    We're looking at page 2.  Is that shown on the page?

11    A.    Yes.  It's at the top of the page.

12    Q.    Is such a side-by-side test the best way to determine

13    the effect of EDTA?

14    A.    Yes, it is.

15    Q.    And --

16    A.    And I think that's consistent with also the

17    statisticians that have provided expert reports.

18    Q.    Is that Dr. Bloch?

19    A.    Yes.

20    Q.    Was this an in vivo test?

21    A.    This was an in vivo test, yes.

22    Q.    And is this -- does this involve rabbits?

23    A.    It involves, yes, U.K. Japanese white rabbits.

24    Q.    Now, if you could go back to page 9.  Can you describe

25    the data or the results which are reported in tables 1 and 2

1    and Figure 1 on this page?

2    A.    Table 1 first.

3    Q.    Just Table 1 at the top.

4    A.    This gives you the aqueous humor concentration at four

5    time points, comparing the two formulations, one with the

6    added EDTA and one without the added EDTA, or what is termed

7    here the current formulation.

8              And you can see that at half-hour, one hour and

9    two hour, the levels of gatifloxacin were superior to

10   those -- with EDTA were superior to those without EDTA.

11   Q.    And what's shown in Table 2?

12   A.    In Table 2 is what I think is previously called

13   summary data.  I'd like to just maybe take a minute, your

14   Honor, to describe AUC.  You may have seen that in other

15   cases as well.

16             AUC is what's called the area under the curve

17   and it's really a measure of the amount of exposure, that is

18   how much -- AUC is directly related to the amount of drug

19   that gets through the cornea and is being measured in the

20   aqueous humor.

21             So, for example, if you -- if you double the

22   amount getting through, you should get double the AUC.  So

23   the AUC is a measure of the total exposure.  It's

24   proportional to the amount of drug that gets through the

25   eye, because the single time point measures the amount only

Stella - direct

1   at that time point.  So AUC is proportional to the amount

2   that gets through to the aqueous humor.

3              And you can see here that over two hours, in the

4   first two hours, it was 40 percent more getting through from

5   the with EDTA versus non-EDTA and over the four hours, it

6   was 27 percent greater in the -- in the aqueous humor

7   compared to -- with the EDTA than without the EDTA.

8   Q.    So the formulation which contained EDTA showed a

9   40 percent increase, roughly, for the area under the curve

10  at two hours; is that correct?

11  A.    That's correct.

12  Q.    And that formulation which contained EDTA showed

13  approximately 27-percent increase over the formulation which

14  did not contain EDTA for the area under the curve at four

15  hours?

16  A.    That's correct.  Over four hours.

17  Q.    Over four hours.

18              And is that data depicted graphically in Figure

19  1 at the bottom of the page?

20              MS. MAZZOCHI:  Your Honor, just to preserve the

21  objection, none of this is in his expert report.

22              THE COURT:  All right.  Thank you.

23              THE WITNESS:  Yes.  This is the, what we would

24  call the aqueous humor time profile.  By the way, your

25  Honor, when we say AUC, it's simply if you take each one

 1    of these and treat them as a block of what we call a

 2    trapezoid.

 3              Basically what you are doing is, as I'm

 4    indicating here by the pointer, you're measuring or

 5    calculating the area under that curve.  So technically, it

 6    is, in fact, the area under the curve, as the name implies.

 7    And you're comparing the area under the curve from -- with

 8    EDTA to the area under the curve without EDTA.

 9    BY MR. BAXTER:

10    Q.    In that figure, the line with the diamonds, which is

11    higher at the half-hour, the one hour and the two hours, is

12    that the data for the formulation with the EDTA?

13    A.    Yes.  And -- and that's consistent with what's in the

14    table that was at the top of the page.

15    Q.    All right.

16    A.    This is a graphical presentation for visualization

17    purposes.

18    Q.    And the lower curve is for the formulation without the

19    EDTA?

20    A.    Yes.

21    Q.    And the amount of EDTA used in this experiment was

22    0.01 percent?

23    A.    0.01 percent, that's correct.

24    Q.    Is there any particular significance of area under the

25    curve or AUC values as opposed to the relative values at

Stella - direct

1   single time points?

2   A.    Well, as I just explained, the AUC is a, really a

3   measure of the total exposure.  So AUC should be and is

4   considered to be proportional to the amount that gets

5   through.

6          So if you end up with a greater AUC with EDTA,

7   it means that more of the drug got through the cornea than

8   without the EDTA, yes.  And the AUC is -- we put a lot

9   more -- a lot more -- that's felt to be more measured.  The

10  single time point only tells you what the concentration is

11  at a single time point.

12  Q.    So from the data reported in JTX-015, were you able to

13  draw any conclusions about the effect of 0.01 percent EDTA

14  on the corneal permeability of gatifloxacin?

15  A.    I felt that it showed that EDTA had a positive

16  impact in improving the transported gatifloxacin across the

17  cornea.

18  Q.    I would like you to turn to JTX-16 and JTX-016-TR in

19  your notebook.  And when you get there, I will ask you if

20  you relied on the data in this report in reaching your

21  conclusion about the infringement of claim 6 of the '045

22  patent.

23  A.    Yes, I did.

24  Q.    If you look at page 3 of the report, can you say

25  anything about the formulations which are being tested?

Stella - direct

1   A.    Yes.  At the top of the -- top of this page, you've

2   got 0.3 percent gatifloxacin, sodium chloride, pH of 6, and

3   the difference between the two formulations is the with and

4   without EDTA.  .01 percent EDTA.

5   Q.    So is this a side-by-side comparison of two

6   formulations, the only difference being that one of them

7   contained 0.01 percent of EDTA?

8   A.    Yes.  And it's also consistent with a good study

9   design, as indicated by Dr. Bloch.

10  Q.    Okay.  And are these the same formulations which were

11  tested in the previous report we just looked at?

12  A.    As far as I can tell, it's identical.  Yes.

13  Q.    Was there any difference between the studies reported

14  in JTX-15 and 16?

15  A.    Yes.  In the earlier study, they were placing three

16  drops in the eye, one at time zero, one at 15 minutes, and

17  one at 30 minutes, and then sampling at one hour, which

18  meant there was, you know, an hour after the initial, but it

19  was 30 minutes after the last drop.

20        So that study involved three drops placed in the

21  eye of the rabbits and in subsequent sampling.  In this

22  particular study, they did a single drop.

23  Q.    I would like you to turn to page 9 of the report and

24  ask you if you considered the data reported on this page in

25  reaching your opinion.

Stella - direct

1    A.    Yes, I did.

2    Q.    And can you tell us what is shown in Table 1 at the

3    top of page 9 of JTX-016?

4    A.    Table 1, like in the previous study, shows individual

5    time points, a quarter of an hour, half an hour, one hour

6    and two hours post administration, where they're comparing

7    the determined mean and standard deviation concentrations at

8    those particular times, and each of the time points, the

9    concentration of EDTA -- concentration of gatifloxacin from

10   the EDTA solution were always superior to those of the --

11   the formulation without the EDTA.

12   Q.    Just so the record is clear, in both this study,

13   JTX-16, and the previous study we looked at, JTX-15, when

14   we're talking about concentrations here, we're talking

15   about -- what concentrations are we talking about?

16   A.    We're talking about the concentrations of

17   gatifloxacin.

18   Q.    In what?

19   A.    In aqueous humor.

20   Q.    Can you tell me what is described in Table 2 on this

21   page?

22   A.    Well, Table 2, like Table 2 in the previous one, is

23   a -- a summary, a summary.  That is the Cmax values, which

24   is the concentration at the maximum concentration.  The

25   Tmax, which is the time at which maximum concentration was

1    observed.  And the fourth column or the last column is the

2    area under the curve, from zero to two hours.  And what you

3    can see here, over the zero to two hours, there was a

4    29 percent higher concentration in the -- from the

5    formulation that had the EDTA.  It compared it to the

6    non-EDTA containing formulation.

7    Q.    And are these results shown graphically in Figure 1 at

8    the bottom of the page?

9    A.    Yes.  This is just the same data that was in the

10   Table 1, the one at the top of the page.  And what you're

11   looking at here is a graphical representation of that

12   data.

13   Q.    Is it --

14   A.    And, again, it shows that at the top curve, the one

15   with the diamonds, it's with the EDTA.  The bottom one,

16   which is the closed squares, is without the EDTA.  And,

17   again, you can see the higher level seen with the EDTA

18   formulation compared to the non-EDTA formulation.

19   Q.    Is it the same data or the same type of plot?

20   A.    Same type of plot.  Sorry.

21   Q.    Okay.

22   A.    Just say the same data as Table 1.

23   Q.    So based on the results presented in JTX-016, were you

24   able to draw any conclusions about the effect of

25   0.01 percent EDTA on corneal permeability of gatifloxacin?

Stella - direct

1   A.    Yes.  In all cases, the -- the aqueous humor

2   concentrations, as measured by both the individual time

3   points as well as the AUC, which is a measure of the total

4   amount that was delivered into the aqueous humor, was

5   superior from the EDTA solution than from the non-EDTA

6   solution.

7   Q.    Now, what was the concentration of gatifloxacin in the

8   studies reported in JTX-15 and 16?

9   A.    It was .3 percent gatifloxacin.

10  Q.    Did you draw any conclusions about the effect of

11  0.01 percent EDTA on the corneal permeability of

12  gatifloxacin in a solution which contained 0.5 percent

13  gatifloxacin from the results presented in JTX-15 and 16?

14  A.    Oh, yes.  The expectation that if .5 percent was used

15  in this study, you would have gotten similar results.

16  Q.    And what was the pH of the formulations tested in

17  JTX-15 and 16?

18  A.    It was pH six.

19  Q.    Can you draw any conclusions about the effect of

20  0.01 percent EDTA on the corneal permeability of

21  gatifloxacin in a solution of about 5.4 pH the results

22  presented in JTX-015 and 016?

23  A.    I would expect that the results would be the same.

24  Q.    What was the concentration of sodium chloride in the

25  formulations tested in JTX-015 and 016?

1    A.      I believe it was .86 -- .86 percent.

2    Q.      Can you draw any conclusions about the effect of

3    0.01 percent EDTA on the corneal permeability of

4    gatifloxacin in a solution which contains about 0.83 weight

5    per volume percent of sodium chloride from the results

6    presented in JTX-15 and 16?

7            MS. MAZZOCHI:  Your Honor, none of this is in

8    his expert report.  Objection.

9            MR. BAXTER:  He was deposed extensively on this.

10           THE COURT:  You may answer.  I'm sorry.

11           THE WITNESS:  Okay.  I expect -- I would expect

12   that the slightly lower, less than five percent drop in

13   sodium chloride would have no effect on the -- in the

14   overall concentrations.  They have no effect, no significant

15   effect.

16   BY MR. BAXTER:

17   Q.      Now, do Lupin's gatifloxacin ANDA products contain

18   benzalkonium chloride or BAK?

19   A.      Yes. ▮

20   ▮      ▮

21   ▮      ▮

22   ▮      ▮

23   ▮      ▮

24   Q.      Does BAK have any effect on the corneal permeability

25   of gatifloxacin?

Stella - direct

1    A.      It doesn't appear to be based on, you know, the work

2    presented by Senju, Dr. Yasueda.  At higher concentrations,

3    BAK has been shown to occasionally, for some drugs, to

4    improve corneal permeability, but it's really hard to say

5    what is happening here.  But I expect that the effect, if

6    anything, would be minimal. ███

7    ███     ████████████████████████████████████████████████

8    ██████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ███████████████████████████████████████████

11   ██████████████████████████████████████████████

12   ███     ████████████████████████████████████████████████

13   █████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   ████████████████████████████████████

17   Q.      Do any of Lupin's -- strike that.  Do any of

18   defendants' experts agree with you in regard to the fact

19   that BAK, even if it was acting as a corneal permeability

20   enhancer, would in no way negate the corneal permeability

21   enhancement effect of EDTA?

22   A.      I believe both Professor Sherman and Dr. Grass both

23   indicated that.

24              MR. BAXTER:  Could we put up Exhibit 257.

25   BY MR. BAXTER:

1   Q.    Sir, having gone through all of that testing and

2   analysis of the claim, first of all, from our analysis of

3   claims 12 through 15, do Lupin's 0.3 and 0.5 percent ANDA

4   products meet the compositional limitations of claim 6?

5   A.    Yes.  They do meet the compositional limitations and,

6   therefore, would infringe.

7   Q.    So they would have -- contain gatifloxacin in an

8   amount between 0.3 and 0.8 and have a pH in the range of

9   from about five to about six?

10  A.    That's correct.

11  Q.    And they would also result in raising the corneal

12  permeability; is that correct?

13  A.    Yes.

14  Q.    In particular, I would like you to go back to JTX-004,

15  and I would like you to look at page 133.

16  A.    JTX what?

17  Q.    004.

18  A.    Oh, sorry.

19  Q.    And page 133.  This is Lupin's 0.5 percent ANDA.

20  A.    Yes, I have it. ▮▮

21  ▮▮         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮

25  ▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Stella - direct



350

Stella - direct

1    Q.    I would like to ask you a few questions about

2    Hi-Tech's ANDA products with respect to claim 6, so I would

3    like you to look at PTX-258.

4                And from our analysis of claims 12 through 16,

Stella - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          MR. CASTELLANO:  Objection, your Honor.  We

19   object to the extent that this question calls for testimony

20   beyond the scope of Dr. Stella's opening report.

21          If your Honor recalls, we raised this issue at

22   the pretrial conference, and your Honor ruled that Dr.

23   Stella was limited to the paragraphs in his report on the

24   issue of the order of addition.

25          THE COURT:  Well, all right.  I mean, I can't

Stella - direct

1    remember what I did at the pretrial conference, but it

2    strikes me that this should be treated consistently with how

3    I treat everything.

4              Now, if you want -- I've got the pretrial

5    conference here.  If you want to tell me where it is that I

6    said he couldn't testify at all, then I'm happy.

7              MR. CASTELLANO:  Your Honor, your ruling is on

8    page 45 of the pretrial transcript.

9              THE COURT:  All right.  I said he couldn't

10   expand.  And I don't know, you know -- I shouldn't have done

11   that.  I should treat it like I do everything elsewhere.  If

12   it's beyond the scope, I let it in, and then we see what

13   happens post-trial.  But if I ruled on it, I ruled on it.

14   It's the same question and the same issue.

15             You may step down, sir.

16             MR. CASTELLANO:  Thank you, your Honor.

17             MR. BAXTER:  I propose in the interests of time

18   that we disagree with the objection, but we will address

19   that if it comes up in the briefing.

20             THE COURT:  All right.

21   BY MR. BAXTER:

22   ■■    ████████████████████████████████

23   ████████████████████████████

24          ██████████████████████████

25   ██████████████████████████████████████

Stella - direct



1

2          MR. CASTELLANO:  First of all, that paragraph

3    was directed to claim 7, I believe, which is no longer in

4    the case.  There's a similar paragraph that goes to this

5    issue with respect to claim 6.

6          MR. BAXTER:  Yes.

7          MR. CASTELLANO:  And I think our position is

8    that if Dr. Stella wants to essentially testify exactly as

9    he did in that paragraph, that's fine with us, but we feel

10   like he should be limited to that in accordance to your

11   Honor's ruling at the pretrial conference.  And that would

12   be paragraph 134 for one of the ANDA products and it's

13   paragraph 158 for the .5.

14         MR. BAXTER:  And I think that is what he has

15   testified to, exactly the words on that page.

16         MR. CASTELLANO:  If that's the case, then we

17   don't have an objection to it.

18         MR. BAXTER:  That is what we thought.

19         THE COURT:  All right.  I mean, at some point

20   this gets to the point where I might as well not have anyone

21   on the stand as opposed to just reading the report.  So it

22   is, you know, our rules sometimes don't lead us to a better

23   product in the end.  But if they're consistent and within

24   the scope of his report, then I will let you continue.  If

25   there's an objection later on, it certainly will be raised

Stella - direct

1    post-trial.

2              And we're actually going to take 15 minutes.

3              (Short recess taken.)

4                    - - -

5              (Proceedings resumed after the short recess.)

6              MS. MAZZOCHI:  Your Honor, if I may get some

7    clarification, because I don't want to irritate the Court.

8    I don't want to use up other people's time.

9              We double-checked over the break.  The word AUC

10   was never used once in any of Dr. Stella's hundred-plus

11   pages of expert reports, never used once in 400-plus pages

12   of deposition testimony.

13             So I just want to know so that I'm not

14   interfering with the process and I'm not standing up and

15   objecting after every question if I think there's something

16   beyond the scope.

17             Does your Honor want us to stand up and object

18   to each question that we think is outside the scope or can

19   we have the understanding of the question and deal with it

20   in post-trial briefing if it becomes an issue?

21             THE COURT:  Well, it strikes me that if there

22   are a series of questions about AUC, you can make the

23   objection once.  I'm not sure I can just have an outstanding

24   objection to every different topic because then it won't be

25   clear whether you realized it at the time and made the

1    objection.

2                    So it is --

3                    MS. MAZZOCHI:  The same --

4                    THE COURT:  It is troubling that in a bench

5    trial, that this continues to be an issue.  But I have to

6    say that it is rare that it is really an issue in

7    post-trial.

8                    MS. MAZZOCHI:  Understood, your Honor.  Then

9    just to be clear, the two topics that we in particular

10   object to are the AUC issues in the figures and then the

11   discussions of Senju and its supposedly heroic formulation

12   efforts.

13                   THE COURT:  And what was the second thing?

14                   MS. MAZZOCHI:  The supposedly heroic formulation

15   efforts, which is not in his reports.  So I --

16                   THE COURT:  I have to say, I didn't think that

17   was real evidence.  I thought that was just superfluous.

18                   MS. MAZZOCHI:  Thank you, your Honor.

19                   THE COURT:  All right.

20   ████████████████

21   ██      █████████████████████████████████████████████

22   ████████████████████████████████████████

23   ██████████████████████████████████████████████

24   ███████████████████████████████████████

25   ███████████████████████████████████████

Stella - direct



Stella - direct

1

2

3

4

5

6

7

8    Q.    Now, up until this time in, discussing your opinions,

9    we haven't described or discussed anything about statistical

10   analyses.

11             In reaching your conclusions about the

12   infringement of claim 6, did you find it necessary to rely

13   on any statistical analyses?

14   A.    No.   I mean we saw consistent results at all times.

15   The levels in the aqueous humor from the formulation with

16   .01 percent EDTA exceeded that without the EDTA, and so my

17   conclusion was based on that consistency.

18   Q.    Is there any requirement for statistical significance

19   in claim 6?

20   A.    As far as I know, there is no requirement for

21   statistical analysis in a patent.   And I believe, your

22   Honor, you ruled that way in the Apotex trial as well.

23   Q.    Would your conclusion about the infringement of claim

24   6 by Lupin's ANDA products and Hi-Tech's ANDA products

25   change if claim 6 were interpreted as requiring the increase

Stella - direct

1    in gatifloxacin concentration in the aqueous humor to be

2    statistically significant?

3    A.    No, it would not change.

4    Q.    Why not?

5    A.    Because, No. 1, the levels were consistently high.

6    Dr. Mayo in his presentation today clearly showed that at

7    least with one of the trials -- I forget if it's a 15 or 16,

8    JTX-15 or 16.  One of them was statistically significant

9    with a relatively rigorous test, as I understand it.

10        The other one was not statistically significant

11    at the .05 or .05.  It was at the .087, I believe, or a

12    number around that.  And as he pointed out in his

13    presentation, if you use the one-sided test, it would

14    actually reach the level of the .05.  But using the more

15    rigorous test, did not meet that.  So I think one was

16    obviously suggestive and supportive and the other was

17    statistically significant.

18    Q.    Now, in your analysis of the infringement of claim 6,

19    you used an interpretation of raising corneal permeability

20    as meaning an increased concentration of gatifloxacin in the

21    aqueous humor as opposed to an increased concentration of

22    the entire formulation of the aqueous humor; is that

23    correct?

24    A.    That is correct.

25    Q.    Well, why didn't you use an interpretation that

Stella - direct

1    required an increased concentration of the entire

2    formulation in the aqueous humor?

3    A.    Well, the patent is purely directed to the

4    gatifloxacin, No. 1.  I mean that is the most.  If you go

5    back to the specification, the specification talks about

6    improving that gatifloxacin exposure as measured by aqueous

7    humor concentrations.  I think that is No. 1.

8              No. 2.  All of the Senju studies are directed to

9    gatifloxacin.  So whether it's specifically there or not,

10   all of the Senju studies have gone that way.

11             Plus, it doesn't make any scientific sense.

12   We've got a patent that is trying to improve the delivery of

13   gatifloxacin.  Why should someone go back and say, well, it

14   must improve everything else?  It doesn't make any

15   scientific sense to me.

16             MS. MAZZOCHI:  Objection.  Beyond the scope of

17   his expert report.

18             MR. BAXTER:  I believe in determining the

19   infringement of claim 6, you reviewed the file history of

20   the reexamination of claim 6; isn't that correct?

21   A.    That is correct.

22   BY MR. BAXTER:

23   Q.    Could I ask you to turn to JTX-003?

24   A.    (Witness complies.)

25   Q.    Did anything occur during the reexamination of the

Stella - direct

1    '045 patent which would change your understanding of the

2    meaning of claim 6?

3    A.    No, there was nothing there that would change my

4    opinion.

5    Q.    Now, you are aware that the language of claim 6 was

6    modified during the reexamination; is that correct?

7    A.    Yes, that was my understanding.

8               MR. BAXTER:  And could we put up PTX-259?  This

9    is just a clean version of the claim before and after the

10   reexamination.

11   BY MR. BAXTER:

12   Q.    You understand that the language of the claim was

13   modified during reexamination?

14   A.    Yes, that's my understanding.

15   Q.    And why shouldn't that modification change the

16   interpretation of claim 6?

17              MS. MAZZOCHI:  Objection, beyond the scope.

18              THE WITNESS:  Sorry.  Did someone --

19              MS. MAZZOCHI:  Yes.  Objection, beyond the

20   scope.

21              THE COURT:  That is just for purposes of the

22   record, but you can answer.

23              THE WITNESS:  Okay.  It just seems to me this is

24   sort of what I would call a cosmetic change.  I don't know

25   that there was simply putting in that, it was an eye drop

1    solution, gatifloxacin eye drop solution.  That it was

2    aqueous.  So it seems to me that there they were just

3    defining the boundary a little bit better but it seemed more

4    cosmetic than anything else.

5    BY MR. BAXTER:

6    Q.    Is there anything else in the reexamination of the

7    '045 patent which supports your interpretation of claim 6?

8    A.    I think there is a number of places.  One of them, of

9    course, is that it is a document that is the -- what was the

10   full number of that?

11   Q.    JTX-003.

12          Now, you are referring to the statement of

13   patent owners --

14   A.    Yes.

15   Q.    -- which is on page 4723.

16   A.    Yes.  Yes.

17   Q.    Okay.  And what about this document tells you that the

18   claims are related to the improved aqueous humor

19   concentration of gatifloxacin?

20          MR. BAXTER:  If I could have page 4728 put up?

21          THE WITNESS:  Well, Senju, the authors of this

22   document, throughout the document really only address the

23   issue of gatifloxacin concentrations in the aqueous humor,

24   and this is one example.  I think there are about four or

25   five.

1           MR. BAXTER:  Is that also shown on the next

2    page?

3    BY MR. BAXTER:

4    Q.    So the record is clear, are you referring to the

5    sentence that says, "As shown in the table, administration

6    of disodium edetate containing formulations resulted in

7    higher gatifloxacin concentrations?"

8    A.    Yes.  It's not directed to any other component.

9    Q.    Is there a similar statement in the next page, 4729?

10   A.    Yes, I think so.  As shown -- this is on page 127, is

11   it?

12   Q.    4729.

13   A.    Yes.  "As shown in the table, administration of the

14   disodium edetate containing gatifloxacin resulted in a

15   sustained high concentration of gatifloxacin for two hours."

16   Q.    What about the next page, JTX-003-4730?

17   A.    Again, "As shown in the table, administration of

18   disodium edetate containing formulations according to claim

19   12 resulted in higher gatifloxacin concentrations in aqueous

20   humor one hour after administration."

21   Q.    And what about the next page, 31?

22   A.    Yes.  And again this is the table on that panel.  "As

23   shown in the table, administration of the disodium edetate

24   containing formulations according to claim 12 resulted in

25   higher gatifloxacin concentrations in aqueous humor."

1    Q.     What about the next page, JTX-0034732?

2    A.     Yes, there is a couple of statements there.

3              "As shown in the table, administration of

4    disodium edetate containing formulations according to claim

5    12 resulted in higher gatifloxacin concentrations in aqueous

6    humor."

7              Also, "The results of all experiments, even when

8    not statistically significant, consistently demonstrate that

9    disodium edetate improved the corneal permeability of

10   gatifloxacin."

11             Professor Mayo, having considered the foregoing

12   results concluded that disodium edetate had a significant

13   and persistent effect of improving the corneal permeability

14   of gatifloxacin.

15   Q.     So on these pages, or in this document, did Senju

16   consistently refer to the corneal permeability as relating

17   to increased aqueous humor concentrations of gatifloxacin by

18   itself?

19   A.     Yes.

20             MS. MAZZOCHI:   Continued objection beyond the

21   scope.

22             THE COURT:   Thank you.

23   BY MR. BAXTER:

24   Q.     And continuing on into page 4733, the same exhibit,

25   same paper, patent owner statement.   What kind of statements

1    did Senju make when distinguishing the invention from the

2    prior art?

3    A.      They consistently, in separating themselves from the

4    prior art, they consistently referred to gatifloxacin

5    levels.

6    Q.      And do you see that on 4734, page 13 of the patent

7    owner's statement?

8    A.      Yes.

9            "However, patent owners submit that one of

10   ordinary skill in the art would not have concluded that

11   employing disodium edetate in the claimed concentration

12   range would increase the corneal permeability of

13   gatifloxacin."

14   Q.      Is there a similar statement on the next page, 4735?

15   A.      "Such skilled artisan would not have reasonably

16   concluded that the amounts of disodium edetate as recited in

17   claim 12 would have any effect on the corneal permeability

18   of gatifloxacin."

19   Q.      And what about on page 4736 of JTX-003?

20   A.      What page is that?  I'm sorry.

21   Q.      It's 4736.  It's page 16 of the patent owners

22   statement.

23   A.      Right.  Okay.

24           "Such skilled artisan would not have reasonably

25   expected that amounts of disodium edetate as recited in

1    claim 12 would have any more effect on the corneal

2    permeability of gatifloxacin."  Again, always referring back

3    to gatifloxacin.

4    Q.    Can we turn to page 4827 of JTX-003?  Go back to 4824

5    in your book.  Excuse me.

6          And what is the title of this paper?

7    A.    Statement of substance of interview.

8    Q.    Okay.  And if we turn to page 4827 of the JTX-003,

9    which is page 4 of that document, are there any statements

10   on this page which support your interpretation of claim 6?

11   A.    Yes.

12             MS. MAZZOCHI:  Same objection.  I'm sorry.

13   (Rising.)

14             Same objection.  It's beyond the scope.

15   A.

16

17             THE WITNESS:  The patent owners representative

18   explained that, "notwithstanding the teaches of Grass, one

19   of ordinary skill in the art would not have concluded that

20   employing disodium edetate in the claimed concentration

21   range would have increased the corneal permeability of

22   gatifloxacin."

23   Q.    And what about on the subsequent page, JTX-003, 4828?

24   A.    One of ordinary skill in the art would have

25   understood, e.g., the teachings of Grass II -- is that Grass

Stella - direct

1    1998? -- that employing disodium edetate in the amounts

2    recited in the proposed amended claims does not improve the

3    corneal permeability of gatifloxacin.

4    Q.    And how about turning to the next document in your

5    notebook, which is on page, JTX-003, 9576?

6              Could you just put the document up, Chris,

7    without the highlighting?

8    A.    This is a statement of allowance; is that correct?

9    Q.    Or reasons for patentability.

10   A.    Right.  Right.

11   Q.    And you understand this document is created by the

12   Patent Office?

13   A.    Right.

14   Q.    Is there anything on this page that supports your

15   understanding that the invention was to lead to the improved

16   aqueous concentration of gatifloxacin?

17   A.    Yes.  At the end of the first paragraph with the

18   sentence staring "moreover."

19             MS. MAZZOCHI:  Same objection.

20             THE COURT:  I hope the court reporter is going

21   to understand what you are saying, because I sure couldn't

22   hear you.

23             MS. MAZZOCHI:  I'm sorry.  Same objection.

24   Beyond the scope.

25             THE WITNESS:  And I'll read that.

1          "Moreover, patent owner has submitted unexpected

2    results relating to increasing the corneal permeability of

3    gatifloxacin with the addition of the 0.01 percent EDTA in

4    the composition as compared to the composition of

5    gatifloxacin without EDTA in the composition. (I believe

6    paragraph 5 of the Mayo declaration of 6/27/2011.)"

7              MR. BAXTER:  And just for the Court's

8    information, this exact sentence is quoted in paragraph 42

9    of Professor Stella's opening report on the claim

10   interpretation of claim 6.

11             THE COURT:  All right.  Well, again, I'm not in

12   a position to judge at this point.

13   BY MR. BAXTER:

14   Q.    Now, you understand that -- what is your understanding

15   of the active step carried out in claim 6 of the '045

16   patent?

17   A.    Well, to me, it's making the solution with the

18   .01 percent EDTA with a result that you get improved corneal

19   permeability.

20   Q.    In conducting your analysis of the infringement of

21   claim 6 for any of the four ANDA products, did you interpret

22   claim 6 as requiring administration to the eye of a patient?

23   A.    No.

24   Q.    Why not?

25   A.    Well, it's the active incorporation to me.  It was the

1    incorporating step of the EDTA into the solution that

2    resulted in the formulation.  That is, the compositional

3    aspect of that is what was claim 6.

4                MR. BAXTER:  Before I forget, plaintiffs would

5    like to move in the file history of the reexamination, the

6    '045 patent.  JTX-003.

7                MS. MAZZOCHI:  Objection, your Honor, but that's

8    because again this is a fairly lengthy document.  The

9    parties can agree to cut it down before it goes to you.

10               THE COURT:  All right.  Thank you.

11               (Joint Trial Exhibit 3 admitted into evidence.)

12               MR. BAXTER:  I will pass the witness at this

13   time, your Honor.

14               THE COURT:  All right.  Cross-examination.

15               MS. MAZZOCHI:  May I approach the witness, your

16   Honor?

17               THE COURT:  Yes.

18               MS. MAZZOCHI:  Thank you.

19               (Documents passed forward.)

20               THE WITNESS:  Thank you.

21               MS. MAZZOCHI:  May I proceed, your Honor?

22               THE COURT:  Yes, you may.

23                         CROSS-EXAMINATION

24   BY MS. MAZZOCHI:

25   Q.   Dr. Stella, can we agree that the anterior chamber of

1    the eye contains aqueous humor?

2    A.    I believe that is correct.

3    Q.    Can you please take a look at claim 6 of the '045

4    reexamination claims in JTX-1?

5          Did the reexamined claims use the word "stable?"

6    A.    All the claims, you are talking about?

7    Q.    Yes.

8    A.    All the reexamined claims?

9    Q.    Yes.

10   A.    No, they do not.  I do not believe so.

11   Q.    Do any of the reexamined claims exclude formulations

12   that contain sodium lauryl sulfate?

13   A.    Do they exclude?

14   Q.    Yes.

15   A.    I don't believe they do, no.

16   Q.    Do any of the reexamined '045 patent claims exclude

17   formulations that contain viscosity agents?

18   A.    The claims do not.

19   Q.    Do any of the reexamined '045 patent claims exclude

20   formulations that include sorbic acid?

21   A.    No, they do not.

22   Q.    For claim 12, will every formulation that complies

23   with the requirements of claim 12 lead to an increase in

24   gatifloxacin in the aqueous humor if it's administered to

25   patients?

Stella - cross

1    A.    Could you ask that question again?  I just want to

2    make sure I heard it correctly.

3              MS. MAZZOCHI:  Your Honor, may I ask that be

4    read back?

5              THE COURT:  All right.

6              (The court reporter read back the requested

7    information.)

8              THE WITNESS:  Claim 12 is a composition patent,

9    right?

10   BY MS. MAZZOCHI:

11   Q.    You have offered opinions on it, sir.  I'm just trying

12   to understand.

13   A.    I'm just saying, I mean claim 12 goes back to the, to

14   the specification and to claim 6.  That, in fact, it does

15   raise, should raise the gatifloxacin concentration.

16   Q.    Well, maybe I can rephrase it this way for you.  Will

17   every composition that complies with the requirements of

18   claim 12 in the '045 patent possess the property of being

19   able to raise corneal permeability?

20             MR. BAXTER:  Objection, your Honor.  This line

21   of questioning clearly goes to the unexpected results and

22   the obviousness part of the case.  This is not, doesn't have

23   anything to do with infringement.

24             MS. MAZZOCHI:  I'm probing how he understands

25   the scope of the claims, your Honor, particularly in view of

Stella - cross

1    the reexamination proceedings.

2              THE COURT:  All right.  Well, I'm a little

3    confused because the scope of the claims to some extent is a

4    legal question and not a factual question.  So you're asking

5    him what he believes claim 12 means?

6              MS. MAZZOCHI:  No, your Honor, whether all the

7    compositions that satisfy the requirements of claim 12 will

8    in turn possess the property of being able to increase

9    corneal permeability of gatifloxacin into aqueous humor.

10             THE COURT:  And you are saying all the

11   compositions meaning a universe of compositions that you are

12   not defining?

13             MS. MAZZOCHI:  The ones defined by claim 12.

14             MR. BAXTER:  Your Honor, this clearly doesn't

15   have anything to do with whether or not their products

16   infringe.  She is just trying to address the question

17   commensurate of scope of unexpected results which is

18   properly done in the obviousness part of the case.

19             THE COURT:  I just want to make sure it's a fair

20   question because comprises means it can include many, many

21   other things.  And so I'm not confident it's a fair

22   question, let alone a relevant question.  So maybe you need

23   to ask the question in a way that I understand it so that it

24   makes sense to me.

25   BY MS. MAZZOCHI:

1    Q.    Dr. Stella, can you think of any formulation that will

2    comply with claim 12 but which will lack the property of

3    being able to raise corneal permeability of gatifloxacin in

4    aqueous humor?

5    A.    I have no idea what that question means.

6    Q.    I'm sorry.  I have lost a word.  Let me rephrase that.

7          Can you think of any formulation that can comply with

8    the requirements of claim 12 of the '045 patent but which

9    will not, if administered to patients, be capable of leading

10   to an increase of gatifloxacin in aqueous humor?

11              MR. BAXTER:  Same objection, your Honor.

12              THE WITNESS:  I have no idea what that question

13   means.

14   BY MS. MAZZOCHI:

15   Q.    Well, you offered opinions in this case -- well, let

16   me take a step back.

17          You haven't tested the Lupin ANDA formulation;

18   correct?

19   A.    It's identical to the Zymar.

20   Q.    Well, you haven't tested the Zymar formulation?

21   A.    No, I have not.  Me personally?

22   Q.    Right.

23   A.    No, I have not.

24   Q.    And the Zymar formulation was never evaluated in any

25   of the four Senju studies that have been looked at:  the

Stella - cross

1   202, the 802, the 901 or the 904 studies; right?

2   A.   It was in the comparison of the foreign to the

3   Japanese one, I believe.

4   Q.   And --

5   A.   So it was tested.

6   Q.   And that's the one that -- and which study do you

7   think that was tested in?

8   A.   It was discussed by Dr. Yasueda -- I'm sorry if I

9   butchered your name -- Yasueda earlier.

10  Q.   And when you said "the Zymar," are you referring to

11  the Japanese formulation as the Zymar?

12  A.   No, compared the Japanese to the foreign, and the

13  foreign was the Zymar, wasn't it?  I believe.

14  Q.   Was that the 0.03 percent or the 0.05 percent?

15  A.   I forget.  Do you want to take me to that, I'd be

16  glad.

17  Q.   Well, we can agree one of them, if it was Zymar,

18  Zymaxid, one of them has never been tested; right?  Zymaxid?

19  A.   Yes.  One of them, as far as I know, was not tested,

20  that's correct.

21  Q.   And you don't recall whether it was .03 or .05?

22  A.   No.

23  Q.   But you offered the opinion that even though the

24  0.5 percent formulation has never been tested in actual

25  corneal permeability study, that it's nevertheless going to

Stella - cross

 1    lead to an improvement in corneal permeability; correct?

 2                MR. BAXTER:  Objection.  Mischaracterizes the

 3    evidence.  It was tested.

 4                THE WITNESS:  Could you -- sorry.  Was there a

 5    question there?  Please state it again.

 6                MS. MAZZOCHI:  Let's go ahead in your book,

 7    start over.

 8                THE WITNESS:  I didn't understand.  I just want

 9    the question repeated.

10                MS. MAZZOCHI:  I'll withdraw the question, your

11    Honor.  We'll get to that a little faster.

12    BY MS. MAZZOCHI:

13    Q.    Actually, before we get to that, for all of your

14    weight volume percent opinions for the defendants' products,

15    that is based on any of the weights and volumes for the

16    entirety of the liquid drug product as a whole as proposed

17    to be sold; correct?

18    A.    Again, state it again because I'm not sure what you

19    are talking about.

20    Q.    You see claims 6, and 12 through 16, there is a term

21    weight volume percent?

22    A.    Uh-huh.

23    Q.    And there is percentages there; right?

24    A.    Yes.

25    Q.    And that based on the calculation for the entirety of

1    the drug product; right?  The entirety of the dose for the

2    composition?

3    A.    I don't know what you are asking.  I mean it's the

4    weight of that particular component in a volume of water

5    that is 100 million liters equivalent.  So it's .01 percent.

6    .01 grams per 100 mL of aqueous humor.

7    Q.    Those weight numbers will change if you look at just

8    gatifloxacin to the exclusion of water in a formulation;

9    right?

10   A.    Exclusion.  I don't understand your question.  I'm

11   sorry.  Maybe I'm -- I'm not comprehending what you are

12   asking.

13   Q.    If we look in claim 12, when it says from about 0.3,

14   et cetera, weight volume percent gatifloxacin, that takes

15   it weight of gatifloxacin in a composition as a whole and

16   divides it by the volume of the composition as a whole;

17   right?

18   A.    That's correct.  Yes.

19   Q.    All right.  And those percentages are going to change

20   if you change the amount of volume in the composition;

21   correct?  If you have the same amount of starting material

22   of gatifloxacin?

23   A.    Your question makes no sense.  Then it wouldn't be

24   weight and volume percent.  I don't know what you are

25   asking, so I'm still confused by your question.

Stella - cross

1    Q.    If you have the same amount of gatifloxacin and you

2    take away a liquid, your weight volume of gatifloxacin is

3    going to be far different; correct?

4    A.    If you take away the volume, it's not weight and

5    volume.

6    Q.    Gatifloxacin even as a weight has volume, sir, doesn't

7    it?

8    A.    Yes, but even if it's got a density of 1, which I

9    don't know what its density is, its volume would be, for

10   example, at .5 percent, it would be approximately somewhere

11   around .5 grams.

12   Q.    Let's get it in this way.  If you add up the weight of

13   gatifloxacin and disodium edetate in a composition of claim

14   12 and exclude the volume of the water, you are not going to

15   have a composition that is .3 weight volume percent

16   gatifloxacin; correct?

17   A.    Oh, I'm not sure where you are going on this.  I don't

18   understand.

19           Yeah, if I mix two solids, the volume of mixing

20   those two solids will be different than just having one of

21   the solids.  But then it wouldn't be weight and volume, it

22   would be weight and weight.

23           And we're talking about here an aqueous liquid

24   pharmaceutical composition.  So I don't know.  Where are you

25   going?  I don't know where you are going on this, but that

378

Stella - cross

1    doesn't make sense within the confines of the claim, but

2    please educate me.

3    Q.      That's fine.  You answered my question actually when

4    you talked about the solids.



25   Q.      All right.  And you have offered the opinion that

1    Lupin's 0.5 weight volume percent gatifloxacin ophthalmic

2    solution is identical to the one found in Example 8 of the

3    '045 patent; is that right?

4              MR. BAXTER:  Objection, your Honor.  I don't

5    believe he testified to that effect at all.  I don't think

6    he testified about these examples at all on direct.

7              THE WITNESS:  When did I testify about them?

8              MS. MAZZOCHI:  I will rephrase it.

9    BY MS. MAZZOCHI:

10   Q.    You have in this case offered the opinion that Lupin

11   0.5 weight volume percent gatifloxacin ophthalmic solution

12   is identical to the one found in Example 8 of the '045

13   patent; correct? █

14   █    ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ███████████████████████████████████

17   Q.    Did you -- is it your understanding that the Zymaxid

18   formulation is identical to the formulation disclosed in the

19   '045 patent as Example 8?

20   A.    I believe it's close.  I mean I think, I think I might

21   have mentioned in my -- I'm not sure if I mentioned it in my

22   deposition, whether it was sodium chloride was slightly

23   different.

24   Q.    Have you offered the opinion that Hi-Tech 0.5 weight

25   volume percent gatifloxacin ophthalmic solution --

Stella - cross

1   A.    Slow down, please.  Slow down. █

2   ██  ████████████████████████████████████

3   ██████████████████████████████████

4   ██████████████████████████████████████

5   ████████████████████████████████████████████

6   ████

7   ██   █████████████

8   Q.    All right.  You indicated you did offer infringement

9   opinions in the Senju vs. Apotex case?

10  A.    Yes.

11  Q.    And we agree claim 6 from the Senju v Apotex case was

12  amended and changed during the reexamination process; right?

13  A.    Yes.

14  Q.    All right.  And one way where claim 6 was changed was

15  to list a 0.01 weight percent amount of EDTA in the

16  formulation description; right?

17  A.    That's correct.

18  Q.    All right.  And then 0.01 weight percent amount of

19  EDTA is within the range of 0.001 to 0.2 weight volume

20  percent; correct?

21  A.    Yes.  In the concentration range, it's in the

22  specification.  That's correct.

23  Q.    All right.  Now, I'd like you to take a look at the

24  reexamination documents, which I believe is in JTX-3.  And

25  if you could use the version in the binder that I gave you

1    and turn to page ALL0009119.  And it has in the lower

2    right-hand corner, .04721?

3                    MR. BAXTER:  Which document?

4                    (Counsel confer.)

5                    MS. MAZZOCHI:  If you could blow up claim 6,

6    please.

7    BY MS. MAZZOCHI:

8    Q.    All right.  Dr. Stella, do you see the amendments made

9    to claim 6 on this page, with the underlined text?

10   A.    Yes.

11   Q.    All right.  And this is the amendment during -- do you

12   know whether this was the amendment during reexamination

13   where the language "about 0.01 weight volume EDTA" was first

14   introduced into the claim?

15   A.    I don't know.  I don't know whether there was a

16   chronology of where -- whether -- I don't remember whether

17   claim 6 was changed at some point during the reexamination

18   after the initial suggestion.

19   Q.    All right.  Well, why don't you turn a few pages

20   forward to the page that has ALL9122.  And that's

21   JTX-003.042724.

22   A.    Um-hmm.

23   Q.    Great.  Do you see the heading that says "support?"

24   "Support for the amendments to claim 6 can be found, for

25   example, in U.S. Patent No. 6,333,045 (the '045 patent) at

1    column 2, lines 40 to 41, lines 54 to 63 and in issued claim

2    6?"

3                  MR. BAXTER:  Objection, your Honor.  This is

4    clearly goes to validity.  It has nothing to do with

5    infringement.

6                  MS. MAZZOCHI:  I need to lay the foundation,

7    your Honor, for the noninfringement related issues.

8                  THE COURT:  I'll let you proceed for the moment.

9                  MS. MAZZOCHI:  Thank you, your Honor.

10   BY MS. MAZZOCHI:

11   Q.    Do you see that text, sir?

12   A.    So column 2, lines 41 through ...

13   Q.    Sir, I'm asking you first do you see the text I just

14   read?

15   A.    Yes, I can see the text.

16   Q.    Now, if we look at column 2, lines 40 to 41, and 54 to

17   63, the text Senju identified in the PTO as the written

18   description support with a narrowing amendment made to claim

19   6.  We'll highlight them for you here in JTX-1.  Do you see

20   those, sir?  I highlighted them.

21   A.    Yes.

22   Q.    Do lines 40 to 41 have anything to do with showing

23   that 0.01 weight volume percent will lead to improved

24   corneal permeability of gatifloxacin?

25                  MR. BAXTER:  Same objection, your Honor.

Stella - cross

1              THE WITNESS:  Sorry.  You are linking out the

2      first sentence to the other?

3              MS. MAZZOCHI:  No, just those first two lines,

4      the first highlighted section, lines 40 to 41.

5              THE WITNESS:  I see an effective component has

6      to do with corneal permeability.

7      BY MS. MAZZOCHI:

8      Q.   I'm talking about the 0.01 weight percent amount.

9      A.   You are asking me the first two lines.

10     Q.   Right.

11     A.   The first two lines have nothing to do with 0.01.

12     Q.   That's fine.

13     A.   Yes.

14     Q.   If we can jump down then to the text that is at lines

15     54 to 63.  Do you see the text that starts off, "Normally,

16     disodium edetate is formulated in an amount of 0.001 to 0.2

17     weight volume percent?"

18     A.   Um-hmm.

19     Q.   All right.  Now, that is just a formulation

20     description; correct?

21     A.   I just want to read the rest of it.  I just want to

22     make sure of the context.

23              So this is a description of the invention; is

24     that correct?  It's under the heading of.

25     Q.   Sir, I'm just asking you whether starting at line

Stella - cross

1    56 -- actually I apologize -- line 58, where it says:

2    "Normally, disodium edetate is formulated in an amount of

3    0.001 to 0.2 weight volume percent."  Is that referring to a

4    formulation?

5    A.    It's referring to the amount of disodium edetate in a

6    formulation, yes.

7    Q.    And the 0.001 to 0.2 weight volume percent was the

8    scope given to original claim 6 for the amount of EDTA that

9    could be formulated into a composition of that method;

10   right?

11            MR. BAXTER:  Objection, relevance.

12            THE COURT:  I'm keeping track.  See where we're

13   going.

14            THE WITNESS:  Yes.  This is under the heading a

15   detailed description of the invention.  That is what was in

16   the original.  That was interpreted to be the concentration

17   range in the original patent, yes.

18   Q.    Okay.  And if we look at the end of these two lines,

19   it says "more preferably 0.01 to 0.1 weight volume percent."

20   Do you see that?

21   A.    Yes.

22   Q.    All right.  Now, that is still a range of EDTA weight

23   percentages; correct?

24   A.    Yes.

25   Q.    All right.  And these three lines here, in lines    58

Stella - cross

1    to 60, don't expressly discuss the term corneal

2    permeability, correct?

3    A.    No.  Not at this point, no.

4    Q.    Now, this range of more preferably 0.01 to 0.1 weight

5    volume percent still includes the 0.05 weight volume percent

6    EDTA; correct?

7    A.    That range would be included.  0.05 would be included

8    in that range, yes.

9    Q.    Can we agree that the only actual experiment disclosed

10   in the '045 patent that tests the formulation with disodium

11   edetate levels at 0.01 weight volume percent EDTA is in

12   experiment 3, which is at column 4 --

13              MR. BAXTER:  Your Honor?

14   Q.    -- of the '045 patent?

15              MR. BAXTER:  Objection.  This has nothing to do

16   with infringement of the claims.

17              THE COURT:  Yes.  I'm trying to figure out when

18   you are going to get to infringement.

19              MS. MAZZOCHI:  There is a point to this, your

20   Honor.

21              THE COURT:  Well, I'm keeping track of your time

22   because it is your time.

23              MS. MAZZOCHI:  I understand.

24              THE WITNESS:  Well, it's mentioned there and it

25   is mentioned in examples 8 and 9.

1   BY MS. MAZZOCHI:

2   Q.    Sure.  I understand that, sir, but the only place it

3   is tested is in experiment 3; correct?

4   A.    .01 percent.

5   Q.    Yes.

6   A.    Yes, that is the only experiment where the .01 percent

7   is tested in the specifications.

8   Q.    Okay.  Now, we can agree that there is no test   data

9   in the '045 patent specification that tested the

10  formulations found in examples 5, 8, or 9 for corneal

11  permeability; is that fair?

12  A.    Say it again, please.

13  Q.    Can you agree there is no test data in the '045 patent

14  specification that tests the formulations found in examples

15  5, 8, or 9 for corneal permeability?

16  A.    I don't believe there is any in the specification that

17  tested for corneal permeability.

18  Q.    All right.  Now, examples 5, 8 and 9, can we agree

19  that the '045 patent indicates that those formulations can

20  be used, for example, as ear drops?

21  A.    Eye drops, ear drops, or nasal drops.

22  Q.    And would it be fair to say that you don't do corneal

23  permeability studies to evaluate a formulation intended as

24  ear drops?

25  A.    It does say "and."  I'm not being argumentive here. It

Stella - cross

1    does say eye drops as well.

2    Q.    I understand that, sir.  But for a formulation

3    designated as an ear drop, do you typically perform corneal

4    permeability studies on such a formulation?

5    A.    No, I would not.

6              MS. MAZZOCHI:  All right.  If you could turn to

7    JTX-13?  This is one of the Senju studies.

8              And, in particular, let's take a look at the one

9    that we call the 802 study.

10             MR. BAXTER:  Objection, your Honor.  Outside the

11   scope of direct.  He didn't testify about this document.

12   This has nothing to do with infringement.

13             MS. MAZZOCHI:  Your Honor, there are opinions on

14   this document in his expert report on infringement, your

15   Honor.

16             THE COURT:  But the expert report, to me, it's

17   not on the report that I'm going to be dealing with.

18             MS. MAZZOCHI:  I understand.  But the point is,

19   your Honor, is that there are, there is test data in this

20   that we think undermines their claims with regard to how

21   well these tests work to show corneal permeability.

22             THE COURT:  And tell me again how that relates

23   back to infringement.

24             MS. MAZZOCHI:  Well, your Honor, they have taken

25   the position that they've got tests that show proof of

1   corneal permeability.  We think that there is test data that

2   undermines the conclusions that have been drawn about the

3   inevitability of these tests to demonstrate corneal

4   permeability.

5           It's Dr. Yasueda's tests that were used for the

6   foundation for the patent itself.

7           MR. BAXTER:  Your Honor, that still has nothing

8   to do with infringement.

9           THE COURT:  And which -- I mean, are we talking

10  about all the claims or claims -- I mean, just give me a

11  claim and tell me how this relates to infringement.

12          MS. MAZZOCHI:  Claim 6, your Honor.  It

13  gets into the standards for evaluating whether or not

14  a formulation has or has not experienced corneal

15  permeability.

16          THE COURT:  All right.  So I just want to make

17  sure I understand how we're using our time.  Even though the

18  purpose of this patent and the patented product is to get

19  this particular compound into the eye, and the invention is

20  that it increases the ability to get this compound into the

21  eye, even though the generics are saying we're exactly like

22  it, you're arguing that actually it does not work?

23          MS. MAZZOCHI:  Your Honor, if I may outside the

24  presence of the witness, I would be happy to explain a bit

25  further.

Stella - cross

1              THE COURT:  All right.  Well, let's take a short

2       break.  All right?  And the witness can step down and step

3       out of the courtroom.

4              (The witness left the courtroom.)

5              MS. MAZZOCHI:  If I may, your Honor --

6              THE COURT:  And I'm just talking in terms of

7       infringement.

8              MS. MAZZOCHI:  Yes.  I understand, your Honor.

9       The studies that the plaintiffs' experts talked about all

10      morning, these 901 and 904 studies, they never tested the

11      actual NDA approved PRODUCT or the ANDA products.  And

12      so --

13              THE COURT:  That to me is an invalidity claim.

14      It's not an infringement claim.

15              MS. MAZZOCHI:  Well, it is, your Honor, because

16      the proof that they are relying on, the evidence that they

17      are trying to rely on to say our formulation, whether ours

18      or theirs, actually does lead to some enhancement of corneal

19      permeability are based on two studies that didn't actually

20      evaluate the NDA product or our ANDA products.

21              Now, they are trying to, as I understand it,

22      reason by analogy that since those formulations are close

23      enough and they think they found something statistically

24      significant about it, then our formulations are going to be

25      able to work in the method of claim 6 as well.

1          We don't think they can sustain their burden of

2     proof that way.  What -- I mean, to me, it's a violation of

3     the Venus versus Bristol-Myers Squibb case because -- and

4     many other cases besides that.

5          To prove the direct infringement, particularly

6     for method claim 6, they have to show that this formulation,

7     when administered, actually does lead to an increase,

8     clearly we have a dispute about the scope of what

9     constitutes the increase, into the aqueous humor.  Okay.

10         The two studies that they talked about as part

11    of their infringement case did not test their products as

12    they are commercially marketed in the United States.  They

13    didn't test our products as they are commercially marketed

14    in the United States.

15         Now, so from what I can understand of their

16    infringement theory, they're trying to say since Lupin's

17    product, for example, is close enough to our product, is

18    close enough to this other product that we put in the study,

19    we think that is enough to prove that your formulation led

20    to this increase in corneal permeability.

21         I don't think that's an appropriate way to prove

22    infringement.  I think that they have the burden to do a

23    direct comparison of how does our product perform to the

24    claims.  They've chosen to go that route for whatever

25    reason.  All I'm trying to then show is that all -- so

1   now --

2                    THE COURT:  Just wait a minute.  Lots of ANDA

3   cases.  I don't think I've ever had a plaintiff or a

4   defendant who said, in order to demonstrate infringement,

5   you actually go out and have to do studies to demonstrate

6   that our product works the same way your product does when

7   they're identical formulations.

8                    So what you are saying -- are you saying that

9   that is a burden that the ANDA plaintiff has to undertake?

10                   MS. MAZZOCHI:  Well, what I think I would frame

11  it as, your Honor, is that if they want to say that our

12  product is identical to their product, okay.

13                   THE COURT:  Which it is, is it not?  Am I

14  missing something?

15                   MS. MAZZOCHI:  It's Q1/Q2.  We could get into

16  the details about it.  The pHs are not identical.  The ANDA

17  specifications as they went in today, if you look at our

18  specification versus their specification, they're not

19  perfectly in alignment.  But be that as it may, they have

20  not shown -- they've never tested their product versus a

21  formulation without EDTA and shown an increase in corneal

22  permeability.  So I understand they're trying to play the

23  game of telephone.

24                   THE COURT:  Well, let's not talk about playing

25  games here.  I thought, and maybe I'm missing this whole

Stella - cross

1  ANDA thing, but I thought that when the '045 patent is

2  associated with a product through the FDA, that we all take

3  as a matter of law that the product is consistent with the

4  patent.

5         Am I missing that?

6         MS. MAZZOCHI:  Yes.  We do not stipulate, your

7  Honor, that their product infringes their own patents here.

8  So -- and the FDA does not police the accuracy of Orange

9  Book listings.  There's a line of cases that I would be

10  happy to cite to your Honor.

11         THE COURT:  Well, these are issues that I guess

12  it would have been nice if we had brought up at some point,

13  not for summary judgment necessarily, but it's issues of

14  law, because I have been feeling as though the questioning

15  has not been focused on the real issue.

16         MS. MAZZOCHI:  Well, your Honor, from where I'm

17  standing, we don't think that the plaintiffs, the way in

18  which they have structured their case from the get-go, have

19  done it the right way to prove infringement.

20         If they wanted to take the position that Lupin's

21  products be equals, they're Product A and A is covered by

22  the patent, then they still had to come forward with the

23  burden of showing that their own product is, in fact,

24  claimed by the patent.

25         And the problem is, is that they've got no test

Stella - cross

1    data in this case showing that their product, as it is

2    constituted here in the United States itself, meets each and

3    every element of the claims, particularly on this method of

4    increasing corneal permeability issue.

5              So what they have done is they've taken

6    formulations that were R&D formulations or Japanese

7    formulations that they said, well, these are similar, but

8    they've added ingredients, or they've taken out ingredients,

9    or they've changed the pH, or they've changed the isotonic

10   agent amount or whatever in such a way that they are

11   actually not identical to the drug as it's actually marketed

12   here in the United States.

13             THE COURT:  And am I the only one in the whole

14   case who didn't realize that there was this underlying

15   dispute that the defendants don't concede that the

16   plaintiffs' product is covered by the patent, or is this an

17   issue that has been around and I just missed it?

18             MR. BAXTER:  There's the first we've heard of

19   it.  We've known that they refuse to concede that they

20   infringe the product.  You saw me just walk through their

21   own ANDA with the claims and I thought it was a waste of

22   time, but it was at their insistence.

23             The test for infringement in the ANDA case

24   is what is most likely to be marketed, and the fair way

25   to look at that is at the end.  There is no commercial

Stella - cross

1    product.  We're not permitted to go outside and get their

2    commercial product.  They don't have approval.  They cannot

3    launch.

4            The fair way to assess whether or not an ANDA

5    product will infringe a patent is by looking at what they've

6    told the FDA, what their ingredients are.  It sounds like

7    now they are telling us that the evidence we've seen in the

8    ANDA, we can't rely upon to assess infringement.

9            MS. MAZZOCHI:  Your Honor, he's

10   mischaracterizing our position.

11           Our position, particularly --

12           THE COURT:  Or just maybe misunderstanding.

13           MS. MAZZOCHI:  Or that could be.

14           For claim 6, they as the patentees have the

15   burden to come forward and show that whatever a formulation

16   is will, in fact, work to increase corneal permeability.

17   And this is what I was trying to get at with Dr. Stella, is

18   that they are not willing to say that every single

19   composition that meets the definition of claim 12 is going

20   to inherently have that property, so if they are not going

21   to say it inherently has that property and achieves that

22   outcome, and they don't have any testimony as far as I'm

23   aware to that effect, then the question becomes, how do we

24   know that this -- that the Lupin product or their own

25   product actually does work as composed to inhibit or, I'm

1    sorry, to increase corneal permeability.

2              Now, the test your Honor heard about this

3    morning from their experts, from Dr. Yasueda, do not test

4    their own products.

5              So the two tests that Dr. Mayo -- the two

6    studies that Dr. Mayo talked about, they're statistically

7    significant, they are not the NDA product.  They're a

8    different product.  ███████████████████████████████████

9    ███████████████████████

10             So we are now in the position of they've

11   taken -- you know, they've basically tried to say, well, we

12   think we can prove infringement because that one is close

13   enough to the NDA formulation or to your formulation that we

14   think we can infer infringement, but it's not the actual

15   product.

16             So that's why when -- from the outset, we've

17   seen their proofs, we don't think they can meet their

18   proofs on claim 6 for a variety of reasons, one of which is

19   that these tests that they're relying on, they never

20   actually test the product and, you know, to the extent they

21   got close with one and these were some of the tests that I

22   was starting to get into, their own reports found that it

23   wasn't significant and it wasn't showing an increase in

24   corneal permeability as measured by aqueous gatifloxacin

25   humor.

Stella - cross

1    So I apologize, your Honor.  You know, I'm in

2   between a rock and a hard place.  I don't think they've met

3   their burden of proof, but in the event that they get to

4   play the game of telephone and say, well, this ingredient we

5   don't have to worry about and it is doesn't matter, you

6   know, this similar composition works like this one, I

7   suppose it's more of a doctrine of equivalents, it's not a

8   literal one, but whatever.

9    I have to then probe, well, how do you know it

10  doesn't matter to put an ingredient in or out to get these

11  results?  How do you -- you know, what standards do you use

12  to say, well, we thought this was a good study and that was

13  a bad study, and these standards that they are applying to

14  keep data in and keep data out and say it worked and say it

15  didn't, they're all over the place.

16   And I think the fact that they've got these

17  standards that are all over the place and conflicting

18  opinions with their own internal documents and the experts

19  testifying here undermines those test results that they want

20  to rely on for infringement purposes.

21   THE COURT:  All right.  Well, I have one concern

22  and one observation.  My one concern is that, generally,

23  when parties come into a case, everybody is on the same

24  page.  I'm not sure that was the situation here and I'm not

25  sure how that affects the kinds of record that we're

1    presenting and whether it's the kind of record I feel

2    comfortable making my decision on.  That's a big concern for

3    me.

4                My observation for plaintiffs' benefit is that

5    if, in fact, we're doing infringement by analogy when you

6    took a day-and-a-half to talk about how difficult

7    formulation was and how tweaking this and that and this and

8    that can take years, then I'm not sure how comfortable I am

9    with infringement by analogy with missing ingredients and

10   added ingredients and et cetera.

11               So I'm uncomfortable with the status of the case

12   right now and whether you all are really trying the case on

13   its merits in the best way possible.

14               Having said that, I'm going to -- just give me a

15   few minutes to think about this.  It strikes me that --

16   well, let me hear from plaintiffs' counsel, first of all,

17   and then it strikes me that in a situation like this,

18   I need to let the record develop and the Federal Circuit

19   can eventually tell me whether I'm right or wrong, depending

20   on whether I rely on this information or not.  But I'm

21   not confident that I can squelch it at this point or stop

22   it.

23               But let me hear from plaintiffs' counsel and

24   then we'll take a short break.  I do want to let you all

25   know that the Marshal's Service, under our new fiscal

Stella - cross

1    regime, doesn't really man the front door after 5:00.

2    Because I didn't know how we would be coming and going this

3    evening, they're giving us an extra 15 minutes, but if you

4    find yourself outside after 5:15, you're out.  You can't get

5    back in.

6              So let me hear from plaintiffs' counsel and then

7    let's take a short afternoon, a short break before we

8    continue the testimony.

9              MR. BAXTER:  There was a lot of things said in

10   the last few minutes.  I'm going to try to just address the

11   one or two things I think are most important.

12             For plaintiffs' infringement case, there are

13   basically two sets of claims.  We have claim 6, which I will

14   talk about second, secondly, and we have claims 12 through

15   16.

16             12 through 16 are just formulation claims.

17   They're just composition claims.  We are not relying on any

18   testing for the infringement of those claims.

19             As you recall in Professor Stella's opening

20   testimony, for the purposes of infringement, we simply

21   compared their ANDA to the claim language.  So I don't think

22   they're saying we're trying to use testing to prove

23   infringement to claim 16, but I'm not sure exactly what they

24   are saying.

25             So there's no testing involved and I think that

Stella - cross

1      the proper legal analysis, for these formulation claims, you

2      shouldn't be testing infringement by comparing their product

3      to our commercial product.  You compare their potential ANDA

4      product to the claims.  It's the claims that matter.

5              So that's what we did, and you didn't hear us

6      mention anything about Zymar or Zymaxid whether we talked

7      about the infringement analysis of claims 12 through 16.

8      There was no attempt to prove anything by analogy.  We

9      simply compared their ANDA product to the claim limitations.

10     There's no testing involved in the infringement of claims 12

11     and 16.  The testing may come up in the validity part of

12     those claims.

13             Now, for claim 6 we rely on some testing to

14     prove infringement.  The limitation of claim 6 is basically

15     we're improving the corneal permeability of gatifloxacin by

16     EDTA.  We have relied upon a series of what their experts

17     concede are fair side by side, with and without comparisons

18     of EDTA.

19             You'll hear both Professor -- Dr. Sherman and

20     Dr. Bloch concede that those were fair with and without

21     tests of EDTA.  They will identify basically one main

22     difference between the formulations which were tested and

23     their ANDA formulations, and that is their ANDA

24     formulations, which this was addressed in Professor Stella's

25     direct testimony, their ANDA formulations contain BAK while

1   the formulations which were tested to assess the effect of

2   EDTA did not.

3           But this is kind of a red herring because all

4   three pharmaceutical experts, Dr. Stella, Dr. Grass and Dr.

5   Sherman, have testified that the presence or absence of BAK

6   would in no way negate the corneal permeability enhancing

7   effect of EDTA on gatifloxacin.

8           So what they're trying to do now is say, well,

9   there's this difference that does not make a difference, but

10  you should have tested it anyway.  Everyone agrees if you

11  add BAK, it does not change the corneal permeability

12  enhancing effect of EDTA.

13          THE COURT:  All right.  Well, let me hear from

14  defendants' counsel again as to -- I mean, that sounds a

15  lot -- it's a lot more -- well, in what way do you disagree

16  with what was just said?

17          MS. MAZZOCHI:  Well, I think when it comes to

18  the composition claims, I think the Federal Circuit has a

19  long line of cases, Bayer versus Elan zbeing one of them,

20  that says that what controls the infringement analysis is

21  the ANDA specification.

22          Those specifications are what they are and we

23  can argue the significance of those.  When it comes to

24  claim 6, I don't necessarily agree with the characterization

25  that he has made of what our experts have said about those

1    tests.

2            The fact of the matter is, is that when it comes

3    to claim 6, they've taken -- they've taken the position that

4    claim 6 requires them to show increasing levels of

5    gatifloxacin in aqueous humor.  They don't necessarily have

6    the standard for what it means to increase.

7            You know, they said it's not statistically

8    significant.  They won't give a higher end.  They won't give

9    a lower end.  But wherever it is they ultimately wind up

10   drawing the line in the sand, I don't think they can

11   necessarily take the position that the formulation, whether

12   it has got more things in it or things detracted from it, pH

13   changes, NACL changes, what have you.  I don't think they

14   can take the position here that all the things that are

15   added in, left out, modified, maybe they think that they're

16   small on an individual level, but in the aggregate, you

17   know, to me, the way to prove infringement and the way to

18   basically reasonably make a claim that your own product is

19   covered by your claims is to have already demonstrated that

20   that product will, in fact, enhance corneal permeability;

21   not an analogy of it, the actual product.

22            So now, you know, if he wants to say, well, we

23   don't think that the change makes a big difference, all

24   right.  Well, but, then, I want to probe the studies where

25   they did then start saying, well, we think this change

Stella - cross

1  makes a difference and that change makes a difference, et

2  cetera.

3              THE COURT:  All right.  I'm going to let you do

4  that.  Before we take a short break and we bring Dr. Stella

5  back on the stand, I just wanted to say I went back to the

6  pretrial conference and both defendants basically said they

7  didn't intend to introduce any new documents or any new

8  witnesses to prove their claim of intervening rights.  I

9  understand now that Hi-Tech doesn't intend to introduce

10  these documents, just use them to refresh the witness'

11  recollection.  So we're going to start with that premise.

12  They are not going to be introduced in the case-in-chief and

13  we'll go from there.

14              All right.  Let's take 15 minutes.

15              (Short recess taken.)

16                      -  -  -

17              (Proceedings resumed after the short recess.)

18              THE COURT:  All right.  You may be seated.

19              Thank you very much.  And you may proceed with

20  your examination.

21              MS. MAZZOCHI:  Thank you, your Honor.

22              Dr. Stella, you can get on the same page.

23  BY MS. MAZZOCHI:

24  Q.    Generally speaking, if you're going to measure corneal

25  permeability in order to determine infringement of claim 6,

Stella - cross

1  you want an in vivo study where you measure concentration in

2  the aqueous humor after administration of two competing

3  solutions, the only difference between which is the presence

4  of EDTA; is that right?

5  A.     That would be the preferred method, for sure.

6  Q.     Now, about the Senju studies that you relied on, those

7  were all performed before this litigation began; correct?

8  A.     Are you talking about the litigation?

9  Q.     Yes, this litigation.

10 A.     Yes, as far as I know.

11 Q.     Okay.  I'd like you to take a look at one of the Senju

12 studies that is called the 802 study which is at JTX-13 TR,

13 please.  And I'd like you to turn to table 7.

14 A.     Yes, I have it.

15        MS. MAZZOCHI:  And for the record, it's at

16 SEN23740.

17 BY MS. MAZZOCHI:

18 Q.     Now, some of the tests in the 802 study compared

19 gatifloxacin formulations --

20 A.     This is the 802, right?

21 Q.     Yes, this is the 802 study.  If you look at the

22 formulation that has the No. 5, and the formulation that is

23 designated E1, would it be fair to say the only two things

24 identified in this table is different between the two

25 formulations is that one is at a pH of 7 and the other is at

1    a pH of 6?

2              I'm sorry.  Did I say E1; right?  Yes.

3    A.    Okay.

4    Q.    Is that fair, sir?

5    A.    Say it again, please.  Just so I can make sure.

6    Q.    Sure.  Is it fair to say that the only difference that

7    is written here in this table 7 between the formulation

8    numbered 5 and the formulation numbered E1 is a change in a

9    pH from 6 to 7?

10   A.    Yes, that appears to be the case.

11   Q.    And if we look at the mean concentration of

12   gatifloxacin measured in aqueous humor for the pH 7

13   formulation, the mean concentration was 2.65 plus or minus

14   1.53; correct?

15   A.    Yes.

16   Q.    And the E1 formulation with a pH of 6 had a mean

17   concentration of 1.97 plus or minus 0.55.  Do you see that?

18   A.    Yes.

19   Q.    All right.  Would you accept that 2.65 divided by 1.97

20   equals 1.345, a few more numbers past that?

21   A.    Yes, somewhere in that range.  Yes.

22   Q.    Okay.  That would be about a more than 30 percent

23   change between those two?

24   A.    Approximately, yes.

25   Q.    Okay.  So can we agree the pH of a formulation can

1   have an effect on corneal permeability?

2   A.    Yes.

3   Q.    If we look at the 802 study --

4   A.    By the way, I don't know what is in each one of those

5   solutions, but there is something else whether they're

6   buffered or not.  Because that can have a dramatic effect as

7   well.  But I think we've agreed that pH can have an effect.

8   Q.    All right.  Well, if you look at the 802 study, I'm on

9   page SEN23740, at the top of the page, first full line, does

10  it state:  "In order to further amplify the corneal

11  penetration effect of EDTA 2Na, we made the EDTA 2Na added

12  formulation hypotonic?

13  A.    Um-hmm.

14  Q.    All right.  And making a formulation hypotonic might

15  have an effect on the corneal permeability outcome; correct?

16  A.    Hypotonic?

17  Q.    Hypo.

18  A.    I don't know what kind of effect it has.  I would not

19  be surprised if it has some effect, yes.

20  Q.    Okay.  And sodium chloride is a tonicity agent;

21  correct?

22  A.    It is a tonicity agent, yes.

23  Q.    And to make a formulation more hypotonic by adjusting

24  amounts of sodium chloride, you would lower the sodium

25  chloride content; correct?

Stella - cross

1    A.    Say it again, please.

2    Q.    Sure.  To make a formulation more hypotonic by

3    adjusting amounts of sodium chloride, you would lower the

4    sodium chloride content; right?

5    A.    Sorry.  Repeat that?  It's just I'm missing some of

6    your words.  And maybe it's your accent.

7    Q.    It's my Italian heritage.

8    A.    Yes, Italiano.

9    Q.    Not today.  To make a formulation more hypotonic?

10   A.    More hypotonic.

11   Q.    Yes.

12   A.    Okay.

13   Q.    By adjusting amounts of sodium chloride, you would

14   lower the sodium chloride content, correct?

15   A.    Yes.  If you lowered the -- you would decrease the

16   osmotic pressure.  Whether it becomes hypotonic -- when we

17   talk about hypotonic and hypertonic, we're doing it in

18   relation to tonicity.  So if you drop it below the normal

19   280 osmoles, then it would be considered hypotonic.  If it

20   was higher, it would by hypertonic.

21         So, yes, in general, right.

22              MS. MAZZOCHI:  If you could look at Table 11

23   within JTX-13.  SEN23742.  Table 11.

24   BY MS. MAZZOCHI:

25   Q.    This is the study that compared the formulations, some

Stella - cross

1    formulations with and without benzalkonium chloride;

2    correct?

3    A.    Hold on.  I have to look at the table.  Okay.  Yes.

4    Yes.

5    Q.    And in this instance, the mean gatifloxacin

6    concentration numbers measured at one hour for the

7    formulation without benzalkonium chloride was 1.04 plus or

8    minus .31; right?

9    A.    That's correct.

10   Q.    And for the formulation with 0.005 percent

11   benzalkonium chloride, it produced a change in pH

12   concentration of 1.14 plus or minus 0.46; is that right?

13   A.    You misstated something.  You said pH values.

14   Q.    I'm sorry.  Gatifloxacin aqueous concentration value

15   of 1.14 plus or minus 0.46.

16   A.    Yes.

17   Q.    Will you accept that 1.14 divided by 1.04 is around

18   1.096?

19   A.    Approximately, yes.

20   Q.    All right.  And would you consider that to be an

21   increase?

22   A.    I don't know.  It is an increase, yes.  I'll agree it

23   is an increase.

24   Q.    It's over a nine percent increase?

25   A.    Whatever that number is.

1   Q.    Okay.

2   A.    It's not over that.  It's whatever the ratio is, yes.

3   Q.    If it's 1.096, then that is a nine .6 percent

4   increase?

5   A.    Yes.

6   Q.    Okay.  Now, EDTA was not present in either of the

7   formulations tested in the benzalkonium chloride study;

8   right?

9   A.    I don't know.  I believe that is true.  Yes.

10  Q.    That's fine.

11  A.    Yes.

12  Q.    If you could turn to JTX-14, please.  And this is a

13  study we sometimes call the 202 study.

14  A.    Go ahead.

15  Q.    This is the 202 study.

16  A.    I'll take your word for it.  Yes, the 202 study.

17  Q.    And this is the one where the Japanese formulation was

18  compared against the foreign study drug?

19  A.    Correct.

20  Q.    All right.  And the foreign study drug included both

21  0.005 percent benzalkonium chloride as well as 0.01 percent

22  EDTA; correct?

23  A.    That's correct.

24  Q.    All right.  And the Japanese formulation did not have

25  either of those two ingredients?

1   A.    That's correct.

2   Q.    Now, do you have any reason to believe that for the

3   Zymar or Zymaxid products in Japan, the two that don't have

4   EDTA that gatifloxacin doesn't cross the corneal membrane?

5   A.    Say it again, please.

6   Q.    Sure.  Do you have any reason to believe that Zymar

7   product in Japan, without EDTA, do you have any reason to

8   believe that gatifloxacin doesn't cross the corneal membrane

9   with that formulation?

10  A.    Is it the Zymar formulation or is it Senju

11  formulation?  I don't know.

12  Q.    Well, the Japanese version of Zymar.

13  A.    Well, yes.  I'm not sure it's the Japanese version of

14  Zymar.  It's the Japanese version of gatifloxacin.

15  Q.    Let's do it this way.  Do you have any reason to

16  believe that the control drug that is identified in the 202

17  study that doesn't have EDTA, doesn't have benzalkonium

18  chloride, you don't dispute that gatifloxacin still gets

19  across the corneal membrane in that formulation, do you?

20  A.    No.

21  Q.    All right.  And if you take a look at page 3 of the

22  report.  You don't dispute that this study reported, a

23  foreign patent was filed, no substantial differences were

24  observed between the Japanese product with no benzalkonium

25  chloride and no EDTA versus the one that did have the 0.005

Stella - cross

1    percent benzalkonium chloride and .01 percent EDTA?

2    A.    That's what they said.  That's what their conclusion

3    was, yes.

4    Q.    And if we look at the mean gatifloxacin concentration

5    numbers reported in the 202 study for the formulation

6    without the 0.005 weight percent benzalkonium chloride and

7    without the EDTA, that produced a gatifloxacin number of

8    0.9335 plus or minus .5718 micrograms per mL; is that right?

9    A.    That's correct.

10   Q.    All right.  And the formulation that did have the

11   benzalkonium chloride in EDTA produced a gatifloxacin

12   aqueous humor concentration of 1.18 plus or minus

13   16500 micrograms per mL; is that right?

14   A.    That's correct.

15   Q.    All right.  And will you accept that 1.118 divided by

16   .9335 is around 1.198?

17   A.    1.198.  Yes, that sounds about right.

18   Q.    So about a 19 percent difference between the two?

19   A.    Yes.

20   Q.    Now, just again talking about factors that might

21   impact corneal permeability of gatifloxacin in ophthalmic

22   solution, you will accept the amount of concentration of

23   EDTA can have an effect?

24   A.    Repeat that again, please.

25   Q.    Sure.  Generally speaking about factors that might

Stella - cross

1    impact corneal permeability of gatifloxacin in ophthalmic

2    solution, would you accept that the amount of concentration

3    of EDTA can have an effect?

4    A.    Yes, it could have an effect.

5    Q.    All right.  And the presence of benzalkonium chloride

6    could have an effect?

7    A.    Well, as I said, the jury is out on that.  There is

8    data that suggests that benzalkonium chloride can act as an

9    absorption promoter.  I'm not -- I don't know, personally

10   don't know whether the .005 does.  It appears to have a

11   small effect here, at least in the Senju study.  So, yes, it

12   may have a small effect.  Yes.

13   Q.    And you don't dispute that there are references in the

14   literature that say benzalkonium chloride itself can

15   increase corneal permeability in some circumstances?

16   A.    Yes, there are statements out there in textbooks and

17   other places.  Right.

18            MS. MAZZOCHI:  All right.  Now, if we can take a

19   look at JTX-15 TR and JTX-16 TR.

20   BY MS. MAZZOCHI:

21   Q.    We can agree that neither of these studies tested a

22   formulation that included benzalkonium chloride; correct?

23   A.    Yes, they did not test benzalkonium chloride.

24   Q.    And both formulations used .86 grams sodium chloride;

25   correct?

Stella - cross

1    A.     I believe that is correct.  Let me double check that.

2    I'm pretty sure that is correct.

3           Yes.

4    Q.     Did you see any photomicrographs of the cornea that

5    were under evaluation in either of these reports,

6    particularly the ones exposed to EDTA?

7    A.     I personally have not seen them.

8    Q.     All right.  Is it your position that 0.01 EDTA in

9    these formulations in these two studies, there were no

10   changes in cell structure?

11   A.     I have no reason to believe that, one way or the

12   other.  So .01 percent based on what other photo

13   micrographs, Dr. Grass and Rojanakskul said .01 percent did

14   not change anything.  So that's right.  But I did not see

15   anything from this study.

16   Q.     All right.  Thank you.  If you can take a look at

17   JTX-15, the 901 study, page SEN14814.

18   A.     The page number again, please?

19   Q.     Sure.  14814.

20   A.     14814.

21   Q.     The top of the abstract.

22   A.     Okay.

23   Q.     It says, "0.3 percent gatifloxacin ophthalmic solution

24   is colored due to contamination by iron, thus a change of

25   formula to add 0.01 percent EDTA is scheduled."

1              Do you see that?

2    A.    Yes.

3    Q.    Is it routine in the pharmaceutical industry that if

4    you're adding EDTA to an ophthalmic solution because it's

5    contaminated by iron that you do a corneal permeability

6    study?

7    A.    Say that again, please.

8    Q.    Is it routine in the pharmaceutical industry that if

9    you're just adding EDTA for contamination control issues

10   that you are going to schedule a corneal permeability study?

11   A.    Not to my knowledge.  But I will point out the second

12   sentence in that same paragraph.  "In the present test, the

13   concentration profiles in aqueous humor of white rabbits

14   were compared after three instillations with and without

15   EDTA at 15 minute intervals in order to verify whether the

16   concentration of gatifloxacin ophthalmic solution in aqueous

17   humor changes by adding the .01 percent EDTA."

18              So the purpose of the study was not to stop the

19   coloration, the purpose of the study was to check whether

20   the EDTA effected the aqueous humor levels.  That's the way

21   I read that statement.

22   Q.    Well, you think it's unethical to do unnecessary

23   studies; right?

24   A.    Right.

25   Q.    All right.  Well, shouldn't the individuals performing

Stella - cross

1    this study have had -- I mean they shouldn't have schedule

2    the study if they wouldn't have thought that EDTA might have

3    an effect at that low level; right?

4    A.    All I can say is that it seemed that the reason they

5    did this work was to verify whether gatifloxacin ophthalmic

6    solution was changed by the presence of .01 percent EDTA.

7    That's all I read into that.  They happened to do that

8    because they thought they may need to use it because of the

9    coloration issue.

10         They may be looking at this for the Japanese

11   thing.  They need it for the Japanese formulation.  If they

12   needed to use EDTA, they wanted to have some idea what

13   effect EDTA has.  So I can't read into their minds as to

14   exactly what they were doing here, but to me the first

15   sentence is not the purpose for doing it.  The second

16   sentence is the purpose for doing this experiment.

17   Q.    Well, you know, you mentioned that second sentence.

18   And it talks about three instillations with and without EDTA

19   at 15 minute intervals; correct?

20   A.    Um-hmm.

21   Q.    And the authors noted here that adding EDTA in the

22   context of this test led to the Tmax accelerating from one

23   hour to 0.5 hours as a consequence of the three dosing

24   schedule; right?

25   A.    Well, yes.  That's sort of an artifact, a little bit

Stella - cross

1    of the sampling period because I think the example half an

2    hour after the -- no, you are right because I think the no

3    EDTA, it was one hour after the last instillation was, yes.

4    You're correct, yes.

5    Q.    Now, if we look further on, if we look further on down

6    in JTX-15, introduction section, there's a reference at the

7    bottom of the introduction section to a method proposed by

8    the Eye Infectious Disease Academic Society.

9              Do you see that?

10   A.    Can I read the rest of that paragraph?  I just don't

11   want to read that sentence out of context.  That's all.  Do

12   you mind if I do that?

13   Q.    I'm just asking if you see it.

14   A.    I just don't like to read sentences out of context.

15   That's all.

16             (Pause.)

17             THE WITNESS:  Okay.  The sentence is --

18   BY MS. MAZZOCHI:

19   Q.    Do you know if the dosing methodology that was used

20   in the study actually does adhere to the method proposed

21   by the Eye Infectious Disease Academic Society for

22   comparisons?

23   A.    I have no idea.  I don't know what that organization

24   is.

25   Q.    If you go to the third line down in the introduction

1    section, the sentence that starts, according.

2              It says, the authors reported, according to a

3    previous study, it has been reported that addition of the

4    0.01 percent EDTA does not make a significant change in the

5    concentration after one hour of instillation, which the

6    migration increases by adding 0.05 percent or more EDTA.

7              Do you see that?

8    A.    Yes.   I assume that's the U.S. versus foreign study.

9    Is that correct?   Reference 3?

10   Q.    Yes.   Reference three does refer to the 202 study; is

11   that correct?

12   A.    That's what they concluded at that time with that

13   study.

14   Q.    Sure.   Let's take a look at JTX-16, which is the 904

15   report.

16              And in particular, at -- I think it's JTX-16-TR

17   at .00008, which is SEN15062.   And I would like to go to

18   the --

19   A.    Hold on a second.   You've lost me.   What page is it?

20   Q.    SEN15062.

21   A.    15?

22   Q.    In JTX-16.

23   A.    Oh, 16.   15.   What was it?   062?

24   Q.    062.

25   A.    062.   Sorry.

Stella - cross

1    Q.     All right.  Do you see the results and discussion

2    paragraph?

3    A.     Yes, I do.

4    Q.     All right.  If you can look around the middle of that

5    paragraph, it talks about an increase of Cmax attributed to

6    blending.

7               Do you see that sentence?

8    A.     Do what?

9    Q.     Do you see the sentence that talks about the Cmax?

10   The increase of Cmax attributed to blending the 0.01

11   EDTA?

12   A.     I don't know what the word blending means in this

13   context.  I'm not being argumentative here.  I just don't

14   know what -- that is not a word that we usually use in the

15   context of this type of study, so I have no idea whether

16   that was a translation usage of a word, but I don't know

17   what blending means here.

18   Q.     All right.

19   A.     Can guess what it means, but I don't know what it

20   actually means.

21   Q.     All right.  You don't dispute, sir, that the authors

22   concluded that although Tmax, looking at the last part of

23   the highlighting -- although Tmax did not change from one

24   hour by blending 0.01 percent EDTA with a single

25   instillation, it's changed from one hour to 0.5 hours with

Stella - cross

1    three instillations.  From these facts, it was suggested

2    that the 0.3 percent gatifloxacin ophthalmic solution

3    reduced the barrier ability of a rabbit cornea.

4              Do you see that text?

5    A.    Yes.

6    Q.    All right.  Now, that outcome, would that be

7    consistent with EDTA performing a function of a chelating

8    agent?

9    A.    Could you repeat the question, please?

10   Q.    Sure.  Where it's talking here about how you can get a

11   shift in the Tmax with the three doses, not necessarily

12   seeing a single dose, is that result consistent with EDTA

13   acting as a chelating agent?

14   A.    I don't know the context that you're asking about.

15   Are you asking it in the context as a -- as a -- a promoter

16   for permeability?

17   Q.    Sure.

18   A.    You're making an assumption there that, and not an

19   unreasonable assumption, that -- that EDTA does this by its

20   chelating, you know, capacity.  But I don't -- I can't

21   answer that question.  These authors are simply speculating

22   in an attempt to -- in an attempt to describe why they got a

23   slight shift in the Tmax.

24   Q.    Well, and the authors stated that they believed that

25   the three-time instillation at 15-minute intervals is a

1    method that overestimate the permeability accelerating

2    effect attributed to blending EDTA more than the single

3    instillation; right?

4    A.    But both studies got about 27 to 29 percent increase,

5    so, in fact, it was the same.  So there really was no

6    increase.

7    Q.    That's what they believe.  They believe, though, that

8    the three dosing approach led to -- would be a method that

9    would overestimate the permeability accelerating effect

10   attributed to blending EDTA more than a single instillation.

11   That's what they concluded; right?

12   A.    Well, I mean, they questioned whether there was an

13   effect and that they -- they have a hypothesis to why it

14   might be happening and therefore they did the single dose

15   study and in both studies they got exactly the same

16   results.

17           So their hypothesis is probably not correct, but

18   I mean that's what they started off to do.  That's what they

19   tried to prove.  But they had a hypothesis and that is what

20   they're doing here, simply hypothesizing that there may be

21   an accelerated effect.  In fact, in the second study, it got

22   better results than in the first study.

23   Q.    If you can turn to Table 1 and two in JTX-16.

24   A.    Tables 1 and 2?  Okay.

25   Q.    Yes.

Stella - cross

1    A.    Yes.

2    Q.    Actually, let's just focus on Table 1.

3          Now, this is the 904 study that you rely on the

4    most; right?

5    A.    No.  I relied on both of them.

6    Q.    All right.

7    A.    Why the most?

8    Q.    Well, because this is the one that has actually got a

9    single dose; right?

10   A.    I said they both were well-designed studies to look at

11   the effect of EDTA.

12   Q.    Well, you don't know if any, either the NDA or ANDA

13   products at issue here have dosing instructions of three

14   times every 15 minutes, do you?

15   A.    No, I don't.

16   Q.    All right.  If you -- so in this 904 study that you

17   rely on, can we agree that where the single 0.01 weight

18   volume percent dose was given, that dose, whether with or

19   without EDTA, never produced a mean -- I'm sorry.  Let me

20   start that over.

21         Can we agree that the 904 study you rely on

22   where a single 0.1 weight volume percent dose was given,

23   that the formulation with EDTA never had a mean gatifloxacin

24   concentration in aqueous humor level that exceeded .96, plus

25   or minus .48?

Stella - cross

1   A.    Now, that's just the mean value.

2   Q.    Right.

3   A.    But that's the mean value max.

4   Q.    Right; is that correct?

5   A.    Yes, that's correct.  Yes.  I mean, if you took the

6   individual rabbits in that case, there would be some numbers

7   well above that, but the mean value was .96.

8   Q.    All right.  And for the formulation that lacked EDTA,

9   can we also agree that that never had a drug level in

10  aqueous humor level measured in micro grams per ml?  Mean

11  values never got above .76, plus or minus 0.27?

12  A.    That's correct.

13  Q.    All right.  Now, any of these Senju studies you

14  reviewed or relied on, did you ever see any of those set

15  forth in any of the defendants' ANDA, proposed ANDA

16  labeling?

17  A.    Say it again, please.

18  Q.    Yes.  Any of the Senju study data you rely on, had you

19  recall ever seeing any of that in the proposed ANDA

20  labeling? █

21  █        ████████████████████████████████████████

22  █        ██████████████████████████████████████████████

23  █        ████████████████████████████████████████

24  Q.    All right.  And do you know whether any of the Senju

25  corneal permeability studies in rabbits show up anywhere in

1    the 0.3 or 0.5 percent NDA labeling?

2    A.    They don't show up because --

3    Q.    Okay.

4    A.    -- it's not -- unless -- no.  As far as I know, they

5    did not.

6    Q.    All right.

7    A.    But I'm not sure what the purpose would be for putting

8    this stuff in because it's internal Senju data.

9    Q.    Okay.

10   A.    It's not publicly available.

11   Q.    If we could go back to claim 12 of the re-examination

12   certificate.  It's in JTX-1.

13             Sir, just to be clear, is it your opinion that

14   enhancing corneal permeability is not a requirement for

15   claim 12 or any claims that depend upon it?

16   A.    It doesn't contain the requirement for improved

17   corneal permeability, but it -- it does, you know, have

18   the -- the nexus back to the -- to the specification, which

19   is the unexpected results seen with the permeability, as

20   well as the other effects, but we're not focusing on that in

21   this trial.

22   Q.    Sir, there's no test in the '045 patent specification

23   for corneal permeability that uses a 0.01 weight volume

24   percent formulation; is that correct?

25   A.    No, but there are formulations in there in Examples

Stella - cross

1    5, 8, 9, as you pointed out earlier, that do have

2    .01 percent.

3    Q.    Right.  The only formulations that were tested in the

4    '045 patent for corneal permeability were at levels of 0.05

5    weight percent EDTA or higher; is that correct?

6    A.    I believe there was no higher ones than that

7    .05 percent.

8    Q.    Sir, do you know where Lupin's ANDA products, ANDA

9    products are going to be manufactured?

10   A.    I don't know.

11   Q.    All right.  Just a couple more questions.

12         The phrase pH, what does that stand for?

13   A.    Sorry?

14   Q.    PH.

15   A.    What does pH stand for?

16   Q.    Yes.

17   A.    It is a technical term.  It's the negative logarithm

18   of hydrogen ion concentration.

19         So in layman's terms, your Honor, that's simply

20   a measure of the acidity of the solution, the amount of

21   acidity of the solution.  That's the simplest term that I

22   could say.

23   Q.    That's fine.

24         Can we agree that when you go from a pH of 5.0

25   to a pH of 6.0, you've dropped the hydrogen ion levels in

Stella - cross

1    aqueous solution tenfold, all other things being equal?

2    A.    Yes.

3    Q.    All right.  And when you go from a pH of 6.0 to a pH

4    of 6.3, the hydrogen ion levels in an aqueous solution have

5    dropped by a further factor of three, all other things about

6    the solution being equal?

7    A.    The factor -- yes.  I think it's a factor -- I don't

8    know what the logarithm of three is, whether it's .2 or .3.

9    No, that's not right.  It's point -- I can -- no, I don't

10   have my cellphone here.

11               I've got a fancy calculator on my app.  No, I

12   don't know what it is.  I would have to check it.  But it's

13   higher than -- it's lower than pH six.  So whatever factor

14   that is.

15   Q.    Okay.  Now, the pH level is something that I think we

16   agree could have an effect on the permeability of

17   gatifloxacin; is that correct?

18   A.    Yes, it can have an effect.

19   Q.    All right.  And that would be true as well for any

20   gatifloxacin that's engaged in transcellular transport; is

21   that correct?

22   A.    That's correct.

23   Q.    All right.

24   A.    Can I say --

25   Q.    You can do it on their clock.

Stella - cross

1    A.     Okay.

2    Q.     Now, in giving any of your opinions in this case, did

3    you review the standards that FDA has for something

4    constituting a pharmaceutical equivalent to an NDA drug?

5    A.     Say it again, please.

6    Q.     Sure.  Did you, in connection with giving any of your

7    opinions in this case, did you look up any definitions that

8    the FDA has for what it means for a drug product to be a

9    pharmaceutical equivalent to another drug product?

10   A.     Well, I'm actually -- I'm not an expert in regulatory

11   agency ruling.  With our old products, I know there's a much

12   higher level required in the sense that bioavailability

13   studies are required for drugs that have limiting

14   properties, like solubility.

15          They -- companies can ask for a biowaiver for

16   those drugs where the dissolving rate and things like that

17   are not that important.

18          I understand for ophthalmic solutions, at least

19   I've been told and I've read a little bit about this, is

20   that for -- to approve and do a biowaiver, that there is no

21   need to do bioequivalents.  The solutions have to be

22   effectively identical.

23   Q.     But -- and you don't know what standards FDA applies

24   to consider solutions to be effectively identical; is that

25   correct?

1    A.    I don't know the details.

2    Q.    Thank you, sir.

3              MS. MAZZOCHI:  That's all, your Honor.

4              THE COURT:  All right.  Redirect.

5              MR. BAXTER:  Could you put back up JTX-13 that

6    you were using and go to the translations of JTX-13 and I

7    guess the translated version of the page with Table 7.  And

8    could you blow up Table 7, please.  No.  Try SEN23740.

9    That's it.

10                        REDIRECT EXAMINATION

11   BY MR. BAXTER:

12   Q.    Dr. Stella, do you remember being asked some questions

13   about comparison of Formula 5 versus Formula E1 in this

14   table in your cross-examination?

15   A.    Yes.

16   Q.    Does Formula 5 contain EDTA?

17   A.    Yes, it does.  .1 percent.

18   Q.    All right.  And does Formula E1 also contain EDTA?

19   A.    Yes.  .1 percent.

20   Q.    So does the comparison of those two formulas tell

21   you anything about the effect of EDTA on corneal

22   permeability?

23   A.    They tell you nothing.

24   Q.    It's not a side by side or with and without comparison

25   of EDTA, is it?

Stella - redirect

1   A.    No.   It's just the pH effects.

2   Q.    Could we go in the same document to SEN23742 in Table

3   11.   And -- we can blow up table 11.   Thank you.   That's

4   great.

5         Do you remember being asked some questions on

6   cross-examination about table 11?

7   A.    Yes.

8   Q.    Do either of the formulations in table 11 contain

9   EDTA?

10  A.    Not as far as I know.

11  Q.    Would that comparison tell you anything about the

12  effect of EDTA on the corneal permeability of enhancement of

13  gatifloxacin?

14  A.    It tells me nothing.

15        MR. BAXTER:   Could you blow up the sentence

16  directly above table 11.   Can you blow up the whole

17  paragraph, where it says paragraph 10, and then we'll just

18  focus in on that last sentence.

19  BY MR. BAXTER:

20  Q.    Do you understand paragraph 10 is describing the

21  experiment for which the results are reported in Table 11?

22  A.    That's correct.

23  Q.    And what is the last sentence?

24  A.    It's says, no effect was observed on AM-1155, which is

25  gatifloxacin, aqueous humor migration due to the 0.005

Stella - redirect

1    benzalkonium chloride.

2    Q.    So the --

3    A.    Yes.

4    Q.    So the people who conducted this report concluded that

5    benzalkonium chloride or BAK didn't have any effect on

6    gatifloxacin corneal permeability; is that correct?

7    A.    That would be my conclusion.  I was only asked whether

8    the numbers were bigger.

9    Q.    What is AM-1155, just so we're clear on the record?

10   A.    AM-1155 in all these reports, your Honor, was the

11   gatifloxacin.  It was the name of the compound during this

12   phase of the drug development formulation.

13            MR. BAXTER:  Could we turn to JTX-14.  And

14   especially the translation version.  And maybe we can go

15   right to the last page, page SEN11686.

16            Yes, 686.  That one, thank you.

17   BY MR. BAXTER:

18   Q.    Is this a side by side comparison, with and without

19   EDTA?

20   A.    No, it's not.  It's got, it's got, one has EDTA and

21   BAK and the other has it without EDTA and BAK.  So it's not

22   a side by side experiment.

23   Q.    So does that tell you anything, or is that the best

24   way to assess the effect of EDTA on the corneal permeability

25   of gatifloxacin?

Stella - redirect

1   A.    No.

2              MR. BAXTER:  Can we turn to JTX-15, the

3   translation version?  And the second page of the document.

4   It has SEN14814.

5              And could you blow up the abstract?

6   BY MR. BAXTER:

7   Q.    Do you remember being asked questions about this

8   during agree your cross-examination?

9   A.    Yes.

10             MR. BAXTER:  Could you highlight the sentence

11  that begins, "as a result."  It's one two, I think it's the

12  fifth line down.  A little east of seven.  One, two, three,

13  four, five.  Right there.  "As a result."  That sentence.

14             Just the one sentence, that's fine.

15  BY MR. BAXTER:

16  Q.    Does that sentence begin, "As a result, adding EDTA

17  caused ...?

18  A.    Yes.

19  Q.    So is that sentence attributing those changes to the

20  addition of EDTA?

21  A.    Yes.

22             MR. BAXTER:  Can we go to JTX-16, the

23  translation version.  And especially SEN15062.  And there is

24  a paragraph or section entitled Results and Discussion.

25             Can you blow up the results and discussion

1    section?  Oh, he has got it.  I'm sorry.  You have got it.

2    BY MR. BAXTER:

3    Q.    And where do I want you to go?  I want you to go, one

4    two, three, four, five, six, seven, eight, nine lines down,

5    I think there is a sentence that begins with "These

6    results..."  Right there.  Do you see this?  I have my

7    pointer on it.  Highlight that sentence.

8    BY MR. BAXTER:

9    Q.    What does that sentence read?

10   A.    "These results agree with the results from the

11   previous report when three instillations were administered

12   at 15 minute intervals."

13   Q.    So what are the people who brought this report saying?

14   A.    That both studies confirm that there was an increase

15   in exposure in the aqueous humor by the addition of

16   .01 percent EDTA.

17            MR. BAXTER:  No further questions, your Honor.

18            THE COURT:  All right.  You may step down, sir.

19   Thank you.

20            MR. KELLY:  Before we break, I wanted to make, I

21   wanted to make a clarification.  Your Honor ruled they can

22   use the documents to refresh the recollection.  Did you

23   intend that to include the documents that were created in

24   January of this year?

25            THE COURT:  Yes.  I mean, yes.

 1              MR. KELLY:  That's fine, your Honor.  That's all

 2     I wanted to know.

 3              THE COURT:  All right.  What is happening next?

 4     I have got another half hour to give you.  I think I'll be

 5     caught up by then if you are ready to do something.

 6              MR. BAXTER:  Yes.  Your Honor, plaintiffs rest

 7     on the infringement part of their case.

 8              THE COURT:  Okay:

 9              MR. RAKOCZY:  Your Honor, William Rakoczy see

10     for the Lupin defendants.

11              For the record, I wanted to do make a Rule 52(c)

12     motion for partial finding, judgment of matter of law for

13     noninfringement on the ground the plaintiffs have failed to

14     carry their burden of proving infringement in this case.

15              Plaintiffs admittedly did not test Lupin's ANDA

16     products.  The test they did do admittedly again did not

17     test the ANDA product or a formulation similar to it.  And

18     we believe for the evidence of record, the tests they ran

19     were flawed in any event.

20              In addition, we've got no evidence whatsoever

21     about who the direct infringer is, how Lupin could possibly

22     infringe in India.  And on top of that, where is the intent

23     necessary for any type of indirect infringement theory?

24              So for all these reasons, your Honor, to

25     preserve for the record, again, we believe Rule 52(c) motion

1   for partial finding of noninfringement on the asserted

2   claims is appropriate.   Thank you.

3                   THE COURT:  All right.  I reserve judgment on

4   that.

5                   MS. KELLER:   Your Honor, Karen Keller on behalf

6   of Hi-Tech Pharmacal Company Inc.

7                   We would join in Lupin's motion for partial

8   judgment of noninfringement under Rule 52(c) for the same

9   reason that Mr. Rakoczy just stated as well as for the

10  additional reason that █████████████████████████████████

11  █████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████

21                   THE COURT:  All right.  I reserve judgment on

22  that.

23                   Are we moving forward on something tonight yet?

24                   MS. KELLER:  Yes, your Honor.  Defendants will

25  move forward with their case now.

1                    THE COURT:  All right.

2                    MR. KELLY:  Your Honor, we understand Dr. Grass

3       is going to be the next witness.  Are you switching the

4       order of your witnesses?

5                    MS. KELLER:  Your Honor, as of yesterday, we had

6       discussed with Mr. Kelly the possibility of taking

7       Dr. Egbaria, who is Hi-Tech's witness, out of order due to

8       his constraints of being the chief scientific officer and

9       vice president and needing to get back to New York on

10      Thursday.

11                   Because of that, and then what happened today

12      with leaving early yesterday and the timing of plaintiffs'

13      case coming in, there was a discussion that possibly

14      Dr. Grass might go today.  So initially this morning we told

15      plaintiffs that it would be likely Mr. Egbaria would go

16      toward.

17                   However, due to the Court allowing the expert

18      time today it allows us to squeeze in Dr. Egbaria today.  He

19      was disclosed on Sunday as being a witness to testify today.

20                   With your Honor's permission, we would like to

21      proceed with Dr. Egbaria, and I believe Dr. Grass will

22      proceed after him tomorrow morning.  We think we can get

23      Dr. Egbaria really close to finished today.

24                   MR. KELLY:  Your Honor, we understood, on Monday

25      I was asked, can we make sure Dr. Egbaria got on either

```
 1    Tuesday or Wednesday, and we said we would work with them on

 2    that.

 3             We specifically inquired this morning is he

 4    going to go on today?  They said had is going to go on after

 5    Dr. Grass, the order in which they gave him to us.

 6             Now, the attorney who is responsible for

 7    cross-examining Dr. Egbaria is locked out of this building

 8    and so we relied upon the representations they made to us.

 9    And that is problem we have here.

10             THE COURT:  Well, that is a significant problem.

11    So are we ready to go forward with anyone?

12             (Counsel confer.)

13             THE COURT:  I mean I will try to make up time.

14    I think I still owe you 20 minutes.  I will make it up

15    somehow, if we have managed to bollox things up.

16             MS. MAZZOCHI:  Your Honor, if your Honor will

17    give us the extra 20 minutes on another day, we'll do that,

18    and then each side hopefully will go home happy tonight.

19    Thank you.

20             THE COURT:  All right.  I'll check my calender

21    and see how we can do this.  In fact, let me, if I can, just

22    check it now.

23             I can trying to go a little late tomorrow as

24    well.  We have this issue with being locked out so I've got

25    a plea at 4:30.  If you go and come back, you all have to be
```

1    here before 5:00.  Otherwise, you get locked out.  I made

2    arrangements for tonight when I probably didn't need to, but

3    apparently it was a huge deal, so I'm not going to do it

4    again.  So if that is when we need to do this, we can do it

5    tomorrow evening.  All right?

6              All right.  Counsel, thank you very much.

7    It will take me awhile to get out of my computer, so go

8    home.

9              (Court recessed at 5:55 p.m.)

10                   -   -   -